LAWRENCE M. ROLNICK (*pro hac vice*)
lrolnick@rksllp.com
MARC B. KRAMER (*pro hac vice*)
mkramer@rksllp.com
NICOLE T. CASTIGLIONE (*pro hac vice*)
ncastiglione@rksllp.com
**ROLNICK KRAMER SADIGHI LLP**
PENN 1, Suite 3401
One Pennsylvania Plaza
New York, New York 10119
Tel.: 212.597.2800

James A. Long (CSB No. 326404)
**THE LONG LAW FIRM, PLLC**
1401 21st Street, Ste. 5801
Sacramento, CA 95811
Tel.: (315) 209-3000

*Court-Appointed Lead and Local
Counsel for the Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| NATHAN FELDMAN, Individually and on Behalf of All Others Similarly Situated, | Case No.  3:25-cv-06105 |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | <u>JURY TRIAL DEMANDED</u> |
| ALTO NEUROSCIENCE, INC., AMIT ETKIN, NICHOLAS SMITH, PO YU CHEN, CHRISTOPHER NIXON COX, CHRIS DIMITROPOULOUS, ANDREW DREYFUS, MICHAEL LIANG, AARON N.D. WEAVER, and GWILL YORK, | **AMENDED CLASS ACTION COMPLAINT** |
| | Hon. Noël Wise, U.S.D.J. |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION .................................................................................................. 4

JURISDICTION AND VENUE ........................................................................................... 10

PARTIES ............................................................................................................................. 11

    I.     Lead Plaintiffs ........................................................................................................11

    II.    The Exchange Act Defendants ............................................................................... 12

    III.   The Securities Act Defendants ................................................................................12

    IV.   Relevant Third Parties ............................................................................................ 14

SECURITIES ACT CLAIMS ............................................................................................. 17

    I.     Alto's Registration Statement and Prospectus Contain Materially False and
         Misleading Statements and Omit to State Material Facts .........................................17

    II.    Class Action Allegations ........................................................................................31

FIRST CAUSE OF ACTION .............................................................................................. 33

SECOND CAUSE OF ACTION .......................................................................................... 35

THIRD CAUSE OF ACTION ............................................................................................. 37

EXCHANGE ACT CLAIMS .............................................................................................. 38

    I.     Factual Background ................................................................................................38

         A.    Alto Neuroscience ................................................................................. 38

         B.    Alto's Successful Phase 2a Trial of ALTO-100.......................................... 38

         C.    Alto Attempts to Further Prove ALTO-100's Efficacy by Conducting
              the Phase 2b Trial ................................................................................. 39

         D.    Capitalizing on Positive Investor Sentiment Generated by the Phase 2a
              Trial, Alto Launches an IPO ................................................................... 42

         E.    The Exchange Act Defendants Misrepresent—and Omit Key Details
              Regarding—the Phase 2b Trial ............................................................... 43

         F.    The Truth Emerges as Alto Reports the Failure of the Phase 2b Trial ....... 44

|   |     |     | G.  | Post-Class Period Developments ................................................................ 44 |
|---|-----|-----|-----|---|
| II.  | | The Exchange Act Defendants' False and Misleading Statements and |
| | | Omissions of Material Fact ...................................................................48 |
| III. | | Additional Allegations of the Exchange Act Defendants' Scienter .......................62 |
| IV. | | Presumption of Reliance ........................................................................67 |
| V.   | | Loss Causation ...................................................................................68 |
| VI.  | | No Safe Harbor..................................................................................71 |
| VII. | | Class Action Allegations .......................................................................72 |

FOURTH CAUSE OF ACTION............................................................................ 73

FIFTH CAUSE OF ACTION ............................................................................... 76

PRAYER FOR RELIEF ..................................................................................... 77

JURY DEMAND ............................................................................................. 77

Lead Plaintiffs Special Situations Cayman Fund, L.P., Special Situations Fund III QP, L.P., and Special Situations Life Sciences Fund, L.P. (collectively, "Lead Plaintiffs"), through their undersigned attorneys, by way of this Amended Class Action Complaint, bring this action individually and on behalf of (i) a class of investors that purchased or otherwise acquired the common stock of Alto Neuroscience, Inc. ("Alto" or the "Company"), pursuant and/or traceable to the Company's Registration Statement and Prospectus issued in connection with the Company's initial public offering ("IPO") conducted on or about February 2, 2024, who assert claims under Section 11, Section 12(a)(2), and Section 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o (the "Securities Act Class"); and (ii) a class of investors that purchased or otherwise acquired Alto common stock between March 18, 2024, and October 22, 2024 (the "Class Period"), without reference to whether such purchases are traceable to the Registration Statement, Prospectus, and IPO, who assert claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (the "Exchange Act Class" and, together with the Securities Act Class, the "Classes").

Lead Plaintiffs allege the following upon personal information as to themselves and their own acts and upon information and belief as to other matters. Lead Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys which includes, among other things, a review and analysis of: Alto's public filings with the United States Securities and Exchange Commission ("SEC"), Alto's press releases and public statements, Alto's earnings call transcripts and presentations, conference calls participated in by Defendants and/or the Company, media and analyst reports concerning Alto, other publicly available documents concerning Alto, and interviews with former Alto employees; in all cases the investigation included review of documents postdating the "Class Period." Lead Counsel's investigation into the factual allegations contained in this Amended Complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for

1  further investigation and/or discovery.

2  **NATURE OF THE ACTION**

3  1.    This is a federal securities class action brought on behalf of the Securities Act Class

4  and the Exchange Act Class.  It involves two sets of claims, one under the Securities Act for the

5  material misrepresentations and omissions made in the Registration Statement and Prospectus that

6  Alto filed in connection with its IPO.  The other, under the Exchange Act, for the materially false

7  and misleading statements that were made after the IPO, which were made recklessly or with

8  Defendants' actual knowledge of their falsity.  While alleged in the same complaint, each claim and

9  class is temporally and substantively separate.

10  2.    In its Registration Statement and Prospectus, Alto misrepresented that enrollment

11  struggles in its key clinical trial—the Phase 2b trial of ALTO-100 (the "Phase 2b Trial")—was a

12  *possible* risk (in the future) when, in reality, significant enrollment difficulties had *already* occurred

13  (and were continuing to occur), injecting low quality, unreliable patients and fully remote clinical

14  trial sites into a trial that was otherwise presented as reliable and appropriately controlled.  After

15  Alto completed its IPO, and with a looming deadline for Phase 2b Trial results in the second half of

16  2024, Defendants later recklessly assured investors that the trial—including the enrollment

17  thereof—was proceeding normally and "so far so good."  What Defendants left out, post-IPO, was

18  that Alto's enrollment efforts were becoming increasingly difficult and desperate and, accordingly,

19  it enrolled participants of lower and lower quality.  The result of Defendants' actions was that the

20  Phase 2b Trial was doomed to fail and, at the very least, was riskier than Defendants had led on.

21  Those risks, concealed from investors, materialized on October 23, 2024, when Alto announced that

22  the Phase 2b Trial had failed, and the price of the Company's common stock declined nearly 70%

23  in response.

24  3.    Over the next several months, Defendants admitted that the failure of the Phase 2b

25  Trial was not caused by anything to do with ALTO-100, but rather the way in which the trial was

26  enrolled and overseen by the Company.  Indeed, Alto disclosed that there was widespread non-

27  compliance among a notoriously risky participant group—those taking ALTO-100 as a

28

monotherapy.  Not only did Alto significantly overweight the monotherapy group out of necessity to fill out the Phase 2b Trial but, in a frenzied rush to add clinical trial sites and boost enrollment, failed to ensure that those sites had the ability to test participants' pharmacokinetic, or "PK" levels to ensure that they were actually taking ALTO-100 as directed and otherwise complying with trial protocols.  Even months after the fact, Defendants were still unable to articulate how many participants actually took ALTO-100 as directed.  This was in stark contrast to Alto's Phase 2a trial of ALTO-100 (the "Phase 2a Trial"), which utilized clinical trial sites capable of testing participants' PK levels and, accordingly, boasted a 90% compliance rate.  Thus, the Phase 2b Trial failed, at least in part, because of the Company's undisclosed difficulties in enrolling qualified patients, resulting in massive corner-cutting to force the trial through and continue ALTO-100 on the (much needed) path to commercialization.  This Action followed.

4.      Alto is a publicly traded, clinical-stage biopharmaceutical company with a stated mission of "redefin[ing] psychiatry."  Alto premises that pursuit on two features of its business. *First*, through its "Precision Psychiatry Platform," the Company "aim[s] to discover brain-based biomarkers to better identify which patients are more likely to respond to [its] novel product candidates," thereby "increase[ing] the likelihood of clinical success" of those drug product candidates.  *Second*, rather than use a clinical research organization ("CRO") like most clinical-stage pharmaceutical companies, the Company claims to have internally "built a team of clinical operations experts" that "engage directly with clinical trial sites and provide clinical monitoring, oversight, and support," which "results in higher quality clinical and biomarker data" and "enables [the Company] to build infrastructure to support decentralized clinical trials"—*i.e.*, clinical trials in which trial participants engage in the trial protocol remotely, rather than through physical visits to a dedicated clinical trial site.  According to the Company, together these "differentiated" approaches "improve upon the traditional, all-comer approach to [central nervous system ("CNS")] drug development" and "establish[] the technology platform for large-scale commercial dissemination of [its] technologies," including at-home devices for the collection and reporting of clinical and biomarker data that, if approved, the Company intends to commercially distribute at scale.

5.      Alto is not a revenue-producing company, and was not during the Class Period.  As a relatively young, clinical-stage biopharmaceutical company, it has no products approved for commercial sale.  Since its inception, Alto has incurred substantial losses and generated no revenue from product sales.  Alto's business model thus depends on both (i) the successful development, regulatory approval, and eventual commercial dissemination of its drug product candidates, and (ii) its ability to secure adequate funding until it can do so.

6.      As of early 2024, Alto's most advanced product was ALTO-100, "a novel small molecule" that is "not targeted by other CNS therapeutics, which would make it first-in-class if approved."  In January 2023, Alto announced favorable results from the Phase 2a Trial in patients with major depressive disorder ("MDD") and post-traumatic stress disorder ("PTSD") across 24 clinical sites.  According to Alto, "patients with MDD characterized by impaired cognition responded significantly better to ALTO-100 than patients without objectively defined cognitive impairment."  The Company touted the Phase 2a Trial results as "clear evidence of efficacy" for ALTO-100 and a "significantly greater change" in "patients with a biomarker profile" than "those without the biomarker profile."

7.      The next step to commercialization of ALTO-100—and revenue for the Company—was a second clinical trial.  Thus, in January 2023, Alto advanced ALTO-100 into the randomized, double-blind, placebo controlled Phase 2b Trial.

8.      However, Alto immediately encountered significant difficulties enrolling qualified, reliable participants in the Phase 2b Trial, an issue that was made worse when the United States Food and Drug Administration ("FDA") requested that the Company increase the number of participants enrolled in the Phase 2b Trial from 200 to 266.  Indeed, there were months when enrollment ceased completely and Alto's employees did not have a *single* potential participant to screen for enrollment in the Phase 2b Trial.

9.      Pausing or postponing the Phase 2b Trial until Alto could recruit a sufficient number of qualified participants was simply not an option.  The Company had no revenue-producing products and was running out of money.  Its "runway" was simple not that long.

10.     As of January 2023, Alto had already incurred net losses of $62 million and had an accumulated deficit of approximately $65.7 million.  Accordingly—and desperate to keep the Company afloat—Alto began utilizing increasingly risky recruitment efforts to fill the Phase 2b Trial, including advertising on Craigslist, paying participants to enroll in the trial, and allowing doctors at its clinical trial sites to enroll participants without Company oversight or approval.

11.     Alto also expanded the number of clinical trial sites it was using far beyond those used during its successful Phase 2a Trial.  Unbeknownst to investors, however, these new clinical trial sites were fully remote and thus not at all equipped to test participants' PK levels to ensure that they were taking ALTO-100 as directed.  This was in contrast to Alto's Phase 2a Trial and particularly risky because, as Alto knew, "participants with neuropsychiatric disorders, including MDD and schizophrenia, constitute a vulnerable patient population and may withdraw from [or fail to comply with] the clinical trial if they are not experiencing improvement in their underlying disease or condition."  This made the enrollment of low quality participants even riskier as, not only were the participants more likely to be "professional" and not suffering from MDD (and thus unlikely to take ALTO-100 as directed), but Alto had no way of monitoring their ongoing compliance in the Phase 2b Trial, as the Company's remote clinical trial sites were incapable of testing participants' PK levels.

12.     Alto also began enrolling significantly more monotherapy patients, *i.e.*, those who would solely be taking ALTO-100 as a treatment for MDD, than adjunctive patients, *i.e.*, those who were already taking an anti-depressant and would be supplementing it with ALTO-100 to treat MDD.  This approach, along with Alto's other recruitment efforts, significantly increased the risk that the Phase 2b Trial would enroll "professional" patients who were simply seeking a cash payout, were not suffering from MDD, and were thus unlikely to actually take ALTO-100 as directed.

13.     Despite these issues and knowing that the Phase 2b Trial faced a substantially greater risk of failure than Alto's previous clinical trials, including because of the unreliable, low quality participant pool and use of remote clinical trial sites, Alto sought to access the capital markets.  The Company desperately needed to raise cash and continue operations and did not want to lose out on

the positive investor sentiment generated by the positive results of the Phase 2a Trial.  Accordingly, Alto launched an IPO in early 2024, selling 8,040,000 shares of common stock at $16.00 per share, for badly needed gross proceeds of approximately $128.6 million.

14.    However, Alto did not disclose the increased risks facing the Phase 2b Trial in its Registration Statement or Prospectus.  To the contrary, the Registration Statement and Prospectus warned only that certain enrollment-related risks were possible when, in fact, they had already materialized.

15.    In the period following Alto's IPO, defendants' actions became far more culpable. Rather than simply omitting certain known (and already materialized) risks facing Alto, defendants began peddling at least half-truths about the Phase 2b Trial and the reality of the Company's insourced approach to clinical trials.

16.    For example, Alto's Chief Executive Officer Amit Etkin told investors that Alto's eschewing of CROs and internal approach to clinical trials "allows us to make sure we have the right sites, are bringing in the right patients who are consistent between Phase 2a and the Phase 2b" and "means that we're both closer to the data and better able to ensure high quality clinical data." Accordingly, with respect to the Phase 2b Trial specifically, Alto was "watching every patient like a hawk" and, as Alto's Chief Development Officer, Jessica Powell, put it, "[w]e know that we are enrolling real patients at sites that have high-quality data."  These statements were false given the difficulties that Alto was still facing enrolling qualified patients in the Phase 2b Trial.

17.    Ultimately, the truth was revealed (and the concealed risk materialized) when Alto announced on October 22, 2024, that the Phase 2b Trial had simply failed.  This was a catastrophic revelation, as investors were looking to the Phase 2b Trial not only to further substantiate the efficacy of ALTO-100, but to validate the Company's "Precision Psychology" approach.  The price of Alto's common stock, which had traded above $20 following the IPO, declined nearly 70% in response, from a closing price of $14.53 on October 22, 2024, to a closing price of $4.36 on October 23, 2024.

18.    In the months following Alto's announcement, Defendants confirmed that the Phase 2b Trial failed precisely because of the risky enrollment efforts they used to populate the study.

19.    According to Defendant Etkin, who spoke to analysts about the reasons for the Phase 2b Trial's failure on a November 18, 2024 conference call, the Phase 2b Trial failed because of "compliance"—*i.e.*, study participants not taking ALTO-100—and "particular patient profiles that lead to" non-compliance specifically within the monotherapy, and not adjunctive, population.  In Defendant Etkin's view, it was "obvious[]" that "people showing more patient-like behavior taking an underlying antidepressant"—*i.e.*, adjunctive participants—"are more likely to be taking the drug" than monotherapy participants.

20.    On a March 4, 2025 conference call with analysts, Defendant Etkin further clarified the reasons for the failure of the Phase 2b Trial.  He revealed that the Phase 2b Trial compliance issues were the result of "the conduct of the trial, especially at the site level, which leads to a greater likelihood of professional patients, a greater likelihood of data that you have a harder time trusting." This occurred, according to Defendant Etkin, "when we enlarged the study" and "went and added sites in the second half of the study," which is where the "noncompliance rate" of "over 40% here in the monotherapy arm" was "clustered."

21.    Defendant Etkin elaborated further on a March 12, 2025 conference call, telling investors that the "issue that really we think drove" the Phase 2b Trial failure was "a professional patient site-level conduct issue," which he made clear "represents a risk, frankly, a risk that we see across the board in our field right now, and we've seen this across study after study."  Unlike the Phase 2b Trial, Alto's other trials included procedures to guard against this "risk," including "measuring urine antidepressant levels," requiring "medical and pharmacy records," and a "sponsor eligibility review," which means "sites can't enroll patients without our say-so."  And Alto was "working on essentially diversifying our clinical trial sites and patient sources *away from the common sources of patient risk like recruitment through social media that has driven a lot of problems across trials to date*."  Given this fact, recruiting participants through Craigslist and paying

1  for their enrollment posed a heightened risk of attracting professional patients that should have been

2  disclosed to investors at the time.

3      22.    Shortly thereafter, on March 20, 2025, Alto filed with the United States Securities

4  and Exchange Commission its annual report for the year-ended December 31, 2024, on Form 10-K

5  (the "2024 10-K").   On page 4 of the 2024 10-K, the Company further confirmed that "the

6  inconsistency of the drug effect between the monotherapy population and the adjunctive population

7  was due to a higher than anticipated level of non-compliance with study medication in the

8  monotherapy group."  On the same page, the Company also revealed something new:  that "[o]nly

9  a subset of sites within the study were setup to evaluate PK levels"—specifically, *only 53 of 196*

10  participants in the Phase 2b Trial were even PK tested at all.

