**ROLNICK KRAMER SADIGHI LLP**
Lawrence M. Rolnick (*pro hac vice*)
Marc B. Kramer (*pro hac vice*)
Nicole T. Castiglione (*pro hac vice*)
PENN 1, Suite 3401
One Pennsylvania Plaza
New York, New York 10119
Tel.: 212.597.2800
Email: lrolnick@rksllp.com
mkramer@rksllp.com
ncastiglione@rksllp.com

*Co-Lead Counsel for Co-Lead Plaintiffs and the Proposed Classes*

**POMERANTZ LLP**
Omar Jafri (*pro hac vice*)
Christopher P.T. Tourek (*pro hac vice*)
Jaime D. Nolasco Esquivel (*pro hac vice*)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel.: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: ojafri@pomlaw.com
ctourek@pomlaw.com
jnolasco@pomlaw.com

*Co-Lead Counsel for Co-Lead Plaintiffs and the Proposed Classes*

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
E-mail: jpafiti@pomlaw.com

*Co-Lead Counsel for Co-Lead Plaintiffs and the Proposed Classes*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| NATHAN FELDMAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ALTO NEUROSCIENCE, INC., AMIT ETKIN, NICHOLAS SMITH, JESSICA POWELL, PO YU CHEN, CHRISTOPHER NIXON COX, CHRIS DIMITROPOULOUS, ANDREW DREYFUS, MICHAEL LIANG, AARON N.D. WEAVER, and GWILL YORK,<br><br>Defendants. | Case No. 5:25-cv-06105-NW<br><br>CLASS ACTION<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**


TABLE OF CONTENTS ........ i

TABLE OF ABBREVIATIONS AND DEFINITIONS ........ iii

NATURE OF THE ACTION ........ 1

JURISDICTION AND VENUE ........ 6

PARTIES ........ 7

FACTS COMMON TO ALL CLAIMS ........ 10

I. Background ........ 10

A. Alto's Business and Operations ........ 10

B. MDD Represents a Multi-Billion Dollar Market Opportunity ........ 11

C. The FDA's Approval Process ........ 12

D. Defendants Conduct High-Stakes Clinical Trials to Validate ALTO-100 for MDD ........ 13

II. Alto's C-Suite Drove Enrollment Pressure and Etkin Acknowledged Concerns About the Remote Sites Before Alto Went Public ........ 16

III. Alto Failed to Conduct Basic Verification to Ensure Real Participants Enrolled in Phase 2b ........ 18

IV. Multiple CWs Corroborate that the Remote Sites Were More Likely to Enroll Participants Who Did Not Have MDD and Were Unable to Confirm Compliance ........ 20

V. Alto Relied on Third Parties to Fill Enrollment Gaps ........ 21

VI. Capitalizing on Positive Investor Sentiment Generated by Phase 2a, Alto Launched an IPO ........ 22

FACTS ALLEGED WITH RESPECT TO COUNTS I, II, AND III ........ 22

I. Defendants Violated the Securities Act by Omitting Material Information from the Defective Registration Statement ........ 22

II. The Defective Registration Statement Also Violated SEC Regulation S-K ........ 27

SECURITIES ACT CLASS ACTION ALLEGATIONS ........ 29

COUNT I

(Against Defendants Alto, Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York for Violations of Section 11 of the Securities Act)....................31

COUNT II

(Against Defendant Alto for Violations of Section 12(a)(2) of the Securities Act)....................32

COUNT III

(Against Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York for Violations of Section 15 of the Securities Act) ....................33

ADDITIONAL FACTS ALLEGED ONLY WITH RESPECT TO COUNTS IV AND V ....................34

I. Defendants Etkin, Smith, and Powell Made Additional Misleading Statements....................34

II. The Truth Begins to Emerge ....................52

III. The Exchange Act Defendants Made Misleading Statements With Scienter ....................54

A. CW Accounts Are Indicative of Scienter ....................54

B. Etkin and Powell Made Statements Indicative of Scienter....................55

C. Post-Class Period Admissions and Developments....................57

D. Core Operations ....................61

E. Defendants' Coverup Enhances Scienter ....................62

F. The Exchange Act Defendants' Claimed Expertise Supports Scienter....................64

EXCHANGE ACT CLASS ACTION ALLEGATIONS ....................65

COUNT IV

(Against Defendants Alto, Etkin, Smith, and Powell for Violations of Section 10(b) of the Exchange Act And Rule 10b-5) ....................68

COUNT V

(Against Defendants Etkin, Smith, and Powell for Violations of Section 20(a) of the Exchange Act) ....................70

PRAYER FOR RELIEF....................70

DEMAND FOR TRIAL BY JURY ....................71

## TABLE OF ABBREVIATIONS AND DEFINITIONS

| Abbreviation | Definition |
|---|---|
| **2Q 2024 10-Q** | SEC Form 10-Q filed on August 13, 2024 |
| **2023 10-K** | SEC Form 10-K filed on March 21, 2024 |
| **2024 10-K** | SEC Form 10-K filed on March 20, 2025 |
| **Abdel** | Fadi Abdel |
| **Adjunctive or Adjunctive Population** | Patients on other medical treatments that took ALTO-100 |
| **Alto or the Company** | Alto Neuroscience, Inc. |
| **ALTO-100** | Alto's flagship drug candidate in the most advanced stage during the Class Period |
| **ANRO** | Alto's NYSE ticker symbol |
| **Beiter** | Lead Plaintiff Eileen Beiter |
| **Biomarker** | Observable characteristics of certain biological conditions |
| **Bishop** | Andrew Bishop |
| **CDO** | Chief Development Officer |
| **CEO** | Chief Executive Officer |
| **Centralized Site** | On-site specific locations that patients visited for Phase 2b |
| **CFO** | Chief Financial Officer |
| **Chen** | Po Yu Chen |
| **Class Period, Exchange Act Class** | March 18, 2024 through October 22, 2024, both dates inclusive |
| **Complaint or SAC** | Second Amended Complaint |
| **Cox** | Nixon Cox |
| **CRO or CROs** | Clinical Resource Organization |
| **C-Suite** | Alto's senior executives, including the CEO, CFO and CDO |

| | |
|---|---|
| **CW or CWs** | Confidential Witness or Confidential Witnesses |
| **Decentralized Trial Sites** | Remote sites for patients in Phase 2b |
| **Dimitropoulos** | Chris Dimitropoulos |
| **Dreyfus** | Andrew Dreyfus |
| **Defendants** | Alto and the Individual Defendants |
| **EEG** | Electroencephalogram |
| **Etkin** | Amit Etkin |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **Exchange Act Class** | Class consisting of all persons who purchased or otherwise acquired Alto's common stock between March 18, 2024 and October 22, 2024, both dates inclusive |
| **Exchange Act Defendants** | Alto, Etkin, Smith, and Powell |
| **FDA** | United States Food and Drug Administration |
| **Feldman** | Lead Plaintiff Nathan Feldman |
| **IPO** | Initial Public Offering |
| **Individual Defendants** | Etkin, Smith, Powell, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, York |
| **IND** | Investigational new drug |
| **Jackson, Mississippi** | A remote site located in Jackson, Mississippi that conducted Phase 2b for Alto |
| **Liang** | Michael Liang |
| **MADRS** | Montgomery-Åsberg Depression Rating Scale |
| **MDD** | Major Depressive Disorder |
| **Monotherapy or Monotherapy Population** | Patients not on any other anti-depressant that took ALTO-100 |
| **NIMH** | National Institute of Mental Health |

| | |
|---|---|
| **NYSE** | New York Stock Exchange |
| **Phase 2a** | ALTO-100 Phase 2a Trial for MDD |
| **Phase 2b** | ALTO-100 Phase 2b Trial for MDD, a 6-week placebo-controlled study |
| **Plaintiffs or "Lead Plaintiffs"** | Special Situation Funds, Feldman, Beiter |
| **Powell** | Jessica Powell |
| **Prospectus** | February 5, 2024 Final Prospectus on Form 424(b)(4) |
| **Registration Statement** | January 12, 2024 Registration Statement on Form S-1 and two January 29, 2024 Amendments on Forms S-1/A |
| **SEC** | U.S. Securities and Exchange Commission |
| **Securities Act** | Securities Act of 1933 |
| **Securities Act Class** | a Class consisting of all persons who purchased or otherwise acquired Alto's common stock pursuant or traceable to the Company's Registration Statement filed with the SEC on Form S-1 on January 12, 2024, and twice amended on Form S-1/A on January 29, 2024, and the body of which was incorporated into the final prospectus on Form 424(b)(4) filed on February 5, 2024 |
| **Securities Act Defendants** | Alto, Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, York |
| **Smith** | Nicholas Smith |
| **Special Situation Funds** | Lead Plaintiffs Special Situations Cayman Fund, L.P., Special Situations Fund III QP, L.P., Special Situations Life Sciences Fund, L.P. |
| **Weaver** | Aaron N.D. Weaver |
| **York** | Gwill York |

Lead Plaintiffs Special Situations Cayman Fund, L.P., Special Situations Fund III QP, L.P., Special Situations Life Sciences Fund, L.P. (collectively, the "Special Situations Funds"), Nathan Feldman ("Feldman"), and Eileen Beiter ("Beiter") (together with the Special Situations Funds, "Plaintiffs" or "Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Second Amended Complaint for Violations of the Federal Securities Laws (hereafter the "Complaint" or the "SAC") against Defendants (as defined below), allege the following, based upon personal knowledge as to Plaintiffs and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of conference calls Defendants held with analysts and investors, any public announcements made by the Defendants, Defendants' filings with the United States Securities and Exchange Commission ("SEC"), wire and press releases published by and regarding Alto Neuroscience, Inc. ("Alto" or the "Company"), analysts' reports and advisories about the Company, articles about Defendants and their industry in financial publications or other news outlets, regulatory filings, interviews with knowledgeable former employees of the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of the following two Classes:

   a. Securities Act Class: a Class consisting of all persons who purchased or otherwise acquired Alto's common stock pursuant or traceable to the Company's Registration Statement filed with the SEC on Form S-1 on January 12, 2024, and twice amended on Form S-1/A on January 29, 2024 (hereafter the "Registration Statement"), and the body of which was incorporated into the final prospectus on Form 424(b)(4) filed on February 5, 2024 (hereafter the "Prospectus"). The Securities Act Class asserts claims under Sections 11, 12(a) and 15 of the Securities Act of 1933 ("Securities Act"). These claims are grounded in strict liability, and do not assert intent to defraud.

b. Exchange Act Class: a Class consisting of all persons who purchased or otherwise acquired Alto's common stock between March 18, 2024, and October 22, 2024, both dates inclusive. The Exchange Act Class asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

Excluded from the Classes are: Defendants, as defined herein, former and current officers, senior managers, and directors of Alto, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, related entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above.

2. Alto is a clinical-stage biopharmaceutical company that focuses on identifying biomarkers to develop neuropsychiatric products tailored to patients with specific cognitive impairments. Of particular relevance here, Alto conducted clinical trials for ALTO-100, a neuropsychiatric molecule that Alto claimed could be effective in treating Major Depressive Disorder ("MDD") in patients with poor verbal memory, which it considered a "biomarker," *see* ¶¶41, 47, 58, 61.

3. Alto is a very small company and has only 63 employees. It has no revenue and has yet to bring a single product to market. As of January 2023, Alto had already incurred net losses of more than $36 million and was anxious to raise money from investors. Viewing the potential efficacy of ALTO-100 as a key avenue to do so, Alto touted the results of a preliminary trial of ALTO-100 as "clear evidence of efficacy" and a "significantly greater change" in "patients with a biomarker profile" than "those without the biomarker profile," immediately advanced ALTO-100 to the pivotal Phase 2b Trial for MDD (hereafter "Phase 2b"), and then initiated an initial public offering ("IPO") to raise money from investors, which ultimately launched in February of 2024.

4. Prior to the closing of its IPO, however, the Company faced serious issues in Phase 2b that demonstrated to Defendants that it was unlikely to be successful. Specifically, Alto's senior executives internally expressed doubt about the Company's ability to meet enrollment requirements for Phase 2b and the compliance of Alto's "decentralized" (*i.e.*, remote) clinical trial sites, which comprised a significant proportion of the overall study population. These issues were multiplied by the completely inadequate controls the Company had put in place to monitor participants' compliance with study

protocol, such as failing to confirm that participants had a valid MDD diagnosis or were *ingesting* ALTO-100 at all during the study period.

5. Following the success of its preliminary test of ALTO-100, Phase 2b was meant to further test the drug's efficacy in treating patients with both MDD and verbal memory problems. A "pivotal" clinical trial is a study that is supposed to be sufficiently large and well-designed to provide evidence of a new drug's safety and efficacy to support regulatory approval. Here, a significant portion of the participants in Phase 2b participated in the trial entirely on a remote basis through Alto's decentralized sites. Even though Alto admitted knowing before Phase 2b that "forgotten/missed dose[s]" and "halting of the prescribed treatment" were "common protocol deviation[s]" when testing for ALTO-100,[1] Alto conducted its pivotal Phase 2b with virtually no safeguards to verify that its participants were taking the product, or even that they had in fact been medically diagnosed with MDD. Alto later admitted that it did not bother to check patients' medical records at the time of enrollment or run known pharmacokinetic tests to determine whether the patients enrolled in the trial even ingested ALTO-100. Multiple Confidential Witnesses ("CWs") confirm that Alto blindly took patients at their word throughout the Class Period, although it knew or recklessly disregarded that many were professional patients and therefore incentivized to give responses that would entitle them to continue in the trial whether truthful or not.

6. Two well-placed CWs have confirmed that, well before Alto went public, the Company's senior executives themselves expressed concerns both with Alto's ability to enroll patients in Phase 2b as well as with the compliance of the decentralized or remote sites. These critical facts of serious concerns were concealed from investors in the defective Registration Statement filed to take the Company public on February 2, 2024, even though the SEC rules on what must be disclosed in a registration statement specifically require issuers to disclose items bearing on whether historical performance (the preliminary test) was likely to be consistent with future results (Phase 2b).

---

[1] *See* ALTO NEUROSCIENCE, INC., *An Open-Label Study of ALTO-100 in Adults with Major Depressive Disorder and/or Posttraumatic Stress Disorder*, Protocol No. ALTO-100-001 Amendment 1 (May 31, 2022) https://cdn.clinicaltrials.gov/large-docs/32/NCT05117632/Prot_SAP_000.pdf, at 55.

7. Enrollment was a critical issue because, before Alto's IPO, the United States Food and Drug Administration ("FDA") had already asked the Company to expand Phase 2b from 200 to 266 patients. The FDA's push to expand the trial size created intense pressure on Alto and its employees to enroll qualified patients, which, according to CW2, Alto executives internally expressed doubt about their ability to meet.

8. The defective Registration Statement did not adequately disclose the specific risks the Company faced and which Alto's senior management internally expressed concerns about. Instead, the defective Registration Statement falsely told investors that Alto's clinical trials were run with the highest emphasis on quality and efficiency, when in fact they were compromised by several shortcuts. The Registration Statement also misleadingly represented the Company's risks as being no different than those faced by any biopharmaceutical company, when in fact they were far more acute because of the shortcuts Alto took and problems with Phase 2b that existed at the time of the IPO. Specifically, it described generic hypothetical risks to enrollment, the decentralized sites, and other aspects of clinical trials. But, unlike most biopharmaceutical companies, these risks had already started to materialize at Alto before the defective Registration Statement became effective.

9. SEC regulations required the Defendants who signed the defective Registration Statement to assess in conjunction with management whether concerns about enrollment and the decentralized sites could adversely impact Alto's business, and to affirmatively disclose those specific concerns. Specifically, the SEC requires that "[t]he discussion and analysis must focus specifically on material . . . uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results. . . ." Even if these Defendants could not determine whether those known risks would necessarily materialize, SEC regulations required all known uncertainties and adverse trends to be assessed and disclosed unless it was affirmatively determined that they would be unlikely to cause future operating results to be inconsistent with past performance to a material degree. Nothing in the public record remotely suggests that any such determination was made, let alone disclosed.

10. After the Company went public, the concealed risks continued to materialize. Multiple CWs confirm that Alto continued to do almost nothing to verify that participants in the trial had actually

been diagnosed with MDD, and used a series of unreliable tools to recruit potential patients as the conditions became more desperate. Specifically, Alto advertised on social media and other forums to recruit patients for Phase 2b, paid patients to participate in the trial, considered increasing the payments to boost enrollment, employed third parties to advertise to and recruit patients, allowed third parties to review eligibility, and had an even more lax screening process for decentralized patients in particular. Alto also set up only a small number of trial sites to evaluate whether patients in Phase 2b actually took ALTO-100, which thwarted the Company's ability to assess compliance with trial protocols in real time. These problems were especially acute in a remote site located in Jackson, Mississippi, which former Alto employees described as "the worst site" and a complete "shit show" and where participants were being screened and enrolled in Phase 2b with limited oversight from the Company. These problems were deepened by Alto's decision to turn a blind eye to whether patients in Phase 2b were even complying with the treatment protocol in the first place.

11. Between March 18, 2024, and October 22, 2024, or during the Exchange Act Class Period, the misrepresentations became egregious. The Defendants who are alleged to have violated the Exchange Act claimed that they had "left no stone unturned" and could think of nothing that gave them pause about Phase 2b. They falsely claimed to watch "every [clinical] site and every patient like a hawk[,]" when the opposite was true for (at least) the decentralized sites and patients. They claimed to monitor clinical sites proactively, in real time, to intervene and prevent problems from occurring rather than reactively like companies with less robust monitoring capabilities. They also continued to tout high quality data and misrepresented the risks to Phase 2b as purely hypothetical, like those faced by any biopharmaceutical company, when in fact those risks had already materialized.

