United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATHAN FELDMAN,
Plaintiff,

v.

ALTO NEUROSCIENCE, INC., et al.,
Defendants.

Case No. 25-cv-06105-NW

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND**

Re: ECF No. 79

This is a putative class action for securities fraud against Alto Neuroscience, Inc. ("Alto") and various Alto officers and directors (collectively "Defendants").[1] Lead Plaintiffs Special Situations Cayman Fund, L.P., Special Situations Fund III QP, L.P., Special Situations Life Sciences Fund, L.P. (collectively, the "Special Situations Funds"), Nathan Feldman ("Feldman"), and Eileen Beiter ("Beiter") (together "Plaintiffs" or "Lead Plaintiffs"), filed a second amended complaint ("SAC") alleging violations of Sections 11, 12, and 15 of the Securities Act of 1933 ("Securities Act") and Sections 10(b) and 20(a)of the Securities Exchange Act of 1934 ("Exchange Act"). SAC, ECF No. 75. Defendants timely moved to dismiss. *See* ECF No. 79. For the reasons set forth below, Defendants' motion is GRANTED with leave to amend.

## I. BACKGROUND[2]

### A. Overview

Founded in 2019, Alto is a clinical-stage biopharmaceutical corporation that focuses on the

[1] The individual Defendants are Amit Etkin, Nicholas Smith, Jessica Powell, Po Yu Chen, Christopher Nixon Cox, Chris Dimitropoulous, Andrew Dreyfus, Michael Liang, Aaron N.D. Weaver, and Gwill York.

[2] All facts are drawn from the SAC unless otherwise noted.

development of neuropsychiatric products. Alto uses brain-based biomarkers—objectively measurable disease indicators—to predict which patients will best respond to treatment. Like many startups, Alto has no commercial products approved for sale and currently is wholly dependent on investors for funding. At the time of its initial public offering ("IPO") in January 2024, Alto's lead product candidate was a small-molecule called ALTO-100, which Alto believed would be effective in treating Major Depressive Disorder ("MDD"). Alto's IPO occurred when the company was in the middle of testing ALTO-100 in a Phase 2b trial; the results of that trial were unfavorable, and Alto's stock cratered as a result. According to Plaintiffs, Defendants misrepresented or omitted material facts related to the Phase 2b trial in their SEC filings[3] and contemporaneous public comments. In particular, Plaintiffs allege that Defendants represented that certain risks were only hypothetical when in fact those risks had already materialized.

**B. ALTO-100 and Clinical Testing**

Before a pharmaceutical company can bring a new drug to market, it must apply for and receive approval from the FDA. The FDA, in turn, will only approve a new drug if it can pass clinical testing, which generally occurs in three phases. The SAC concerns Alto's Phase 2 testing, conducted in two stages, Phase 2a and 2b. In January 2023, Alto announced positive Phase 2a results: patients with the identified biomarker showed better improvement of MDD over those without it. *See* ECF No. 79-9, Alto Form S-1 at 140.[4] "Based on the results . . . [the company] advanced ALTO-100 into an ongoing, randomized, double-blind, placebo-controlled Phase 2b clinical trial in 266 patients with MDD characterized by this cognition biomarker." *Id.* "The Phase 2b trial was initiated in January 2023 and [Alto] expect[ed] to report topline data from this trial in the second half of 2024." *Id.* According to the SAC, Alto used these announcements to

---

[3] The SEC filings at issue are those filed in anticipation of Alto's IPO: the company's Registration Statement, its amendments, and the Prospectus. Alto filed its Registration Statement on January 12, 2024 and filed two limited amendments to the Registration Statement shortly thereafter. The Prospectus, which incorporated the Registration Statement in full, was filed on February 5, 2024.