11      23.    Accordingly, Defendant Etkin told investors that, going forward, Alto was bringing

12  "a much higher level of rigor" to its other trials, including "requiring medical and pharmacy

13  records," requiring participants to "show that [they're] getting refills prior to coming in," and

14  "[b]lood measures or urine measures that you['re] taking the drug."

## JURISDICTION AND VENUE

16      24.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15

17  of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, and Sections 10(b) and 20(a) of the

18  Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R.

19  § 240.10b-5.

20      25.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

21  § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15

22  U.S.C. § 78aa.

23      26.    Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C.

24  § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391.  Many of the acts

25  giving rise to the violations complained of herein, including the dissemination of false and

26  misleading information, occurred in this District.  Alto has its principal place of business in this

27  District and Defendants committed tortious acts and transacted business in this District.

28

27.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

## PARTIES

## I.     Lead Plaintiffs

28.     Lead Plaintiff Special Situations Cayman Fund, L.P., as set forth in the certification accompanying its Motion for Appointment as Lead Plaintiff (ECF No. 21-2), incorporated by reference herein, purchased Alto common stock during the Class Period and 13,500 shares of Alto common stock pursuant to the IPO.  Special Situations Cayman Fund, L.P. is a limited partnership organized under the laws of Delaware and is part of a larger family of Special Situations funds having a place of business at 572 Madison Avenue, Suite 2600, New York, New York 10022.

29.     Lead Plaintiff Special Situations Fund III QP, L.P., as set forth in the certification accompanying its Motion for Appointment as Lead Plaintiff (ECF No. 21-2), incorporated by reference herein, purchased Alto common stock during the Class Period and 46,500 shares of Alto common stock pursuant to the IPO.  Special Situations Fund III QP, L.P. is a limited partnership organized under the laws of Delaware and is part of a larger family of Special Situations funds having a place of business at 572 Madison Avenue, Suite 2600, New York, New York 10022.

30.     Lead Plaintiff Special Situations Life Sciences Fund, L.P., as set forth in the certification accompanying its Motion for Appointment as Lead Plaintiff (ECF No. 21-2), incorporated by reference herein, purchased Alto common stock during the Class Period and 60,000 shares of Alto common stock pursuant to the IPO.  Special Situations Life Sciences Fund, L.P. is a limited partnership organized under the laws of Delaware and is part of a larger family of Special Situations funds having a place of business at 572 Madison Avenue, Suite 2600, New York, New York 10022.

## II.    The Exchange Act Defendants

31.    Defendant Alto is a Delaware corporation with principal executive offices located at 650 Castro Street, Suite 450, Mountain View, California 94041.  The Company's common stock trades in an efficient market on the NYSE under the ticker symbol "ANRO."

32.    Defendant Amit Etkin is Alto's President, Chief Executive Officer ("CEO"), and Chair of the Company's Board of Directors, and served in those positions during the entirety of the relevant period.  Defendant Etkin signed Alto's Registration Statement.

33.    Defendant Nicholas Smith is Alto's Chief Financial Officer ("CFO") and Chief Business Officer and served in those positions during the entirety of the relevant period.  Defendant Smith signed Alto's Registration Statement.

34.    Defendants Etkin and Smith possessed the power and authority to control the contents of Alto's SEC filings, press releases, and other market communications.  Defendants Etkin and Smith were provided with copies of Alto's SEC filings alleged herein to be materially false and misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Alto, and their access to material information available to them but not to the public, Defendants Etkin and Smith knew that the adverse facts specified herein had not been disclosed to and were being concealed from the investing public, and that the representations being made were materially false and misleading and omitted to state material facts. Defendants Etkin and Smith are liable for the materially false and misleading statements and omissions pleaded herein.

35.    Alto, Defendant Etkin, and Defendant Smith are collectively referred to herein as the "Exchange Act Defendants."

## III.    The Securities Act Defendants

36.    Defendant Po Yu Chen was a member of Alto's Board of Directors during the relevant period, having served since April 2022.  Defendant Chen received a Ph.D. in Cellular Molecular Medicine and Neuroscience from The Johns Hopkins University School of Medicine and a B.S. in LifeScience – Chemistry from Penn State University.  According to Alto, Defendant Chen

had significant experience covering biotechnology companies as an investment professional. Defendant Chen signed Alto's Registration Statement.

37.  Defendant Christopher Nixon Cox was a member of Alto's Board of Directors during the relevant period, having served since April 2022.  Defendant Cox received a J.D. from the New York University School of Law, a certificate in Finance from New York University Stern School and a B.A. in Politics from Princeton University.  According to Alto, Defendant Cox has significant financial expertise and investment experience.  Defendant Cox signed Alto's Registration Statement.

38.  Defendant Chris Dimitropoulos was a member of Alto's Board of Directors during the relevant period, having served since January 2023.  Defendant Dimitropoulos received an M.S. in Biotechnology from Johns Hopkins University and a B.S. in Finance from the University of Illinois.  According to Alto, Defendant Dimitropoulos had significant financial expertise and investment experience in the life sciences industry.  Defendant Dimitropoulos signed Alto's Registration Statement.

39.  Defendant Andrew Dreyfus was a member of Alto's Board of Directors during the relevant period, having served since October 2023.  Defendant Dreyfus received a B.A. in English from Connecticut College.  According to Alto' Defendant Dreyfus had extensive leadership experience in the healthcare industry and serving as a public company director.  Defendant Dreyfus signed Alto's Registration Statement.

40.  Defendant Michael Liang was a member of Alto's Board of Directors during the relevant period, having served since November 2023.  Defendant Liang conducted his Postdoctoral fellowship in Biological Chemistry at Harvard University and received a Ph.D. in Chemistry from Stanford University and a B.S. in Bioorganic Chemistry from the University of California, Berkeley. According to Alto, Defendant Liang had significant financial and investment expertise in the life sciences industry.  Defendant Liang signed Alto's Registration Statement.

41.  Defendant Aaron N.D. Weaver was a member of Alto's Board of Directors during the relevant period, having served since May 2021.  Defendant Weaver received a Master of Laws

from the Queensland University of Technology, a Bachelor of Law from the University of Queensland and a Bachelor of Business Administration from the University of Queensland. According to Alto, Defendant Weaver had significant financial expertise and expertise serving on the board of directors of other public companies. Defendant Weaver signed Alto's Registration Statement.

42.    Defendant Gwill York was a member of Alto's Board of Directors during the relevant period, having served since September 2021. Defendant York received an M.B.A. from Harvard Business School and a B.A. in Urban and Developing Economics from Harvard University. According to Alto, Defendant York had significant investment experience, financial expertise, and a history of advising early-stage healthcare and technology companies. Defendant York signed Alto's Registration Statement.

43.    The Exchange Act Defendants and Defendants Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York are collectively referred to herein as the "Securities Act Defendants."

44.    The Securities Act Defendants are liable for the materially false and misleading statements and omissions contained in the Registration Statement and Prospectus.

## IV.    **Relevant Third Parties**

45.    **CW-1**: CW-1 was a Clinical Trial Coordinator at Alto from February 2023 to November 2024. In that role, they were responsible for, among other things, screening, via Zoom, potential participants in Alto's Phase 2b Trial. CW-1 was one of six Alto employees assigned to this role solely and specifically for the Company's decentralized, or fully-remote, clinical trial site located in Jackson, Mississippi. CW-1 and the other Clinical Trial Coordinators conducted secondary screenings of participants that were sent to them after being pre-qualified for the Phase 2b Trial by Alto employees known as "Clinical Trial Specialists," who conducted the initial screenings of participants. According to CW-1, enrollment in the Phase 2b Trial was extraordinarily difficult at multiple points during the trial, and especially during the summer of 2023, when there was a period of six weeks to two months in which CW-1 received zero potential participants with whom to conduct secondary screenings. As CW-1 put it: "They would screen people, but none of

them qualified"; Alto "didn't have any subjects"; and the "recruitment team wasn't able to find patients." According to CW-1, during the periods of stagnant enrollment, Alto contracted with third-party vendors to market the Phase 2b Trial to participants for enrollment specifically at the Jackson, Mississippi decentralized trial site. CW-1 said that "every time there was something wrong," Alto's management would "force the board to invest in a third party" to help find participants. But that also did not appear to yield participants, according to CW-1, because none of the participants CW-1 interviewed had been referred by those third parties. Furthermore, according to CW-1, Alto allowed the individual running the decentralized trial site in Jackson, Mississippi, who did not work for the Company, to begin recruiting their own participants into the Phase 2b Trial.

46.    **CW-3:** CW-3 was a Clinical Trial Specialist at Alto from March 2023 to November 2024. In that role, they were responsible for screening potential participants for the Phase 2b Trial. They reported to Fadi Abdel, Alto's Senior Vice President of Clinical Innovation, and worked exclusively at the decentralized trial site in Jackson, Mississippi. CW-3 confirmed that trial participants assigned to the Jackson, Mississippi site engaged in the Phase 2b Trial entirely remotely, with screening and follow-up interviews conducted remotely and the patient never visiting the trial site. CW-3 stated that Alto's screening process took patients at their word about their medical histories and diagnoses and that Alto did not require any medical records or proof of diagnosis for a patient to be eligible for the Phase 2b Trial. CW-3 also reported that Alto advertised the Phase 2b Trial on Craigslist and paid participants to enroll.

47.    **CW-4:** CW-4 served as staffer reporting to Defendants Etkin and later Defendant Smith from September 2021 to May 2023. CW-4 then transitioned to a role performing administrative work for Alto from May 2023 to April 2025. In that role, CW-4 reported to Erin McQuade, Alto's General Counsel and Chief Administrative Officer and, later, to John Linder, a consultant for the Company. CW-4's roles at Alto involved onboarding and off-boarding of employees and the facilitation of employee performance reviews. According to CW-4, when the results of the Phase 2b Trial were announced, Alto held an "all-hands" meeting and flew in Company leaders, including co-founder Dan Segal and Defendant Smith. At the all-hands meeting, Alto

displayed a slide presentation that showed that the decentralized trial site in Jackson, Mississippi, had the worst numbers among all clinical trial sites. "This site in particular had bad numbers," CW-4 said. CW-4 further explained that there were questions from employees at the meeting about whether the poor data from the Jackson, Mississippi trial site was due to "serial trial participants" who were merely seeking the cash payout for participating in the Phase 2b Trial and had thus lied to meet the trial criteria, throwing off the data. Alto employees at the all-hands meeting further commented amongst themselves that, if the Jackson, Mississippi trial site had not been included, the results would have been much better. Based on their review of the data displayed in the slide presentation, CW-4 confirmed that the results from the decentralized site in Jackson, Mississippi dragged down the overall results of the Phase 2b Trial.

48.    **CW-5:**  CW-5 was a Clinical Trial Specialist at Alto from June 2022 to August 2023. In that role, CW-5 reported to Fadi Abdel, Alto's Senior Vice President of Clinical Innovation, and was responsible for screening, enrolling, and monitoring participants in Alto's Phase 2b trials of ALTO-100 and ALTO-300. CW-5 worked solely at Alto's decentralized clinical trial site in Jackson, Mississippi. According to CW-5, Alto held an "all-hands" meeting shortly before their departure from the Company in August 2023. This all-hands meeting was led by Alto's CEO, Defendant Etkin, who expressed frustration that the Phase 2b Trial was trending differently than the Phase 2a Trial. According to CW-5, Defendant Etkin "was more frustrated around that time" and recalled a statement to the effect of: "We really need to go through this biomarker data, there are some inconsistencies. We all need to sort through that together." These issues, according to CW-5, were connected to "the decentralized trial" in Jackson, Mississippi, and Defendant Etkin directed his ire toward the team assigned to that site to enroll and work with remote trial participants. "He got on us," CW-5 said. "We couldn't do anything right. Everything was wrong."

49.    **CW-6:**  CW-6 was a Clinical Research Associate at Alto from March 2023 to January 2025. In that role, they monitored clinical trial sites to ensure patient safety, data integrity, and that the sites were following trial protocols. CW-6 was the Clinical Research Associate assigned to the decentralized clinical trial site in Jackson, Mississippi for Alto's Phase 2b trial of ALTO-300

and then for Alto's Phase 2b Trial of ALTO-100 in patients with MDD.  CW-6 reported that Alto assigned a number of Clinical Trial Specialists and Clinical Trial Coordinators to work exclusively with the decentralized clinical trial site in Jackson, Mississippi, and that they handled both the Phase 2b ALTO-100 trial and the Phase 2b ALTO-300 trial.  According to CW-6, even though Alto provided staff to assist running the decentralized trial site in Jackson, Mississippi, the trial site was led by a doctor and staff that were responsible for ensuring patient safety, that protocol was being followed, and that data was properly entered, and they were struggling to do things correctly and timely.  "They were terrible.  It was just terrible."  It was "the worst site."  CW-6 said that the site director of the Jackson, Mississippi clinical trial site, Haley Dougay, was not keeping up with what needed to be reviewed and completed for the trial, even though she was supposed to be in charge of Alto's Clinical Trial Specialists and Clinical Trial Coordinators.

## SECURITIES ACT CLAIMS

50.    This portion of the Amended Complaint asserts claims pursuant to Sections 11, 12, and 15 of the Securities Act and does not allege nor sound in fraud.

51.    This portion of the Amended Complaint disclaims all claims and allegations of fraud.

**I.    Alto's Registration Statement and Prospectus Contain Materially False and Misleading Statements and Omit to State Material Facts**

52.    On January 12, 2024, Alto issued a registration statement on Form S-1 which, after two amendments, was declared effective by the SEC on February 1, 2024 (the "Registration Statement").

53.    A few weeks later, on February 2, 2024, Alto's shares began publicly trading on the New York Stock Exchange under the ticker symbol, "ANRO."

54.    Thereafter, on February 5, 2024, the Company filed with the SEC a prospectus on Form 424B4, which incorporated and formed part of the Registration Statement (the "Prospectus").

55.    On pages 24 and 25 of the Registration Statement, under the "Risk Factors" section, the Company disclosed the following risk:

> *We may find it difficult to enroll patients in our clinical trials.  If we encounter difficulties enrolling subjects in our clinical trials,*

*our clinical development activities could be delayed or otherwise adversely affected.*

Patient enrollment is a significant factor in the timing of clinical trials, and the timing of our clinical trials depends, in part, on the speed at which we can recruit patients to participate in our trials, as well as completion of required follow-up periods. We may not be able to initiate or continue clinical trials for our product candidates if we are unable to identify and enroll a sufficient number of eligible patients to participate in these trials to such trial's conclusion as required by the FDA or comparable foreign regulatory authorities. Subject enrollment is affected by many factors including the size and nature of the patient population, competing clinical trials in the same or similar indications or at the same trial site, the severity of the disease or condition under investigation, the availability and efficacy of approved drugs and diagnostics for the disease or condition under investigation, the number and location of clinical sites, the proximity of patients to clinical sites, willingness of patients to participate in a decentralized clinical trial, the eligibility and exclusion criteria for the trial, perceived risks and benefits of the product candidate under study, the design of the clinical trial, continued enrollment of prospective patients by clinical trial sites, the risk that enrolled patients will not complete a clinical trial, our ability to recruit clinical trial investigators with the appropriate competencies and experience, efforts to facilitate timely enrollment in clinical trials, patient referral practices of physicians, the ability to monitor patients adequately during and after treatment, competing clinical trials, and clinicians' and patients' perceptions as to the potential advantages and risks of the product candidate being studied in relation to other available therapies, including any new products that may be approved for, or any product candidates under investigation for, the indications we are investigating.

We will be required to identify and enroll a sufficient number of subjects for each of our clinical trials. Utilizing our Platform, we plan to focus our development activities on patients characterized by a biomarker that we believe will be most likely to respond to our product candidates. As a result, the potential patient populations for our clinical trials may be narrowed, and we may experience difficulties in identifying and enrolling a sufficient number of patients in our clinical trials. We may not be able to initiate or continue clinical trials if we are unable to locate a sufficient number of eligible subjects to participate in the clinical trials required by the FDA or comparable foreign regulatory authorities. In addition, the process of finding and diagnosing subjects may prove costly.

We have in the past and may in the future experience participant withdrawals or discontinuations from our trials. Withdrawal of

participants from our clinical trials, including participants in any control groups, may compromise the quality of our data. Even if we are able to enroll a sufficient number of participants in our clinical trials, we may have difficulty maintaining enrollment of such patients in our clinical trials, and delays in enrollment may result in increased costs or may affect the timing or outcome of our clinical trials. Any of these conditions may negatively impact our ability to complete such trials or include results from such trials in regulatory submissions, which could adversely affect our ability to advance the development of our product candidates. Additionally, participants with neuropsychiatric disorders, including MDD and schizophrenia, constitute a vulnerable patient population and may withdraw from the clinical trial if they are not experiencing improvement in their underlying disease or condition or if they experience other difficulties or issues relating to their underlying disease or condition or otherwise.

Additionally, other pharmaceutical companies targeting these same diseases are recruiting clinical trial patients from similar patient populations, which may make it more difficult to fully enroll any clinical trials. Our inability to enroll a sufficient number of patients for any of our future clinical trials would result in significant delays or may require us to abandon one or more clinical trials altogether. In addition, we expect to rely on clinical trial sites to ensure proper and timely conduct of our future clinical trials and, while we intend to enter into agreements governing their services, we will have limited influence over their actual performance.

We cannot assure you that our assumptions used in determining expected clinical trial timelines are correct or that we will not experience delays in enrollment, which would result in the delay of completion of such trials beyond our expected timelines.