12. On October 22, 2024, the truth concealed by Alto and the Defendants who violated the Exchange Act began to emerge when Alto announced in a press release that Phase 2b had failed to meet its primary endpoint. On this news, the price of Alto's common stock fell by nearly 70% from its previous day's closing price of $14.53 to close at $4.36 on October 23, 2024. The price of Alto's common stock declined again the next trading day to close at $4.13 on October 24, 2024. Alto then promptly abandoned the development of ALTO-100 to treat MDD.

13. After the Exchange Act Class Period ended, Alto and its Chief Executive Officer ("CEO") corroborated the CW accounts described in this Complaint. They publicly confirmed that Phase 2b failed because Alto recruited professional patients, *i.e.*, those interested in financial benefits and disinterested in participating in the clinical trial. They also conceded that the failure to screen professional patients was caused by a failure to check medical records and urine samples, and was exacerbated by "misconduct" at decentralized sites, heavy recruitment on social media, and allowing third parties to screen patients. Notably, two CWs confirm that Alto's CEO internally admitted concerns both about enrollment as well as the decentralized sites before the Exchange Act Period commenced.

14. The Exchange Act Defendants' actual knowledge or reckless disregard of the truth is further bolstered by their own statements, positions and experience, and the core operations inference. Attempts to intimidate or threaten witnesses who either cooperated or could cooperate with Lead Plaintiffs' investigation into the claims raised in this Complaint only strengthen an inference of wrongdoing.

15. As a result of Defendants' wrongful acts and omissions, and the consequent precipitous decline in the market value of Alto's securities, Lead Plaintiffs and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16. The claims asserted herein arise under and pursuant to §§ 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77o), and §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n and 78t(a)) and Rules 10b-5 promulgated thereunder by the SEC (17 C.F.R. §§ 240.10b-5, 240.14a-9).

17. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331, § 22 of the Securities Act, and § 27 of the Exchange Act.

18. Venue is proper in this District pursuant to § 22 of the Securities Act, (15 U.S.C. § 77v), § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District. Alto has its principal place of business in this District and Defendants committed tortious acts and transacted business in this District.

19. In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange.

**PARTIES**

20. Lead Plaintiff Special Situations Cayman Fund, L.P., as set forth in the certification accompanying its Motion for Appointment as Lead Plaintiff (ECF No. 21-2), incorporated by reference herein, purchased Alto common stock during the Class Periods and 13,500 shares of Alto common stock pursuant to the IPO. Special Situations Cayman Fund, L.P. is a limited partnership organized under the laws of Delaware and is part of a larger family of Special Situations Funds having a place of business at 527 Madison Avenue, Suite 2600, New York, New York 10022.

21. Lead Plaintiff Special Situations Fund III QP, L.P., as set forth in the certification accompanying its Motion for Appointment as Lead Plaintiff (ECF No. 21-2), incorporated by reference herein, purchased Alto common stock during the Class Periods and 46,500 shares of Alto common stock pursuant to the IPO. Special Situations Fund III QP, L.P. is a limited partnership organized under the laws of Delaware and is part of a larger family of Special Situations funds having a place of business at 527 Madison Avenue, Suite 2600, New York, New York 10022.

22. Lead Plaintiff Special Situations Life Sciences Fund, L.P., as set forth in the certification accompanying its Motion for Appointment as Lead Plaintiff (ECF No. 21-2), incorporated by reference herein, purchased Alto common stock during the Class Periods and 60,000 shares of Alto common stock pursuant to the IPO. Special Situations Life Sciences Fund, L.P. is a limited partnership organized under the laws of Delaware and is part of a larger family of Special Situations funds having a place of business at 527 Madison Avenue, Suite 2600, New York, New York 10022.

23. Lead Plaintiff Feldman purchased or otherwise acquired Alto's common stock at artificially inflated prices during the Class Periods, as described in Mr. Feldman's previously filed Certification (ECF No. 25-3) and Declaration (ECF No. 25-4), and he was damaged upon the revelation of the alleged corrective disclosures and/or materialization of concealed risks.

24. Lead Plaintiff Beiter purchased or otherwise acquired Alto's common stock at artificially inflated prices during the Exchange Act Class Period, as described in Ms. Beiter's previously filed Certification (ECF No. 25-3) and Declaration (ECF No. 25-4), and she was damaged upon the revelation of the alleged corrective disclosures and/or materialization of concealed risks.

25. Defendant Alto is a Delaware corporation with principal executive offices located at 650 Castro Street, Suite 450, Mountain View, California 94041. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ANRO."

26. Defendant Amit Etkin ("Etkin") is Alto's President, CEO, and Chair of the Company's Board of Directors, and served in those positions during the entirety of the relevant period. Etkin signed Alto's defective Registration Statement and its Annual Reports filed with the SEC on Form 10-K.

27. Defendant Nicholas Smith ("Smith") is Alto's Chief Financial Officer ("CFO") and Chief Business Officer and served in those positions during the entirety of the relevant period. Smith signed Alto's defective Registration Statement and its Annual Reports filed with the SEC on Form 10-K.

28. Defendant Jessica Powell ("Powell") is Alto's Chief Development Officer ("CDO") and served in that position during the entirety of the relevant period.

29. Defendant Po Yu Chen ("Chen") was a Director of Alto. Chen signed Alto's defective Registration Statement and, as a member of Alto's Board of Directors, exercised informed oversight over the Company's risk management processes.

30. Defendant Christopher Nixon Cox ("Cox") was a Director of Alto. Cox signed Alto's defective Registration Statement and, as a member of Alto's Board of Directors, exercised informed oversight over the Company's risk management processes.

31. Defendant Chris Dimitropoulos ("Dimitropoulos") was a Director of Alto. Dimitropoulos signed Alto's defective Registration Statement and, as a member of Alto's Board of Directors, exercised informed oversight over the Company's risk management processes.

32. Defendant Andrew Dreyfus ("Dreyfus") was a Director of Alto. Dreyfus signed Alto's defective Registration Statement and, as a member of Alto's Board of Directors, exercised informed oversight over the Company's risk management processes.

33. Defendant Michael Liang ("Liang") was a Director of Alto. Liang signed Alto's defective Registration Statement and, as a member of Alto's Board of Directors, exercised informed oversight over the Company's risk management processes.

34. Defendant Aaron N.D. Weaver ("Weaver") was a Director of Alto. Weaver signed Alto's defective Registration Statement and, as a member of Alto's Board of Directors, exercised informed oversight over the Company's risk management processes.

35. Defendant Gwill York ("York") was a Director of Alto. York signed Alto's defective Registration Statement and, as a member of Alto's Board of Directors, exercised informed oversight over the Company's risk management processes.

36. The Defendants identified in Paragraphs 26 through 35 are sometimes referred to herein collectively as the "Individual Defendants." Alto and the Individual Defendants are sometimes collectively referred to herein as the "Defendants." Alto, Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York are sometimes referred to as the "Securities Act Defendants." Alto, Etkin, Smith and Powell are sometimes referred to as the "Exchange Act Defendants."

37. The Individual Defendants possessed the power and authority to control the contents of Alto's SEC filings, press releases, and/or other market communications. The Securities Act Defendants were provided with copies of Alto's defective Registration Statement alleged herein to be materially false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or to cause it to be corrected.

38. Because of their positions with Alto, and their access to material information available to them but not to the public, the Exchange Act Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the investing public, and that the representations being made were materially false and misleading and omitted to state material facts.

39. Accordingly, Defendants are liable for the materially false and misleading statements and omissions pleaded herein.

## FACTS COMMON TO ALL CLAIMS

### I. Background

#### A. Alto's Business and Operations

40. Alto is a clinical-stage biopharmaceutical company that focuses on the development of neuropsychiatric products tailored to specific patient populations. Etkin founded the Company in 2019. Etkin is an expert in neuropsychiatry, a branch of medicine that seeks to diagnose, treat, and prevent mental disorders. Specifically, Alto focuses on identifying brain-based biomarkers it claims are particularly responsive to the products the Company is attempting to develop.

41. Biomarkers are observable characteristics of certain biological conditions. For example, poor verbal memory, such as the ability to recall lists of unrelated words, is the biomarker for patients Alto expected to benefit from ALTO-100. Alto claims that treatments based on biomarker recognition can be more effective than the trial-and-error approach common in modern medicine.

42. Alto claims that it eschews the use of traditional clinical resource organizations, or "CROs," in favor of conducting its clinical trials entirely in-house "using a team of clinical operations experts . . . that engage directly with clinical trial sites and provide clinical monitoring, oversight, and support to ensure trials are run with the highest emphasis on quality and efficiency." Alto claims further that this "insourced model" not only "results in higher quality clinical and biomarker data," but also "support[s] decentralized clinical trials" with "broader demographic and geographic reach" and the potential for "large-scale commercial dissemination of [its] technologies."

43. The Company generated no revenue during the Class Period or in the year before the Class Period, as it admitted in its Form 10-K filed on March 21, 2024 (the "2023 10-K") and Form 10-K filed on March 20, 2025 ("the 2024 10-K"), when it told investors, "[w]e have no products approved for commercial sale and have not generated any revenue from product sales to date. As a result, we are not profitable, have incurred substantial losses in each period since our inception, and we expect to incur significant losses for the foreseeable future." ALTO-100 was the Company's flagship drug candidate in the most advanced stage during the Class Period. The Company also had no drugs approved by the FDA during the Class Period, making it entirely dependent on investors to fund its operations until it could bring a product to market.

**B. MDD Represents a Multi-Billion Dollar Market Opportunity**

44. MDD, also known as clinical depression, is a mood disorder that causes a persistent low or depressed mood and a loss of interest in activities people once enjoyed, impacting how people feel, think, and behave, and can lead to a variety of emotional and physical problems. The symptoms of MDD include, but are not limited to, feeling sad or hopeless, an increase or decrease in appetite, trouble sleeping, and low energy or fatigue. MDD is one of the most common mental health conditions. According to the National Institute of Mental Health ("NIMH"), an estimated 21 million U.S. adults, or 8.3% of all adults in the United States, have had at least one episode related to MDD. According to NIMH, an estimated 14.5 million U.S. adults, or 5.7% of all adults in the United States, have experienced at least one major depressive episode with severe impairment in a year.

45. As the Company acknowledged in its 2023 10-K, mental health is one of the largest drivers of U.S. healthcare spending, with an estimated $280 billion spent on mental health services in 2020, representing an increase of over 60% over the prior decade. Prescription data also shows that approximately 13% of adults in the United States are on antidepressant drugs. Consequently, the market to treat MDD is massive and presented a game-changing opportunity for Alto. Nevertheless, clinical testing of individuals with neuropsychiatric disorders, including MDD, can be difficult because, as Alto explained in the Registration Statement, they "constitute a vulnerable patient population and may withdraw from the clinical trial if they are not experiencing improvement in their underlying disease or condition."

46. Indeed, analysts covering Alto during the Class Period noted that if ALTO-100 for MDD was commercialized, it "could lead to a >$2.5B[illion] peak sales opportunity." *See* Brian P. Skorney, Luke P. Herrmann, and Charles A. Moore, *Alto Neuroscience, Inc. (ANRO): 1Q24 Print Straightforward, Awaiting 2H24 Phase 2b ALTO-100 Results*, BAIRD EQUITY RESEARCH, at 3.

47. According to the Company, approximately 40% of patients with MDD have the biomarker for poor verbal memory, which is predictive of a better response to treatment with ALTO-100. This meant that, should ALTO-100 succeed in its clinical trials, it would have been uniquely poised to address MDD and corner the lucrative MDD market, creating a massive revenue opportunity for the Company.

**C. The FDA's Approval Process**

48. In the United States, the FDA regulates drugs under the Federal Food, Drug, and Cosmetic Act, and its implementing regulations, pursuant to which no pharmaceutical product, including drugs like ALTO-100, may be commercially marketed to the public, and, in turn, generate revenue from sales, without prior approval from the FDA.

49. Congress legislated broad authority to the FDA to regulate the sale of pharmaceuticals, 21 U.S.C. § 321(g)(1), and in doing so, implemented the FDA's "Mission" to require "protect[ing] the public by ensuring that … drugs are safe and effective." 21 U.S.C. § 393(b)(2)(B).

50. Untested drugs require premarket approval of safety and effectiveness before they may be "introduce[d] or deliver[ed] for introduction into interstate commerce." 21 U.S.C. § 355(a), (d). Any such approval process is rigorous, lengthy, and under the purview of the FDA's strictures.

51. A pharmaceutical company must first submit an investigational new drug ("IND") application that outlines preclinical study results and proposed phases of human clinical trials. There are typically three phases, each of which must be executed successfully before the new drug can undergo FDA review and approval. 21 C.F.R. § 312.21.

52. Phase 1 clinical trials are the initial introduction of an IND into a small pool of humans, generally in the range of 20 to 80 test subjects. 21 C.F.R. § 312.21(a). Phase 1 clinical trials are typically focused on discovering the product's safety profile, designed to determine the metabolism and pharmacologic actions of the product in humans and the side effects associated with increasing doses. During Phase 1, sufficient information about the product's pharmacokinetics and pharmacological effects should be obtained to permit the design of well-controlled, scientifically valid, Phase 2 studies.

53. Once the safety profile is established and dosage selected, the product candidate typically progresses to Phase 2 testing. Phase 2 clinical trials usually involve larger patient populations than Phase 1 trials and are used to evaluate or conduct exploratory analysis of the product's efficacy for a particular indication or indications in patients with the disease or condition under study and to determine the common short-term side effects and risks associated with the IND. 21 C.F.R. § 312.21(b).

54. Phase 2 clinical trials are meant to be well controlled, closely monitored, and designed to provide sufficient evidence of preliminary efficacy for specific indications to warrant further

investigation. Indeed, Phase 2 is critical, as Phase 2 offers "preliminary evidence of drug efficacy by: 1) comparing the study drug with 'historical controls' from published case series or trials that established the efficacy of standard therapies, 2) examining different dosing arms within the trial, or 3) randomizing subjects to different arms (such as a control arm)." *See* Craig A. Umscheid, et al., "*Key Concepts of Clinical Trials: A Narrative Review*," *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC3272827.

55. Finally, if the IND has demonstrated sufficiently promising efficacy in a Phase 2 trial, sponsors move forward with confirmatory Phase 3 trials. Phase 3 clinical trials are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the product and to provide an adequate basis for marketing approval for widespread public use. 21 C.F.R. § 312.21(c). Phase 3 studies usually include an even further expanded patient population than Phase 2 trials (*e.g.*, from several hundred to several thousand subjects) and typically involve double-blinded comparisons with placebos.

56. With few exceptions, a pharmaceutical company that does not successfully complete each and every trial phase cannot seek the FDA's approval to market the medicine through a new drug application. ALTO-100 for MDD patients could not advance to Phase 3 trials because Phase 2b failed, and the Company abandoned clinical development of ALTO-100 for MDD patients altogether.

**D. Defendants Conduct High-Stakes Clinical Trials to Validate ALTO-100 for MDD**

57. ALTO-100 is intended to act in the hippocampus region of the brain to improve cognitive and mood symptoms in patients afflicted with MDD and other serious mental health issues.

58. After completing the Phase 1 trial for ALTO-100 in MDD, which measured the safety, tolerability, and pharmacological effects of the product, the Company then moved to Phase 2, which was intended to measure the efficacy of ALTO-100 in trial participants who had both MDD and poor verbal memory—the biomarker. The first step in Phase 2 was the ALTO-100 Phase 2a Trial (hereafter "Phase 2a"). It had 133 participants with a primary diagnosis of MDD. It was an open-label trial, *i.e.*, every patient received ALTO-100 and there was no blinding at all. All patients underwent pre-treatment biomarker testing.

59. Of these 133 patients, 123 passed quality control checks and were given ALTO-100. 45 patients were not on any other anti-depressant and therefore took ALTO-100 as a "monotherapy," while

78 patients were on other treatments for which ALTO-100 was taken as an "adjunctive." Patients in Phase 2a were then given 40mg of ALTO-100 twice daily over an eight-week treatment period.

60. The primary endpoint for Phase 2a was a change in the Montgomery-Åsberg Depression Rating Scale ("MADRS") score from its original baseline at week six of treatment. The MADRS is a 10-item, clinician-rated scale used to measure the severity of depressive symptoms in adults.

61. In January 2023, Alto reported that Phase 2a confirmed poor verbal memory as a predictive biomarker of patients who would have a positive response to ALTO-100 in treating MDD. According to Alto, the biomarker also correlated positively with MADRS score improvements: Alto reported better improvement on the MADRS score for patients *with* poor verbal memory who took ALTO-100 as a monotherapy compared to patients *without* poor verbal memory who took ALTO-100 as a monotherapy. Alto also stated that similar results were observed for patients who took ALTO-100 as an adjunctive treatment. In connection with Phase 2a, Alto tested participants' pharmacokinetic, or "PK" levels. As Etkin later explained during a conference call on March 12, 2025, Alto "saw about 90% compliance" from participants, "and that's measured by PK in either the monotherapy or adjunctive group." Overall, Alto reported that Phase 2a had favorable top-line results, supplied "clear evidence of efficacy," and demonstrated a "significantly greater change" in "patients with a biomarker profile" than "those without the biomarker profile." The Company used these announcements to generate positive investor sentiment and quickly launch its IPO to raise money from investors.

62. Based on Phase 2a's results, Alto advanced ALTO-100 into a randomized, double-blind, placebo-controlled Phase 2b. Alto originally designed Phase 2b to include 200 participants across 26 clinical trial sites that largely overlapped those used in Phase 2a. However, before the Company went public, the FDA objected to the design, and asked Alto to expand the trial from 200 to 266 patients specifically because of concerns that a smaller number would not have enough statistical power to evaluate ALTO-100 in the monotherapy population, *i.e.,* patients taking ALTO-100 without the added benefit of another anti-depressant—the very subgroup that Alto ultimately admitted failed to show a statistically significant response. And as Defendants understood, unlike the adjunctive patients whose MDD diagnosis was verified by the fact that they were already taking prescribed medication to treat

MDD, the monotherapy patients posed a significantly greater risk of *not*, in fact, suffering from MDD, but rather entering Phase 2b solely for the payment the Company promised.