[4] Plaintiffs do not dispute that Exhibits 8, 10, 11, 12, 14, 16, 18, and 19 to Defendants' motion to dismiss—namely SEC filings and transcripts of investor calls and conferences that contain Defendants' allegedly false or misleading statements to investors—have been incorporated by reference into the SAC provided they are not used to dispute facts from the complaint. *See* ECF No. 82 at 3.

generate positive investor sentiment and quickly launch its IPO to raise money from investors. SAC ¶ 61.

The Phase 2b trial differed from the Phase 2a trial in a couple different ways. First, it included more patients. Phase 2a enrolled 133 patients, while Phase 2b enrolled 266. *Id.* ¶¶ 59, 62. Alto had originally designed the Phase 2b trial to include only 200 participants across 26 clinical trial sites that largely overlapped those used in Phase 2a, but the FDA directed Alto to expand the trial to 266 patients. *Id.* Second, Phase 2a was conducted at a centralized trial site while Phase 2b was conducted at both centralized and decentralized trial sites across the United States. *Id.* ¶ 65. At a centralized trial site, a patient visits a specific location for all procedures connected with the trial, including data collection and monitoring. Conversely, at a decentralized trial site, most trial activity occurs at the participant's home.[5]

These two elements of Phase 2b—high enrollment targets and the use of remote sites—created significant problems for Alto. Plaintiffs allege that Alto, struggling to recruit enough patients for the trial, turned to recruitment tactics that Alto knew would diminish the quality of the trial results. Especially suspect was Alto's decision to advertise that it would pay patients for their participation in the trial, a practice the company knew would attract "professional patients" and others who were unlikely to follow the protocols required to gather quality data. These issues were exacerbated by the use of decentralized trial sites because it meant there were fewer, if any, touchpoints with patients to ensure compliance with trial protocols. What's more, Plaintiffs allege that some of the remote sites, free from Alto's direct oversight, cut corners when enrolling patients. The most egregious of these sites was in Jackson, Mississippi.

**C. The IPO**

In January 2024, despite the ongoing problems, Alto went public midway through the

[5] In its Registration Statement, Alto explained that its internal clinical development expertise enabled it "to build infrastructure to support decentralized clinical trials, managed by dedicated clinical trial investigators trained specifically for remote-only patient care and monitoring. Patients are recruited nation-wide through online advertising campaigns, screened for eligibility, and then biomarkers are collected in a patient's home, or at a convenient location. Follow-up visits can be conducted remotely via telehealth, similar to how the majority of routine psychiatric care is currently conducted . . . ." S-1 at 139.

United States District Court
Northern District of California

Phase 2b trial. In filings with SEC, Alto explained its business operations generally and the promise of ALTO-100 in particular. Additionally, Defendants made a slew of generalized disclosures related to their business. To Plaintiffs, however, some of these risk disclosures materially misrepresented or omitted information that should have been relayed to investors. Specifically, Alto made a number of statements about *hypothetical* risks the company *might* face in the process of conducting the Phase 2b trial when some of those risks had already materialized and caused issues within the trial. For example, the offering documents explained that Alto "may experience difficulty in finding and enrolling sufficient qualified patients for [its] biomarker-guided trials [or] enrollment in clinical trials may be slower than we anticipate . . ." SAC ¶ 97. Alto further warned investors that "subjects may fail to enroll or remain in our trials at the rate we expect . . ." *Id.* Plaintiffs contend that Alto's statement that it "may experience difficulty" with enrollment falsely implied that the company had not *already* struggled to enroll qualifying participants in the trial.

On February 2, 2024, Alto shares began publicly trading on the NYSE. "On October 22, 2024, Alto issued a press release announcing the topline results of Phase 2b and informed investors that Phase 2b did not meet its primary endpoint. Alto subsequently abandoned development for ALTO-100 as a treatment for MDD." *Id.* at ¶ 66. On this news, the price of Alto's common stock fell by nearly 70% from its previous day closing price of $14.53, to close at $4.36 on October 23, 2024. The price of Alto's common stock declined again the next trading day to close at $4.13 on October 24, 2024.