56.     On page 38 of the Registration Statement, the Company disclosed the following risks:

*We rely on, and intend to continue to rely on, our internal clinical development expertise to conduct our current and future clinical trials. This model includes internal teams and systems as well as external vendors and CROs to comprise a full clinical trial team. If our clinical trial team does not comply with applicable regulatory requirements, meet expected deadlines, or run trials effectively, our development programs and our ability to seek or obtain regulatory approval for or commercialize our product candidates may be delayed.*

We conduct much of our clinical trial work (*e.g.*, clinical and medical monitoring, data management, and project management) with internal personnel, though we selectively employ CROs when

conducting our Phase 1 pharmacodynamic trials and use certain CRO and/or vendor services (*e.g.*, biostatistics, pharmacovigilance, central raters, and rater training and remediation services) to augment our internal expertise. We also rely on our internal, proprietary systems for some data, Spectra, Altoscope, and TechCheck. See the section titled "Business—Our Differentiated Approach and Capabilities—Our Precision Psychiatry Platform— Computerized Neurocognitive Battery," and "—EEG." Moreover, some of our trials include a decentralized clinical trial component supported by our internal personnel wherein clinical trial activity occurs in the participant's home or at a local health care facility and includes virtual elements of care, exposing us to increased risk of variability and lack of control of the clinical trial. See the section titled "Business—Our Differentiated Approach and Capabilities— Our Internal Clinical Development Expertise and Decentralized Clinical Trial Infrastructure."

Although we believe that we have the capabilities to conduct clinical trials through our insourced model, we may need to rely on third party CROs to conduct clinical trials if our internal capabilities cannot scale as we work to progress our current product candidates through development, as we potentially expand our product candidate portfolio, or if we do not have sufficient personnel to support our decentralized clinical trial model. Moreover, without the use of an experienced CRO, our insourced team is responsible for the coordination of drug supply through various shipping vendors as well as the supply of certain equipment (*e.g.*, EEG devices) for our trials, and our failure to coordinate such matters in an effective and efficient manner could have a material adverse effect on our trials. Our failure or the failure of any CROs we may employ to conduct the trials in compliance with FDA regulations could result in a delay or failure in obtaining FDA approval and could require us to repeat any preclinical studies or clinical trials we or the CRO administered. Our insourced personnel could fail to meet deadlines or run less effectively than a CRO, which could delay development of our product candidates and our ability to seek or obtain regulatory approval or marketing approval for our product candidates.

Further, under our insource model we presently contract directly with all of our clinical trial sites, and therefore have to negotiate budgets and contracts with each trial site, which may result in delays to our development timelines and increased costs. If any of our relationships with trial sites terminate, we may not be able to enter into arrangements with alternative trial sites or do so on commercially reasonable terms. Switching or adding additional trial sites can also involve additional costs and requires time and focus of our clinical trial operations management team.

57.     Page 139 of the Registration Statement describes Alto's "Internal Clinical Development Expertise and Decentralized Clinical Trial Infrastructure," stating:

> We make use of our own internal capabilities and expertise to conduct our clinical trials, rather than outsourcing clinical development execution to contract research organizations, or CROs. ***We have built a team of clinical operations experts, led by Dr. Adam Savitz and Jessica Powell, that engage directly with clinical trial sites and provide clinical monitoring, oversight, and support to ensure trials are run with the highest emphasis on quality and efficiency.*** This insourced model creates synergies between trials, and enables us to conduct multiple studies simultaneously, reduce cost, and apply learnings across programs to enhance execution. ***We believe our approach results in higher quality clinical and biomarker data, benefits we have now observed through our two completed Phase 2a trials.*** Finally, our strict approach to data oversight enables us to design software tools, such as Spectra, Techcheck, and Altoscope, which are tailored to the requirements of our biomarker data collection with an understanding of how these data will ultimately be gathered in clinical practice. While we conduct most of our clinical work internally, we do selectively employ CROs when conducting our Phase 1 pharmacodynamic trials and use certain CRO capabilities to augment our internal expertise.
>
> The insights from running our trials internally have additionally enabled us to build infrastructure to support decentralized clinical trials, managed by dedicated clinical trial investigators trained specifically for remote-only patient care and monitoring. Patients are recruited nation-wide through online advertising campaigns, screened for eligibility, and then biomarkers are collected in a patient's home, or at a convenient location. Follow-up visits can be conducted remotely via telehealth, similar to how the majority of routine psychiatric care is currently conducted. This enables our clinical trials to have broader demographic and geographic reach, and to further support equity and diversity in our trial populations. Importantly, we believe it also establishes the technology platform for large-scale commercial dissemination of our technologies to identify biomarkers if approved, giving us early experience reaching and assessing our target populations in unique ways.

58.     The Registration Statement contained untrue statements of material fact, omitted to state facts required to be stated therein, omitted to state facts necessary to make the statements therein not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

59.    Specifically, the statements in Paragraph 55 were materially false and misleading and omitted to state material facts because they speak of the risks that Alto "*may* find it difficult to enroll patients in [its] clinical trials" and that, *if* it did "encounter difficulties" doing so, its "clinical development activities *could* be delayed or otherwise adversely affected" as if those were as-yet-unrealized risks and contingencies, without disclosing that these risks had already come to fruition.

60.    Indeed, by the time the Registration Statement was filed with the SEC, Alto had *already* experienced significant difficulties enrolling qualified patients in its Phase 2b Trial of ALTO-100.

61.    Alto originally designed the Phase 2b Trial to include 200 participants across 26 clinical trial sites that largely overlapped with those used in its prior successful Phase 2a Trial of ALTO-100.

62.    The Phase 2a Trial included 133 participants with a primary diagnosis of MDD and 110 patients with PTSD across 24 clinical trial sites.

63.    Of the 123 participants with MDD who passed quality control checks and were given ALTO-100, 45 were intended to take it as a monotherapy while 78 were intended to take it as an adjunctive to their existing antidepressant medication.  According to Alto, the Phase 2a Trial found a "[s]imilar enrichment for monotherapy vs. adjunctive," with response rates reaching "~80% in monotherapy and ~50% in adjunctive."

64.    In the Phase 2a Trial, Alto ensured that participants were taking ALTO-100 as directed by routinely testing their pharmacokinetic, or "PK" levels, at the Company's 24 clinical trial sites.  As Defendant Etkin told investors during a conference call on March 12, 2025, Alto "saw about 90% compliance" from participants in the Phase 2a Trial, "and that's measured by PK in either the monotherapy or adjunctive group."  In other words, in Phase 2a, 90% of patients took the drug and had it register in their blood on the industry-accepted PK test.

65.    Overall, the Phase 2a Trial had favorable top-line results, with "patients with MDD characterized by impaired cognition respond[ing] significantly better to ALTO-100 than patients without objectively defined cognitive impairment."

66.    Based on the favorable top-line results of the Phase 2a Trial, Alto advanced ALTO-100 into a randomized, double-blind, placebo-controlled Phase 2b Trial.

67.    Alto began enrolling patients in the Phase 2b Trial in January 2023, but *immediately* encountered difficulty enrolling qualified participants.

68.    Even worse, approximately six months into recruitment for the Phase 2b Trial, Alto received written feedback from the U.S. Food and Drug Administration ("FDA") on the Phase 2b Trial protocol, which resulted in the Company increasing the number of participants targeted for enrollment from 200 to 266.  What had been a difficult recruiting problem had only become more challenging.

69.    According to CWs, some of which are described herein, Alto was unable to recruit a sufficient number of qualified, reliable participants in the Phase 2b Trial, especially after the FDA's feedback forced the Company to increase enrollment.

70.    For example, CW-1 was a Clinical Trial Coordinator at Alto from February 2023 to November 2024, who was responsible for conducting secondary screenings (after initial screening calls by Alto employees called "recruiters" or Clinical Trial Specialists), via Zoom, of potential participants in Alto's Phase 2b Trial.  According to CW-1, enrollment flagged at multiple points during the Phase 2b Trial, and especially during the summer of 2023, when there was a period of six weeks to two months in which CW-1 received zero potential trial participants with whom to conduct secondary screenings.  As CW-1 put it:  "They would screen people, but none of them qualified"; Alto "didn't have any subjects"; and the "recruitment team wasn't able to find patients."

71.    According to CW-3, a Clinical Trial Specialist at Alto from March 2023 to November 2024, Alto began advertising the Phase 2b Trial on Craigslist and paying participants to enroll in the trial in order to boost enrollment.

72.    This information is corroborated by CW-1, who explained that Alto also engaged third parties to aid in its recruitment efforts and even permitted the doctor in charge of the decentralized trial site in Jackson, Mississippi, who was not employed by Alto, to recruit their own participants.  According to CW-1, "every time there was something wrong," Alto's management

would "force the board to invest in a third party" to help find participants.  But that also did not appear to yield qualified participants, because none of the participants CW-1 interviewed had been referred by those third parties.

73.    Alto also attempted to boost enrollment by expanding the number of clinical trial sites for the Phase 2b Trial from 26 to 34.  However, many of the new clinical trial sites—including the one in Jackson, Mississippi—operated entirely remotely and did not have any in-person interaction with participants.  The fully-remote nature of these clinical trial sites meant that, for the participants who ended up enrolling in the Phase 2b Trial, Alto was unable to test their PK levels to ensure that they were taking ALTO-100 as directed.

74.    The resulting situation at the Jackson, Mississippi clinical trial site was "terrible," "just terrible," according to CW-6, a Clinical Research Associate at Alto from March 2023 to January 2025.  CW-6 said that the site director of the Jackson, Mississippi clinical trial site, Haley Dougay, was not keeping up with what needed to be reviewed and completed for the Phase 2b Trial, even though she was supposed to be in charge of Alto's Clinical Trial Specialists and Clinical Trial Coordinators.  As CW-6 put it, the decentralized clinical trial site in Jackson, Mississippi was "the worst site."

75.    This information is corroborated by CW-5, a Clinical Trial Specialist at Alto from June 2022 to August 2023 who was assigned to the decentralized clinical trial site in Jackson, Mississippi.  According to CW-5, Alto held an "all-hands" meeting shortly before their departure from Alto in August 2023.  This all-hands meeting was led by Alto's CEO, Defendant Etkin, who expressed frustration that the Phase 2b Trial was trending differently than the Phase 2a Trial.  CW-5 remembers Alto management "saying this is looking really different" and "they knew it was trending differently at that point."

76.    According to CW-5, Defendant Etkin "was more frustrated around that time" and recalled a statement to the effect of:  "We really need to go through this biomarker data, there are some inconsistencies.  We all need to sort through that together."  These issues, according to CW-5, were connected to "the decentralized trial" in Jackson, Mississippi, and Defendant Etkin directed

his ire toward the team assigned to that site to enroll and work with remote trial participants. "He got on us," CW-5 said. "We couldn't do anything right. Everything was wrong."

77.    Alto also boosted enrollment in the Phase 2b Trial by enrolling significantly more monotherapy patients, *i.e.*, those who would solely be taking ALTO-100 as a treatment for MDD, than adjunctive patients, *i.e.*, those who were already taking an anti-depressant and would be supplementing it with ALTO-100 to treat MDD. Ultimately, 135 monotherapy participants completed the Phase 2b Trial as opposed to only 61 adjunctive participants.

78.    The Phase 2b Trial was completed in late September 2024 and, approximately one month later, on October 22, 2024, Alto issued a press release announcing top-line results from the Phase 2b Trial. As explained in the press release, the Phase 2b Trial "did not meet its primary endpoint, assessed by a change from baseline in Montgomery-Åsberg Depression Rating Scale (MADRS), compared to placebo." Specifically, the "biomarker-defined MDD patient group treated with ALTO-100 did not demonstrate a statistically significant improvement in depressive symptoms compared to placebo." Moreover, "ALTO-100 did not demonstrate benefit over placebo on the pre-specified key secondary analyses."

79.    According to CW-4, when the results of the Phase 2b Trial were announced, Alto held an "all-hands" meeting and flew in Company leaders, including co-founder Dan Segal and Defendant Smith.

80.    At the all-hands meeting, Alto displayed a slide presentation that showed that the decentralized trial site in Jackson, Mississippi, had the worst numbers among all clinical trial sites. "This site in particular had bad numbers," CW-4 said. CW-4 further explained that there were questions from employees at the meeting about whether the poor data from the Jackson, Mississippi trial site was due to "serial trial participants" who were merely seeking the cash payout for participating in the Phase 2b Trial and had thus lied to meet the trial criteria, throwing off the results.

81.    Alto employees at the all-hands meeting further commented amongst themselves that, if the results from the Jackson, Mississippi trial site had not been included in the Phase 2b Trial, the results would have been much better. Based on their review of the data displayed in the slide

presentation, CW-4 confirmed that the results from the decentralized clinical trial site in Jackson, Mississippi dragged down the overall results of the Phase 2b Trial.

82.    A few weeks later, on November 18, 2024, Defendant Etkin explained on a conference call that the failure of the Phase 2b Trial was in fact due to "compliance." "When we looked at compliance with the drug in patients based on blood draws, we saw that the adjunctive population was fully compliant . . . [while] the monotherapy group was far less compliant than we had anticipated." Defendant Etkin went on to explain that "[i]f you look at the compliant patients, whether monotherapy or adjunctive, we saw a consistent effect of the drug and a consistent effect of the biomarker in predicting better outcome[s] with the drug."

83.    Five months later, on March 20, 2025, Alto filed with the SEC its annual report for the year-ended December 31, 2024, on Form 10-K (the "2024 10-K"). The 2024 10-K explained that there was an "inconsistency" between the effects of ALTO-100 on the monotherapy and adjunctive populations in the Phase 2b trial "due to a higher than anticipated level of non-compliance with study medication in the monotherapy group, which the adjunctive group demonstrated a high level of compliance (56% in the monotherapy vs. 100% in the adjunctive)."

84.    The 2024 10-K further admitted that "[o]nly a subset of sites within the study were setup to evaluate PK levels."



Clear drug effect in prespecified adjunctive population



Compliance rate among monotherapy and adjunctive patients in PK sample*



*Only a subset of sites within the study were setup to evaluate PK levels

85.    In other words, Alto was only able to test the PK levels of 53 patients in the Phase 2b Trial to confirm that they were in fact taking ALTO-100 as directed.

86.     Alto's 2024 10-K further explained that "[i]n the subset of patients that had evidence of taking ALTO-100 through blood sample analysis, a greater improvement was observed with ALTO-100 compared to placebo in the patients with the cognitive biomarker . . . and the patients with the cognitive biomarker demonstrated a greater improvement than those without the biomarker . . . . The analyses in the pharmacokinetic, or PK, positive sample are supportive of the overall potential efficacy of ALTO-100 in patients with the cognitive biomarker."

87.     Alto confirmed this information on September 17, 2025, during a conference call with investors.  Defendant Etkin explained that the Phase 2b Trial was plagued by "a fairly large number of professional patients who were assessed as people who were saying that they were taking the drug, but repeatedly detected none in their blood."  Going forward, Defendants explained that Alto would be "requiring medical and pharmacy records. You have to show that you're getting refills prior to coming in. Blood measures or urine measures that you're taking the drug . . . ."

88.     The statements in Paragraph 56 were materially false and misleading and omitted to state material facts because they speak of certain risks—that, because Alto relies on its "internal clinical development expertise to conduct [its] current and future clinical trials," and *if* its "team is unable to execute according to [its] strategy, comply with regulatory requirements, or run trials effectively," Alto's "ability to obtain regulatory approval *may* be delayed and [its] business *could* be materially harmed," and that the "decentralized clinical trial component" of "some of" Alto's trials "expos[es] [Alto] to increased risk of variability and lack of control of the clinical trial"—as if those were as-yet-unrealized risks and contingencies, without disclosing that these risks had already come to fruition.  As set forth in Paragraphs 61-87, Alto's insourced approach to clinical trials and its "decentralized clinical trial component" led to significant difficulties enrolling qualified patients in the Phase 2b Trial.  Alto's decentralized clinical trial sites were particularly problematic given that they could not test participants' PK levels.  This significantly increased the risk that participants in the Phase 2b Trial would not comply with trial protocols and take ALTO-100 as directed especially because, as the Company explained in the Registration Statement, "participants with neuropsychiatric disorders, including MDD and schizophrenia, constitute a vulnerable patient

population and may withdraw from [or fail to comply with] the clinical trial if they are not experiencing improvement in their underlying disease or condition."  This, in turn, increased the risk that the Phase 2b Trial would fail—not because of anything to do with ALTO-100—but because of non-compliance.  And that is precisely what happened.  As Alto has admitted, the failure of the Phase 2b Trial was due to "compliance."  Indeed, "[i]n the subset of patients that had evidence of taking ALTO-100 through blood sample analysis, a greater improvement was observed with ALTO-100 compared to placebo in the patients with the cognitive biomarker . . . ."

89.     The statements in Paragraph 57 were materially false and misleading and omitted to state material facts.  Specifically, it was materially false and misleading for Alto to state that it had "built a team of clinical operations experts . . . that engage directly with clinical trial sites and provide clinical monitoring, oversight, and support to ensure trials are run with the highest emphasis on quality and efficiency" while omitting that the quality and efficiency of the Phase 2b Trial would be materially adversely affected by Alto's inability to recruit qualified participants for the trial, as set forth in Paragraphs 61-87.  It was also materially false and misleading for Alto to state that its insourced approach to clinical trials "results in higher quality clinical and biomarker data, benefits we have now observed through our two completed Phase 2a trials" when, in reality, its insourced approach led to significant difficulties enrolling qualified participants in the Phase 2b Trial which, in turn, led to low quality clinical data, as set forth in Paragraphs 61-87.  Indeed, as Defendant Etkin explained, the Phase 2b Trial results were skewed "a fairly large number of professional patients who were assessed as people who were saying that they were taking the drug, but repeatedly detected none in their blood."  When Alto looked solely at the "subset of patients that had evidence of taking ALTO-100 through blood sample analysis, a greater improvement was observed with ALTO-100 compared to placebo in the patients with the cognitive biomarker . . . ."