63. Phase 2b was a 6-week, placebo-controlled study that started to enroll patients across the United States in January 2023, randomizing them 1:1 to take 40mg twice daily of ALTO-100 or a placebo. Two-thirds of the enrolled patients took ALTO-100 as a monotherapy, and the remaining one-third took ALTO-100 as an adjunctive.

64. According to the Company's defective Registration Statement, filed on January 12, 2024, Phase 2b enrolled patients were screened for a comprehensive set of Electroencephalogram, or "EEG," and cognitive biomarkers. Alto informed investors that this was done in an automated manner with software tools. Specifically, Alto told investors that it assessed the biomarker of poor verbal memory through a computerized test called Spectra, which patients can take independently on their computer for about 60 minutes. Alto also claimed that it collected EEG, which is a non-invasive test measuring electrical brain activity, often collected through a headband. Finally, Alto told investors that patients utilized wearable devices to capture sleep and activity patterns, so as to correlate these patterns with drug intervention outcomes and derive biomarkers that could predict the successful responses to drugs. The Company provided the following schematic to investors to outline the basic structure of Phase 2b:




65. Phase 2b was conducted both at centralized and decentralized trial sites across the United States. A centralized trial site is where patients visit specific locations for all procedures connected with the trial, including data collection and monitoring. Conversely, a decentralized trial site is where the trial activity occurs at the participant's home. Trials that take place at decentralized trial sites depend on the patient to independently keep up with the trial protocols and take the drug or placebo assigned at

randomization. The use of decentralized trial sites in this case was particularly risky given that, as Alto admitted in the defective Registration Statement, patients with MDD are a vulnerable population that cannot be relied upon to comply with trial protocols. Without proper methods of verification, Alto could not ensure that patients enrolled in Phase 2b were actually taking ALTO-100 as directed. The primary endpoint for Phase 2b was the change from baseline on the MADRS compared to placebo over a six-week double-blind treatment period in patients positive for the cognitive biomarker, with improvement in the overall population assessed as a secondary endpoint.

66. On October 22, 2024, Alto issued a press release announcing the topline results of Phase 2b and informed investors that Phase 2b did not meet its primary endpoint. Alto subsequently abandoned development for ALTO-100 as a treatment for MDD.

## II. Alto's C-Suite Drove Enrollment Pressure and Etkin Acknowledged Concerns About the Remote Sites Before Alto Went Public

67. Prior to Alto's IPO, serious concerns about enrollment in light of the FDA's feedback on trial design as well as the remote sites had already emerged at the Company. This is confirmed by, among other things, the accounts of CW1 and CW2.

68. Alto employed Confidential Witness 1 ("CW1") from June 2022 to May 2023.[2] CW1 served as a Clinical Trial Specialist, and reported to Alto's Senior Vice President of Innovation, Fadi Abdel ("Abdel"). CW1 screened patients for Phase 2b and conducted follow-up interviews with patients once they were enrolled. CW1 was also assigned to the Jackson, Mississippi site that enrolled only remote patients.

69. CW1 attended all-hands Company meetings, in which Etkin discussed the status of ALTO-100's clinical trials. According to contemporaneous notes documented by Plaintiffs' investigator while interviewing CW1, CW1 observed that during one such all-hands Company meeting held before the Company went public, Etkin became increasingly frustrated at the progress of ALTO-100's clinical

---

[2] CW1's LinkedIn profile indicates that CW1's employment ended at Alto in August 2023, but Defendants informed Plaintiffs that CW1's employment ended at Alto in May 2023. For the purposes of this pleading, both dates are before the Class Period or before the Company went public in February 2024 but after Phase 2b started in January 2023. As such, the all-hands meeting CW1 related where Etkin expressed concerns about the remote sites necessarily occurred before Alto's IPO.

trials. During the all-hands meeting, according to CW1, Etkin expressed concerns that Phase 2b was trending differently than Phase 2a, and about "something they weren't expecting to see, and something was off, and it had a lot to do with the decentralized trial, the remote trial." Because of these concerns with the remote sites, CW1 stated that Etkin "got on to us. We couldn't do anything right. Everything was wrong." CW1 construed that to be a reference to CW1 and CW1's team who recruited patients for the remote site in Jackson, Mississippi.

70. Other CWs corroborated that there were serious concerns about enrollment within Alto's C-Suite before the Company went public. Confidential Witness 2 ("CW2") was a Senior Clinical Trial Specialist and then a Trial Master File and Quality Document Support Specialist at Alto from November 2022 to May 2025. CW2 reported to Abdel and later, Alto's Vice President of Quality, Michelle Robinson Moran. CW2 stated that as a result of enrollment concerns, senior executives pressured Abdel to increase enrollment and that the pressure campaign lasted throughout the time that CW2 worked on Phase 2b.

71. As a Senior Clinical Trial Specialist, CW2 screened potential participants in the ALTO-100 trials and interviewed them after they were enrolled. CW2 was one of only ten Alto employees assigned to screen, enroll and conduct follow-up sessions with clinical trial participants for Alto's remote or decentralized trial sites. CW2's work was focused on the decentralized site in Jackson, Mississippi. CW2's team screened thousands of potential participants for Phase 2b.

72. CW2 stated that Alto's executives put intense pressure on Abdel to increase enrollment for Phase 2b. The defective Registration Statement identified Abdel as Alto's Senior Vice President of Innovation and a "Key Employee" at the Company alongside five other C-suite executives. After being pressured himself, Abdel, in turn, put intense pressure on CW2's team to increase enrollment. CW2 knows this because Abdel regularly met with C-suite executives, and then expressly relayed to CW2 that those C-suite executives were "not happy" about enrollment and internally expressed concerns that enrollment targets for Phase 2b were not being met. Executives in the C-suite typically include the

CEO, CFO and CDO, *i.e.*, Etkin, Smith, and Powell.[3] CW2 confirmed that this pressure campaign existed throughout the time that CW2 screened participants for the remote sites.

73. CW2 recalled that the screening team was under so much pressure to increase enrollment for Phase 2b that the team considered advertisements for trial participants on bus stop shells, Craigslist, and multiple social media sites. CW2 explained that the advertisements for Phase 2b committed to pay participants for enrolling in the clinical trial. CW2 explained that this practice attracted participants who simply sought to get paid, sometimes going as far as to lie to enroll in the trial. In fact, CW2 also confirmed that Alto considered increasing the payment amount to trial participants, but CW2 objected, stating that Alto was already receiving applications from patients who were only interested in receiving a payout.

74. CW2 described the Jackson, Mississippi trial site as a poorly operated "shit show." CW2 communicated these concerns to Abdel, but CW2's concerns were disregarded. CW2 suspected that the poor quality of participants at the decentralized sites undermined the overall results of Phase 2b. CW2 said that Abdel resigned from Alto around the same time that Alto shut down the Jackson, Mississippi site.

## III. Alto Failed to Conduct Basic Verification to Ensure Real Participants Enrolled in Phase 2b

75. Promising to pay individuals to participate in a clinical trial, especially without a detailed verification of their medical history, presents the known risk of attracting individuals without the subject diagnosis—here, MDD—who want to participate in the trial simply for monetary compensation. Indeed, individuals who in fact suffer from MDD are far more likely to volunteer to participate in a medical trial without payment in an effort to get relief from debilitating symptoms, so the promise of payment adds little other than an enhanced risk of attracting professional trial participants. Despite understanding this known risk posed by its promises of payment to trial participants, Alto did nothing to verify that participants in Phase 2b had actually been diagnosed with MDD and, in fact, failed to implement

[3] https://www.investopedia.com/terms/c/c-suite.asp.

commonsense guardrails to ensure that participants were in fact following trial protocols and taking ALTO-100 as directed.

76. According to CW2, patients were screened and follow-up interviews were conducted for the Jackson, Mississippi site via video calls. CW2 also confirmed that the first step for Phase 2b participants was to fill out an online questionnaire and then take the MADRS. CW2 stated that patients would then be given an EEG device which monitored brain electrical activity.

77. CW2 further stated that Alto did not check trial participants' medical records to confirm accuracy and simply accepted whatever the patients represented. CW2 also affirmed that Alto failed to verify any information in follow-up interviews with trial participants. CW2 explained that there was no way of confirming whether patients actually took ALTO-100 during Phase 2b. Instead, Alto simply continued to take patients at their word.

78. Alto employed Confidential Witness 3 ("CW3") from March 2023 to November 2024. CW3 served as a Clinical Trial Specialist and reported to Abdel. CW3 screened patients for Phase 2b and conducted follow-up interviews with patients once they were enrolled.

79. CW3 corroborated that, when screening patients for Phase 2b, the Company did not verify pertinent information by checking medical records or requiring proof of a doctor's diagnosis of MDD. Instead, it simply took the patients at their word. CW3 also corroborated that Alto advertised on Craigslist and paid patients to enroll in Phase 2b.

80. According to CW3, Alto sent potential participants in Phase 2b an EEG device to self-administer a scan of brain electrical activity.

81. Alto employed Confidential Witness 4 ("CW4") from September 2021 to April 2025. CW4 served as a Chief of Staff, and later as a Human Resources and Operations Associate. As a Chief of Staff, CW4 reported directly to Etkin, and later to Smith, and then later, when working as a Human Resources and Operations Associate, reported to Alto's General Counsel and Chief Administrative Officer. CW4 onboarded and off-boarded employees at Alto, and also facilitated annual employee performance reviews. CW4 was familiar with the Alto employees who worked on Phase 2b.

82. According to CW4, Alto created its own platform to screen patients for clinical trials, which had potential participants fill out an online questionnaire. CW4 also confirmed that Abdel and

Alto Director of Data Engineering, Faizen Badami, created Alto's platform. Like CW2, CW3, and CW7, CW4 corroborated that Alto advertised on social media and elsewhere to recruit patients for Phase 2b. Like CW2 and CW3, CW4 also corroborated that Alto did not verify a participant's medical records and instead took patients at their word.

## IV. Multiple CWs Corroborate that the Remote Sites Were More Likely to Enroll Participants Who Did Not Have MDD and Were Unable to Confirm Compliance

83. Driven by its enrollment struggles and its need to enroll a sufficient number of participants to complete Phase 2b, Alto used remote clinical trial sites to conduct a substantial proportion of Phase 2b. Alto had virtually no capacity to control trial participants enrolled at the decentralized sites, confirm their MDD diagnosis, or their compliance with the study protocol, including whether they were even taking ALTO-100 as directed. Alto's lack of control over the conduct of the remote trial locations heightened the extant risk that participants without MDD would participate in the study and, in turn, the extant risk that Phase 2b would fail.

84. Alto employed Confidential Witness 5 ("CW5") from March 2023 to January 2025. CW5 served as a Clinical Research Associate. CW5's duties included monitoring trial investigative sites and ensuring patient safety, data integrity, and that the trial investigative sites were following the protocol.

85. In the course of CW5's duties, CW5 monitored the Jackson, Mississippi site run by Dr. Andrew Bishop ("Bishop"). According to CW5, the Jackson, Mississippi site was "terrible . . . just terrible." Specifically, CW5 stated that the Jackson, Mississippi site struggled to complete tasks correctly and on time.

86. CW5 stated further that the Jackson, Mississippi site director, Haley Dougay, was supposed to be in charge of the Clinical Trial Specialists and Coordinators but failed to keep up with what needed to be reviewed and completed for the trials at the Jackson, Mississippi site.

87. According to CW5, Bishop did a poor job at managing the Jackson, Mississippi site, and said that it was "the worst site."

88. Alto employed Confidential Witness 6 ("CW6") from February 2023 to November 2024. CW6 served as a Clinical Research Coordinator. CW6's duties included screening patients via Zoom for Phase 2b.

89. According to CW6, during a summer in the middle of the recruitment for Phase 2b, before many false and misleading statements were made, there was a slowdown in enrollment, and for an approximate six-week period, CW6 and CW6's team did not screen any potential patients for enrollment at the Jackson, Mississippi site. To boost enrollment during the slowdown, CW6 also explained that Alto contracted with a third-party vendor to help find patients for the Jackson, Mississippi site. CW6 recalled that the third party was hired to help with recruitment at the Jackson, Mississippi site overseen by Bishop. However, CW6 believes that even this third party was not able to find recruits. CW6 also stated that one of Bishop's own clinical employees was helping to screen patients for the clinical trial, but that the person was "overwhelmed."

90. CW6 conducted follow-ups with patients via Zoom where CW6 asked the patients about how they were doing. Patients also sat for interviews to determine their score on the MADRS the same day as their follow-ups.

**V. Alto Relied on Third Parties to Fill Enrollment Gaps**

91. Confidential Witness 7 ("CW7") was employed by Excell Research from January 2024 to April 2024. Excell Research is a medical research site that has conducted multiple clinical trials, mostly for neurological and psychiatric conditions. Excell Research enrolled patients for Alto's ALTO-100 clinical trials during the Class Period. CW7 served as a Director of Patient Recruitment. CW7's duties included overseeing patient recruitment for clinical trials at Excell Research, including for Phase 2b.

92. According to CW7, Excell Research enrolled approximately 30 patients for Phase 2b, with 70% of those patients enrolled in a decentralized clinical trial site.

93. CW7 confirmed that third party recruiters, including Trial Partners, ImageBloom, and StudyKIK, were hired by Alto to place advertisements to attract participants for Phase 2b, and that the third parties advertised for Phase 2b on social media, among other forums. CW7 also confirmed CW6's

account that Alto hired third party recruiters for short periods of time when enrollment for Phase 2b had slowed down.

### VI. Capitalizing on Positive Investor Sentiment Generated by Phase 2a, Alto Launched an IPO

94. Despite the difficulties that it was facing enrolling qualified participants in Phase 2b, Alto did not want to lose the positive investor sentiment that it had generated from the announcement of the Phase 2a results of ALTO-100.

95. Accordingly, on January 12, 2024, Alto filed a defective Registration Statement on Form S-1. Alto twice amended the defective Registration Statement on January 29, 2024. On February 1, 2024, the twice-amended defective Registration Statement was declared effective by the SEC.

96. On February 2, 2024, Alto's shares began publicly trading on the NYSE under the ticker symbol, "ANRO." On February 5, 2024, the Company filed the Prospectus with the SEC, which incorporated and formed part of the defective Registration Statement. The Prospectus disclosed that Alto would be offering 8,040,000 shares of common stock at a public offering price of $16.00 per share, for aggregate gross proceeds of approximately $128.6 million before underwriting discounts and commissions and other offering expenses.

On February 6, 2024, Alto announced the closing of its upsized IPO of 9,246,000 shares of common stock, which included the Company's underwriters' full exercise of their option to purchase an additional 1,206,000 shares of Alto common stock at the $16.00 per share offering price. Alto's aggregate gross proceeds from the IPO were approximately $128.6 million, less underwriting discounts and commissions and other offering expenses.

## <u>FACTS ALLEGED WITH RESPECT TO COUNTS I, II, AND III</u>

### I. Defendants Violated the Securities Act by Omitting Material Information from the Defective Registration Statement

97. The defective Registration Statement contained numerous misleading statements and omitted to state material facts necessary to make the statements not misleading under the circumstances in which they were made. Under a sub-heading entitled "Risks Related to Product Candidate Development and Commercialization," the defective Registration Statement represented enrollment risks as merely hypothetical even though concerns about enrollment and the remote sites already existed.

Specifically, the defective Registration Statement claimed that "**we *may* experience difficulty in finding and enrolling sufficient qualified patients for our biomarker-guided trials, enrollment in clinical trials *may* be slower than we anticipate**, or participants may drop out or fail to return for post-treatment follow-up at a higher rate than we anticipate;" and "**subjects *may* fail to enroll or remain in our trials at the rate we expect**, or fail to return for post-treatment follow-up, including subjects failing to remain in our trials due to movement[.]"

98. The statements identified in Paragraph 97 were materially false and misleading when made because, at the time the defective Registration Statement became effective, the risks had already materialized. Specifically, the defective Registration Statement omitted to disclose that: (a) senior executives had already internally expressed serious concerns about Alto's ability to enroll qualified patients, as confirmed by CW2, (b) senior executives had already internally expressed serious concerns about Alto's decentralized trial sites like the site in Jackson, Mississippi, as confirmed by CW1; and (c) as a result of the foregoing, there was already a material risk to enrollment, including whether subjects would remain participants of Phase 2b.

99. Similarly, the defective Registration Statement also claimed that enrollment related risks to the trial's success were merely hypothetical: "**We *may* find it difficult to enroll patients in our clinical trials. *If* we encounter difficulties enrolling subjects in our clinical trials, our clinical development activities *could be* delayed or *otherwise adversely affected*.**" The defective Registration Statement further stated that "[s]ubject enrollment is affected by many factors including" but not limited to: the "***willingness of patients to participate in a decentralized clinical trial***"; "***continued enrollment of prospective patients by clinical trial sites***"; and "***the ability to monitor patients adequately during and after treatment***[.]"

100. The statements identified in Paragraph 99 were materially false and misleading when made because, at the time the defective Registration Statement became effective, the risks had already materialized. Specifically, the defective Registration Statement omitted to disclose that: (a) senior executives had already internally expressed serious concerns about Alto's ability to enroll qualified patients and were pressuring Abdel to increase enrollment, as confirmed by CW2, all while Alto was already experiencing enrollment issues for Phase 2b, especially at its decentralized trial sites like its site

in Jackson, Mississippi; (b) senior executives had already expressed serious concerns about Alto's decentralized trial sites like the site in Jackson, Mississippi, as confirmed by CW1; (c) Alto's failure to conduct basic verification and monitor whether patients enrolled in Phase 2b were compliant with trial protocols increased the risk that Phase 2b would be delayed and adversely affected; (d) Alto set up "[o]nly a subset of sites within the study . . . to evaluate PK levels" increasing the risk that patients enrolled in Phase 2b would be noncompliant with trial protocols; and (e) as a result, Alto's ability to monitor patients during and after treatment was already compromised.