### D. Confidential Witnesses

Plaintiffs' claims are based primarily on confidential witness ("CW") testimony. The SAC cites seven CWs with varying degrees of knowledge about the operation of the Phase 2b trial, with particular reliance on CW1 and CW2. CW1 was a Clinical Trial Specialist at Alto from June 2022 to May 2023. "According to contemporaneous notes documented by Plaintiffs' investigator while interviewing CW1, CW1 observed that during one such all-hands Company meeting held before the Company went public, Etkin [Alto's CEO] became increasingly frustrated at the progress of ALTO-100's clinical trials," "expressed concerns that Phase 2b was trending differently than

Phase 2a," and commented that "something was off." *Id.* ¶ 69. CW1 understood Etkin's comments to reference issues Alto was having at the remote sites, particularly the Jackson, Mississippi site.

CW2 was a "Senior Clinical Trial Specialist and then a Trial Master File and Quality Document Support Specialist at Alto from November 2022 to May 2025." *Id.* ¶ 70. According to CW2, Alto's executives put intense pressure on employees to increase patient enrollment, prompting the screening team to consider advertisements on bus stop shells, Craigslist, and social media sites. CW2 explained that the advertisements for Phase 2b committed to pay participants for enrolling in the clinical trial, attracting participants "who simply sought to get paid, sometimes going as far as to lie to enroll in the trial." *Id.* ¶ 73.

Additionally, CW2 stated that "Alto did not check trial participants' medical records to confirm accuracy," "simply accepted whatever the patients represented," and "affirmed that Alto failed to verify any information in follow-up interviews with trial participants." *Id.* ¶ 77. CW2 explained "that there was no way of confirming whether patients actually took ALTO-100 during Phase 2b. Instead, Alto simply continued to take patients at their word." *Id.*

The remaining CWs discussed in the complaint corroborate CW1's and CW2's statements that (1) Alto struggled to find trial participants for Phase 2b; (2) Alto advertised on social media and elsewhere to recruit patients for the trial; (2) Alto did not verify pertinent information through medical records or proof of a doctor's diagnosis of MDD when screening patients; and (3) the Jackson, Mississippi site was poorly operated and difficult to manage.

### E. The Alleged Misstatements

#### 1. Securities Act Misstatements

Plaintiffs allege seven misstatements under the Securities Act. Six of the seven misstatements are warnings about hypothetical risks that Plaintiffs allege had already come to pass. The hypothetical risks set forth in those statements impermissibly omitted that: (a) Alto's executives had serious concerns about enrollment and the remote sites already developed before the IPO; (b) Alto systematically failed to conduct basic verification to ensure that real participants enrolled in Phase 2b, including testing pharmacokinetic ("PK") levels to ensure compliance; (c)

Alto utilized remote sites that exacerbated enrollment difficulties; and (d) Alto relied on risky third parties to meet enrollment targets as the conditions became more desperate. *See* ¶¶67-93; *see also* Opp'n at 10-11.

The seventh alleged misstatement concerns the benefits of Alto's insourced approach to clinical trials. Plaintiffs allege Defendants misled investors when they stated that its ""trials are run with the highest emphasis on quality and efficiency." ¶ 107.

**2. Exchange Act Misstatements**

Plaintiffs challenge sixteen post-IPO statements made in SEC filings and at investor conferences between March and September 2024. Eleven of the statements were made at investor conferences and discussed Alto's differentiated "insourced" approach to clinical trials (rather than using a third-party CRO), and the remaining five were made in periodic SEC filings, which mirror the statements Plaintiffs challenged in the Offering Documents.

## II. LEGAL STANDARD

### A. Rule 12(b)(6) and Rule 8(a)(2)

To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim that is facially plausible. Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Typically, the "complaint need only satisfy the 'minimal notice pleading requirements' of Rule 8(a)(2)." *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). Rule 8(a)(2) merely requires "a short and plain statement of the claim showing that the pleader is entitled to relief."