90.     The Registration Statement also violated Item 303 of SEC Regulation SK, 17 C.F.R. § 229.303 ("Item 303"), which mandates (among other things) disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact" on the registrant's business.  17 C.F.R. § 229.303(b)(2)(ii).  Specifically, the Registration

Statement failed to disclose, as required, the known trend that Alto had encountered significant difficulties enrolling qualified participants in the Phase 2b Trial, as set forth in Paragraphs 61-87. These difficulties could have, and did, have a material unfavorable impact on Alto's business, as the price of Alto's common stock plummeted nearly 70% when the top-line results of the Phase 2b Trial were announced.  Additionally, Alto's difficulties enrolling qualified patients in the Phase 2b Trial should have been disclosed because, at the time of the IPO, the future of the trial was in legitimate doubt.  If Alto was unable to recruit a sufficient number of qualified participants and was forced to pause or postpone the Phase 2b trial, it would have had crippling effects on the Company which, at the time of the IPO, had already incurred net losses of $62 million and an accumulated deficit of approximately $65.7 million.  As explained in the Registration Statement, Alto had "no products approved for commercial sale and [had] not generated any revenue from product sales to date.  As a result, [it was] not profitable, . . . incurred substantial losses in each period since [its] inception, and . . . expect[ed] to incur significant losses for the foreseeable future."  Thus, a pause or postponement of its most advanced clinical trial program due to insufficient enrollment would have been catastrophic.  Yet the Securities Act Defendants failed to disclose Alto's significant enrollment issues in the Registration Statement in violation of Item 303 of Regulation SK.

91.     Finally, the Registration Statement violated Item 105 of SEC Regulation SK, 17 C.F.R. § 229.105 ("Item 105"), which requires the disclosure of "material factors that make an investment in the registrant or offering speculative or risky."  While the Registration Statement disclosed the risk that enrollment issues might "delay[]" or "otherwise adversely affect" the Company's "clinical development activities," it did not disclose the risk that enrollment issues could have a material adverse effect on the results of the Phase 2b Trial.  Specifically, the issues Alto faced enrolling qualified participants in the Phase 2b Trial led to an expansion of the clinical trial sites used to recruit participants for, and eventually to conduct, the clinical trial.  As Alto later admitted, those trial sites were not equipped to evaluate participants' PK levels to ensure that they were taking ALTO-100 as directed.  This was in contrast to the clinical trial sites used in Alto's successful Phase 2a Trial, which were set up to evaluate participants' PK levels and, accordingly, had a 90%

compliance rate.  The Phase 2b Trial, on the other hand, had a highly inconsistent compliance rate, with only 56% of the monotherapy participants taking ALTO-100 as directed.  Moreover, Alto was only able to establish the PK levels of 53 study participants (of nearly 200 who completed the trial, and about 300 enrollees) in the Phase 2b Trial, meaning that the compliance rate was highly likely to be even worse than Alto ultimately reported.  Alto's inability to establish participants' PK levels was especially problematic given that, as the Company explained in the Registration Statement, "participants with neuropsychiatric disorders, including MDD and schizophrenia, constitute a vulnerable patient population and may withdraw from [or fail to comply with] the clinical trial if they are not experiencing improvement in their underlying disease or condition."  The enrollment issues also led to Alto broadening its struggling recruitment efforts.   The Company began advertising the Phase 2b Trial on Craigslist, paying participants to enroll, and allowing doctors at Alto's clinical trial sites to recruit their own participants without oversight or approval from the Company.  These efforts increased the risk that the Phase 2b Trial would be plagued by professional patients who were seeking a cash payout and not actually suffering from MDD (and thus unlikely to take ALTO-100 as directed).  This, in turn, increased the risk that the Phase 2b Trial would fail.  And that is exactly what happened.  As Alto later admitted, the Phase 2b Trial failed—not because of anything to do with ALTO-100—but because of participants' non-compliance.

92.     As Defendant Etkin explained, the Phase 2b Trial was plagued by "a fairly large number of professional patients" who were not taking ALTO-100 as prescribed.  Alto's enrollment issues also led to the Company enrolling, out of necessity, significantly more monotherapy participants than adjunctive participants.  This too, increased the risk that the Phase 2b Trial would fail.  And, again, that is precisely what happened.  Alto has since disclosed that the adjunctive group of participants were "fully compliant" with taking ALTO-100 as directed while the monotherapy group was "far less compliant."  According to Defendant Etkin, the adjunctive participants "are clearly [the] real patients who are coming in on a medication that they're already taking daily and are far more likely to be the target population just from a clinical perspective alone."  Yet, because of the difficulties Alto faced enrolling qualified participants in the Phase 2b Trial, it was forced to

enroll participants who were unlikely to be the "real patients" that would benefit from ALTO-100 and be part of the Company's "target population" from a clinical perspective.

93.    None of this is particularly surprising and would have been known to Alto's management—experienced in the field of mental health as they were.  Prior to forming Alto, Defendant Etkin was a Professor of Psychiatry and Behavior Sciences at the Stanford University School of Medicine and was an "international leader in the neuroscience of psychiatric disorders and their treatments."  Defendant Etkin received an M.D. and Ph.D. in neurobiology at Columbia University, an M.Phil. in Neurobiology from Columbia University, and a B.S. in Biology from the Massachusetts Institute of Technology.  Defendant Chen likewise had a Ph.D. in Cellular Molecular Medicine and Neuroscience from The Johns Hopkins University School of Medicine.  Defendant Liang also had a Ph.D. in Chemistry from Stanford University and a B.S. in Bioorganic Chemistry from the University of California, Berkeley.  Thus, given their vast experience in the field, the Securities Act Defendants knew full well that monotherapy patients are those who enter a clinical trial claiming to have MDD but are on no current medication *at all*.

94.    As Alto itself has admitted, patients with depressive disorders are already heightened compliance risks.  Of those with the disorders (heightened risks), Alto added to the study people not on any other medication (another heightened risk), and then, at yet another level, made the trial purely remote (another heightened risk).  The compliance issues were entirely foreseeable in this environment, but Alto needed to complete its trial.

95.    Yet the Securities Act Defendants failed to disclose the risk that significant enrollment issues could have a material adverse effect on the results of the Phase 2b Trial in violation of Item 105 of Regulation SK.

96.    The Prospectus contained substantively the same statements identified in Paragraphs 55, 56, and 57, which were materially false and misleading and omitted to state material facts for the same reasons set forth in Paragraphs 59-87, 88, and 89.

## II.    Class Action Allegations

97.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a) and 23(b)(3) on behalf of all persons that purchased Alto common stock directly in or traceable to the IPO and pursuant to the Registration Statement and Prospectus. The Securities Act Class asserts claims only under Section 11, Section 12(a)(2) and Section 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o. The Securities Act Class does not assert any claims sounding in fraud. Any person who did not acquire their Alto shares directly in or traceable to the IPO and pursuant to the Registration Statement and Prospectus is not included in the Securities Act Class. Also excluded from the Securities Act Class are the Securities Act Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which the Securities Act Defendants have or had a controlling interest.

98. The members of the Securities Act Class are so numerous that joinder is impracticable. The IPO involved the issuance and sale of approximately 6.7 million shares of Alto common stock, which were publicly traded on the New York Stock Exchange following the IPO. Though the exact number of Securities Act Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believe that there are at least thousands of members in the proposed Securities Act Class. Record owners and other members of the Securities Act Class may be identified from records maintained by Alto or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

99. Lead Plaintiffs' claims are typical of the claims of the Securities Act Class, as all Securities Act Class members were and are similarly affected by the Securities Act Defendants' conduct.

100. Lead Plaintiffs will fairly and adequately protect the interests of Securities Act Class members and have retained counsel competent and experienced in securities class action litigation and intend to pursue this action vigorously. Lead Plaintiffs will fairly and adequately protect the interests of the Securities Act Class and do not have any interests contrary to or in conflict with the Securities Act Class.

101. Common questions of law and fact exist as to all Securities Act Class members and

predominate over any questions solely affecting individual Securities Act Class members. Among the common questions of law and fact are: (a) whether the Securities Act Defendants violated the Securities Act; (b) whether the Registration Statement and Prospectus contained untrue statements of material fact, omitted to state facts required to be stated therein, omitted to state facts necessary to make the statements therein not misleading, and/or were not prepared in accordance with the rules and regulations governing their preparation; and (c) whether and to what extent the members of the Securities Act Class have sustained damages and the proper measure of damages.

102.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Securities Act Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Securities Act Class members to individually redress the alleged wrongs done to them. Further, there will be no difficulty in managing this action as a class action.

### FIRST CAUSE OF ACTION

**Violations of Section 11 of the Securities Act Against**

**the Securities Act Defendants**

103.    Lead Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1-14 and 24-103 as if fully set forth herein.

104.    This cause of action is brought on behalf of the Securities Act Class against the Securities Act Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k. This cause of action does not allege nor intend to allege fraud or fraudulent intent, and any implication of fraud or fraudulent intent is expressly disclaimed.

105.    Section 11 gives rise to liability if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated herein or necessary to make the statements therein not misleading . . . ." 15 U.S.C. §77k(a).

106.    Among others, "every person who signed the registration statement" and "every

person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted" may be liable under Section 11.

107.    The Registration Statement contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein not misleading, and omitted to state material facts required to be stated therein.

108.    Alto is the registrant for the IPO.  The Securities Act Defendants were responsible for the contents and dissemination of the Registration Statement, and Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York each signed the Registration Statement.

109.    As the issuer of the shares, Alto is strictly liable to Lead Plaintiffs and the Securities Act Class for the Registration Statement's material misstatements and omissions.  As signatories of the Registration Statement, Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York are also strictly liable to Lead Plaintiffs and the Securities Act Class for the material misstatements and omissions contained therein.

110.    None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements contained in the Registration Statement, or the Registration Statement itself, was complete, accurate, not misleading, or without omission of any material fact.

111.    By reason of the conduct alleged herein, each Securities Act Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

112.    Lead Plaintiffs and other members of the Securities Act Class purchased and/or acquired Alto common stock pursuant or traceable to the Registration Statement and IPO.  At the time of their purchases of Alto common stock pursuant to the Registration Statement and IPO, Lead Plaintiffs and other members of the Securities Act Class were without knowledge of the facts concerning the conduct alleged herein.

113.    Lead Plaintiffs and the Securities Act Class have sustained damages.  The value of

Alto common stock has declined substantially subsequent to and because of the Securities Act Defendants' violations.

**SECOND CAUSE OF ACTION**

**Violations of Section 12(a)(2) of the Securities Act Against**

**Defendant Alto**

114.    Lead Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1-14 and 24-103 as if fully set forth herein.

115.    This cause of action is brought on behalf of the Securities Act Class against Defendant Alto for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2).  This cause of action does not allege nor intend to allege fraud or fraudulent intent, and any implication of fraud or fraudulent intent is expressly disclaimed.

116.    Section 12(a)(2) gives rise to liability as to "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. . . ." 15 U.S.C. §77l(a)(2).  At a minimum, liability under Section 12(a)(2) liability extends to those who passed title to the security to the purchaser.

117.    Alto qualifies as a statutory seller pursuant to SEC Rule 159A, which provides that an issuer is a statutory seller for purposes of Section 12(a)(2) regardless of the form of underwriting. Specifically, SEC Rule 159A(a), 17 C.F.R. §230.159A(a)(1)-(4), provides, in part, the following "[d]efinition of seller for purposes of section 12(a)(2) of the [1933] Act":

> For purposes of section 12(a)(2) of the Act only, in a primary offering of securities of the issuer, regardless of the underwriting method used to sell the issuer's securities, seller shall include the issuer of the securities sold to a person as part of the initial distribution of such securities, and the issuer shall be considered to offer or sell the securities to such person, if the securities are offered or sold to such person by means of any [prospectus] . . . [or] other communication that is an offer in the offering made by the issuer to such person.

118.    For the purpose of SEC Rule 159A(a), "information is provided or a communication

is made by or on behalf of an issuer if an issuer or an agent or representative of the issuer authorizes or approves the information or communication before its provision or use." Note 1, 17 C.F.R. §230.159A(a); *see also* 70 Fed. Reg. 44722 at 44769 (Aug. 3, 2005).

119.     The Prospectus contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein not misleading, and omitted to state material facts required to be stated therein.  Defendant Alto owed Lead Plaintiffs and other members of the Securities Act Class a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that they were true and accurate.  Defendant Alto, in the exercise of reasonable care, should have known of the material misstatements and omissions of material fact contained in the Prospectus, as set forth herein.

120.     Lead Plaintiffs and other members of the Securities Act Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omission contained in the Prospectus when they purchased Alto common stock pursuant to or traceable to the Prospectus, Registration Statement, and IPO.

121.     By reason of the conduct alleged herein, Defendant Alto violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Lead Plaintiffs and other members of the Securities Act Class who purchased Alto common stock pursuant to or traceable to the Prospectus, Registration Statement, and IPO sustained substantial damages in connection with their purchases.  Accordingly, Lead Plaintiffs and the other members of the Securities Act Class who hold Alto common stock issued pursuant to the Prospectus, Registration Statement, and IPO have the right to rescind and recover the consideration paid for their shares, and hereby tender their Alto common stock to Defendant Alto.  Securities Act Class members who have sold their Alto common stock seek damages to the extent permitted by law.

**THIRD CAUSE OF ACTION**

**Violations of Section 15 of the Securities Act Against**

**Defendants Etkin, Smith, Chen, Cox,**

**Dimitropoulos, Dreyfus, Liang, Weaver, and York**

122.    Lead Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1-14 and 24-103 as if fully set forth herein.

123.    This cause of action is brought on behalf of the Securities Act Class against Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o. This cause of action does not allege nor intend to allege fraud or fraudulent intent, and any implication of fraud or fraudulent intent is expressly disclaimed.

124.    Where a violation of Section 11 occurs, Section 15 gives rise to liability as to "[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section[] 77k. . . ." 15 U.S.C. §77o(a). Control persons under Section 15 are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable. . . ." *Id.*

125.    Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York, by virtue of their positions as directors and officers of Alto, were, at the time of the conduct alleged herein, controlling persons of Alto within the meaning of Section 15 of the Securities Act.

126.    Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York each signed the Registration Statement and was privy to, and had actual knowledge of, the material facts concealed from Lead Plaintiffs and the Securities Act Class.

127.    By reason of the conduct alleged herein, Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York violated Section 15 of the Securities Act and are liable to Lead Plaintiffs and the Securities Act Class for the damages suffered as a result.

**EXCHANGE ACT CLAIMS**

**I.    Factual Background**

    **A.    Alto Neuroscience**

    128.    Alto is a clinical stage biopharmaceutical company with a stated mission of "redefin[ing] psychiatry by leveraging neurobiology to develop personalized and highly effective treatment options."

    129.    To do so, Alto states it uses its proprietary "Precision Psychiatry Platform" to "discover brain-based biomarkers to better identify which patients are more likely to respond to [its] novel product candidates."

    130.    Another one of Alto's stated competitive advantages is that it eschews the use of traditional clinical resource organizations, or "CROs," in favor of conducting its clinical trials entirely in-house "using a team of clinical operations experts . . . that engage directly with clinical trial sites and provide clinical monitoring, oversight, and support to ensure trials are run with the highest emphasis on quality and efficiency."  Alto claims that this "insourced model" not only "results in higher quality clinical and biomarker data," but also "support[s] decentralized clinical trials" with "broader demographic and geographic reach" and the potential for "large-scale commercial dissemination of [its] technologies."

    131.    As of 2024, Alto had five clinical-stage products in its pipeline addressing MDD, bipolar depression, and schizophrenia.  Alto's most advanced product was ALTO-100, a "novel small molecule that has shown evidence of a pro-neurogenesis/neuroplasticity mechanism of action," which the Company believes "binds a receptor not targeted by other CNS therapeutics," making it first-in-class if approved.

    **B.    Alto's Successful Phase 2a Trial of ALTO-100**

    132.    Alto's Phase 2a Trial included 133 participants with a primary diagnosis of MDD and 110 patients PTSD across 24 clinical trial sites.  It was an open-label trial, *i.e.*, every patient received ALTO-100.

    133.    Of the 123 participants with MDD who passed quality control checks and were given

ALTO-100, 45 were to take it as a monotherapy while 78 were to take it as an adjunctive to their existing antidepressant medication. According to Alto, the Phase 2a Trial found a "[s]imilar enrichment for monotherapy vs. adjunctive," with response rates reaching "~80% in monotherapy and ~50% in adjunctive."

134. In the Phase 2a Trial, Alto ensured that participants were taking ALTO-100 as directed by routinely testing their pharmacokinetic, or "PK" levels, at the Company's clinical trial sites. As Defendant Etkin told investors during a conference call on March 12, 2025, Alto "saw about 90% compliance" from participants in the Phase 2a Trial, "and that's measured by PK in either the monotherapy or adjunctive group."

135. While seeming a basic condition, compliance (*i.e.*, actually taking the drug at issue) is a known issue in the clinical research space. Alto knew compliance was critical to a reliable and successful trial. Even if Alto-100 was 100% effective in a hypothetical vacuum, if study participants *did not take the drug*, the study would fail as a result of patient population and not because of the actual effectiveness. Thus, having reliable and appropriate patients in the study was a baseline requirement to make the study itself useful from a research (and ultimately, economic) standpoint.

136. On information and belief, Alto's knowledge that compliance was important to study results, and in particular the reliability of the study, was a driving factor behind Alto testing *all* 2a participants.

137. Overall, the Phase 2a Trial had favorable top-line results, with "patients with MDD characterized by impaired cognition respond[ing] significantly better to ALTO-100 than patients without objectively defined cognitive impairment."

**C.    Alto Attempts to Further Prove ALTO-100's Efficacy by Conducting the Phase 2b Trial**

138. Based on the favorable top-line results of the Phase 2a Trial, Alto advanced ALTO-100 into a randomized, double-blind, placebo-controlled Phase 2b Trial.