101. The defective Registration Statement also purported to warn investors of the risks that patients, and specifically those with MDD, may withdraw from the clinical trials, which could undermine both enrollment and the ultimate outcome of the clinical trials, without disclosing that these risks had already started to materialize and had a high risk of increasing after the Company went public:

> We have in the past and may in the future experience participant withdrawals or discontinuations from our trials. ***Withdrawal of participants from our clinical trials, including participants in any control groups, may compromise the quality of our data.*** Even if we are able to enroll a sufficient number of participants in our clinical trials, ***we may have difficulty maintaining enrollment of such patients in our clinical trials, and delays in enrollment may result in increased costs or may affect the timing or outcome of our clinical trials***. Any of these conditions ***may negatively impact our ability to complete such trials or include results from such trials in regulatory submissions, which could adversely affect our ability to advance the development of our product candidates***. Additionally, participants with neuropsychiatric disorders, including MDD and schizophrenia, constitute a vulnerable patient population and ***may withdraw from the clinical trial if they are not experiencing improvement in their underlying disease or condition or if they experience other difficulties or issues relating to their underlying disease or condition or otherwise***.

102. The statements identified in Paragraph 101 were materially false and misleading when made because, at the time the defective Registration Statement became effective, the risks had already materialized. Specifically, the defective Registration Statement omitted to disclose that: (a) senior executives had already internally expressed serious concerns about Alto's ability to enroll qualified patients and were pressuring Alto screeners to increase enrollment, as confirmed by CW2; (b) senior executives had already internally expressed serious concerns about Alto's decentralized trial sites, as confirmed by CW1; (c) Alto's decision to skip basic medical record verification and or even verify

whether patients enrolled in Phase 2b were taking the assigned treatment or were otherwise compliant with trial protocols, especially given its actual knowledge from other trials that participants "common[ly]" skipped doses or halted treatment altogether, had already increased the risk that Phase 2b would be delayed and adversely affected; (d) Alto set up "[o]nly a subset of sites within the study . . . to evaluate PK levels" increasing the risk that patients enrolled in Phase 2b would be noncompliant with trial protocols; and (e) as a result, data quality, enrollment, and the ability to successfully complete Phase 2b and commercialize ALTO-100 were already at risk.

103. The defective Registration Statement portrayed the failure to run clinical trials effectively as also remote, even while Alto was already experiencing issues enrolling patients at the decentralized trial sites:

> We rely on, and intend to continue to rely on, our internal clinical development expertise to conduct our current and future clinical trials. This model includes internal teams and systems as well as external vendors and CROs to comprise a full clinical trial team. ***If our clinical trial team does not*** comply with applicable regulatory requirements, meet expected deadlines, ***or run trials effectively, our development programs and our ability to seek or obtain regulatory approval for or commercialize our product candidates may be delayed***.

104. The statements identified in Paragraph 103 were materially false and misleading when made because, at the time the defective Registration Statement became effective, the risks had already materialized. Specifically, the defective Registration Statement omitted to disclose that: (a) Alto had already taken significant shortcuts with Phase 2b in enrolling patients, especially at the decentralized trial sites where, for example, Bishop was enrolling patients in Phase 2b with limited oversight from the Company, and Alto's senior executives had already expressed concerns about such enrollment; (b) Alto had already compromised the chances to obtain meaningful results from Phase 2b by skipping basic verification of medical records and drug intake; (c) Alto's senior executives had already expressed internally concerns about the conduct of decentralized sites, like Jackson, Mississippi; (d) as a result of the foregoing, Alto already faced major undisclosed uncertainty about the design, enrollment and conduct of Phase 2b.

105. The defective Registration Statement further represented the risks of variability and the loss of control associated with remote testing as hypothetical, even though the risks were already materializing in the non-compliant Phase 2b:

> Moreover, some of our trials include a decentralized clinical trial component supported by our internal personnel wherein clinical trial activity occurs in the participant's home or at a local health care facility and includes virtual elements of care, ***exposing us to increased risk of variability and lack of control of the clinical trial***.

106. The statements identified in Paragraph 105 were materially false and misleading when made because, at the time the defective Registration Statement became effective, the risks had already materialized. Specifically, the defective Registration Statement omitted to disclose that: (a) Alto's senior executives already knew there were problems with the lack of control in the decentralized trial sites of Phase 2b; (b) Alto's senior executives already internally expressed concerns about Alto's ability to comply with applicable regulatory requirements and enroll quality patients as directed by the FDA, all while Alto was already experiencing enrollment issues for Phase 2b, especially at its decentralized trial sites like its site in Jackson, Mississippi where, for example, Bishop was enrolling patients in Phase 2b with limited oversight from the Company; (c) as a result of the foregoing, the risk of variability had already increased and Alto's ability to control Phase 2b was already at risk.

107. In a sub-heading entitled "Internal Clinical Development Expertise and Decentralized Clinical Trial Infrastructure," Defendants made misleading statements about the high quality and efficiency of Alto's clinical trials:

> We make use of our own internal capabilities and expertise to conduct our clinical trials, rather than outsourcing clinical development execution to contract research organizations, or CROs. ***We have built a team of clinical operations experts, led by Dr. Adam Savitz and Jessica Powell, that engage directly with clinical trial sites and provide clinical monitoring, oversight, and support to ensure trials are run with the highest emphasis on quality and efficiency.*** This insourced model creates synergies between trials, and enables us to conduct multiple studies simultaneously, reduce cost, and apply learnings across programs to enhance execution. ***We believe our approach results in higher quality clinical and biomarker data,*** benefits we have now observed through our two completed Phase 2a trials. Finally, our strict approach to data oversight enables us to design software tools, such as Spectra, Techcheck, and Altoscope, which are tailored to the requirements of our biomarker data collection with an understanding of how

> these data will ultimately be gathered in clinical practice. While we conduct most of our clinical work internally, we do selectively employ CROs when conducting our Phase 1 pharmacodynamic trials and use certain CRO capabilities to augment our internal expertise.

108. The statements identified in Paragraph 107 were materially false and misleading when made because, at the time the defective Registration Statement became effective, the risks had already materialized. Specifically, the defective Registration Statement omitted to disclose that: (a) Alto's senior executives already internally admitted concerns about using decentralized trial sites and the impact patients at the decentralized trial sites would have on Phase 2b; (b) Alto's senior executives already internally admitted concerns about Alto's ability to enroll qualified patients as directed by the FDA; (c) Alto had already compromised the chance to obtain "higher quality clinical and biomarker data" by recruiting professional patients, by neglecting to verify whether they were even medically diagnosed with MDD or had taken the treatment assigned in randomization, and by permitting Bishop to enroll patients in Phase 2b with limited oversight from the Company; and (d) as a result of the foregoing, Alto's descriptions of high quality and efficiency were materially false and misleading when made.

## II. The Defective Registration Statement Also Violated SEC Regulation S-K

109. SEC Regulation S-K required the Securities Act Defendants to include in the defective Registration Statement a section called "Management Discussion and Analysis." The purpose of that section is specifically aimed at giving investors the information that past performance might not be indicative of future results. As the plain text of the regulation states: "The discussion and analysis must focus specifically on . . . uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results. . . ." 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303"). Here, the key performance results that had been provided to investors were the Phase 2a results and the key "future operating results" were the outcome of Phase 2b. The Securities Act Defendants knew, or should have known, that the existing difficulties with Phase 2b created a material risk that it would not confirm the efficacy of ALTO-100. "Disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations." SEC Release Nos. 33-8056; 34-45321; FR-61.

110. The SEC has emphasized that the disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See* Comm'n Guidance Regarding Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (Dec. 19, 2003).

111. Item 105 also required the Securities Act Defendants to include in the defective Registration Statement a "discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c) (2011). Item 105's purpose is "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." Sec. Offering Reform, S.E.C. Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004). The discussion of risk factors must be specific to the particular company and its operations, and must explain how the risk affects the company and/or the securities being offered. Generic or boilerplate attempts to disclose potential risks and shield oneself from liability—like the Securities Act Defendants did here—do not tell investors how the specific risks could affect their investment. *See* Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

112. Put simply, Item 105 required the Securities Act Defendants to disclose the most significant risks that ***could*** adversely affect Alto's present or future business expectations and prohibited the Defendants from relying on generic risks that could apply to virtually any other biopharmaceutical company in the industry. They failed to do so and left undisclosed myriad significant risks, including the risks posed by the Company's failure to verify participants' MDD diagnosis, failure to verify basic information, including checking medical records, and otherwise ensuring compliance with trial protocols and the taking of ALTO-100 as directed, and the likelihood of noncompliance raised by those failures and the resulting increased risk that Phase 2b would fail.

113. Specifically, the Securities Act Defendants omitted to disclose in the defective Registration Statement that serious concerns about the remote sites and Alto's ability to enroll quality patients as directed by the FDA had already created major uncertainty about whether Phase 2b could succeed, if at all, as well as whether the failure of Phase 2b could adversely affect Alto's present and future business expectations. Item 303 affirmatively required the Defendants to disclose this uncertainty with a high degree of specificity to comply with Regulation S-K's rigorous disclosure requirements. Under Item 303, even if a defendant cannot determine whether an uncertainty will occur, disclosure is still required unless the defendant affirmatively determines that no material effect is reasonably likely. The Securities Act Defendants cannot meet this standard because an uncertainty already existed as confirmed by the accounts of CW1 and CW2. Yet, Defendants did not disclose to investors the concerns they admitted internally, the risks they already posed, or the impact of the risks on Alto.

114. Defendants also violated their affirmative disclosure duties imposed by Item 105. Defendants did not disclose Phase 2b's risk of failure in particular with the high degree of specificity demanded by Item 105, and, in fact, the trial ultimately failed when the undisclosed risks fully materialized.

## **<u>SECURITIES ACT CLASS ACTION ALLEGATIONS</u>**

115. The Securities Act Class consists of all persons who purchased or otherwise acquired Alto's common stock pursuant or traceable to the Company's defective Registration Statement, and the body of which was incorporated into the Prospectus. The Securities Act Class asserts claims under Sections 11, 12(a) and 15 of the Securities Act. These claims are grounded in strict liability, and do not assert that any Securities Act Defendant acted with the intent to defraud. Excluded from the Securities Act Class are: Defendants, former and current officers, senior managers, and directors of Alto, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, related entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above.

116. The members of the Securities Act Class are so numerous that joinder of all members is impracticable. According to the 2023 10-K, Alto had "87 stockholders of record" and the "actual number of holders of our common stock is greater than this number of record holders," because it also

"includes stockholders who are beneficial owners, but whose shares are held in street name by brokers or held by other nominees" and shares held "in trust." Additionally, the Company's securities were actively traded on the NYSE. While the exact number of Securities Act Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the Securities Act Class. Record owners and other members of the Classes may be identified from records maintained by the Company, its transfer agent and brokers, and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

117. Common questions of law and fact exist as to all members of the Securities Act Class and predominate over any questions solely affecting individual members of the Securities Act Class. Among the questions of law and fact common to the Securities Act Class are:

a. Whether the Securities Act Defendants made inaccurate statements and/or omitted material information to investors in the defective Registration Statement;

b. Whether the Securities Act Defendants' misrepresentations and omissions violated federal securities laws; and

c. Whether the Securities Act Defendants' misrepresentations and omissions were material.

118. Lead Plaintiffs' claims are typical of the claims of the members of the Securities Act Class as all members of the Securities Act Class were similarly affected by Defendants' wrongful conduct in violation of federal law, and all assert the same legal claims arising out of the same conduct.

119. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Securities Act Class. Lead Plaintiffs have no interests antagonistic to the Securities Act Class and have retained highly experienced counsel specializing in securities litigation.

120. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all claims is impracticable. Furthermore, as the damages suffered by individual Securities Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action on behalf of the Securities Act Class.

**COUNT I**

**(Against Defendants Alto, Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York for Violations of Section 11 of the Securities Act)**

121. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

122. This Count is based on strict liability and does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

123. This Count is asserted against the Company and each Securities Act Defendant named herein for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Lead Plaintiffs, who purchased and/or otherwise acquired Alto's securities traceable to the defective Registration Statement (*see* ECF Nos. 21-2, 25-3, 25-4), and all members of the Class who purchased or otherwise acquired Alto's securities pursuant to, or traceable to the defective Registration Statement.

124. The Company is the issuer of the stock issued via the defective Registration Statement. As such, the Company is strictly liable for each misleading statement contained therein, even for innocent misrepresentations.

125. Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York signed the defective Registration Statement and/or were directors or senior officers of the Company at the time the defective Registration Statement was effected and each consented to be identified as a director or senior officer of Alto in the defective Registration Statement. Therefore, each had a duty to make a reasonable investigation into the statements contained in the defective Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, these Defendants should have known of the misleading statements and omissions contained in the defective Registration Statement. As such, each of these Defendants is liable to Lead Plaintiffs and the Securities Act Class.

126. Lead Plaintiffs and other members of the Securities Act Class acquired Alto's securities without knowledge of the untruths and/or omissions alleged herein. Lead Plaintiffs and the other

members of the Securities Act Class were thus damaged by Defendants' material misstatements and omissions.

127. This Action was brought within one year after the discovery of the untrue statements and omissions and within three years of the offering date.

**COUNT II**
**(Against Defendant Alto for Violations of Section 12(a)(2) of the Securities Act)**

128. Lead Plaintiff Special Situation Funds repeats and re-alleges each and every allegation contained above as if fully set forth herein.

129. This cause of action is brought on behalf of the Securities Act Class against Defendant Alto for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771(a)(2). This cause of action does not allege nor intend to allege fraud or fraudulent intent, and any implication of fraud or fraudulent intent is expressly disclaimed.

130. Section 12(a)(2) gives rise to liability as to "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading[.]" 15 U.S.C. § 771(a)(2). At a minimum, liability under Section 12(a)(2) extends to those who passed title to the security to the purchaser.

131. Alto qualifies as a statutory seller pursuant to SEC Rule 159A, which provides that an issuer is a statutory seller for purposes of Section 12(a)(2) regardless of the form of underwriting. Specifically, SEC Rule 159A(a), 17 C.F.R. § 230.159A(a)(1)-(4), provides, in part, the following "[d]efinition of seller for purposes of section 12(a)(2) of the [1933] Act":

> For purposes of section 12(a)(2) of the Act only, in a primary offering of securities of the issuer, regardless of the underwriting method used to sell the issuer's securities, seller shall include the issuer of the securities sold to a person as part of the initial distribution of such securities, and the issuer shall be considered to offer or sell the securities to such person, if the securities are offered or sold to such person by means of any [prospectus] . . . [or] other communication that is an offer in the offering made by the issuer to such person.

132. For the purpose of SEC Rule 159A(a), "information is provided or a communication is made by or on behalf of an issuer if an issuer or an agent or representative of the issuer authorizes or approves the information or communication before its provision or use." Note 1, 17 C.F.R. § 230.159A(a); *see also* 70 Fed. Reg. 44722 at 44769 (Aug. 3, 2005).

133. The Prospectus contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein not misleading, and omitted to state material facts required to be stated therein. Defendant Alto owed Lead Plaintiff Special Situations Funds and other members of the Securities Act Class a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that they were true and accurate. Defendant Alto, in the exercise of reasonable care, should have known of the material misstatements and omissions of material fact contained in the Prospectus, as set forth herein.

134. Lead Plaintiff Special Situations Funds and other members of the Securities Act Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus when they purchased Alto common stock pursuant to or traceable to the Prospectus.

135. By reason of the conduct alleged herein, Defendant Alto violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Lead Plaintiff Special Situations Funds and other members of the Securities Act Class who purchased Alto common stock pursuant to or traceable to the Prospectus sustained substantial damages in connection with their purchases. Accordingly, Lead Plaintiff Special Situations Funds and the other members of the Securities Act Class who hold Alto common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their Alto common stock to Defendant Alto. The Securities Act Class members who have sold their Alto common stock also seek damages to the extent permitted by law.

## COUNT III
**(Against Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York for Violations of Section 15 of the Securities Act)**

136. Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

137. This Count is asserted pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York.

138. Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York were each control persons by virtue of their positions as directors, senior officers, and/or authorized representatives of the Company. Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York had the power to influence, and did, in fact, exercise control over the day-to-day activities of Alto, and did cause it to issue a defective and misleading Registration Statement.

139. Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York directly participated in the control of Alto by having signed, or authorized the signing of, the defective Registration Statement and authorizing the sale of Alto common stock to Lead Plaintiffs and other members of the Securities Act Class.

140. As control persons, Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York were involved with the day-to-day operations of Alto and were involved in reviewing and/or providing descriptions of Alto's operations and business prospects, including Phase 2b, in the defective Registration Statement. Each had the ability to control the contents thereof.

141. Lead Plaintiffs and other members of the Securities Act Class acquired Alto's securities without knowledge of the untruths and/or omissions alleged herein. Lead Plaintiffs and the other members of the Securities Act Class were thus damaged by the primary violations of the Company. By virtue of the conduct alleged herein, and their status as control persons of the Company, Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York are each secondarily liable to Lead Plaintiffs and the Securities Act Class for the primary violations of Alto.

## <u>ADDITIONAL FACTS ALLEGED ONLY WITH RESPECT TO COUNTS IV AND V</u>

### I. Defendants Etkin, Smith, and Powell Made Additional Misleading Statements

142. Unlike Counts I, II, and III, which are premised only on strict liability, Counts IV and V allege that after the Company went public, Etkin, Smith and Powell, or the "Exchange Act Defendants,"

made additional misstatements with scienter in violation of Section 10(b) and Section 20(a) of the Exchange Act.

143. The Exchange Act Defendants possessed the power and authority to control the contents of the Company's public communications with investors as well as the ability and opportunity to prevent their issuance or to cause them to be corrected.