When considering a motion to dismiss, the court "must take all of the factual allegations in the complaint as true," but it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. Likewise, allegations contradicted by matters properly subject to judicial notice or by exhibit need not be accepted as true. *Produce Pay, Inc. v. Izguerra Produce, Inc.*, 39 F.4th 1158, 1161 (9th Cir. 2022).

United States District Court
Northern District of California

**B. Rule 9(b)**

"Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003). Claims sounding in fraud or mistake, however, are subject to heightened pleading requirements of Rule 9(b), which require that a plaintiff claiming fraud "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Accordingly, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F.3d at 1106 (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)). To decide whether a complaint sounds in fraud, a court must "determine, after a close examination of the language and structure of the complaint, whether the complaint alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of a claim." *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotations and citations omitted).

**C. Private Securities Litigation Reform Act**

To assert a claim under the PSLRA, the plaintiff must plead with particularity, *inter alia,* the element of falsity. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91 (9th Cir. 2009). "To satisfy the exacting requirements under the PSLRA for pleading falsity, "Plaintiffs must plead 'specific facts indicating why' the statements at issue were false when made." *In re Cloudera, Inc.*, No. 19-CV-03221-LHK, 2021 WL 2115303, at *11 (N.D. Cal. May 25, 2021) (quoting *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008); *see also In re Stratosphere Corp. Sec. Litig.,* No. CV–S–96–708–PMP, 1997 WL 581032, at *13 (D. Nev. May 20, 1997) (to plead falsity, plaintiff must provide "evidentiary facts contemporary to the alleged false or misleading statements from which this court can make inferences permissible under Rule 9(b)."). Moreover, to be actionable, a statement must be false "at [the] time by the people who made them." *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001). "The fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made." *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993).

The PSLRA requires that complaints alleging falsity "specify each statement alleged to

United States District Court
Northern District of California

have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (quoting 15 U.S.C. § 78u-4(b)(1)).

## III. DISCUSSION

### A. Sections 11, 12(a)(2), and 15 of the Securities Act

Plaintiffs' first three claims arise under the Securities Act and can be analyzed together. *See Sodha v. Golubowski*, 154 F.4th 1019, 1032 (9th Cir. 2025) (citing 15 U.S.C. §§ 77k, 77l, 77o).[6] Securities Act claims are not subject to Rule 9(b)'s heightened pleading standard unless they "sound in fraud." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012). To determine whether a complaint "sounds in fraud," courts must closely examine the language and structure of the complaint and decide whether it "allege[s] a unified course of fraudulent conduct" and "rel[ies] entirely on that course of conduct as the basis of a claim." *Id.* at 885–86 (alterations in original) (citing *Rubke*, 551 F.3d at 1161).

As currently pled, Plaintiffs' Securities Act claims sound in fraud. Indeed, Plaintiffs point to Defendants' knowledge of and concern for certain risks—*e.g.*, meeting enrollment goals—as evidence of falsity itself.[7] For example, Plaintiffs allege that Alto's statements that it "may experience difficulty in finding and enrolling sufficient qualified patients" for the trial "were

---

[6] Section 11 of the Securities Act imposes liability on Defendants if "any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." § 77k(a). Section 12 largely mimics Section 11, except that it regulates statements in a company's prospectus, rather than statements in a registration statement. § 77l. Section 15 penalizes persons who control a company that violates Sections 11 and 12. *See* 15 U.S.C. § 77o(a); *In re Rigel*, 697 F.3d at 886. Both sides agree that Plaintiffs need only allege a misstatement within the Registration Statement and/or the Prospectus, and further agree that the Section 15 claim rises or falls with the others.