139. Alto originally designed the Phase 2b Trial to include 200 participants across 26 clinical trial sites that largely overlapped with those used in its prior successful Phase 2a Trial of ALTO-100.

140. Alto began enrolling patients in the Phase 2b Trial in January 2023, but encountered significant difficulty enrolling qualified participants.

141. Even worse, approximately six months into recruitment for the Phase 2b Trial, Alto received written feedback from the U.S. Food and Drug Administration ("FDA") on the Phase 2b Trial protocol, which resulted in the Company increasing the number of participants targeted for enrollment from 200 to 266.

142. According to CWs, some of which are described herein, Alto was unable to recruit a sufficient number of qualified participants in the Phase 2b Trial, especially after the FDA's feedback forced the Company to increase enrollment.

143. For example, CW-1 was a Clinical Trial Coordinator at Alto from February 2023 to November 2024, who was responsible for conducting secondary screenings (after initial screening calls by Alto employees called "recruiters" or Clinical Trial Specialists), via Zoom, of potential participants in Alto's Phase 2b Trial. According to CW-1, enrollment flagged at multiple points during the Phase 2b Trial, and especially during the summer of 2023, when there was a period of six weeks to two months in which CW-1 received zero potential trial participants with whom to conduct secondary screenings. As CW-1 put it: "They would screen people, but none of them qualified"; Alto "didn't have any subjects"; and the "recruitment team wasn't able to find patients."

144. These enrollment difficulties caused Alto to implement several measures that, both individually and collectively, exposed the Phase 2b Trial to far greater risk of failure than was ever disclosed to investors.

145. For example, according to CW-3, a Clinical Trial Specialist at Alto from March 2023 to November 2024, Alto began advertising the Phase 2b Trial on Craiglist and paying participants to enroll in the trial in order to boost enrollment.

146. This information is corroborated by CW-1, who explained that Alto also engaged

third parties to aid in its recruitment efforts and even permitted the doctor in charge of the decentralized trial site in Jackson, Mississippi, who was not employed by Alto, to recruit their own participants.  According to CW-1, "every time there was something wrong," Alto's management would "force the board to invest in a third party" to help find participants.  But that also did not appear to yield qualified participants, because none of the participants CW-1 interviewed had been referred by those third parties.

147.    The patients recruited by the doctor in charge of the Jackson, Mississippi clinical trial site were apparently never approved by the Company.  As Defendant Etkin later admitted on a March 12, 2025 conference call, the Company eventually "instituted a sponsor eligibility review," which means "sites can't enroll patients without our say-so," but did so *only after* the Phase 2b Trial was completed.

148.    Alto also attempted to boost enrollment by expanding the number of clinical trial sites for the Phase 2b Trial from 26 to 34.  However, many of the new clinical trial sites—including the one in Jackson, Mississippi—operated entirely remotely and did not have any in-person interaction with participants.  The fully-remote nature of these clinical trial sites meant that, for the participants who ended up enrolling in the Phase 2b Trial, Alto was unable to test their PK levels to ensure that they were taking ALTO-100 as directed.

149.    The resulting situation at the Jackson, Mississippi clinical trial site was "terrible," "just terrible," according to CW-6, a Clinical Research Associate at Alto from March 2023 to January 2025.  CW-6 said that the site director of the Jackson, Mississippi clinical trial site, Haley Dougay, was not keeping up with what needed to be reviewed and completed for the Phase 2b Trial, even though she was supposed to be in charge of Alto's Clinical Trial Specialists and Clinical Trial Coordinators.  As CW-6 put it, the decentralized clinical trial site in Jackson, Mississippi was "the worst site."

150.    This information is corroborated by CW-5, a Clinical Trial Specialist at Alto from June 2022 to August 2023 who was assigned to the decentralized clinical trial site in Jackson, Mississippi.  According to CW-5, Alto held an "all-hands" meeting shortly before their departure

from Alto in August 2023.  This all-hands meeting was led by Alto's CEO, Defendant Etkin, who expressed frustration that the Phase 2b Trial was trending differently than the Phase 2a Trial.  CW-5 remembers Alto management "saying this is looking really different" and "they knew it was trending differently at that point."

151.    According to CW-5, Defendant Etkin "was more frustrated around that time" and recalled a statement to the effect of: "We really need to go through this biomarker data, there are some inconsistencies.  We all need to sort through that together."  These issues, according to CW-5, were connected to "the decentralized trial" in Jackson, Mississippi, and Defendant Etkin directed his ire toward the team assigned to that site to enroll and work with remote trial participants.  "He got on us," CW-5 said.  "We couldn't do anything right.  Everything was wrong."

152.    Alto also boosted enrollment in the Phase 2b Trial by enrolling significantly more monotherapy patients, *i.e.*, those who would solely be taking ALTO-100 as a treatment for MDD, than adjunctive patients, *i.e.*, those who were already taking an anti-depressant and would be supplementing it with ALTO-100 to treat MDD.

**D.    Capitalizing on Positive Investor Sentiment Generated by the Phase 2a Trial, Alto Launches an IPO**

153.    Despite the difficulties that it was facing enrolling qualified participants in the Phase 2b Trial, the Exchange Act Defendants did not want to lose the positive investor sentiment that Alto had generated from the announcement of the Phase 2a Trial results of ALTO-100.

154.    Accordingly, on January 12, 2024, Alto filed the Registration Statement, which became effective on February 1, 2024.

155.    On February 2, 2024, Alto's common stock began publicly trading on the New York Stock Exchange under the ticker symbol "ANRO," and closed at a price of $20.70 per share.

156.    A few days later, on February 5, 2024, Alto filed the Prospectus with the SEC that incorporated and formed part of the Registration Statement.  The Prospectus disclosed that Alto would be offering 8,040,000 shares of common stock at a public offering price of $16.00 per share, for aggregate gross proceeds of approximately $128.6 million before underwriting discounts and

1    commissions and other offering expenses.

2        157.    On February 6, 2024, Alto announced the closing of its upsized IPO of 9,246,000

3    shares of common stock, which included the Company's underwriters' full exercise of their option

4    to purchase an additional 1,206,000 shares of Alto common stock at the $16.00 per share offering

5    price. Alto's aggregate gross proceeds from the IPO were approximately $128.6 million, less

6    underwriting discounts and commissions and other offering expenses.

7        **E.    The Exchange Act Defendants Misrepresent—and Omit Key Details**

8             **Regarding—the Phase 2b Trial**

9        158.    Following the IPO, the Exchange Act Defendants recklessly misrepresented and

10   omitted key details regarding the Phase 2b Trial to investors.

11       159.    For example, Alto's Chief Development Officer, Jessica Powell, told investors on

12   September 9, 2024, that Alto does not "use CROs . . . [b]ecause [they] collect higher quality data by

13   doing it in-house" and that Alto's approach to monitoring study participants represents "a shift from

14   reactive monitoring, which is really the industry norm, to more of a proactive approach so that

15   [they're] picking up site issues earlier in the process." As a result, Powell claimed, they "know

16   [they] are enrolling real patients at sites that have high-quality data."

17       160.    In reality, the opposite was true. Alto's Phase 2b trial of ALTO-100 was plagued by

18   serial trial participants who did not actually take ALTO-100 during the trial—a direct result of the

19   Company's decentralized approach to clinical trials and undisclosed enrollment issues.

20       161.    Defendant Etkin also told investors on March 18, 2024, that Alto's internal approach

21   to clinical trial development "means . . . we're both closer to the data and better able to ensure high

22   quality clinical data . . . [than] the usual clinical trial because we don't involve a CRO." Defendant

23   Etkin went on to explain on June 6, 2024, that Alto was leveraging its internal clinical development

24   resources to great effect in the Phase 2b Trial, claiming that it "allows [Alto] to make sure we have

25   the right sites, are bringing in the right patients," that it was "watching every site and every patient

26   like a hawk," and "ha[d] a lot of eyes on everything [and is] constantly monitoring sites," and that

27   the Phase 2b Trial was accordingly going "so far so good."

28

162.    At the same time, however, Alto was still struggling to recruit a sufficient number of qualified participants for the Phase 2b Trial and had added additional, decentralized clinical trial sites that were incapable of testing participants' PK levels to ensure that they were taking ALTO-100 as directed.  This was particularly problematic because, as Alto explained in the Registration Statement, "participants with neuropsychiatric disorders, including MDD and schizophrenia, constitute a vulnerable patient population and may withdraw from [or fail to comply with] the clinical trial if they are not experiencing improvement in their underlying disease or condition."

**F.    The Truth Emerges as Alto Reports the Failure of the Phase 2b Trial**

163.    On July 16, 2024, Alto announced that it had completed enrollment of the Phase 2b Trial with 300 participants.  Only 196 of those participants completed the Phase 2b Trial, with 135 participants taking ALTO-100 as a monotherapy and 61 taking it as an adjunctive to another anti-depressant.

164.    The Phase 2b Trial was completed in late September 2024.

165.    Approximately one month later, on October 22, 2024, after the market closed, Alto issued a press release announcing top-line results from the Phase 2b Trial.  As explained in the press release, the Phase 2b Trial "did not meet its primary endpoint, assessed by a change from baseline in Montgomery-Åsberg Depression Rating Scale (MADRS), compared to placebo."  Specifically, the "biomarker-defined MDD patient group treated with ALTO-100 did not demonstrate a statistically significant improvement in depressive symptoms compared to placebo."  Moreover, "ALTO-100 did not demonstrate benefit over placebo on the pre-specified key secondary analyses."

166.    The price of Alto common stock plummeted nearly 70% in response to this news, from a closing price of $14.53 on October 22, 2024, to a closing price of $4.36 on October 23, 2024.

**G.    Post-Class Period Developments**

167.    According to CW-4, when the results of the Phase 2b Trial were announced, Alto held an "all-hands" meeting and flew in Company leaders, including co-founder Dan Segal and Defendant Smith.

168.    At the all-hands meeting, Alto displayed a slide presentation that showed that the

decentralized trial site in Jackson, Mississippi, had the worst numbers among all clinical trial sites. "This site in particular had bad numbers," CW-4 said. CW-4 further explained that there were questions from employees at the meeting about whether the poor data from the Jackson, Mississippi trial site was due to "serial trial participants" who were merely seeking the cash payout for participating in the Phase 2b Trial and had thus lied to meet the trial criteria, throwing off the results.

169. Alto employees at the all-hands meeting further commented amongst themselves that, if the results from the Jackson, Mississippi trial site had not been included in the Phase 2b Trial, the results would have been much better. Based on their review of the data displayed in the slide presentation, CW-4 confirmed that the results from the decentralized clinical trial site in Jackson, Mississippi dragged down the overall results of the Phase 2b Trial.

170. A few weeks later, on November 18, 2024, Defendant Etkin explained on a conference call that the failure of the Phase 2b Trial was in fact due to "compliance." "When we looked at compliance with the drug in patients based on blood draws, we saw that the adjunctive population was fully compliant . . . [while] the monotherapy group was far less compliant than we had anticipated." Defendant Etkin went on to explain that "[i]f you look at the compliant patients, whether monotherapy or adjunctive, we saw a consistent effect of the drug and a consistent effect of the biomarker in predicting better outcome[s] with the drug."

171. Five months later, on March 20, 2025, Alto filed with the SEC its annual report for the year-ended December 31, 2024, on Form 10-K (the "2024 10-K"). The 2024 10-K explained that there was an "inconsistency" between the effects of ALTO-100 on the monotherapy and adjunctive populations in the Phase 2b trial "due to a higher than anticipated level of non-compliance with study medication in the monotherapy group, which the adjunctive group demonstrated a high level of compliance (56% in the monotherapy vs. 100% in the adjunctive)."

172. The 2024 10-K further revealed that "[o]nly a subset of sites within the study were setup to evaluate PK levels."





173.    In other words, Alto was only able to establish the PK levels of 53 patients in the Phase 2b Trial to confirm that they were in fact taking ALTO-100 as directed.  This sits in stark contrast to the enrollment figures provided of over 300 enrollees.

174.    Alto's 2024 10-K further explained that "[i]n the subset of patients that had evidence of taking ALTO-100 through blood sample analysis, a greater improvement was observed with ALTO-100 compared to placebo in the patients with the cognitive biomarker . . . and the patients with the cognitive biomarker demonstrated a greater improvement than those without the biomarker . . . . The analyses in the pharmacokinetic, or PK, positive sample are supportive of the overall potential efficacy of ALTO-100 in patients with the cognitive biomarker."

175.    Alto confirmed this information on September 17, 2025, during a conference call with investors.  Defendant Etkin explained that the Phase 2b trial was plagued by "a fairly large number of professional patients who were assessed as people who were saying that they were taking the drug, but repeatedly detected none in their blood."  Going forward, Defendants explained that Alto would be "requiring medical and pharmacy records. You have to show that you're getting refills prior to coming in. Blood measures or urine measures that you're taking the drug . . . ."

176.    The Exchange Act Defendants made further admissions in the period following the failure of the Phase 2b Trial.  On a conference call with analysts on November 20, 2024, Defendant Etkin revealed that noncompliance of monotherapy participants is "a challenge that we as a field have been dealing with" and "*that we've been wrestling with in this field for a long time*,"

specifically "a situation where, especially in a monotherapy, the person's not coming in with a documented depression for which they're being treated, as a clinical diagnosis, you have to take the patient's word for it. And that is the reality of psychiatry, is it's hard to know, does that person really, at the end of the day, have depression? That's not an issue for adjunctive patients. ***That's in part why all of our other large-scale efficacy studies really focus on that adjunctive population.***" In Defendant Etkin's view, it was "obvious[]" that "people showing more patient-like behavior taking an underlying antidepressant"—*i.e.*, adjunctive participants—"are more likely to be taking the drug" than monotherapy participants.

177.    On a March 4, 2025 conference call with analysts, Defendant Etkin further clarified the 'reasons' for the failure of the Phase 2b Trial. He revealed that the Phase 2b Trial compliance issues were the result of "the conduct of the trial, especially at the site level, which leads to a greater likelihood of professional patients, a greater likelihood of data that you have a harder time trusting." This occurred, according to Defendant Etkin, "when we enlarged the study" and "went and added sites in the second half of the study," which is where the "noncompliance rate" of "over 40% here in the monotherapy arm" was "clustered."

178.    Defendant Etkin further elaborated shortly thereafter on a March 12, 2025 conference call, saying the "issue that really we think drove" the Phase 2b Trial failure was "a professional patient site-level conduct issue," which Defendant Etkin made clear "represents a risk, frankly, a risk that we see across the board in our field right now, and we've seen this across study after study." Unlike the Phase 2b Trial, according to Defendant Etkin, Alto's other trials include procedures to guard against this "risk," including "measuring urine antidepressant levels," requiring "medical and pharmacy records," and a "sponsor eligibility review," which means "sites can't enroll patients without our say-so." And Alto was also "working on essentially diversifying our clinical trial sites and patient sources ***away from the common sources of patient risk like recruitment through social media that has driven a lot of problems across trials to date***."

179.    Likewise, during an April 29, 2025 conference call, Defendant Etkin confirmed that noncompliance within "particular sites that recruited a fairly substantial number of people . . . really highlighted the risks that we'd been aware of."

## II.    The Exchange Act Defendants' False and Misleading Statements and Omissions of Material Fact

180.    On March 18, 2024, Defendant Etkin participated in a fireside chat at UBS's Virtual CNS Day.  During the fireside chat, in response to an analyst's question, Defendant Etkin described the purported advantages of Alto's internal approach to clinical trials, especially by comparison to using a CRO, stating:

> So it's a very interesting question because part of the plain vanilla trial is actually using a CRO, right?  That is the most common way in which these trials are done.  What we've actually done is build our own clinical operations team internally.  So we have about half the company is a clinical operations and clinical development core.  And we have an engineering team that develops the software and then implements it in training sites and a data science team that makes sense of the data that we're seeing in our trials, as well as a lot of archival data that we've built on these disorders and these biomarkers.  ***And what that actually means is that we're both closer to the data and better able to ensure high quality clinical data, high quality biomarker data, and actually do it at half the cost of the usual clinical trial because we don't involve a CRO.  So in many ways, we get better outcome and save money by finding a system that's more fit for purpose for doing these kinds of trials***.  And our sites, frankly, have really enjoyed being part of these trials because it's different, because they get to learn things that they haven't been exposed to.  ***And so all of that's gone extremely well***.

181.    These statements were materially false and misleading and omitted to state material facts.  Specifically, it was materially false and misleading for Defendant Etkin to represent that Alto's insourced approach to clinical trials had gone "extremely well," was "better able to ensure high quality clinical data," "get[s] a better outcome," and was "more fit for purpose for doing [clinical] trials" when, in reality, Alto's insourced approach led to significant difficulties enrolling qualified participants in the Phase 2B Trial.  This, in turn, led to low quality clinical data, as Alto was forced to expand the number of the clinical trial sites used to recruit participants for, and eventually to conduct, the clinical trial.  As Alto later admitted, those trial sites were not equipped

to evaluate participants' PK levels to ensure that they were taking ALTO-100 as directed. This was in contrast to the clinical trial sites used in Alto's successful Phase 2a Trial, which were setup to evaluate participants' PK levels and, accordingly, had a 90% compliance rate. The Phase 2b Trial, on the other hand, had a highly inconsistent compliance rate, with only 56% of the monotherapy participants taking ALTO-100 as directed. Moreover, Alto was only able to establish the PK levels of 53 study participants in the Phase 2b Trial (53 being a fraction of the 300 enrollees), meaning that the compliance rate was highly likely to be even worse than Alto reported. Alto's inability to test participants' PK levels was especially problematic given that, as the Company itself admitted in the Registration Statement, "participants with neuropsychiatric disorders, including MDD and schizophrenia, constitute a vulnerable patient population and may withdraw from [or fail to comply with] the clinical trial if they are not experiencing improvement in their underlying disease or condition."