144. On March 18, 2024, Etkin attended a Fireside Chat at UBS's Virtual CNS Day, where he talked at length about the purported advantages of Alto's internal approach to clinical trials, in comparison to using a CRO:

> **Analyst:** Could you give me a sense, I don't know if you can disclose this but for let's say the phase 2B study that you did, doing it this way where you're using a lot of these cutting edge technology and some of these sophisticated tools, what's the cost implication of that versus if you were just doing a plain vanilla clinical trial?
>
> **Etkin:** It's a very interesting question because part of the plain vanilla trial is actually using a CRO, that is the most common way in which these trials are done. What we've actually done is build our own clinical operations team internally, we have about half the companies are clinical operations and clinical development core, and we have an engineering team that develops the software and then implements it and train sites, and a data science team that makes sense of the data that we're seeing in our trials as well as a lot of archival data that we've built on these disorders and these biomarkers.
>
> ***And what that actually means is that we're both closer to the data and better able to ensure high quality clinical data, high quality biomarker data, and actually do it at half the cost of the usual clinical trial because we don't involve a CRO.*** In many ways, we get better outcome and save money by finding a system that's more fit for purpose for doing these kinds of trials. And our sites, frankly, have really enjoyed being part of these trials because it's different because they get to learn things that they haven't been exposed to. ***And so all of that has gone extremely well.***

145. The statements identified in Paragraph 144 were materially false and misleading when made because they led investors to believe that Alto's in-house clinical testing was superior to "plain vanilla" clinical trials, when the opposite was true. Indeed, contrary to Etkin's assertion that Alto was both "closer to the data and better able to ensure high quality clinical data," Alto's utilization of decentralized trial sites and decision to skip verifying either medical records or drug intake compromised Alto's ability to ensure high quality clinical data. In addition, Etkin's representation that in-house

clinical trials were superior was misleading because it omitted to disclose the following information: (i) Alto already knew from prior clinical trials that it was "common" for patients to miss doses or halt treatment, especially those in vulnerable patient populations like individuals suffering from MDD, and therefore that compliance to protocol had to be monitored and verified, yet the Company set up "[o]nly a subset of sites within the study . . . to evaluate PK levels"; (ii) Alto experienced significant enrollment problems for Phase 2b that forced the Company to lure patients from social media, pay patients to participate, and employ third-party recruiters; (iii) the Company lowered standards to increase enrollment, utilizing a lax screening process for potential patients where the Company did not verify medical records to determine that patients were eligible to participate in Phase 2b; (iv) the aforementioned practices were intended to and did attract professional patients, who were there for payment rather than treatment, and were thus less likely to follow the Phase 2b protocol, thereby threatening Phase 2b's success; (v) Alto's decentralized clinical trial site in Jackson, Mississippi was the "worst site," facing significant issues and enrolling patients unsupervised by the Company; and (vi) as a result of the foregoing, Alto's in-house clinical testing was not only worse than the industry practice of relying on CROs but also created a material risk that Alto would be unable to successfully complete Phase 2b and commercialize ALTO-100.

146. In response to a specific analyst question about whether the Company ran into any hurdles in executing Phase 2b, Etkin also made the following misleading statements:

> **Analyst:** For this type of biomarker-driven strategy, do you think that there is a limitation from how many sites are available in the US or outside US that can actually execute on a study like this? Did you run into that type of a hurdle?
>
> **Etkin:** ***We have not. Essentially, we are looking for good quality sites. We're looking for sites that know psychiatric patients, preferably that treat psychiatric patients so that the people they bring in are going to be high quality participants.*** But then we don't actually count on them knowing how to do any of the biomarkers because we teach them. And in teaching them, we've also been doing this for a long time, we've learned both how to teach them and how to ensure high quality data collection through software that we develop and give to them for them to use during acquisition. ***And so right now we're getting very, very high QC pass rate for data collection that has not been a barrier at all. And as I mentioned, we have data collection happening in people's homes in a decentralized clinical trial framework, which is frankly more like what clinical care is going to look***

> ***like ultimately down the line. We've tested a lot of these things in our trials in the phase 2As that we brought into the phase 2Bs. We've tried to change as little as possible in how we do these trials and then that should translate well into a phase 3.***

147. The statements identified in Paragraph 146 were materially false and misleading when made because when asked whether the number of sites needed had created any hurdles to execution of Phase 2b, Etkin falsely responded that it had not. However, contrary to Etkin's assertion that Alto was getting "very, very high QC pass rate for data collection[,]" Alto's utilization of decentralized trial sites and poor monitoring procedures were a significant barrier for quality data collection, and already threatened the successful execution of Phase 2b. Moreover, his statements were misleading because he omitted to disclose the following information: (i) Alto already knew from prior clinical trials that it was "common" for patients to miss doses or halt treatment, especially those in vulnerable patient populations like individuals suffering from MDD, and therefore that compliance to protocol had to be monitored and verified, yet the Company set up "[o]nly a subset of sites within the study . . . to evaluate PK levels"; (ii) Alto experienced significant enrollment problems for Phase 2b that forced the Company to lure patients from social media, pay patients to participate, and employ third-party recruiters; (iii) the Company lowered standards to increase enrollment, utilizing a lax screening process for potential patients where the Company did not verify medical records to determine that patients were eligible to participate in Phase 2b; (iv) the aforementioned practices were intended to and did attract professional patients, who were there for payment rather than treatment, and were thus less likely to follow the Phase 2b protocol, thereby threatening Phase 2b's success; (v) Alto's decentralized clinical trial site in Jackson, Mississippi was the "worst site," facing significant issues and enrolling patients unsupervised by the Company; and (vi) as a result of the foregoing, the increased number of clinical sites—especially remote sites and the Jackson, Mississippi site—was creating a hurdle to the execution of Phase 2b, and Alto's ability to successfully complete Phase 2b and commercialize ALTO-100 was already at serious risk.

148. On March 21, 2024, the Company filed its 2023 10-K. The 2023 10-K contained the same misstatements that were previously made in the defective Registration Statement regarding the high quality and efficiency of the Company's clinical trials:

> We make use of our own internal capabilities and expertise to conduct our clinical trials, rather than outsourcing clinical development execution to

> contract research organizations, or CROs. ***We have built a team of clinical operations experts, led by Dr. Adam Savitz and Jessica Powell, that engage directly with clinical trial sites and provide clinical monitoring, oversight, and support to ensure trials are run with the highest emphasis on quality and efficiency.*** This insourced model creates synergies between trials, and enables us to conduct multiple studies simultaneously, reduce cost, and apply learnings across programs to enhance execution. ***We believe our approach results in higher quality clinical and biomarker data, benefits we have now observed through our two completed Phase 2a trials.*** Finally, our strict approach to data oversight enables us to design software tools, such as Spectra, Techcheck, and Altoscope, which are tailored to the requirements of our biomarker data collection with an understanding of how these data will ultimately be gathered in clinical practice. While we conduct most of our clinical work internally, we do selectively employ CROs when conducting our Phase 1 pharmacodynamic trials and use certain CRO capabilities to augment our internal expertise.

149. The statements identified in Paragraph 148 were materially false and misleading when made because: (a) Alto did not run its pivotal Phase 2b "with the highest emphasis on quality and efficiency"; (b) Alto's approach to Phase 2b was not designed to and did not result in "higher quality clinical data and biomarker data," but instead compromised trial data; and (c) the statements omitted to disclose the following information: (i) Alto already knew from prior clinical trials that it was "common" for patients to miss doses or halt treatment, especially those in vulnerable patient populations like individuals suffering from MDD, and therefore that compliance to protocol had to be monitored and verified, yet the Company set up "[o]nly a subset of sites within the study . . . to evaluate PK levels"; (ii) Alto experienced significant enrollment problems for Phase 2b that forced the Company to lure patients from social media, pay patients to participate, and employ third-party recruiters; (iii) the Company lowered standards to increase enrollment, utilizing a lax screening process for potential patients where the Company did not verify medical records to determine that patients were eligible to participate in Phase 2b; (iv) the aforementioned practices were intended to and did attract professional patients, who were there for payment rather than treatment, and were thus less likely to follow the Phase 2b protocol, thereby threatening Phase 2b's success; (v) Alto's decentralized clinical trial site in Jackson, Mississippi was the "worst site," facing significant issues and enrolling patients unsupervised by the Company; and (vi) as a result of the foregoing, Alto's ability to successfully complete Phase 2b and commercialize ALTO-100 was already at serious risk.

150. Later in the 2023 10-K, under a "Risks Related to Product Candidate Development and Commercialization" sub-heading, Defendants continued to misrepresent enrollment difficulties as remote possibilities: "***We may find it difficult to enroll patients in our clinical trials. If we encounter difficulties enrolling subjects in our clinical trials, our clinical development activities could be delayed or otherwise adversely affected***." The Company further stated that "[s]ubject enrollment is affected by many factors including" but not limited to: the "***willingness of patients to participate in a decentralized clinical trial***"; "***continued enrollment of prospective patients by clinical trial sites***"; and "***the ability to monitor patients adequately during and after treatment***[.]"

151. The statements identified in Paragraph 150 were materially false and misleading when made because: (a) Alto was already experiencing significant enrollment issues and Alto executives had already expressed concerns that the Company would not meet its enrollment goals; (b) Alto's use of decentralized trial sites and poor monitoring protocols already harmed the Company's ability to monitor patients adequately during and after treatment; and (c) the statements omitted to disclose the following information: (i) Alto already knew from prior clinical trials that it was "common" for patients to miss doses or halt treatment, especially those in vulnerable patient populations like individuals suffering from MDD, and therefore that compliance to protocol had to be monitored and verified, yet the Company set up "[o]nly a subset of sites within the study . . . to evaluate PK levels"; (ii) Alto experienced significant enrollment problems for Phase 2b that forced the Company to lure patients from social media, pay patients to participate, and employ third-party recruiters; (iii) the Company lowered standards to increase enrollment, utilizing a lax screening process for potential patients where the Company did not verify medical records to determine that patients were eligible to participate in Phase 2b; (iv) the aforementioned practices were intended to and did attract professional patients, who were there for payment rather than treatment, and were thus less likely to follow the Phase 2b protocol, thereby threatening Phase 2b's success; (v) Alto's decentralized clinical trial site in Jackson, Mississippi was the "worst site," facing significant issues and enrolling patients unsupervised by the Company; and (vi) as a result of the foregoing, Alto's ability to successfully complete Phase 2b and commercialize ALTO-100 was already at serious risk.

152. The 2023 10-K again contained the same misstatements that were previously made in the defective Registration Statement regarding the Company's risks of MDD patient withdrawal that thereon would impact enrollment and the ultimate outcome of the clinical trials, without disclosing that these risks had already started to materialize:

> We have in the past and may in the future experience participant withdrawals or discontinuations from our trials. ***Withdrawal of participants from our clinical trials, including participants in any control groups, may compromise the quality of our data.*** Even if we are able to enroll a sufficient number of participants in our clinical trials, ***we may have difficulty maintaining enrollment of such patients in our clinical trials, and delays in enrollment may result in increased costs or may affect the timing or outcome of our clinical trials. Any of these conditions may negatively impact our ability to complete such trials or include results from such trials in regulatory submissions, which could adversely affect our ability to advance the development of our product candidates***. Additionally, participants with neuropsychiatric disorders, including MDD and schizophrenia, constitute a vulnerable patient population and ***may withdraw from the clinical trial if they are not experiencing improvement in their underlying disease or condition or if they experience other difficulties or issues relating to their underlying disease or condition or otherwise***.

153. The statements identified in Paragraph 152 were materially false and misleading when made because: (a) Alto was already experiencing significant enrollment issues and Alto executives had already expressed concerns that the Company would not meet its enrollment goals; and (b) the statements omitted to disclose the following information: (i) Alto already knew from prior clinical trials that it was "common" for patients to miss doses or halt treatment, especially those in vulnerable patient populations like individuals suffering from MDD, and therefore that compliance to protocol had to be monitored and verified, yet the Company set up "[o]nly a subset of sites within the study . . . to evaluate PK levels"; (ii) Alto experienced significant enrollment problems for Phase 2b that forced the Company to lure patients from social media, pay patients to participate, and employ third-party recruiters; (iii) the Company lowered standards to increase enrollment, utilizing a lax screening process for potential patients where the Company did not verify medical records to determine that patients were eligible to participate in Phase 2b; (iv) the aforementioned practices were intended to and did attract professional patients, who were there for payment rather than treatment, and were thus less likely to follow the Phase 2b protocol, thereby threatening Phase 2b's success; (v) Alto's decentralized clinical trial site in Jackson,

Mississippi was the "worst site," facing significant issues and enrolling patients unsupervised by the Company; and (vi) as a result of the foregoing, Alto's ability to successfully complete Phase 2b and commercialize ALTO-100 was already at serious risk.

154. As Defendants previously did in the defective Registration Statement, Defendants also portrayed in the 2023 10-K additional risks of clinical trial team compliance and remote testing as hypothetical risks:

> We rely on, and intend to continue to rely on, our internal clinical development expertise to conduct our current and future clinical trials. This model includes internal teams and systems as well as external vendors and CROs to comprise a full clinical trial team. ***If our clinical trial team does not*** comply with applicable regulatory requirements, meet expected deadlines***, or run trials effectively, our development programs and our ability to seek or obtain regulatory approval for or commercialize our product candidates may be delayed.***

155. The statements identified in Paragraph 154 were materially false and misleading when made because: (a) Alto had already taken significant shortcuts with Phase 2b in enrolling patients, especially at the decentralized trial sites, and Defendants had already expressed concerns about such enrollment; (b) Alto had already compromised the chances to obtain meaningful results from Phase 2b by skipping basic verification of medical records and drug intake; (c) Defendants had already expressed internally concerns about the conduct of decentralized sites, like Jackson, Mississippi; (d) as a result of the foregoing, Alto already faced major undisclosed uncertainty about the design, enrollment and conduct of Phase 2b.

156. On June 6, 2024, Etkin attended the Jefferies Global Healthcare Conference and again touted Alto's robust internal clinical trial approach. During the conference call, Etkin made the following materially misleading statements:

> And then we run these trials ourselves. We don't use CROs. ***We have an internal clinical operations team which allows us to make sure we have the right sites, are bringing in the right patients who are consistent between the phase 2A and the phase 2B, all run within the United States, and that the design of the phase 2B in turn leaves little gap to the phase three***. It's designed to look like a phase 3 as well. So trying to give ourselves every chance of success, and ultimately trying to avoid the pitfalls often in biotech, which is where you just take that big swing prematurely before you actually know enough about your drug. And that's true really for all of our programs.

157. The statements identified in Paragraph 156 were materially false and misleading when made because Alto was not (as it later admitted) bringing in "the right patients" to make the participant pool "consistent between phase 2a and the phase 2b." In fact, it was bringing in the wrong patients and the participant pool in Phase 2a was totally inconsistent with the participant pool in Phase 2b. Indeed, Alto's internal clinical operations team was not "bringing in the right patients[,]" but instead, due to the significant pressure to meet the FDA's 266 patient threshold and the concerns Defendants already expressed internally about meeting the Phase 2b enrollment goal, Defendants utilized social media and other forums to advertise Phase 2b to potential patients, paid patients to participate, employed third parties to advertise to and recruit patients, and utilized a lax screening process for potential patients where the Company did not require patients to provide medical records to determine that they were eligible to participate in Phase 2b. As a result of the foregoing, Alto increased the risk of attracting professional patients who would not follow the Phase 2b protocol, thereby threatening Phase 2b's success. Moreover, the statements assuring investors that the participant pools of the two trials were consistent was misleading because the statements omitted to disclose the following information: (i) Alto already knew from prior clinical trials that it was "common" for patients to miss doses or halt treatment, especially those in vulnerable patient populations like individuals suffering from MDD, and therefore that compliance to protocol had to be monitored and verified, yet the Company set up "[o]nly a subset of sites within the study . . . to evaluate PK levels"; (ii) Alto experienced significant enrollment problems for Phase 2b that forced the Company to lure patients from social media, pay patients to participate, and employ third-party recruiters; (iii) the Company lowered standards to increase enrollment, utilizing a lax screening process for potential patients where the Company did not verify medical records to determine that patients were eligible to participate in Phase 2b; (iv) the aforementioned practices were intended to and did attract professional patients, who were there for payment rather than treatment, and were thus less likely to follow the Phase 2b protocol, thereby threatening Phase 2b's success; (v) Alto's decentralized clinical trial site in Jackson, Mississippi was the "worst site," facing significant issues and enrolling patients unsupervised by the Company; and (vi) as a result of the foregoing, Alto did not bring

in the "right patients" for Phase 2b, the participant pools for the two trials were not consistent and Alto's ability to successfully complete Phase 2b and commercialize ALTO-100 was already at serious risk.