[7] Plaintiffs are careful in to avoid language regarding Defendants' knowledge in most of their Securities Act claims, stating only that senior executives had "concerns," but that rhetorical choice cannot save those claims. To have concerns, senior executives needed to know the facts animating those concerns. Regardless, for at least one misstatement alleged under the Securities Act, Plaintiffs explicitly allege Defendants' knowledge. *See,* SAC ¶ 106 (alleging Defendants made materially false and misleading statements because they failed to disclose that "senior executives ***already knew*** there were problems with the lack of control in the decentralized trial sites of Phase 2b.")

materially false and misleading when made ***because***" Defendants failed to disclose that "senior ***executives had already internally expressed serious concerns*** about Alto's ability to enroll qualified patients . . . [and] about Alto's decentralized trial sites like the site in Jackson, Mississippi." SAC ¶¶ 97-98 (emphasis added).

In alleging knowledge, Plaintiffs allege fraud. *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1057 (9th Cir. 2023) (claims based on allegation that "management knew" revenue predictions were wrong sounded in fraud); *City of Pontiac Gen. Emps.' Ret. Sys. v. Bush*, No. 20-cv-06651-JST, 2022 WL 1467773, at *3 n.1 (N.D. Cal. Mar. 1, 2022) (claims based on defendants' knowledge of falsity of the challenged statements sounded in fraud). And it doesn't matter that Plaintiffs attempt to disclaim fraud for the Securities Act claims; such attempts "are unconvincing where the gravamen of the complaint is fraud and no effort is made to show any other basis for the claims." *In re Rigel*, 697 F.3d at 885–86 (holding that Rule 9(b) applied when the plaintiff's Section 11 claim "relie[d] on the same alleged misrepresentations from the December 13, 2007 press release that are central to [p]laintiff's Section 10(b) fraud claim" even though the plaintiff "disclaimed in its complaint any allegation of fraud in connection with the section 11 cause of action").

But Defendants' knowledge of the falsity of specific statements—and, more specifically, the evidence Plaintiffs put forth to demonstrate that knowledge—doesn't just subject the Securities Act claims to Rule 9(b), it also illustrates why Plaintiffs' claims fail on the merits as currently pled. As noted above, "[t]he PSLRA has exacting requirements for pleading falsity," which require a plaintiff to plead "specific facts indicating why" the statements at issue were false. *Metzler,* 540 F.3d at 1070. These facts must be "contemporaneous," and they must "establish a contradiction between the alleged materially misleading statements and reality." *In re Cloudera*, 2021 WL 2115303, at *11).

Notwithstanding Plaintiffs' claims to the contrary, a statement that Alto may have difficulty enrolling patients is not false ***because*** executives "internally expressed serious concerns about enrolling patients." To be false, Plaintiffs must allege that, at the time the statement was made, Defendants ***were experiencing*** "difficulty in finding and enrolling sufficient qualified

patients." To the extent the SAC makes that allegation, it fails to do so explicitly, and the evidence within the SAC is not sufficiently particularized to warrant that conclusion. For example, CW1 left the company eight months before Alto made that alleged misstatement, so CW1 cannot speak to whether the statement was false in January 2024. And though CW2 worked at Alto during the IPO, the SAC is silent as to when CW2 felt "intense pressure" to increase enrollment. The Phase 2b trial began in January of 2023, a full year before the IPO, and Alto continued enrolling patients after the company went public. That is not particularized enough to meet the standard set by the PSLRA and Rule 9(b). *See Weston Fam. P'ship LLLP v. Twitter*, 29 F.4th 611, 621 (9th Cir. 2022) (rejecting plaintiffs' argument that the Court should infer that defendants had acted a certain way "based on later facts or developments").

What's more, most of the statements include phrases that Plaintiffs haven't defined, so their falsity cannot be ascertained. For example, what does "difficulty in finding and enrolling sufficient qualified patients" mean? At what point did Alto experience "difficulty" enrolling patients? And what is a "qualified patient" for the purposes of the 2b trial? Plaintiffs must clearly explain the meaning and relevance of these types of terms if Plaintiffs are to succeed in alleging that each of Alto's statements, were false.