182.    Alto knew compliance was critical to a reliable and successful clinical trial. Even if ALTO-100 was 100% effective in a hypothetical vacuum, if the participants enrolled in the Phase 2b Trial did not actually take ALTO-100 as directed, the Phase 2b Trial would fail as a result of non-compliance and not anything to do with ALTO-100 or its effectiveness treating MDD. Thus, having high quality participants enrolled in the Phase 2b Trial—those actually suffering from MDD and willing to take ALTO-100 as directed—was a baseline requirement to making the Phase 2b Trial useful from a research (and, ultimately, economic) standpoint.

183.    The enrollment issues also led to Alto broadening its recruitment efforts. The Company began advertising the Phase 2b Trial on Craigslist, paying participants to enroll, and allowing doctors at Alto's clinical trial sites to recruit their own participants *without oversight or approval from the Company*. These efforts increased the risk that the Phase 2b Trial would be plagued by professional patients who were seeking a cash payout and not actually suffering from MDD (and thus unlikely to take ALTO-100 as directed). This, in turn, increased the risk that the Phase 2b Trial would fail. And that is exactly what happened. As Alto later admitted, the Phase 2b Trial failed—not because of anything to do with ALTO-100—but because of participants' non-

1   compliance.  As Defendant Etkin explained, the Phase 2b Trial was plagued by "a fairly large

2   number of professional patients" who were not taking ALTO-100 as prescribed.  Finally, Alto's

3   enrollment issues also led to the Company enrolling, out of necessity, significantly more

4   monotherapy participants than adjunctive participants.  This too, increased the risk that the Phase

5   2b Trial would fail.  And, again, that is precisely what happened.  Alto has since disclosed that the

6   adjunctive group of participants were "fully compliant" with taking ALTO-100 as directed while

7   the monotherapy group was "far less compliant."  According to Defendant Etkin, the adjunctive

8   participants "are clearly [the] real patients who are coming in on a medication that they're already

9   taking daily and are far more likely to be the target population just from a clinical perspective alone."

10  Yet, because of the difficulties Alto faced enrolling qualified participants in the Phase 2b Trial, it

11  was forced to enroll participants who were unlikely to be the "real patients" that would benefit from

12  ALTO-100 and be part of the Company's "target population" from a clinical perspective.

13       184.   An analyst then asked Defendant Etkin whether there was a "limitation [on] how

14  many sites are available in the U.S. or outside U.S. that can actually execute on a study like [the

15  Phase 2b study]?  Like, did you run into that type of hurdle?"  Defendant Etkin responded:

> **We have not**.  **So we have, essentially, we're looking for good quality sites, right?  So we're looking for sites that know psychiatric patients, preferably that treat psychiatric patients so that the people they bring in are gonna be high quality participants**. . . .  **And so right now we're getting very, very high QC pass rate for data collection.  That has not been a barrier at all.**  And as I mentioned, we have data collection happening in people's homes in a decentralized clinical trial framework, which is frankly more like what clinical care is going to look like ultimately down the line.  **So we've tested a lot of these things in our trials in the phase 2as that we brought into the phase 2bs.  We've tried to change as little as possible in how we do trials.**

23       185.   These statements were materially false and misleading and omitted to state material

24  facts.  Specifically, it was materially false and misleading for Defendant Etkin to represent that Alto

25  was "looking for good quality sites . . . so that the people they bring in are gonna be high quality

26  participants . . . this has not been a barrier at all" when, in reality, the new clinical trial sites that

27  Alto had added to increase enrollment in the Phase 2b Trial were not equipped to evaluate

28

participants' PK levels to ensure that they were taking ALTO-100 as directed. This was in contrast to the clinical trial sites used in Alto's successful Phase 2a Trial, which were setup to evaluate participants' PK levels, making Defendant Etkin's statement that "[w]e've tried to change as little as possible in how we do trials" materially false and misleading. It was also materially false and misleading for Defendant Etkin to state that Alto was targeting "high quality participants" when, in fact, the Company's significant difficulties enrolling qualified patients in the Phase 2b Trial led it to enroll low quality participants. Specifically, the Company began advertising the Phase 2b Trial on Craigslist, paying participants to enroll, and allowing doctors at Alto's clinical trial sites to recruit their own participants without oversight or approval from the Company. These efforts increased the risk that the Phase 2b Trial would be plagued by professional patients who were seeking a cash payout and not actually suffering from MDD (and thus unlikely to take ALTO-100 as directed). This, in turn, increased the risk that the Phase 2b Trial would fail. And that is exactly what happened. As Alto later admitted, the Phase 2b Trial failed—not because of anything to do with ALTO-100—but because of participants' non-compliance. As Defendant Etkin explained, the Phase 2b Trial was plagued by "a fairly large number of professional patients" who were not taking ALTO-100 as prescribed. Finally, Alto's enrollment issues also led to the Company enrolling, out of necessity, significantly more monotherapy participants than adjunctive participants. This too, increased the risk that the Phase 2b Trial would fail. And, again, that is precisely what happened. Alto has since disclosed that the adjunctive group of participants were "fully compliant" with taking ALTO-100 as directed while the monotherapy group was "far less compliant." According to Defendant Etkin, the adjunctive participants "are clearly [the] real patients who are coming in on a medication that they're already taking daily and are far more likely to be the target population just from a clinical perspective alone." Yet, because of the difficulties Alto faced enrolling qualified participants in the Phase 2b Trial, it was forced to enroll participants who were unlikely to be the "real patients" that would benefit from ALTO-100 and be part of the Company's "target population" from a clinical perspective.

186. On March 21, 2024, the Company filed with the SEC its annual report for the year-

ended December 31, 2023, on Form 10-K (the "2023 10-K").

187.    Page 11 of the 2023 10-K describes Alto's "Internal Clinical Development Expertise and Decentralized Clinical Trial Infrastructure," stating:

> We make use of our own internal capabilities and expertise to conduct our clinical trials, rather than outsourcing clinical development execution to contract research organizations, or CROs. ***We have built a team of clinical operations experts, led by Dr. Adam Savitz and Jessica Powell, that engage directly with clinical trial sites and provide clinical monitoring, oversight, and support to ensure trials are run with the highest emphasis on quality and efficiency.*** This insourced model creates synergies between trials, and enables us to conduct multiple studies simultaneously, reduce cost, and apply learnings across programs to enhance execution. ***We believe our approach results in higher quality clinical and biomarker data, benefits we have now observed through our two completed Phase 2a trials.*** Finally, our strict approach to data oversight enables us to design software tools, such as Spectra, Techcheck, and Altoscope, which are tailored to the requirements of our biomarker data collection with an understanding of how these data will ultimately be gathered in clinical practice. While we conduct most of our clinical work internally, we do selectively employ CROs when conducting our Phase 1 pharmacodynamic trials and use certain CRO capabilities to augment our internal expertise.
>
> The insights from running our trials internally have additionally enabled us to build infrastructure to support decentralized clinical trials, managed by dedicated clinical trial investigators trained specifically for remote-only patient care and monitoring. Patients are recruited nation-wide through online advertising campaigns, screened for eligibility, and then biomarkers are collected in a patient's home, or at a convenient location. Follow-up visits can be conducted remotely via telehealth, similar to how the majority of routine psychiatric care is currently conducted. This enables our clinical trials to have broader demographic and geographic reach, and to further support equity and diversity in our trial populations. Importantly, we believe it also establishes the technology platform for large-scale commercial dissemination of our technologies to identify biomarkers if approved, giving us early experience reaching and assessing our target populations in unique ways.

188.    These statements were materially false and misleading and omitted to state material facts. Specifically, it was materially false and misleading for Alto to state that it had "built a team of clinical operations experts . . . that engage directly with clinical trial sites and provide clinical

monitoring, oversight, and support to ensure trials are run with the highest emphasis on quality and efficiency" while omitting that the quality and efficiency of the Phase 2b Trial would be materially adversely affected by Alto's inability to recruit qualified participants for the trial, as set forth in Paragraphs 61-87.  It was also materially false and misleading for Alto to state that it "believe[s] [its] approach results in higher quality clinical and biomarker data, benefits we have now observed through our two completed Phase 2a trials" when, in reality, its efforts to enroll sufficient participants in the Phase 2b Trial led to low quality clinical data.  Indeed, as Defendant Etkin explained, the Phase 2b Trial results were skewed "a fairly large number of professional patients who were assessed as people who were saying that they were taking the drug, but repeatedly detected none in their blood."  When Alto looked solely at the "subset of patients that had evidence of taking ALTO-100 through blood sample analysis, a greater improvement was observed with ALTO-100 compared to placebo in the patients with the cognitive biomarker . . . ."

189.    On pages 64 and 65 of the 2023 10-K, under the "Risk Factors" section, Alto asserted the following risk:

> ***We may find it difficult to enroll patients in our clinical trials. If we encounter difficulties enrolling subjects in our clinical trials, our clinical development activities could be delayed or otherwise adversely affected.***
>
> Patient enrollment is a significant factor in the timing of clinical trials, and the timing of our clinical trials depends, in part, on the speed at which we can recruit patients to participate in our trials, as well as completion of required follow-up periods. We may not be able to initiate or continue clinical trials for our product candidates if we are unable to identify and enroll a sufficient number of eligible patients to participate in these trials to such trial's conclusion as required by the FDA or comparable foreign regulatory authorities. Subject enrollment is affected by many factors including the size and nature of the patient population, competing clinical trials in the same or similar indications or at the same trial site, the severity of the disease or condition under investigation, the availability and efficacy of approved drugs and diagnostics for the disease or condition under investigation, the number and location of clinical sites, the proximity of patients to clinical sites, willingness of patients to participate in a decentralized clinical trial, the eligibility and exclusion criteria for the trial, perceived risks and benefits of the product candidate under study, the design of the

1
2
3
4
5
6
7

clinical trial, continued enrollment of prospective patients by clinical trial sites, the risk that enrolled patients will not complete a clinical trial, our ability to recruit clinical trial investigators with the appropriate competencies and experience, efforts to facilitate timely enrollment in clinical trials, patient referral practices of physicians, the ability to monitor patients adequately during and after treatment, competing clinical trials, and clinicians' and patients' perceptions as to the potential advantages and risks of the product candidate being studied in relation to other available therapies, including any new products that may be approved for, or any product candidates under investigation for, the indications we are investigating.

8
9
10
11
12
13
14
15

We will be required to identify and enroll a sufficient number of subjects for each of our clinical trials. Utilizing our Platform, we plan to focus our development activities on patients characterized by a biomarker that we believe will be most likely to respond to our product candidates. As a result, the potential patient populations for our clinical trials may be narrowed, and we may experience difficulties in identifying and enrolling a sufficient number of patients in our clinical trials. We may not be able to initiate or continue clinical trials if we are unable to locate a sufficient number of eligible subjects to participate in the clinical trials required by the FDA or comparable foreign regulatory authorities. In addition, the process of finding and diagnosing subjects may prove costly.

16
17
18
19
20
21
22
23
24
25

We have in the past and may in the future experience participant withdrawals or discontinuations from our trials. Withdrawal of participants from our clinical trials, including participants in any control groups, may compromise the quality of our data. Even if we are able to enroll a sufficient number of participants in our clinical trials, we may have difficulty maintaining enrollment of such patients in our clinical trials, and delays in enrollment may result in increased costs or may affect the timing or outcome of our clinical trials. Any of these conditions may negatively impact our ability to complete such trials or include results from such trials in regulatory submissions, which could adversely affect our ability to advance the development of our product candidates. Additionally, participants with neuropsychiatric disorders, including MDD and schizophrenia, constitute a vulnerable patient population and may withdraw from the clinical trial if they are not experiencing improvement in their underlying disease or condition or if they experience other difficulties or issues relating to their underlying disease or condition or otherwise.

26
27
28

190.    These statements were materially false and misleading and omitted to state material facts because they speak of the risks that Alto "*may* find it difficult to enroll patients in [its] clinical

trials" and that, *if* it did "encounter difficulties" doing so, its "clinical development activities *could* be delayed or otherwise adversely affected" as if those were as-yet-unrealized risks and contingencies, without disclosing that these risks had already come to fruition. Specifically, the issues Alto faced enrolling qualified participants in the Phase 2b Trial led to an expansion of the clinical trial sites used to recruit participants for, and eventually to conduct, the clinical trial. As Alto later admitted, those trial sites were not equipped to evaluate participants' PK levels to ensure that they were taking ALTO-100 as directed. This was in contrast to the clinical trial sites used in Alto's successful Phase 2a Trial, which were setup to evaluate participants' PK levels and, accordingly, had a 90% compliance rate. The Phase 2b Trial, on the other hand, had a highly inconsistent compliance rate, with only *56%* of the monotherapy participants taking ALTO-100 as directed (of those Alto established PK levels for). Moreover, Alto was only able to establish the PK levels of 53 participants in the Phase 2b Trial (out of 196 final participants, in turn out of 300 'enrollees'), meaning that the compliance rate was likely to be even *worse* than Alto reported. Alto's inability to test participants' PK levels was especially problematic given that, as the Company admitted in the Registration Statement, "participants with neuropsychiatric disorders, including MDD and schizophrenia, constitute a vulnerable patient population and may withdraw from [or fail to comply with] the clinical trial if they are not experiencing improvement in their underlying disease or condition." The enrollment issues also led to Alto broadening its recruitment efforts. The Company began advertising the Phase 2b Trial on Craigslist, paying participants to enroll, and allowing doctors at Alto's clinical trial sites to recruit their own participants without oversight or approval from the Company. These efforts increased the risk that the Phase 2b Trial would be plagued by professional patients who were seeking a cash payout and not actually suffering from MDD (and thus unlikely to take ALTO-100 as directed). This, in turn, increased the risk that the Phase 2b Trial would fail. And that is exactly what happened. As Alto later admitted, the Phase 2b Trial failed—not because of anything to do with ALTO-100—but because of participants' non-compliance. As Defendant Etkin explained, the Phase 2b Trial was plagued by "a fairly large number of professional patients" who were not taking ALTO-100 as prescribed. Finally, Alto's

enrollment issues also led to the Company enrolling, out of necessity, significantly more monotherapy participants than adjunctive participants. This too, increased the risk that the Phase 2b Trial would fail. And, again, that is precisely what happened. Alto has since disclosed that the adjunctive group of participants were "fully compliant" with taking ALTO-100 as directed while the monotherapy group was "far less compliant." According to Defendant Etkin, the adjunctive participants "are clearly [the] real patients who are coming in on a medication that they're already taking daily and are far more likely to be the target population just from a clinical perspective alone." Yet, because of the difficulties Alto faced enrolling qualified participants in the Phase 2b Trial, it was forced to enroll participants who were unlikely to be the "real patients" that would benefit from ALTO-100 and be part of the Company's "target population" from a clinical perspective. Yet the Exchange Act Defendants omitted to tell the market any of this information and instead vaguely warned investors that Alto "*may* find it difficult to enroll patients in [its] clinical trials" and that, *if* it did "encounter difficulties" doing so, its "clinical development activities *could* be delayed or otherwise adversely affected," when, in reality, these risks had already materialized.

191.    On page 76 of the 2023 10-K, the Alto asserted the following additional risks:

> ***We rely on, and intend to continue to rely on, our internal clinical development expertise to conduct our current and future clinical trials. This model includes internal teams and systems as well as external vendors and CROs to comprise a full clinical trial team. If our clinical trial team does not comply with applicable regulatory requirements, meet expected deadlines, or run trials effectively, our development programs and our ability to seek or obtain regulatory approval for or commercialize our product candidates may be delayed.***
>
> We conduct much of our clinical trial work (*e.g.*, clinical and medical monitoring, data management, and project management) with internal personnel, though we selectively employ CROs when conducting our Phase 1 pharmacodynamic trials and use certain CRO and/or vendor services (*e.g.*, biostatistics, pharmacovigilance, central raters, and rater training and remediation services) to augment our internal expertise. We also rely on our internal, proprietary systems for some data, Spectra, Altoscope, and TechCheck. See the section titled "Business—Our Differentiated Approach and Capabilities—Our Precision Psychiatry Platform—Computerized Neurocognitive Battery," and "—EEG." ***Moreover,***

*some of our trials include a decentralized clinical trial component supported by our internal personnel wherein clinical trial activity occurs in the participant's home or at a local health care facility and includes virtual elements of care, exposing us to increased risk of variability and lack of control of the clinical trial.* See the section titled "Business—Our Differentiated Approach and Capabilities— Our Internal Clinical Development Expertise and Decentralized Clinical Trial Infrastructure."

192.    These statements were materially false and misleading and omitted to state material facts because they speak of certain risks—that, because Alto relies on its "internal clinical development expertise to conduct [its] current and future clinical trials," and *if* its "team is unable to execute according to [its] strategy, comply with regulatory requirements, or run trials effectively," Alto's "ability to obtain regulatory approval *may* be delayed and [its] business *could* be materially harmed," and that the "decentralized clinical trial component" of "some of" Alto's trials "expos[es] [Alto] to increased risk of variability and lack of control of the clinical trial"—as if those were as-yet-unrealized risks and contingencies, without disclosing that these risks had already come to fruition. Specifically, Alto's insourced approach to clinical trials and its "decentralized clinical trial component" led to significant difficulties enrolling qualified patients in the Phase 2b Trial. Alto's decentralized clinical trial sites were particularly problematic given that they could not test participants' PK levels. This significantly increased the risk that participants in the Phase 2b Trial would not comply with trial protocols and take ALTO-100 as directed especially because, as the Company explained in the Registration Statement, "participants with neuropsychiatric disorders, including MDD and schizophrenia, constitute a vulnerable patient population and may withdraw from [or fail to comply with] the clinical trial if they are not experiencing improvement in their underlying disease or condition." This, in turn, increased the risk that the Phase 2b Trial would fail—not because of anything to do with ALTO-100—but because of non-compliance. And that is precisely what happened. As Alto has admitted, the failure of the Phase 2b Trial was due to "compliance." Indeed, "[i]n the subset of patients that had evidence of taking ALTO-100 through blood sample analysis, a greater improvement was observed with ALTO-100 compared to placebo in the patients with the cognitive biomarker . . . ."