158. Etkin also discussed the Company's ability to oversee Phase 2b, misleadingly assuring investors that the Company was in a position to immediately remedy any issues related to Phase 2b:

> ***So trying to do all of those things that best position the study while also watching every site and every patient like a hawk.*** So every single clinical and biomarker data set gets reviewed prior to randomization at Alto as well as by the site as well as by the third party and rating vendors. ***So a lot of eyes on everything, constantly monitoring sites, making sure that any one site doesn't go and recruit that many more people than other sites, so we have representation broadly. And so far so good. I think actually executing it through an internal team also builds a lot of ownership in what we're doing.***

159. The statements identified in Paragraph 158 were materially false and misleading when made because: (a) Alto did not have "a lot of eyes on everything" and contrary to Etkin's assertion that Alto was "watching every site and every patient like a hawk[,]" it did not even bother to look at patient medical records, or test patients to verify that they took the randomized treatments; (b) Alto did not ensure "that any one site doesn't go and recruit that many more people than other sites, so we have representation broadly" because a disproportionate amount of decentralized patients were funneled through Jackson, Mississippi, internally acknowledged as a site with poor trial execution; and (c) the statements omitted to disclose the following information: (i) Alto already knew from prior clinical trials that it was "common" for patients to miss doses or halt treatment, especially those in vulnerable patient populations like individuals suffering from MDD, and therefore that compliance to protocol had to be monitored and verified, yet the Company set up "[o]nly a subset of sites within the study . . . to evaluate PK levels"; (ii) Alto experienced significant enrollment problems for Phase 2b that forced the Company to lure patients from social media, pay patients to participate, and employ third-party recruiters; (iii) the Company lowered standards to increase enrollment, utilizing a lax screening process for potential patients where the Company did not verify medical records to determine that patients were eligible to participate in Phase 2b; (iv) the aforementioned practices were intended to and did attract professional patients, who were there for payment rather than treatment, and were thus less likely to follow the Phase 2b protocol, thereby threatening Phase 2b's success; (v) Alto's decentralized clinical trial site in Jackson,

Mississippi was the "worst site," facing significant issues and enrolling patients unsupervised by the Company; and (vi) as a result of the foregoing, Alto's ability to successfully complete Phase 2b and commercialize ALTO-100 was already at serious risk.

160. During the June 6, 2024 conference, Etkin was asked to explain why Phase 2b was effective, and he again misrepresented that Phase 2b was then executing well:

> **Interviewer:** And so maybe one more question is just summarize to us why you're confident this study can work. I know we walked through a lot of things, but if you can summarize.
>
> **Etkin:** Yeah. So it's a very directed, hypothesis-driven approach. We knew the population we were going for, mechanistically that told us to find, then multiple replications including prospective replications of the biomarker that enriches response, which is specific for the drug in a study format where we know we can pull the right patients out consistently. ***And then we know through execution that we've been able to carry forward our processes very smoothly from phase 2A to phase 2B. And everything has gone so far very well in execution of the trial and we're around the corner from the results themselves.***

161. The statements identified in Paragraph 160 were materially false and misleading when made because analysts were specifically asking why Alto was confident that the Phase 2b study would "work" and Etkin misrepresented that Alto had "been able to carry forward [its] processes very smoothly from phase 2a to phase 2b." In fact, the opposite was true. Alto was not executing Phase 2b well, but instead had compromised trial integrity with a series of shortcuts designed to boost enrollment and lower costs, including paying and heavily recruiting patients, relying on decentralized sites, skipping medical record verification, and declining to verify drug intake. Moreover, the assurances that the processes were moving smoothly from Phase 2a to Phase 2b were misleading because the statements omitted to disclose the following information: (i) Alto already knew from prior clinical trials that it was "common" for patients to miss doses or halt treatment, especially those in vulnerable patient populations like individuals suffering from MDD, and therefore that compliance to protocol had to be monitored and verified, yet the Company set up "[o]nly a subset of sites within the study . . . to evaluate PK levels"; (ii) Alto experienced significant enrollment problems for Phase 2b that forced the Company to lure patients from social media, pay patients to participate, and employ third-party recruiters; (iii) the Company lowered standards to increase enrollment, utilizing a lax screening process for potential

patients where the Company did not verify medical records to determine that patients were eligible to participate in Phase 2b; (iv) the aforementioned practices were intended to and did attract professional patients, who were there for payment rather than treatment, and were thus less likely to follow the Phase 2b protocol, thereby threatening Phase 2b's success; (v) Alto's decentralized clinical trial site in Jackson, Mississippi was the "worst site," facing significant issues and enrolling patients unsupervised by the Company; and (vi) as a result of the foregoing, Alto had not carried the clinical trial processes forward smoothly from Phase 2a to Phase 2b, and Alto's ability to successfully complete Phase 2b and commercialize ALTO-100 was already at serious risk.

162. On August 13, 2024, Alto filed with the SEC its quarterly report for the second quarter of 2024 on Form 10-Q (the "2Q 2024 10-Q"). The 2Q 2024 10-Q contained substantively the same misstatements identified in Paragraphs 150, 152, 154, which were materially false and misleading and omitted to state material facts for the same reasons set forth in Paragraphs 151, 153, 155.

163. On September 9, 2024, Alto held an Investor Day and presented to shareholders. During that presentation, Powell presented on behalf of the Company and spoke about "how we conduct our clinical trials" at the Company, stating:

> We are unique in that we use a model that really relies on an in-house approach and we often get the question why don't we use CROs. ***And the answer to that is simple because we collect higher quality data by doing it in house and there are multiple reasons for that.*** One is that we have a substantially reduced cost overall which actually allows us to do more while we're spending less. ***And while we're doing more, it's not just about volume, it's also about spending on the right aspects of the study so that we're actually improving quality overall***. We also have a highly trained team. All of our CRAs worked at CROs before they came to Alto and, once at Alto, they receive ongoing additional training that's specific to Alto and specific to our trials in psychiatry.

164. The statements identified in Paragraphs 163 were materially false and misleading when made because, among other things, (a) Alto's use of its in-house clinical trial team did not "improv[e] quality overall" but actually compromised quality—specifically, Alto already knew from prior clinical trials that it was "common" for patients to miss doses or halt treatment, especially those in vulnerable patient populations like individuals suffering from MDD, and therefore that compliance to protocol had to be monitored and verified, yet the Company set up "[o]nly a subset of sites within the study . . . to

evaluate PK levels"; and (b) in addition, the statements omitted to disclose the following information: (i) Alto experienced significant enrollment problems for Phase 2b that forced the Company to lure patients from social media, pay patients to participate, and employ third-party recruiters; (ii) the Company lowered standards to increase enrollment, utilizing a lax screening process for potential patients where the Company did not verify medical records to determine that patients were eligible to participate in Phase 2b; (iii) the aforementioned practices were intended to and did attract professional patients, who were there for payment rather than treatment, and were thus less likely to follow the Phase 2b protocol, thereby threatening Phase 2b's success; (iv) Alto's decentralized clinical trial site in Jackson, Mississippi was the "worst site," facing significant issues and enrolling patients unsupervised by the Company; and (v) as a result of the foregoing, Alto's in-house clinical trial operations were not improving quality overall and Alto's ability to successfully complete Phase 2b and commercialize ALTO-100 was already at serious risk.

165. The conversation continued with Powell making misleading statements regarding how the Company closely monitored clinical sites proactively and intervened quickly if problems arose at any point:

> The last one I'll talk about today is our actual approach to monitoring. We do things just like a CRO does in terms of traditional monitoring aspects. CROs really are about reviewing individual case report forms, an example of which is shown on the upper right here. At Alto, we do things with our own unique way, we're a very data driven company, I'll get to that in a little bit, but we really focus on direct data entry with our sites and real time data review. What this means is our CRAs are picking up data entry errors in real time. ***We do things like eligibility review that prevent inadvertent enrollment and this is really a shift from reactive monitoring, which is really the industry norm, to more of a proactive approach so that we're picking up site issues earlier in the process.***
>
> We also use a mix of onsite and remote risk-based monitoring, this is assessing what type of risk a site may have and spending more time with them if they need it. And we use independent external raters to confirm MDD as well as monitor rater performance. And Amit and Adam have both spoken to that a few times already but we're using third parties to actually confirm the MDD diagnosis before the patients are enrolled into the study and we're using third parties to independently monitor the rater performance over the study conduct. ***This ensures we have another layer of independent oversight in addition to what we're doing internally and we go deeper***. We do cumulative reviews and there's two plots here. The

> middle one is actually looking at our own monitor's performance. ***So, we are monitoring how our CRAs are actually looking at the site data and we have many metrics to look at that, this is just one so that, if an individual CRA falls off, we can pick that up pretty quickly, within a week or two, and go in and intervene and support that***.
>
> The bottom one here is a plot that shows the reasons for screen failure across sites. There are many reasons for screen failure, we're just checking trends here, and we're able to compare those to the study averages, to the expected averages and, ***if you see something abnormal in a site, you can go in and intervene***. These are two examples, we're doing this across protocol deviations, concomitant medications, adverse events such that ***we get this really comprehensive view of how a site is performing and can intervene very quickly if we pick up nuances and, again, data-driven company, really looking at metrics across sites to intervene.***

166. The statements identified in Paragraphs 165 were materially false and misleading when made because Powell asserted that Alto was able to detect and intervene in a timely manner whenever a site was experiencing performance problems, when in fact the opposite was true. Specifically, Alto was not closely monitoring clinical trial sites for abnormalities and instead the Jackson, Mississippi site had significant performance issues which went unremedied and had a material negative impact on Phase 2b. Moreover, Alto's use of "eligibility review" did not prevent errors in enrollment, and instead, because of the significant pressure to meet the FDA's 266 patient threshold, Alto utilized a flawed approach to enrollment that put Phase 2b's success at risk. In addition, the assertion that Alto was able to promptly detect and remedy performance issues at clinical sites was misleading because the statements omitted to disclose the following information: (i) Alto already knew from prior clinical trials that it was "common" for patients to miss doses or halt treatment, especially those in vulnerable patient populations like individuals suffering from MDD, and therefore that compliance to protocol had to be monitored and verified, yet the Company set up "[o]nly a subset of sites within the study . . . to evaluate PK levels"; (ii) Alto experienced significant enrollment problems for Phase 2b that forced the Company to lure patients from social media, pay patients to participate, and employ third-party recruiters; (iii) the Company lowered standards to increase enrollment, utilizing a lax screening process for potential patients where the Company did not verify medical records to determine that patients were eligible to participate in Phase 2b; (iv) the aforementioned practices were intended to and did attract professional patients, who were there for payment rather than treatment, and were thus less likely to follow the Phase

2b protocol, thereby threatening Phase 2b's success; (v) Alto's decentralized clinical trial site in Jackson, Mississippi was the "worst site," facing significant issues and enrolling patients unsupervised by the Company; and (vi) as a result of the foregoing, Alto was not able to promptly detect and remedy performance issues—especially at remote sites—and Alto's ability to successfully complete Phase 2b and commercialize ALTO-100 was already at serious risk.

167. Powell continued to make material misrepresentations about how Alto knew it was "enrolling real patients," limited score inflation from clinical sites, had "high quality data" and was making sure that "execution" went according to plan:

> ***And all of these metrics set us up very well to pick up patient trends or site trends that, really, we can intervene on and ensure they do not become an issue for the site. We know that we are enrolling real patients at sites that have high quality data. So, at the end of the study, we are confident that we have a well-executed, well-balanced study.***

168. The statements identified in Paragraphs 167 were materially false and misleading when made because, among other things, Alto did not "know that [it] was enrolling real patients." In fact, paid trial participants who did not have MDD were not "real patients" at all and paid patients who were not already taking prescriptions for MDD (monotherapy patients) were a red flag that they were not real patients. In addition, (a) Alto could not quickly intervene to prevent adverse events at clinical sites, but instead issues at trial sites like the decentralized trial site in Jackson, Mississippi went unaddressed compromising "high quality data"; and (b) the statements omitted to disclose the following information: (i) Alto already knew from prior clinical trials that it was "common" for patients to miss doses or halt treatment, especially those in vulnerable patient populations like individuals suffering from MDD, and therefore that compliance to protocol had to be monitored and verified, yet the Company set up "[o]nly a subset of sites within the study . . . to evaluate PK levels"; (ii) Alto experienced significant enrollment problems for Phase 2b that forced the Company to lure patients from social media, pay patients to participate, and employ third-party recruiters; (iii) the Company lowered standards to increase enrollment, utilizing a lax screening process for potential patients where the Company did not verify medical records to determine that patients were eligible to participate in Phase 2b; (iv) the aforementioned practices were intended to and did attract professional patients, who were there for payment rather than treatment, and were thus less likely to follow the Phase 2b protocol, thereby

threatening Phase 2b's success; (v) Alto's decentralized clinical trial site in Jackson, Mississippi was the "worst site," facing significant issues and enrolling patients unsupervised by the Company; and (vi) as a result of the foregoing, Alto did not "know" it was enrolling "real patients" and its ability to successfully complete Phase 2b and commercialize ALTO-100 was already at serious risk.

169. During the Investor Day held on September 9, 2024, Etkin again gave investors false assurances about Alto's clinical trial quality and made brazenly false statements claiming that Alto had been "sweating the details" on execution, left no stone unturned, and he could not think of anything that was missing from the clinical trial:

> Multiple external data sets, looking at placebo so think here about how oncology or rare disease often work that you have other external control arms, we've implemented that here and looked at placebo to show similar or slightly worse response to placebo in poor memory patients. The drug has been very well tolerated, over 400 people dosed prior to the phase 2B so there's no surprising adverse events as we go into the phase 2B and then really ***sweating the details on both execution*** and designing the study to try to mitigate placebo in the first place. ***So, I would ask a question which we ask ourselves all the time which is can you think of any stone we have not unturned and turned over and seen what's there? Is there anything that we've missed? Is there any thought that we didn't have that we should have had? We don't think so.*** We'd certainly love if anybody has suggestions which really says that short of just doing the trial itself, there's not any more to do and, lucky for us, October is around the corner and we're well on track to report results next month.

170. The statements identified in Paragraphs 169 were materially false and misleading when made because (a) Alto was not "sweating the details" on execution and leaving no stone unturned, but instead compromised trial integrity with a series of shortcuts designed to boost enrollment and lower costs, including paying and heavily recruiting patients, relying on decentralized sites, skipping medical record verification, and declining to verify drug intake, and (b) the statements omitted to disclose the following information: (i) Alto already knew from prior clinical trials that it was "common" for patients to miss doses or halt treatment, especially those in vulnerable patient populations like individuals suffering from MDD, and therefore that compliance to protocol had to be monitored and verified, yet the Company set up "[o]nly a subset of sites within the study . . . to evaluate PK levels"; (ii) Alto experienced significant enrollment problems for Phase 2b that forced the Company to lure patients from social media, pay patients to participate, and employ third-party recruiters; (iii) the Company lowered

standards to increase enrollment, utilizing a lax screening process for potential patients where the Company did not verify medical records to determine that patients were eligible to participate in Phase 2b; (iv) the aforementioned practices were intended to and did attract professional patients, who were there for payment rather than treatment, and were thus less likely to follow the Phase 2b protocol, thereby threatening Phase 2b's success; (v) Alto's decentralized clinical trial site in Jackson, Mississippi was the "worst site," facing significant issues and enrolling patients unsupervised by the Company; and (vi) as a result of the foregoing, Alto's ability to successfully complete Phase 2b and commercialize ALTO-100 was already at serious risk.

171. On September 17, 2024, Etkin attended the Cantor Fitzgerald Global Healthcare Conference, where Etkin again made misleading statements concerning high quality data and Phase 2b's execution:

> The other thing you can see here is part of our design and our execution. We run our own trials. We have our own clinical operations team. We don't use a CRO. ***That ensures higher quality data***, allow us to operate with much greater capital efficiency, roughly half the cost of industry averages. ***And so we wanted to make sure execution was as we had wanted it.*** And what you can see, for example, is that the site baseline visit three is very similar to the MGH MADRS score. And that suggests that as designed, there's no incentive here for score inflation from sites, which is a common driver of placebo response.
>
> * * *
>
> As I mentioned, we're going to be looking at good memory as a qualitative comparison, and then there'll be a variety of other things that come out of this trial, not everything will be top line data. We're going to try to make top line data as clear as possible for how our decision making lays out. So where are we? At this point, I would argue that we've tried to turn over every stone we could possibly find before doing this real powered direct test of this drug. We have a target population that's linked mechanistically to the drug that we understand how to identify and we can do even with a commercial ready web-based tool that we've given investors access to coming into investor day.

172. The statements identified in Paragraph 171 were materially false and misleading when made because: (a) Alto's approach to overseeing Phase 2b did not "ensure[] higher quality data," but instead caused a significant gap in oversight and control that posed a threat to quality data collection and increased the risk of poor execution; and (b) the statements omitted to disclose the following information: (i) Alto already knew from prior clinical trials that it was "common" for patients to miss

doses or halt treatment, especially those in vulnerable patient populations like individuals suffering from MDD, and therefore that compliance to protocol had to be monitored and verified, yet the Company set up "[o]nly a subset of sites within the study . . . to evaluate PK levels"; (ii) Alto experienced significant enrollment problems for Phase 2b that forced the Company to lure patients from social media, pay patients to participate, and employ third-party recruiters; (iii) the Company lowered standards to increase enrollment, utilizing a lax screening process for potential patients where the Company did not verify medical records to determine that patients were eligible to participate in Phase 2b; (iv) the aforementioned practices were intended to and did attract professional patients, who were there for payment rather than treatment, and were thus less likely to follow the Phase 2b protocol, thereby threatening Phase 2b's success; (v) Alto's decentralized clinical trial site in Jackson, Mississippi was the "worst site," facing significant issues and enrolling patients unsupervised by the Company; and (vi) as a result of the foregoing, Alto's ability to successfully complete Phase 2b and commercialize ALTO-100 was already at serious risk.