As Defendants point out in their reply, only one CW, CW6, actually addresses the pace of enrollment directly. *See* ECF 83 at 5. But at best CW6 alleges only that enrollment slowed for six weeks at one of what was presumably several sites operating in the summer of 2023, six months before the IPO. (¶ 89.) Without additional allegations, however, the Court does not know if the slow enrollment was anomalous or whether enrollment ever ticked back up.

The failure to plead falsity with particularity is endemic to the SAC, and it is directly attributable to the vague and conclusory timeline Plaintiffs have provided in their complaint. Beyond providing start and end dates that generally cover the entirety of the Phase 2b trial period, there are no dates or even general timeframes provided alongside any of the CWs allegations. With a clinical trial that lasted eighteen months, and alleged misstatements that occurred at the approximate midpoint, Plaintiffs must do more than aver that Defendants knew *something* at *some point*. Plaintiffs do not necessarily need more than CWs to demonstrate falsity, *see Glazer Cap.*

*Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766-67 (9th Cir. 2023), but they can only withstand a motion to dismiss if the CWs' allegations are sufficiently particularized consistent with the strictures of Rule 9(b) and the PSLRA.

Accordingly, Defendants' motion to dismiss the Securities Act claims is GRANTED, and Plaintiffs are given leave to amend to provide more particularized allegations.

**B. Sections 10(b) and 20(a) of the Exchange Act**

Plaintiffs remaining two claims arise under the Exchange Act. Among other things, Exchange Act claims require Plaintiffs to plead "with particularity facts giving rise to a *strong inference*" that the Defendants acted with scienter when making the alleged false statements. 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). "A strong inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). The inference must be that the "'defendant[ ] made false or misleading statements either *intentionally* or with *deliberate recklessness*.'" *Id.* (quoting *Zucco*, 552 F.3d at 991 (emphasis in original)). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so . . . are not sufficient." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). "[T]he plaintiff must plead a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Zucco*, 552 F.3d at 991 (internal quotation marks and citation omitted).

The SAC fails to plead that the Exchange Act Defendants acted with scienter when making the alleged misstatements. Plaintiffs are required to "allege scienter with respect to each of the individual defendants." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014). On this front, the SAC is woefully deficient. Plaintiffs do not allege any facts that indicate the Exchange Act Defendants intended to deceive investors or that they did so with malicious intent. Beyond conclusory allegations that the Exchange Act Defendants "intended to be deceitful, or, in the alternative, acted with reckless disregard for the truth," the SAC is silent on scienter. SAC ¶ 235.

Plaintiffs point to the CWs' allegations as evidence that the Exchange Defendants knew

United States District Court
Northern District of California

that risks related to enrollment and the decentralized trial sites had materialized. But, where, as here, the CWs had little if any interaction with upper management, the value of the CWs allegations to establish scienter is minimal. *See In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010) (finding confidential witness allegations insufficient when they "had no personal interactions" with any of the individual defendants); *Kovtun v. VIVUS, Inc.*, No. C 10-4957 PJH, 2012 WL 4477647, at *18 (N.D. Cal. Sept. 27, 2012), *aff'd sub nom. Ingram v. VIVUS, Inc.*, 591 F. App'x 592 (9th Cir. 2015) ("[N]owhere does plaintiff allege . . . that a CW reported to upper management about a particular result of a clinical trial . . . and that upper management proposed (or agreed) to conceal this result from the public, or in fact did conceal it."). The one CW that did interact with management, CW1, left the company ten months before the Class Period and provides no particularized facts that any Individual Defendant intended to mislead investors.

Because the failure to sufficiently allege scienter is dispositive, the Court ends its analysis here. Defendants' motion to dismiss the Exchange Act claims is GRANTED with leave to amend.

## IV. CONCLUSION

Defendants' motion is GRANTED WITH LEAVE TO AMEND. Any amended complaint shall be filed within 21 days of this Order.

**IT IS SO ORDERED.**

Dated: August 7, 2026

Noël Wise
United States District Judge