193.    A few months later, on May 14, 2024, Alto filed with the SEC its quarterly report for the first quarter of 2024 on Form 10-Q (the "1Q2024 10-Q").  The 1Q2024 10-Q contained substantively the same statements identified in Paragraphs 188, 190, and 192, which were materially false and misleading and omitted to state material facts for the same reasons set forth in Paragraphs 189, 191, and 193.

194.    On June 6, 2024, during a conference call with analysts, Defendant Etkin painted a picture of a robust internal clinical trial approach at Alto, stating:

> And then we run these trials ourselves.  We don't use CROs.  We have an internal clinical operations team, ***which allows us to make sure we have the right sites, are bringing in the right patients who are consistent between the Phase 2a and the Phase 2b*** . . . .  So trying to do all those things that best position the study ***while also watching every site and every patient like a hawk***.  So every single clinical and biomarker data site gets reviewed prior to randomization at Alto, as well as by the site, as well as by the third party and rating vendors.  ***So a lot of eyes on everything, constantly monitoring sites, making sure that sites don't get, that any one site doesn't go and recruit that many more people than other sites.***  We have representation broadly.  ***And, you know, so far so good.***

195.    These statements were materially false and misleading and omitted to state material facts.  Specifically, it was materially false and misleading for Defendant Etkin to represent that Alto's insourced approach to clinical trials "allow[ed it] to make sure we have the right sites" when, in reality, the new clinical trial sites that Alto had added to increase enrollment in the Phase 2b Trial were not equipped to evaluate participants' PK levels to ensure that they were taking ALTO-100 as directed.  Alto was thus not "watching every site and every patient like a hawk" and, indeed, was incapable of doing so.  This was in contrast to the clinical trial sites used in Alto's successful Phase 2a Trial, which were setup to evaluate participants' PK levels, making Defendant Etkin's statement that everything was "consistent between the Phase 2a and Phase 2b" Trials materially false and misleading.  Defendant Etkin's statement was also materially false and misleading because Alto did not advertise the Phase 2a Trial on Craigslist, pay participants to enroll, or allow doctors at Alto's clinical trial sites to recruit their own participants without oversight or approval from the Company. It was also materially false and misleading for Defendant Etkin to state that Alto was "bringing in

the right patients" for the Phase 2b Trial when, in fact, the Company's significant difficulties enrolling qualified patients in the Phase 2b Trial led it to enroll low quality participants. Specifically, the Company began advertising the Phase 2b Trial on Craigslist, paying participants to enroll, and allowing doctors at Alto's clinical trial sites to recruit their own participants without oversight or approval from the Company. These efforts increased the risk that the Phase 2b Trial would be plagued by professional patients who were seeking a cash payout and not actually suffering from MDD (and thus unlikely to take ALTO-100 as directed). This, in turn, increased the risk that the Phase 2b Trial would fail. And that is exactly what happened. As Alto later admitted, the Phase 2b Trial failed—not because of anything to do with ALTO-100—but because of participants' non-compliance. As Defendant Etkin explained, the Phase 2b Trial was plagued by "a fairly large number of professional patients" who were not taking ALTO-100 as prescribed. Finally, Alto's enrollment issues also led to the Company enrolling, out of necessity, significantly more monotherapy participants than adjunctive participants. This too, increased the risk that the Phase 2b Trial would fail. And, again, that is precisely what happened. Alto has since disclosed that the adjunctive group of participants were "fully compliant" with taking ALTO-100 as directed while the monotherapy group was "far less compliant." According to Defendant Etkin, the adjunctive participants "are clearly [the] real patients who are coming in on a medication that they're already taking daily and are far more likely to be the target population just from a clinical perspective alone." Yet, because of the difficulties Alto faced enrolling qualified participants in the Phase 2b Trial, it was forced to enroll participants who were unlikely to be the "real patients" that would benefit from ALTO-100 and be part of the Company's "target population" from a clinical perspective. Thus, Defendant Etkin's statement "so far so good" with the Phase 2B Trial was materially false and misleading and omitted to state material facts.

196.    On August 13, 2024, Alto filed with the SEC its quarterly report for the second quarter of 2024 on Form 10-Q (the "2Q 2024 10-Q"). The 2Q 2024 10-Q contained substantively the same statements identified in Paragraphs 188, 190, and 192, which were materially false and

misleading and omitted to state material facts for the same reasons set forth in Paragraphs 189, 191, and 193.

197.    On September 9, 2024, Alto held an Investor Day and presented to shareholders. During that presentation, Alto's Chief Development Officer, Jessica Powell, presented on behalf of the Company and spoke about "how we conduct our clinical trials at Alto," stating:

> We are unique in that we use a model that really relies on an in-house approach. ***And we often get the question, why don't we use CROs? And the answer to that is simple. Because we collect higher quality data by doing it in-house***. . . . We also have a highly trained team. All of our CRAs worked at CROs before they came to Alto. And once at Alto, they receive ongoing additional training that's specific to Alto and specific to our trials in psychiatry. And we have a really high retention rate with our CRAs and our entire team. ***It's actually the same team executing our Phase 2b trial that executed on our Phase 2a***. And you would never see that in a CRO. In fact, CROs have a notoriously high turnover rate of their CRAs, 25 to 35% over the past few years. We at Alto have had a zero voluntary turnover rate over the past three years. . . . The last one I'll talk about today is our actual approach to monitoring. We do things just like a CRO does in terms of traditional monitoring aspects. CROs really are about reviewing individual case report forms, an example of which is shown on the upper right here. At Alto, we do things with our own unique way. We're a very data-driven company. I'll get to that in a little bit. But we really focus on direct data entry with our sites and real-time data review. What this means is our CRAs are picking up data entry errors in real time. ***We do things like eligibility review that prevent inadvertent enrollment. And this is really a shift from reactive monitoring, which is really the industry norm, to more of a proactive approach so that we're picking up site issues earlier in the process.*** We also use a mix of on-site and remote risk-based monitoring. This is assessing what type of risk a site may have and spending more time with them if they need it. And we use independent external raters to confirm MDD as well as monitor rater performance. And Amit and Adam have both spoken to that a few times already. But we're using third parties to actually monitor confirm the MDD diagnosis before the patients are enrolled into the study, and we're using third parties to independently monitor the rater performance over the study conduct. This ensures we have another layer of independent oversight in addition to what we're doing internally. And we go deeper. . . . So we are monitoring how our CRAs are actually looking at the site data. And we have many metrics to look at that. This is just one. So that if an individual CRA falls off, we can pick that up pretty quickly, within a week or two, and go in and intervene

and support that.  The bottom one here is a plot that shows the reasons for screen failure across sites.  There are many reasons for screen failure.  We're just checking trends here, and we're able to compare those to the study averages, to the expected averages.  And if you see something abnormal in a site, you can go in and intervene.  These are two examples.  We're doing this across protocol divinations, concomitant medications, adverse events, such that we get this really comprehensive view of how a site is performing and can intervene very quickly if we pick up nuances.  And again, data-driven company really looking at metrics across sites to intervene.  And all of this is really scalable for phase three.  I think that's really important because we do this at the phase 2b level, but to upscale to phase three is going to be very simple for us.  ***At Alto, we have over 100 currently activated sites across our clinical trials, that we selected from three to 400 sites that we chose the very best that we want to work with.  On the Phase 2B study, we have 34 sites that have enrolled patients on that study. 25 of these are professional CNS sites.  Five of them are academic VA sites, and four are decentralized sites. This allows us to have a site blend that includes professional, experienced sites that know how to execute psychiatry studies***.  It expands our access to thought leaders and also to patient populations that we might not otherwise target.  And it expands our geographic reach such that we are including patients across the United States.  ***And all of these metrics set us up very well to pick up patient trends or site trends that really we can intervene on and ensure they do not become an issue for the site.  We know that we are enrolling real patients at sites that have high-quality data.***  So at the end of the study, we are confident that we have a well-executed, well balanced study.

198.    These statements were materially false and misleading and omitted to state material facts.  Specifically, it was materially false and misleading for Powell to state that Alto's insourced approach to clinical trials produced "high quality data," took "a proactive approach [to ensure that the Company] pick[ed] up site issues," "patient trends," and "site trends" to "ensure that they do not become an issue for the site" when, in reality, the new clinical trial sites that Alto had added to increase enrollment in the Phase 2b Trial were not equipped to evaluate participants' PK levels to ensure that they were taking ALTO-100 as directed.  Alto was thus not "taking a proactive approach" to ensure that site issues and patient trends did not negatively impact the outcomes of Alto's clinical trials.  It was also materially false and misleading for Powell to state that Alto's insourced approach to clinical trials ensured that the Company was "enrolling real patients" when, in reality, it led to

the enrollment of low quality patients. Specifically, the Company's significant difficulties enrolling qualified patients in the Phase 2b Trial caused it to advertise the Phase 2b Trial on Craigslist, pay participants to enroll, and allow doctors at Alto's clinical trial sites to recruit their own participants without oversight or approval from the Company. These efforts increased the risk that the Phase 2b Trial would be plagued by professional patients who were seeking a cash payout and not actually suffering from MDD (and thus unlikely to take ALTO-100 as directed). This, in turn, increased the risk that the Phase 2b Trial would fail. And that is exactly what happened. As Alto later admitted, the Phase 2b Trial failed—not because of anything to do with ALTO-100—but because of participants' non-compliance. As Defendant Etkin explained, the Phase 2b Trial was plagued by "a fairly large number of professional patients" who were not taking ALTO-100 as prescribed. Finally, Alto's enrollment issues also led to the Company enrolling, out of necessity, significantly more monotherapy participants than adjunctive participants. This too, increased the risk that the Phase 2b Trial would fail. And, again, that is precisely what happened. Alto has since disclosed that the adjunctive group of participants were "fully compliant" with taking ALTO-100 as directed while the monotherapy group was "far less compliant." According to Defendant Etkin, the adjunctive participants "are clearly [the] real patients who are coming in on a medication that they're already taking daily and are far more likely to be the target population just from a clinical perspective alone." Yet, because of the difficulties Alto faced enrolling qualified participants in the Phase 2b Trial, it was forced to enroll participants who were unlikely to be the "real patients" that would benefit from ALTO-100 and be part of the Company's "target population" from a clinical perspective.

## III.    Additional Allegations of the Exchange Act Defendants' Scienter

199.    As set forth above, the Exchange Act Defendants made a series of false and/or misleading statements or omissions, or failed to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, throughout the Class Period. As alleged herein, the Exchange Act Defendants acted with scienter because they knew or recklessly disregarded that the public documents and statements issued or disseminated in Alto's name were materially false and/or misleading; knew that such statements or documents would

be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth herein, the Exchange Act Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over and/or receipt and/or modification of the Company's allegedly materially false and misleading statements and omissions of material fact, and/or the Exchange Act Defendants' associations with the Company that made them privy to confidential and/or proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

200. The Exchange Act Defendants' scienter can be inferred because the statements and omissions that Lead Plaintiffs allege to be materially false or misleading concerned the core operations of the Company: its insourced approach to clinical trials and the Phase 2b Trial of its leading product, ALTO-100.

201. Alto's insourced approach to clinical trials was a core operation critical to the Company and that supposedly differentiated it from other drug development companies, who typically relied on CROs to run clinical trials, and supposedly allowed the Alto to generate higher quality data for less money than CROs and those competing companies. Following the IPO, the Exchange Act Defendants either were in possession of information regarding the significant difficulties that Alto was having enrolling qualified patients in the Phase 2b Trial and the increasingly risky recruitment efforts the Company employed to boost enrollment, as well as the attendant risks to the Phase 2b Trial, or were or were reckless in not knowing or failing to ascertain such facts when they made the statements and omissions complained of herein.

202. Likewise, as the Company's product candidate most advanced in development and—as the Company framed it—the first true test of the Company's unique Precision Psychiatry platform, ALTO-100 was part of Alto's core operations. Following the IPO, the Exchange Act Defendants either were in possession of information regarding the significant difficulties that Alto was having enrolling qualified patients in the Phase 2b Trial and the increasingly risky recruitment efforts the Company employed to boost enrollment, as well as the attendant risks to the Phase 2b

1    Trial, or were or were reckless in not knowing or failing to ascertain such facts when they made the

2    statements and omissions complained of herein.

3    203.    The Exchange Act Defendants also repeatedly spoke publicly, including to analysts

4    and investors, concerning the Company's insourced approach to clinical trials and about the Phase

5    2b Trial of ALTO-100, further underscoring the importance of these issues to the Company and the

6    Exchange Act Defendants' knowledge and familiarity with these topics.   Further, many of the

7    statements and omissions complained of herein were made in direct response to questions on these

8    very topics.

9    204.    Moreover, the Exchange Act Defendants had a motive to make the misstatements

10   and/or omissions complained of herein.   Following the IPO, Alto was still not a revenue-producing

11   company.   It had no products approved for commercial sale and had incurred substantial losses and

12   generated no revenue from product sales since its inception.   Specifically, as the Company stated in

13   the Registration Statement in connection with the IPO, Alto had incurred net losses of $27.7 million,

14   $9.2 million, and $25.1 million for the years ended December 31, 2022, December 31, 2021, and

15   the nine months ended September 30, 2023, respectively.   Alto's business model thus depended on

16   continued funding and financing, including continued access to the capital markets, all of which

17   would evaporate if the Company announced any issues or delays in the Phase 2b Trial of its leading

18   product candidate, ALTO-100.   Moreover, the higher Alto's stock price, the less dilution existing

19   shareholders (including Defendants Etkin and Smith, who were each significant shareholders of the

20   Company) would face as a result of these financing activities.   Insofar as the Exchange Act

21   Defendants could inflate and/or keep the price of Alto stock inflated, they could reasonably expect

22   that further access to the capital markets would be less costly.

23   205.    Alto chose to seek an IPO and enter the public markets during the relevant period.

24   Mere months before the IPO, on November 21, 2023, Alto had closed a Series C round of financing,

25   raising $45 million in what Alto described as an "oversubscribed" offering.   On information and

26   belief, Alto could have sought a Series D, Series E, or another round of financing, but accessed the

27   public capital markets, complete with their disclosure regimes and requirements, instead.

28

206.    In a January 10, 2023 press release announcing the Phase 2a Trial results, Alto stated that it "anticipated to readout" the Phase 2b Trial results "in the first quarter of 2024." Instead of results, investors got an IPO, without any insight into the Phase 2b Trial.

207.    Having then completed an IPO, still without results from the Phase 2b Trial, the Exchange Act Defendants had the motive and opportunity to keep Alto's stock price inflated throughout the Class Period by reassuring investors that the Phase 2b Trial was reliable and supported by Alto's insourced approach to clinical trials, and by failing to disclose that Alto's efforts to enroll qualified patients in the Phase 2b Trial were still unsuccessful and, as a result, it was resorting to increasingly risky recruitment practices.

208.    The statements of several former employees of Alto further support a strong inference of scienter.

209.    According to CW-1, enrollment in the Phase 2b Trial was extraordinarily difficult at multiple points during the trial, and especially during the summer of 2023, when there was a period of six weeks to two months in which CW-1 received zero potential participants with whom to conduct secondary screenings. As CW-1 put it: "They would screen people, but none of them qualified"; Alto "didn't have any subjects"; and the "recruitment team wasn't able to find patients." According to CW-1, during the periods of stagnant enrollment, Alto contracted with third-party vendors to market the Phase 2b Trial to participants for enrollment specifically at the Jackson, Mississippi decentralized trial site. CW-1 said that "every time there was something wrong," Alto's management would "force the board to invest in a third party" to help find participants. But that also did not appear to yield participants, according to CW-1, because none of the participants CW-1 interviewed had been referred by those third parties. Furthermore, according to CW-1, Alto allowed the individual running the decentralized trial site in Jackson, Mississippi, who did not work for the Company, to begin recruiting their own participants into the Phase 2b Trial.

210.    CW-3 confirmed that trial participants assigned to the Jackson, Mississippi site engaged in the Phase 2b Trial entirely remotely, with screening and follow-up interviews conducted remotely and the patient never visiting the trial site. CW-3 stated that Alto's screening process took

patients at their word about their medical histories and diagnoses and that Alto did not require any medical records or proof of diagnosis for a patient to be eligible for the Phase 2b Trial. CW-3 also reported that Alto advertised the Phase 2b Trial on Craigslist and paid participants to enroll.

211. According to CW-5, Alto held an "all-hands" meeting shortly before their departure from the Company in August 2023. This all-hands meeting was led by Alto's CEO, Defendant Etkin, who expressed frustration that the Phase 2b Trial was trending differently than the Phase 2a Trial. CW-5 remembers "them saying this is looking really different" and "they knew it was trending differently at that point."

212. According to CW-5, Defendant Etkin "was more frustrated around that time" and recalled a statement to the effect of: "We really need to go through this biomarker data, there are some inconsistencies. We all need to sort through that together." These issues, according to CW-5, were connected to "the decentralized trial" in Jackson, Mississippi, and Defendant Etkin directed his ire toward the team assigned to that site to enroll and work with remote trial participants. "He got on us," CW-5 said. "We couldn't do anything right. Everything was wrong."