173. On September 26, 2024, Etkin attended TD Cowen's 4th Annual Novel Mechanisms in Neuropsychiatry Summit. At this event, Etkin misrepresented that there was nothing that gave him "any pause at all" concerning Phase 2b:

> So, I don't think a CRO exists that has the capacity to do cognitive measures in real-time patient selection. We're doing EEG, we're doing wearables, all of that, we're QCing in real time as well. Often, CROs don't even do real-time data entry. So, when you are looking at data and site performance, it's months delayed relative to when the events happen.
>
> ***So, you can't get in there and fix it in a real-time way, and we can in our trials. You get a much better, higher quality data set.*** You also reduce the cost. We run at about half the cost of our industry peers for these kinds of trials.
>
> * * *
>
> Everything we do is to constrain that variability, and there's nothing in what we've seen so far in our monitoring of the trial and our conduct that would suggest anything different. So, our guidance is that we would expect placebo to come in the historical norms. We would expect the variability in terms of the standard deviation to come within historical norms, standard deviation of the change scores. ***There's nothing per se that has given us any pause at all.***

174. The statements identified in Paragraph 173 were materially false and misleading when made because, among other things, (a) Defendants represented to investors that Alto could monitor the clinical trials and "fix it in a real time way" when in fact Alto was unable to monitor or fix non-compliance on the part of trial participants—specifically, the Company admitted there were trial concerns that gave it pause, *see* ¶¶67–74; (b) Alto's approach to Phase 2b did not allow it "fix [issues] in a real-time way" or "get a much better, higher quality data set," but instead compromised trial integrity with a series of shortcuts designed to boost enrollment and lower costs, including paying and heavily recruiting patients, relying on decentralized sites, skipping medical record verification, and declining to verify drug intake; and (c) the statements omitted to disclose the following information: (i) Alto already knew from prior clinical trials that it was "common" for patients to miss doses or halt treatment, especially those in vulnerable patient populations like individuals suffering from MDD, and therefore that compliance to protocol had to be monitored and verified, yet the Company set up "[o]nly a subset of sites within the study . . . to evaluate PK levels"; (ii) Alto experienced significant enrollment problems for Phase 2b that forced the Company to lure patients from social media, pay patients to participate, and employ third-party recruiters; (iii) the Company lowered standards to increase enrollment, utilizing a lax screening process for potential patients where the Company did not verify medical records to determine that patients were eligible to participate in Phase 2b; (iv) the aforementioned practices were intended to and did attract professional patients, who were there for payment rather than treatment, and were thus less likely to follow the Phase 2b protocol, thereby threatening Phase 2b's success; (v) Alto's decentralized clinical trial site in Jackson, Mississippi was the "worst site," facing significant issues and enrolling patients unsupervised by the Company; and (vi) as a result of the foregoing, Alto had no ability to monitor participant complaints or "fix it in real time" and Alto's ability to successfully complete Phase 2b and commercialize ALTO-100 was already at serious risk.

## II. The Truth Begins to Emerge

175. On October 22, 2024, after the market closed, Alto issued a press release announcing that Phase 2b "did not meet its primary endpoint, assessed by a change from baseline in [MADRS], compared to placebo." Specifically, the "biomarker-defined MDD patient group treated with ALTO-100 did not demonstrate a statistically significant improvement in depressive symptoms compared to placebo."

Moreover, "ALTO-100 did not demonstrate benefit over placebo on the pre-specified key secondary analyses." This announcement was a corrective disclosure and materialization of the foreseeable risk that the Exchange Act Defendants had previously concealed from the investing public, including Lead Plaintiffs and other members of the Exchange Act Class.

176. On this news, the price of Alto's common stock fell by nearly 70% from its previous day closing price of $14.53 to close at $4.36 on October 23, 2024. The price of Alto's common stock declined again the next trading day to close at $4.13 on October 24, 2024.

177. Analysts interpreted Phase 2b's failure as a warning sign for Alto's entire business model. For example, analysts from Jefferies observed that Phase 2b's failure "raises questions around [Alto's] overall biomarker approach to CNS/psychiatry (e.g. tailoring treatments to maximize efficacy)." Andrew Tsai and Matthew Barcus, *Overall Precision Psychiatry Approach Hurt by (-) Phase IIb Depression Results*, JEFFERIES, Oct. 22, 2024, at 1; *see also* Myles R. Minter and John Boyle, *ALTO-100 Phase IIb Miss in Depression Disappointing; Focus Will Shift to ALTO-300 Data Phase IIb in First Half of 2025*, WILLIAM BLAIR, Oct. 22, 2024, at 1 (noting that the Phase 2b failure "undoubtedly will cast investor doubt on Alto's Precision Neuropsychiatry approach to pair specific mechanisms of action to patient biomarkers of drug response.").

178. Further, analysts immediately and significantly reduced the value of Alto's common stock because of Phase 2b's failure, with one analyst reducing the price target to $4 a share. Laura Chico, *Moving to Neutral, New $4 Target Following ALTO-100 Readout*, WEDBUSH, Oct. 23, 2024, at 1. News articles also directly attributed the decline in Alto's stock price to the announcement that Phase 2b had failed. On October 22, 2024, after the market closed, Bloomberg reported that the price of Alto's common stock fell "after saying Phase 2b study of ALTO-100 in patients with major depressive disorder didn't meet its primary endpoint." Many other publications focused on finance and the biopharmaceutical industry, including but not limited to SeekingAlpha, MT Newswire, Fierce Pharma, FirstWord Pharma and BioWorld, also directly linked the decline in Alto's stock price to Phase 2b's failure.

179. Unlike Alto, which fell nearly 70% on October 23, 2024, the S&P 500 declined by less than 1% on the same date (close to close). IBB, an ETF focused on the biotech industry, fell less than

1.5%. Both the S&P 500 and IBB fell an order of magnitude less on October 23, 2024, than Alto, indicating that market and industry factors did not cause the price decline.

180. Over the subsequent months, Defendants conceded that Phase 2b's failure was the direct result of the failure to exclude professional patients in Phase 2b, and the Company's failure to effectively monitor the decentralized sites to make sure that participants were actually taking ALTO-100 during Phase 2b. *See infra* at Section III(C).

181. As a result of the Exchange Act Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Exchange Act Class members have suffered significant losses and damages. The damages suffered by Lead Plaintiffs and other members of the Exchange Act class were directly and proximately caused by the Exchange Act Defendants' wrongful conduct as alleged herein.

## III. The Exchange Act Defendants Made Misleading Statements With Scienter

### A. CW Accounts Are Indicative of Scienter

182. As described in detail in Paragraphs 68 through 93, many of the CWs were in a position to know about the serious problems Phase 2b faced since they screened patients, participated in meetings where Etkin spoke, reported to high-level executives who directly reported to Etkin or otherwise described events that were well known throughout a small company of only 63 employees. Among other things, CW1 and CW2 confirm that Etkin was worried about the remote sites and the C-Suite internally expressed concerns about the ability to meet enrollment expectations even before the Company went public. CW2, CW3, and CW4 confirm that Alto systematically failed to conduct basic verification, which itself created a huge risk of enrolling professional patients in the trial. CW2, CW3, CW4, and CW7 confirm that Alto paid patients to enroll in the trial, and relied heavily on social media sites and other advertising mechanisms to recruit patients. Etkin ultimately admitted that social media advertising was one of the causes for patients' "noncompliance" in Phase 2b. CW4 confirms that a presentation was shown demonstrating that the remote site in Jackson, Mississippi was the leading cause of Phase 2b's failure, the same site Etkin internally expressed concerns about from the very beginning. And CW6 and CW7 confirm that Alto extensively relied on third parties to make up for enrollment shortfalls.

### B. Etkin and Powell Made Statements Indicative of Scienter

183. Etkin and Powell had actual knowledge of the limitations of Alto's in-house clinical trial team. They knew, for example, that paid trial participants could feign MDD and were also at high risk of non-compliance. They also knew that Alto was struggling to find a sufficient number of participants with MDD. They were also aware of the deficiencies in monitoring compliance—particularly at remote sites and the Jackson, Mississippi location. Despite their knowledge, they repeatedly assured investors that their in-house clinical trial operations were superior to industry-standard practice and resulted in higher quality data. They also never disclosed to investors what they knew about the problems Alto faced in replicating the participant pool for Phase 2b.

184. Etkin and Powell spoke publicly and in detail about ALTO-100 and Phase 2b. *See* ¶¶144, 146, 156, 158, 160, 163, 165, 167, 169, 171, 173. Etkin regularly addressed pointed questions from analysts concerning ALTO-100 and its clinical trials and responded with a high degree of specificity to demonstrate that he was aware of the details that rendered his statements misleading when made.

185. For example, on March 18, 2024 at the Fireside Chat at UBS's Virtual CNS Day, Etkin made statements demonstrating that he closely monitored decentralized sites, conducted quality control and had access to granular data:

> **Ash Verma:** For this type of biomarker-driven strategy, do you think that there is a limitation from how many sites are available in the US or outside US that can actually execute on a study like this? Did you run into that type of a hurdle?
>
> **Amit Etkin:** ***We have not.*** Essentially, we are looking for good quality sites. We're looking for sites that know psychiatric patients, preferably that treat psychiatric patients so that the people they bring in are going to be high quality participants. But then we don't actually count on them knowing how to do any of the biomarkers because we teach them. And in teaching them, we've also been doing this for a long time, we've learned both how to teach them and how to ensure high quality data collection through software that we develop and give to them for them to use during acquisition. ***And so right now we're getting very, very high QC pass rate for data collection that has not been a barrier at all. And as I mentioned, we have data collection happening in people's homes in a decentralized clinical trial framework, which is frankly more like what clinical care is going to look like ultimately down the line.***

186. On June 6, 2024 at the Jefferies Global Healthcare Conference, in response to an analyst's question about Phase 2b, Etkin claimed that he was constantly watching every site and every patient like a hawk:

> ***So trying to do all of those things that best position the study while also watching every site and every patient like a hawk.*** So every single clinical and biomarker data set gets reviewed prior to randomization at Alto as well as by the site as well as by the third party and rating vendors. ***So a lot of eyes on everything, constantly monitoring sites, making sure that any one site doesn't go and recruit that many more people than other sites, so we have representation broadly. And so far so good.*** I think actually executing it through an internal team also builds a lot of ownership in what we're doing.

187. On September 26, 2024 at TD Cowen's 4th Annual Novel Mechanisms in Neuropsychiatry Summit, Etkin represented that Alto had access to real-time information to "fix" any issues at clinical sites "in a real-time way":

> So, I don't think a CRO exists that has the capacity to do cognitive measures in real-time patient selection. ***We're doing EEG, we're doing wearables, all of that, we're QCing in real time as well.*** Often, CROs don't even do real-time data entry. So, when you are looking at data and site performance, it's months delayed relative to when the events happen. ***So, you can't get in there and fix it in a real-time way, and we can in our trials. You get a much better, higher quality data set.*** You also reduce the cost. We run at about half the cost of our industry peers for these kinds of trials.

188. Powell made similar statements showing she had intimate knowledge of the pertinent information that rendered the Exchange Act Defendants' statements false or misleading. For example, on September 9, 2024, at Alto's Investor Day, Powell discussed both enrollment and monitoring to claim that Alto corrected errors in real time, monitored clinical sites very closely, and took a "proactive" approach to ensure the removal of ineligible patients from Phase 2b:

> ***The last one I'll talk about today is our actual approach to monitoring.*** We do things just like a CRO does in terms of traditional monitoring aspects. CROs really are about reviewing individual case report forms, an example of which is shown on the upper right here. ***At Alto, we do things with our own unique way, we're a very data driven company, I'll get to that in a little bit, but we really focus on direct data entry with our sites and real time data review. What this means is our CRAs are picking up data entry errors in real time. We do things like eligibility review that prevent inadvertent enrollment and this is really a shift from reactive monitoring, which is really the industry norm, to more of a proactive***

> ***approach so that we're picking up site issues earlier in the process. We also use a mix of onsite and remote risk-based monitoring, this is assessing what type of risk a site may have and spending more time with them if they need it. And we use independent external raters to confirm MDD as well as monitor rater performance. And Amit and Adam have both spoken to that a few times already but we're using third parties to actually confirm the MDD diagnosis before the patients are enrolled into the study and we're using third parties to independently monitor the rater performance over the study conduct. This ensures we have another layer of independent oversight in addition to what we're doing internally and we go deeper. We do cumulative reviews and there's two plots here. The middle one is actually looking at our own monitor's performance. So, we are monitoring how our CRAs are actually looking at the site data and we have many metrics to look at that, this is just one so that, if an individual CRA falls off, we can pick that up pretty quickly, within a week or two, and go in and intervene and support that.***

189. At the Investor Day, Powell further claimed that the Company could quickly intervene if abnormalities at clinical sites led to "screen failure":

> There are many reasons for screen failure, we're just checking trends here, and we're able to compare those to the study averages, to the expected averages and, if you see something abnormal in a site, you can go in and intervene. ***These are two examples, we're doing this across protocol deviations, concomitant medications, adverse events such that we get this really comprehensive view of how a site is performing and can intervene very quickly if we pick up nuances and, again, data-driven company, really looking at metrics across sites to intervene.***

190. By making public statements and responding to securities analysts about the subject of the fraud with a high degree of specificity, Etkin and Powell affirmed that they were sufficiently knowledgeable to address these topics and to answer the analysts' questions, which further supports a strong inference that they knew or recklessly disregarded the true facts concerning the severe problems with Phase 2b.

## C. Post-Class Period Admissions and Developments

191. Events and Defendants' own admissions after the Class Period bolster an inference of fraud and corroborate the CWs' accounts.

192. Internally, many Alto employees recognized that the key failure of Phase 2b stemmed from the Jackson, Mississippi site and the participation of remote, professional patients seeking a cash

payout. According to CW4, after Phase 2b's results were announced, CW4 attended an all-hands Company meeting, which Alto senior executives attended, including Etkin and Smith. CW4 confirmed that, according to the data presented at the all-hands meeting, the decentralized sites and, in particular, the trial site in Jackson, Mississippi, had the worst metrics among all investigative sites for Phase 2b.

193. CW4 explained that the data presented at the all-hands Company meeting demonstrated that the decentralized site with remote participants dragged down the overall results of Phase 2b. According to CW4, Alto employees suggested in the all-hands Company meeting that the poor data was due to serial trial participants, *i.e.*, professional patients, who lied to meet the criteria and merely sought the cash payout for participating in Phase 2b. Alto employees at the all-hands meeting further commented amongst themselves that, if the results from the Jackson, Mississippi trial site had not been included in Phase 2b, the results would have been much better.

194. CW4 and CW2 also confirmed that, shortly after the failure of Phase 2b, Abdel – who designed the screening process for Phase 2b – was forced out of the Company and resigned.

195. Externally, the Exchange Act Defendants also made damning admissions that substantively corroborated the CW accounts from both before and during the Class Period. Etkin repeatedly admitted that Phase 2b failed because of what he called "compliance," *i.e.*, patients in the trial not taking ALTO-100 as directed, if at all, or otherwise withdrawing from the trial entirely. For example, on November 18, 2024, at the Stifel Healthcare Conference, Etkin admitted that the driver of noncompliance was the monotherapy cohort—the "red flag" group the FDA had expressed concerns about when it directed Alto to increase the number of trial participants:

> And it came down, as you said, to why essentially. And the why for us, we try to be as simple, as much drawn by the ground truth as possible, turned out to be about compliance. ***When we looked at compliance with the drug in patients based on blood draws, we saw that the adjunctive population was fully compliant and the effect size therefore is something that we'd trust. The monotherapy group was far less compliant than we had anticipated.***

196. When pressed directly regarding why Phase 2b's failure would not impact Alto's other clinical trials, Etkin again blamed "compliance," stating, "and it's incredibly frustrating for us and for everybody else that we saw the outcome we saw, the compliance was a factor."

197. On November 20, 2024, at the Jefferies London Healthcare Conference, Etkin admitted that Alto did not even check any medical records, stating that the Exchange Act Defendants simply took "***the patient's word for it.***"

198. On March 4, 2025, Etkin spoke at TD Cowen's 45th Annual Healthcare Conference and conceded Alto's in-house clinical trials had greater quality control issues than industry practice. Specifically, he admitted that that Phase 2b's failure was the result of "the conduct of the trial, ***especially at the site level***, which leads to a greater likelihood of professional patients, a greater likelihood of data that you have a harder time trusting." This occurred, according to Etkin, "when we enlarged the study" and "went and added sites in the second half of the study," which is where the "noncompliance rate" of "over 40% here in the monotherapy arm" was "clustered." As confirmed by CW1, Etkin was already worried about remote sites before the Company went public and right after Phase 2b commenced. *See* ¶¶68–69.

199. On March 12, 2025, Etkin spoke at the Leerink Global Healthcare Conference and admitted that Phase 2b's failure was also caused by a lack of "sponsor-eligibility review," which means "***sites can't enroll patients without our say-so***," "***measuring urine antidepressant levels***," and requiring "***medical and pharmacy records***[.]" As CW6 confirmed, the site run by Bishop in Jackson, Mississippi was enrolling patients on its own. Etkin further stated that Alto was also "working on essentially diversifying our clinical trial sites and patient sources ***away from the common sources of patient risk like recruitment through social media that has driven a lot of problems across trials to date***." Etkin again confirmed that the "issue that really we think drove" the failure of Phase 2b was "a professional patient site-level conduct issue." And CW2 confirms that, during the Class Period, the social media campaigns, including considering paying patients even more as the need for increasing quality patients in the trial became more acute, increased the risk of professional patients enrolling in Phase 2b.

200. On March 20, 2025, the Company filed its 2024 10-K where Alto again admitted that compliance was the main obstacle in Phase 2b, stating that there was an "inconsistency" between the effects of ALTO-100 on the monotherapy and adjunctive populations in Phase 2b "due to a higher than anticipated level of non-compliance with study medication in the monotherapy group, while the

adjunctive group demonstrated a high level of compliance (56% in the monotherapy vs. 100% in the adjunctive)."

201. The 2024 10-K further revealed that "[o]nly a subset of sites within the study were setup to evaluate PK levels." "PK" means pharmacokinetic, which is the study of how the body interacts with administered substances for the entire duration of exposure. Therefore, "PK levels" refers to the concentration of a drug in a patient's body over time. PK levels are tested through analyzing biological samples, including blood, urine, saliva, or tissue. Here, the PK levels measured the concentration of ALTO-100 in a patient's body.

202. The 2024 10-K revealed that Alto was only able to establish the PK levels of 53 of 266 patients in Phase 2b to confirm that they were in fact taking ALTO-100 as directed as a result of Alto's decision to set up "[o]nly a subset of sites within the study . . . to evaluate PK levels":




203. During the April 29, 2025 Jones Trading Virtual CNS Symposium, Etkin again conceded that the failure of Phase 2b was because of "professional patients in a subset of the study[.]"

204. On September 17, 2025 at TD Cowen's 5th Annual Novel Mechanisms in Neuropsychiatry & Epilepsy Summit, Etkin specifically admitted that Phase 2b had "a fairly large number of ***professional patients who we assessed as people who were saying that they were taking the drug, but repeatedly detected none in their blood***." Going forward, Etkin explained that Alto would be "***requiring medical and pharmacy records. You have to show that you're getting refills prior to***

***coming in, blood measures or urine measures that you're taking the drug*** . . ." As CW2, CW3, and CW4, confirm, the failure to do basic tasks like checking a patient's medical records was a persistent issue in Phase 2b throughout the Class Period.

205. As a result, Defendants' internal and external actions after the Class Period, and the widespread acknowledgement that the risks outlined by the CWs, as known to the Company at the beginning of the Class Period, was the cause of the failure of Phase 2b, demonstrate that they either knew about the issues and risks associated with Phase 2b, or at least, recklessly disregarded them.

**D. Core Operations**

206. The successful development and commercialization of ALTO-100 concerned the Company's core operations. Alto is a small company of only 63 employees—59 employees in the United States—as noted by Alto's 2023 10-K filed during the Exchange Act Class Period. ALTO-100 for MDD was the Company's most advanced trial and the first drug Defendants expected to bring to market. All other drugs in Alto's pipeline were months, if not years, behind in terms of their capacity to succeed.

207. Moreover, Alto had no revenue or profits throughout the Class Period, as it admitted in its 2023 10-K, when it told investors, "[w]e have no products approved for commercial sale and have not generated any revenue from product sales to date. As a result, we are not profitable, have incurred substantial losses in each period since our inception, and we expect to incur significant losses for the foreseeable future." Consequently, the Company's success was largely dependent on the success of Phase 2b.

208. Conversely, the upside from Phase 2b was huge, as noted by analysts covering the Company, who observed that should the ALTO-100 clinical trials be successful, it "could lead to a >$2.5B[illion] peak sales opportunity." *See* Brian P. Skorney, Luke P. Herrmann, and Charles A. Moore, *Alto Neuroscience, Inc. (ANRO): 1Q24 Print Straightforward, Awaiting 2H24 Phase 2b ALTO-100 Results*, BAIRD EQUITY RESEARCH, at 3.

209. Further, Phase 2b's success was critical not only for the Company's goal to corner the multi-billion-dollar market for MDD treatment, but also justify Alto's entire business model. As one analyst commented during the Class Period when discussing the importance of Phase 2b, "[d]ata from

this trial could de-risk Alto's Precision Psychiatry Platform approach with the next readout leveraging EEG based biomarkers identified by Alto Scope in the Phase IIb trial of ALTO-300 in adjunctive MDD therapy." Myles R. Minter and Sarah Schram, *Biotechnology: Takeaways From Expert Breakfast With Sanjay Mathew, M.D. Discussing Several Upcoming Catalysts in the Neuropsych Space*, WILLIAM BLAIR, Apr. 11, 2024, at 3. Another noted that Phase 2b had "the potential to validate [Alto's] CNS/psychiatry platform and novel biomarker-based approach." Andrew Tsai, AJ Velazquez-Mao, and Matthew Barcus, *Phase IIb Depression Data Could De-Risk Overall Precision Psychiatry Approach*, JEFFERIES, May 14, 2024, at 1. Thus, it would de-stigmatize Alto's biomarker-based approach in manufacturing drugs, and lead to increased confidence from the market and an increased inflow of capital from investors.

210. Indeed, when Alto announced that Phase 2b had failed, analysts interpreted the results as a major risk to the Company's business model, with one analyst remarking that the failed clinical trial "undoubtedly will cast investor doubt on Alto's Precision Neuropsychiatry approach to pair specific mechanisms of action to patient biomarkers of drug response." Myles R. Minter and John Boyle, *ALTO-100 Phase IIb Miss in Depression Disappointing; Focus Will Shift to ALTO-300 Data Phase IIb in First Half of 2025*, WILLIAM BLAIR, Oct. 22, 2024, at 1. Further, analysts deemed ALTO-100's failed Phase 2b to show poor prospects for Alto's other drugs, stating that while Alto was still investigating ALTO-203 and ALTO-300, "neither program holds credit in our estimates and following the ALTO-100 miss, we are hesitant to change this view . . . Finally, we are increasing our valuation discount rate to 40% (prior 25%) which reflects increased development risks . . . We are moving to Neutral (from Outperform) as we anticipate the stock will be range-bound absent success from the 1H25 readouts." Laura Chico, *Moving to Neutral, New $4 Target Following ALTO-100 Readout*, WEDBUSH, Oct. 23, 2024, at 1.

211. Accordingly, a failed clinical trial that could invalidate Alto's entire existence in the eyes of the market supports a strong inference that the subject of the fraud was so important that it would be absurd to assume that Defendants did not know the specific facts that rendered their statements false and misleading when made.

**E. Defendants' Coverup Enhances Scienter**

212. The Exchange Act Defendants' scienter is enhanced by Alto's attempts to intimidate, or otherwise place undue pressure on, witnesses who could confirm or corroborate the allegations of fraud raised in this litigation. On information and belief, the Exchange Act Defendants and/or their agents have contacted numerous CWs or other former Alto employees in an attempt to have them recant what they truthfully disclosed information to Plaintiffs' investigators or otherwise discourage them from cooperating with Plaintiffs' investigation. Several CWs who voluntarily provided information to Plaintiffs before the Amended Complaint was filed on January 23, 2026 (ECF No. 52) have discontinued any communication, likely due to this pressure.

213. Even worse, at least one potential new witness contacted by Plaintiffs to confirm or corroborate the SAC's allegations told Plaintiffs' investigators that the Exchange Act Defendants, through their agents, sent threatening emails to discourage witnesses from cooperating with Plaintiffs and their Counsel. A screenshot of the conversation between that potential witness and Plaintiffs' investigator is depicted below:




214. Because this potential witness had not previously been identified in any prior filing in this Action and was only recently contacted by Plaintiffs' investigators, there is no way for Defendants to have known the identity of the potential witness and thus this was not an effort to determine whether facts attributed to a witness already identified in the complaint were true. Instead, it was an attempt to silence witnesses and discourage them from coming forward. Nor can the potential witness be motivated to misrepresent the existence of the Exchange Defendants' threats since the witness has not provided any information yet or been identified in any complaint.

215. The "generic" nature of the threatening email referenced by the victim of the intimidation raises a strong inference that many former or current employees were similarly threatened or otherwise dissuaded from cooperating with Plaintiffs' investigation of fraud.

216. Consequently, the Exchange Act Defendants' attempts to intimidate or otherwise pressure former or current Alto employees with the purpose of preventing their truthful disclosure of fraud enhances an inference of scienter.

217. The Exchange Act Defendants also covered up the full trial results from Phase 2b. Federal regulations require that the results of the clinical trials must be submitted to the FDA no later than a year after the clinical trial is completed. 42 C.F.R. §§ 11.42(b), 11.44(a). The results are then posted online within 30 days regardless of whether quality control review is complete.

218. The Exchange Act Defendants were aware of this requirement, as Alto submitted the results of Phase 2a for ALTO-100 to the FDA. *See Pilot Decentralized Trial*, ClinicalTrials.gov, Nat'l Library of Medicine, https://clinicaltrials.gov/study/NCT05419869?locStr=Jackson,%20 Mississippi&country=US&state=Mississippi&city=Jackson&term=ALTO&rank=3&tab=results (last visited Apr. 1, 2026).

219. Phase 2b's primary completion date was September 5, 2024. However, the Exchange Act Defendants have withheld the full results from the public. According to the National Library of Medicine's website, the Phase 2b "[s]tudy results have not been submitted." *Phase 2b Study of ALTO-100 in MDD*, ClinicalTrials.gov, Nat'l Library of Medicine, https://clinicaltrials.gov/study/NCT05712187?term=ALTO-100&rank=3&tab=results&a=2 (last visited Apr. 1, 2026). Instead, on September 4, 2025, the Exchange Act Defendants requested an extension to delay disclosing the full trial results, and continue to withhold them from investors.

**F. The Exchange Act Defendants' Claimed Expertise Supports Scienter**

220. The Exchange Act Defendants' decades of experience in the fields of psychiatry, neuroscience and biotechnology fields, including seeking FDA approval for pharmaceutical drugs, further supports their scienter. Indeed, the defective Registration Statement assured investors that "core members of [Alto's] scientific and clinical leadership team bring decades of experience across CNS drug development" and that, "[t]o date, our management team has been involved in the approval of 25 drugs and the clinical development of more than 100 product candidates."

221. Etkin has an M.D. and Ph.D. in neurobiology from Columbia University, an M.Phil. in Neurobiology from Columbia University, and a B.S. in Biology from the Massachusetts Institute of

Technology. Before founding Alto, Etkin was a Professor of Psychiatry and Behavior Sciences at the Stanford University School of Medicine and claims to be an international leader in the neuroscience of psychiatric disorders and their treatments. In his career in academia, Etkin ran a well-funded lab with over 30 students, post-doctoral researchers, and staff. He has also authored more than 100 scientific articles. Consequently, Etkin had significant experience in both the relevant fields and in conducting scientific trials to know the risks associated with Phase 2b and Alto's failure to properly screen and monitor the Phase 2b participants.

222. Before joining Alto, Smith served in various roles at Aptinyx Inc., a CNS-focused biopharmaceutical company, including as a Director for Corporate Development, a Senior Director for Corporate Development and Investor Relations, and a Vice President for Investor Relations and Corporate Development. Accordingly, Smith had significant experience in investor relations to know the necessity of accurately disclosing the material risks of Phase 2b in the SEC filings that he signed.

223. Powell has a B.A. in Biology from Texas A&M University, and has decades of experience in the neuroscience and biotechnology fields. Powell's specific experience was touted in the defective Registration Statement, including that she "has led numerous early- and late-stage development programs in neuroscience over her more than 20 years in the field" and brought "more than 20 years of neuroscience research to the team with a heavy emphasis on operational efficiency." Powell also managed a large neuroscience laboratory from April 2001 to September 2013 at Stanford University, and then moved into the private sector, serving as a Project Manager at SRI International with a focus on IND enabling preclinical studies from August 2014 to April 2015, a Senior Clinical Project Manager at Bioclinica, a contract research organization, leading Phase 3 Alzheimer's and Parkinson's clinical trials from April 2015 to December 2017, and as a Vice President of Clinical Operations at Alkahest, Inc., a biotechnology company, from March 2018 to June 2022. Powell's decades of experience in neuroscience and with clinical trials would have alerted her to risks to Phase 2b posed by Alto's failure to properly screen and monitor the Phase 2b participants.

## EXCHANGE ACT CLASS ACTION ALLEGATIONS

224. The Exchange Act Class consists of all persons who purchased or otherwise acquired Alto's common stock between March 18, 2024, and October 22, 2024, both dates inclusive. The

Exchange Act Class asserts claims under Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. Excluded from the Class are: Defendants, former and current officers, senior managers, and directors of Alto, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, related entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above.

225. The members of the Exchange Act Class are so numerous that joinder of all members is impracticable. According to the 2023 10-K, Alto had "87 stockholders of record" and the "actual number of holders of our common stock is greater than this number of record holders," because it also "includes stockholders who are beneficial owners, but whose shares are held in street name by brokers or held by other nominees" and shares held "in trust." Additionally, the Company's securities were actively traded on the NYSE. While the exact number of Class members for the Exchange Act Class is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the Exchange Act Class. Record owners and other members of the Exchange Act Class may be identified from records maintained by the Company, its transfer agent and brokers, and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

226. Common questions of law and fact exist as to all members of the Exchange Act Class and predominate over any questions solely affecting individual members of the Exchange Act Class. Among the questions of law and fact common to the Exchange Act Class are:

a. Whether the Exchange Act Defendants' misrepresentations and omissions violated federal securities laws;

b. Whether the Exchange Act Defendants' misrepresentations and omissions were material;

c. Whether the Exchange Act Defendants made misrepresentations and omissions to investors during the Exchange Act Class Period;

d. Whether the Exchange Act Defendants acted with scienter;

e. Whether the prices of Alto's securities during the Exchange Act Class Period were artificially inflated because of the Exchange Act Defendants' conduct complained of herein; and

f. Whether the members of the Exchange Act Class have sustained damages and, if so, what is the proper measure of damages.

227. Lead Plaintiffs' claims are typical of the claims of the members of the Exchange Act Class as all members of the Exchange Act Class were similarly affected by Defendants' wrongful conduct in violation of federal law, and all assert the same legal claims arising out of the same conduct.

228. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Act Class. Lead Plaintiffs have no interests antagonistic to the Exchange Act Class and have retained highly experienced counsel specializing in securities litigation.

229. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all claims is impracticable. Furthermore, as the damages suffered by individual Exchange Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Exchange Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

230. For the Exchange Act Class, Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. During the Exchange Act Class Period, Defendants made public misrepresentations of material fact and failed to disclose material facts necessary to make the statements they publicly made during the Exchange Act Class Period not misleading under the circumstances in which they were made;

b. Alto's shares traded in an efficient market;

c. Alto's shares were liquid and traded with heavy volume during the Exchange Act Class Period;

d. Alto's shares traded on the NYSE, and the Company was covered by multiple analysts, journalists, and industry commentators;

e. The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

f. Lead Plaintiffs and members of the Exchange Act Class purchased, acquired and/or sold Alto's shares between the time the Exchange Act Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

g. The market for Alto common stock was open, well-developed and efficient at all relevant times. As a result of the Exchange Act Defendants' materially false and misleading statements, Alto common stock traded at artificially inflated prices during the relevant period. The artificial inflation dissipated as the market learned of the nature and extent of the Exchange Act Defendants' misrepresentations.

h. Based upon the foregoing, Lead Plaintiffs and the members of the Exchange Act Class are entitled to a presumption of reliance upon the integrity of the market.

231. Alternatively, Lead Plaintiffs and the members of the Exchange Act Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Exchange Act Defendants omitted material information in their Exchange Act Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT IV**

**(Against Defendants Alto, Etkin, Smith, and Powell for Violations of Section 10(b) of the Exchange Act And Rule 10b-5)**

232. Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein except the allegations related only to the Securities Act claims identified in Paragraphs 97 through 141.

233. During the Exchange Act Class Period, the Exchange Act Defendants or Alto, Etkin, Smith, and Powell, individually and in concert, directly or indirectly, (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an

effort to maintain artificially high market prices for the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

234. The Exchange Act Defendants acted with scienter in that they knew or deliberately disregarded that the public statements made during the Exchange Act Class Period; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements as primary violations of the securities laws. The Exchange Act Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's materially misleading statements, and/or their associations with the Company, were privy to confidential proprietary information concerning the Company and participated in the fraudulent scheme alleged herein.

235. The Exchange Act Defendants had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and during the Exchange Act Class Period intended to be deceitful, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company personnel.

236. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Exchange Act Class Period. Lead Plaintiffs and the other members of the Exchange Act Class relied on the statements described above and/or the integrity of the market price of Company securities during the Exchange Act Class Period in purchasing Company securities at prices that were artificially inflated as a result of these Defendants' false and misleading statements.

237. Had Lead Plaintiffs and the other members of the Exchange Act Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

238. As a result of the wrongful conduct alleged herein, Lead Plaintiffs and other members of the Exchange Act Class have suffered damages in an amount to be established at trial.

239. By reason of the foregoing, the Exchange Act Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Lead Plaintiffs and the other

members of the Exchange Act Class for substantial damages which they suffered in connection with their purchase of Company securities during the Exchange Act Class Period.

**COUNT V**
**(Against Defendants Etkin, Smith, and Powell for Violations of Section 20(a) of the Exchange Act)**

240. Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein except the allegations related only to the Securities Act claims identified in Paragraphs 97 through 141.

241. During the Exchange Act Class Period, as the CEO of Alto, Etkin, CFO of Alto, Smith, and CDO of Alto, Powell, exercised control over the day-to-day activities of the Company, including the description to investors of Alto's operations, material trends, and operating environment. Because of their roles and responsibilities at Alto, Etkin, Smith, and Powell knew the adverse non-public information concealed by Alto. Further, they exercised authority and capability to control the contents of the misleading statements made as alleged herein.

242. As control persons of a publicly owned company, Etkin, Smith, and Powell each had a duty to disseminate accurate and truthful information with respect to Phase 2b, and to promptly correct any public statements issued by Alto which had become materially false and/or misleading.

243. By virtue of their positions and their power to control public statements about Alto and Phase 2b, Etkin, Smith, and Powell had the power and ability to control the actions of Alto and its employees. By reason of such conduct, Etkin, Smith, and Powell are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant Action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as Class Representatives;

B. Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Classes by reason of the acts and transactions alleged herein;

C. Awarding compensatory damages in favor of Lead Plaintiffs and the other members of

the Securities Act Class and Exchange Act Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

Dated: April 6, 2026

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Omar Jafri*

Omar Jafri (*pro hac vice*)
Christopher P.T. Tourek (*pro hac vice*)
Jaime D. Nolasco Esquivel (*pro hac vice*)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: ojafri@pomlaw.com
ctourek@pomlaw.com
jnolasco@pomlaw.com

Jennifer Pafiti
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
E-mail: jpafiti@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs and the Proposed Class*

**ROLNICK KRAMER SADIGHI LLP**
Lawrence M. Rolnick (*pro hac vice*)
Marc B. Kramer (*pro hac vice*)
Nicole T. Castiglione (*pro hac vice*)
PENN 1, Suite 3401
One Pennsylvania Plaza
New York, New York 10119
Tel.: 212.597.2800
lrolnick@rksllp.com
mkramer@rksllp.com
ncastiglione@rksllp.com

*Co-Lead Counsel for Lead Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Omar Jafri*
Omar Jafri