213. According to CW-4, when the results of the Phase 2b Trial were announced, Alto held an "all-hands" meeting and flew in Company leaders, including co-founder Dan Segal and Defendant Smith. At the all-hands meeting, Alto displayed a slide presentation that showed that the decentralized trial site in Jackson, Mississippi, had the worst numbers among all clinical trial sites. "This site in particular had bad numbers," CW-4 said. CW-4 further explained that there were questions from employees at the meeting about whether the poor data from the Jackson, Mississippi trial site was due to "serial trial participants" who were merely seeking the cash payout for participating in the Phase 2b Trial and had thus lied to meet the trial criteria, throwing off the data. Alto employees at the all-hands meeting further commented amongst themselves that, if the Jackson, Mississippi trial site had not been included, the results would have been much better. Based on their review of the data displayed in the slide presentation, CW-4 confirmed that the results from the decentralized site in Jackson, Mississippi dragged down the overall results of the Phase 2b Trial.

1    **IV.    Presumption of Reliance**

2        214.    Lead Plaintiffs intend to rely upon the presumption of reliance established by the

3    fraud-on-the-market doctrine in that, among other things: (1) the Exchange Act Defendants made

4    public misrepresentations or failed to disclose material facts during the relevant time period; (2) the

5    omissions and misrepresentations were material; (3) Alto's common stock traded in an open and

6    efficient market; (4) the misrepresentations alleged would tend to induce a reasonable investor to

7    misjudge the value of Alto common stock; and (5) Lead Plaintiffs and other members of the

8    Exchange Act Class purchased or acquired Alto common stock between the time when the Exchange

9    Act Defendants misrepresented or failed to disclose material facts and the time when the true facts

10   were disclosed, without knowledge of the misrepresented or omitted facts.

11       215.    The market for Alto common stock was open, well-developed and efficient at all

12   relevant times.  As a result of the aforementioned materially false and misleading statements, Alto

13   common stock traded at artificially inflated prices during the relevant period.  The artificial inflation

14   dissipated as the market learned of the nature and extent of the Exchange Act Defendants'

15   misrepresentations regarding the Phase 2b trial of ALTO-100 and Alto's insourced approach to

16   clinical trials.

17       216.    At all relevant times, the market for Alto common stock was efficient for the

18   following reasons, among others: (1) Alto filed periodic reports with the SEC; (2) Alto common

19   stock met the requirements for listing, was listed and actively and highly traded on the New York

20   Stock Exchange, a highly efficient market, during the time that Lead Plaintiffs and other members

21   of the Exchange Act Class purchased or acquired Alto common stock; (3) several analysts followed

22   Alto, each of which wrote reports that were publicly available and entered the public marketplace;

23   and (4) Alto regularly communicated with public investors via established market communication

24   mechanisms, including through regular disseminations of press releases on the major news wire

25   services and through other wide-ranging public disclosures, such as communications with the

26   financial press, securities analysts and other similar reporting services.  As a result, the market for

27

28

Alto common stock promptly digested current information regarding Alto from all publicly available sources and such information was reflected in Alto's stock price.

217.    Under these circumstances, Lead Plaintiffs and other members of the Exchange Act Class suffered similar injury through their purchases of Alto common stock at artificially inflated prices, and a presumption of reliance applies.

218.    In addition, or in the alternative, a Class-wide presumption of reliance is appropriate pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that the Exchange Act Defendants had a duty to disclose.

**V.    Loss Causation**

219.    As the truth about the Exchange Act Defendants' fraud was revealed to the market, the price of Alto common stock plummeted, and Lead Plaintiffs and other members of the Exchange Act Class suffered significant investment losses.

220.    The Exchange Act Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and other members of the Exchange Act Class.  During the time that Lead Plaintiffs and other members of the Exchange Act Class purchased Alto common stock, the market price of that common stock was artificially inflated as a direct result of the Exchange Act Defendants' materially false and misleading statements. Specifically, Defendants' statements regarding the Phase 2b trial of ALTO-100 and Alto's insourced approach to clinical trials caused the price of Alto common stock to be artificially inflated.

221.    As the truth emerged regarding the false and misleading nature of the Exchange Act Defendants' statements regarding the Phase 2b Trial of ALTO-100 and Alto's insourced approach to clinical trials, and as the foreseeable risks previously concealed by the Exchange Act Defendants' material misrepresentations and omissions materialized, the price of Alto common stock plummeted and Lead Plaintiffs and other members of the Exchange Act Class were damaged.

222.    On October 22, 2024, after the market closed, Alto issued a press release announcing top-line results from the Phase 2b Trial.  As explained in the press release, the Phase 2b Trial "did

not meet its primary endpoint, assessed by a change from baseline in Montgomery-Åsberg Depression Rating Scale (MADRS), compared to placebo." Specifically, the "biomarker-defined MDD patient group treated with ALTO-100 did not demonstrate a statistically significant improvement in depressive symptoms compared to placebo." Moreover, "ALTO-100 did not demonstrate benefit over placebo on the pre=specified key secondary analyses."

223.    Alto's announcement of the top-line results of the Phase 2b Trial was a corrective disclosure and materialization of the foreseeable risk that the Exchange Act Defendants had previously concealed from the investing public, including Lead Plaintiffs and other members of the Exchange Act Class.

224.    The price of Alto common stock plummeted nearly 70% in response to this news, from a closing price of $14.53 on October 22, 2024, to a closing price of $4.36 on October 23, 2024.

225.    Analysts and media connected the massive decline in Alto's stock price to the news of the failure of the Phase 2b Trial.

226.    On October 22, 2024, after hours, *Bloomberg* reported that the price of Alto's common stock fell "after saying Phase 2b study of ALTO-100 in patients with major depressive disorder didn't meet its primary endpoint."

227.    On October 23, 2024, Wedbush analyst Laura Chico downgraded Alto common stock from Outperform to Neutral and lowered her price target from $29 to $4, expressly citing the failed Phase 2b Trial.

228.    *SeekingAlpha*, a website focused on investor-related news, also linked the decline in the price of Alto common stock to the failed Phase 2b Trial, running the headline: *Alto Neuroscience stock crashes amid failed study and Wedbush downgrade.*.

229.    *MT Newswires* likewise connected Alto's stock price decline to failure of the Phase 2b Trial, writing "Alto Neurosciences (ANRO) shares tumbled by over 62% after the company said a phase 2b study of ALTO-100 in patients with major depressive disorder failed to meet its primary endpoint compared with placebo."

230.    Trade press also linked Alto's stock price decline to the failure of the Phase 2b Trial. *BioPharmaDrive*'s headline read, "Alto hits new low as depression drug flunks key test," and stated that "investors may have lost some faith, as the biotech's shares were down by two-thirds Wednesday morning."

231.    Reporter Nick Taylor of *FierceBiotech* wrote in an October 23, 2024 article: "Alto Neuroscience hit a bum note in an early test of its precision neuropsychiatry model.  A phase 2b trial of Alto's lead drug candidate in depression missed its primary and key secondary endpoints, prompting investors to wipe 60% off the biotech's share price."

232.    *BioWorld* also connected the Phase 2b Trial failure to Alto's stock price decline, writing "[d]espite positive findings from an earlier trial, Alto Neuroscience Inc.'s BDNF-targeting candidate, ALTO-100, failed to best placebo in a phase IIb study in major depressive disorder, sending shares of the company to their lowest price since going public in a February 2024 IPO, as investors worried about readthrough to Alto's biomarker-based approach for treating psychiatric disorders."

233.    *FirstWord Pharma* also connected Alto's stock price decline to the Phase 2b Trial failure, writing "Alto Neuroscience lost more than half its value on Wednesday after the company reported that a Phase IIb study of its experimental drug ALTO-100 in patients with biomarker-defined major depressive disorder (MDD) failed to meet its primary endpoint. CEO Amit Etkin called the results "surprising and disappointing . . . sending shares down as much as 62%."

234.    *MedCity News* reported, under a headline of *Alto Neuroscience's Depression Trial Failure Sends Shares Into Downward Spiral*, that "[t]he Phase 2b failure of the drug, ALTO-100, comes nearly nine months after Mountain View, California-based Alto raised more than $128 million in an IPO priced at $16 per share.  Alto shares opened Wednesday at $5.15 each, down 64.5% from Tuesday's closing stock price."

235.    *BioSpace* also connected the Phase 2b Trial failure to the decline in the price of Alto common stock, writing "Alto Neuroscience's Phase IIb therapy has failed to improve symptoms of major depressive disorder compared to placebo, sending the biotech's shares down 60% in after-

market trading Tuesday evening." *Biospace* continued, "[t]he clinical failure comes nine months after Alto became one of the earliest **biotechs of 2024 to IPO**, raising $128.6 million in early February. The stunning failure of ALTO-100 brings back echoes of Acelyrin last year; it was one of the few biotechs to test the IPO waters in 2023, raising a massive $540 million, only to fail a clinical trial a few months later."

236. Unlike Alto, which fell nearly 70% on October 23, 2024, the S&P 500 declined by less than 1% on the same date (close to close). IBB, an ETF focused on the biotech industry, fell less than 1.5%. Both the S&P 500 and IBB fell an order of magnitude less on October 23, 2024, than Alto, indicating that market and industry factors did not cause the price decline.

237. After the Class Period, the Exchange Act Defendants admitted that, among individuals who actually took ALTO-100 as directed and had their PK levels tested, there was a *positive* response to ALTO-100. Thus, ALTO-100's efficacy was not a confounding factor in the failure of the Phase 2b Trial. While the Phase 2b Trial may have failed for multiple reasons, at least one of those reasons was, as the Exchange Act Defendants have since admitted, the quality of the participants in the Phase 2b Trial and the utility of Alto's clinical trial sites, topics about which the Exchange Act Defendants spoke about at length and made materially false and misleading statements and omissions.

238. Lead Plaintiffs' losses, as well as the losses of other members of the Exchange Act Class, were caused, at least in part, by the materialization of the concealed risk of Alto's enrollment of low quality participants in the Phase 2b Trial and the utility of Alto's clinical trial sites, even allowing for the possibility that there were additional contributing factors to the failure of the Phase 2b Trial.

**VI.    No Safe Harbor**

239. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made. Nor was it stated with respect to any

of the statements forming the basis of this Amended Complaint that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Exchange Act Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Alto who knew that those statements were false when made.

**VII. Class Action Allegations**

240. Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased or otherwise acquired Alto common stock between March 21, 2024, and October 22, 2024. The Exchange Act Class asserts claims only under Section 10(b) and Section 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Excluded from the Exchange Act Class are the Exchange Act Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which the Exchange Act Defendants have or had a controlling interest.

241. The members of the Exchange Act Class are so numerous that joinder is impracticable. Though the exact number of Exchange Act Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believe that there are at least thousands of members in the proposed Exchange Act Class. As of March 18, 2024, Alto had over 26,000,000 shares of common stock outstanding, which were actively traded on the New York Stock Exchange in an efficient market.

242. Lead Plaintiffs' claims are typical of the claims of the Exchange Act Class, as all Exchange Act Class members were and are similarly affected by the Exchange Act Defendants'

conduct.  Lead Plaintiffs and all members of the Exchange Act Class sustained damages as a result of the Exchange Act Defendants' wrongful conduct as alleged herein.

243.    Lead Plaintiffs will fairly and adequately protect the interests of Exchange Act Class members and have retained counsel competent and experienced in securities class action litigation and intend to pursue this action vigorously.  Lead Plaintiffs will fairly and adequately protect the interests of the Exchange Act Class and do not have any interests contrary to or in conflict with the Exchange Act Class.

244.    Common questions of law and fact exist as to all Exchange Act Class members and predominate over any questions solely affecting individual Exchange Act Class members.  Among the common questions of law and fact are:  (a) whether the Exchange Act Defendants violated the Exchange Act; (b) whether the Exchange Act Defendants omitted and/or misrepresented material facts; (c) whether the Exchange Act Defendants knew or recklessly disregarded that their statements were false; (d) whether the price of Alto common stock was artificially inflated during the Class Period; and (e) whether and to what extend the Exchange Act Class have sustained damages and the proper measure of damages.

245.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Exchange Act Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Exchange Act Class members to individually redress the alleged wrongs done to them.  Further, there will be no difficulty in managing this action as a class action.

**FOURTH CAUSE OF ACTION**

**Violations of Section 10(b) of the Exchange Act and**

**Rule 10b-5 Against the Exchange Act Defendants**

246.    Lead Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1-49 and 129-246 as if fully set forth herein.

247.    This cause of action is brought on behalf of the Exchange Act Class against the Exchange Act Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

248.    The Exchange Act Defendants both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements alleged herein to:  (1) deceive the investing public, including Lead Plaintiffs and other members of the Exchange Act Class, as alleged herein; (2) artificially inflate and maintain the market price of Alto common stock; and (3) cause Lead Plaintiffs and other members of the Exchange Act Class to purchase Alto common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Exchange Act Defendants took the actions set forth above.

249.    The Exchange Act Defendants both directly and indirectly:  (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit on the purchasers of Alto common stock in an effort to artificially inflate and maintain the market prices for Alto common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

250.    By virtue of their high-level positions at Alto, Defendants Etkin and Smith were authorized to make public statements, and made public statements, on Alto's behalf.  These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of Alto's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

251.    In addition, the Exchange Act Defendants had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading so that the market price of Alto common stock would be based on truthful, complete, and accurate information.

252.    The Exchange Act Defendants acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them.  The Exchange Act Defendants' material misrepresentations and omissions were done knowingly and/or recklessly and had the effect of concealing the truth with respect to the Phase 2b trial of ALTO-100 and Alto's insourced approach to clinical trials.  By concealing these material facts from investors, the Exchange Act Defendants supported the artificially inflated price of Acadia common stock.

253.    The dissemination of the materially false and misleading information, as set forth above, artificially inflated the market price of Alto common stock.  In ignorance of the fact that the market prices were artificially inflated and relying directly or indirectly upon the materially false and misleading statements made by the Exchange Act Defendants, and upon the integrity of the market in which Alto's common stock trades, or upon the absence of material adverse information that was recklessly disregarded by the Exchange Act Defendants but not disclosed in public statements by the Exchange Act Defendants, Lead Plaintiffs and other members of the Exchange Act Class purchased Alto common stock at artificially inflated prices.  As a disclosure was issued and the foreseeable risks previously concealed by the Exchange Act Defendants' material misstatements and omissions materialized, the price of Alto common stock substantially declined.

254.    At the time of the material misrepresentations alleged herein, Lead Plaintiffs and other members of the Exchange Act Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiffs and other members of the Exchange Act Class known the truth with respect to the Phase 2b trial of ALTO-100 and Alto's insourced approach to clinical trials, which were concealed by the Exchange Act Defendants, Lead Plaintiffs and other members of the Exchange Act Class would not have purchased Alto common stock, or if they had purchased such common stock, they would not have done so at the artificially inflated prices that they paid.

255.    By virtue of the foregoing, the Exchange Act Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

256.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Lead Plaintiffs and other members of the Exchange Act Class have suffered damages in connection with their transactions in Alto common stock.

**FIFTH CAUSE OF ACTION**

**Violations of Section 20(a) of the Exchange Act**

**Against Defendants Etkin and Smith**

257.    Lead Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1-49 and 129-246 as if fully set forth herein.

258.    This cause of action is brought on behalf of the Exchange Act Class against Defendants Etkin and Smith for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

259.    Defendants Etkin and Smith were controlling persons of Alto within the meaning of Section 20(a) of the Exchange Act.

260.    By virtue of their high level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, Alto's operations and/or knowledge or reckless disregard of the materially false and misleading statements filed with the SEC or disseminated to the investing public, Defendants Etkin and Smith had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of Alto.

261.    Defendants Etkin and Smith were provided with or had unlimited access to copies of Alto's press releases, scripts, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Defendants Etkin and Smith had direct and supervisory involvement in the day-to-day operations of Alto and therefore are presumed to have had the power to control or influence the particular false and misleading statements giving rise to the securities violations alleged herein.

262.    Defendants Etkin and Smith culpably participated in Alto's violation of Section 10(b) and Rule 10b-5 with respect to the Third Cause of Action.

263.    By reason of the conduct alleged in the Third Cause of Action, Alto is liable for

violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Defendants Etkin and Smith are liable pursuant to Section 20(a) based on their control of Alto.

264.    Defendants Etkin and Smith are liable for the aforesaid wrongful conduct and are liable to Lead Plaintiffs and other members of the Exchange Act Class for the substantial damages suffered in connection with their purchases of Alto common stock.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs, on behalf of themselves and the Classes of persons similarly situated, respectfully request relief and judgment as follows:

1.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Lead Plaintiffs as the representatives of the Securities Act Class and Exchange Act Class;

2.    Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Securities Act Class and Exchange Act Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

3.    Awarding Lead Plaintiffs and the Securities Act Class and Exchange Act Class their reasonable costs and expenses incurred in this action, including attorneys' and expert fees; and

4.    Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury as to all issues so triable.

1

DATED:  January 23, 2026

Respectfully submitted,

2

**ROLNICK KRAMER SADIGHI LLP**

3

4

By:        /s/ *Lawrence M. Rolnick*

5

Lawrence M. Rolnick (*pro hac vice*)
Marc B. Kramer (*pro hac vice*)

6

Nicole T. Castiglione (*pro hac vice*)
**ROLNICK KRAMER SADIGHI LLP**

7

PENN 1, Suite 3401
One Pennsylvania Plaza

8

New York, New York 10119

9

Tel.: 212.597.2800
lrolnick@rksllp.com

10

mkramer@rksllp.com
ncastiglione@rksllp.com

11

12

James A. Long (Bar No. 326404)
1401 21st Street, Ste. 5801

13

Sacramento, CA 95811
Tel.: (315) 209-3000

14

15

*Court-Appointed Lead and Local
Counsel for the Class*

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on January 23, 2026, I caused the foregoing to be electronically filed

3

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to

4

the email addresses denoted on the Electronic Mail Notice List.

5

6

*/s/ Lawrence M. Rolnick*
Lawrence M. Rolnick

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT