**ROLNICK KRAMER SECURITIES LITIGATION LLP**
Lawrence M. Rolnick (*pro hac vice*)
Marc B. Kramer (*pro hac vice*)
Nicole T. Castiglione (*pro hac vice*)
PENN 1, Suite 3401
One Pennsylvania Plaza
New York, New York 10119
Tel.: 212.597.2800
Email: lrolnick@rksllp.com
mkramer@rksllp.com
ncastiglione@rksllp.com

*Co-Lead Counsel for Co-Lead Plaintiffs and the Proposed Classes*

**POMERANTZ LLP**
Omar Jafri (*pro hac vice*)
Christopher P.T. Tourek (*pro hac vice*)
Jaime D. Nolasco Esquivel (*pro hac vice*)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel.: (312) 377-1181
Facsimile: (312) 377-1184
Email: ojafri@pomlaw.com
ctourek@pomlaw.com
jnolasco@pomlaw.com

*Co-Lead Counsel for Co-Lead Plaintiffs and the Proposed Classes*

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
E-mail: jpafiti@pomlaw.com

*Co-Lead Counsel for Co-Lead Plaintiffs and the Proposed Classes*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

NATHAN FELDMAN, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

ALTO NEUROSCIENCE, INC., AMIT ETKIN, NICHOLAS SMITH, JESSICA POWELL, PO YU CHEN, CHRISTOPHER NIXON COX, CHRIS DIMITROPOULOS, ANDREW DREYFUS, MICHAEL LIANG, AARON N.D. WEAVER, and GWILL YORK,

Defendants.

Case No. 5:25-cv-06105-NW

CLASS ACTION

**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .... i
TABLE OF ABBREVIATIONS AND DEFINITIONS .... iii
NATURE OF THE ACTION .... 1
JURISDICTION AND VENUE .... 5
PARTIES .... 6
FACTS COMMON TO ALL CLAIMS .... 8
I. Background .... 8
A. Alto's Business and Operations .... 8
B. The FDA's Approval Process .... 9
C. Defendants Initiate the High-Stakes Phase 2b Clinical Trial to Validate ALTO-100 for MDD .... 10
II. Alto Experienced Significant Challenges Meeting Phase 2b Enrollment Targets Before Alto Went Public .... 12
III. Alto Failed to Conduct Basic Verification to Ensure Qualified Participants Enrolled in Phase 2b .... 15
IV. Multiple CWs Corroborate that the Remote Sites Were More Likely to Enroll Participants Who Did Not Have MDD and Were Unable to Confirm Compliance .... 18
V. Alto Relied on Third Parties to Fill Enrollment Gaps Before and After the IPO .... 19
VI. Capitalizing on Positive Investor Sentiment, Alto Launched an IPO .... 20
VII. Alto's Lax Monitoring Practices Increased the Risk of Enrolling Professional Patients in Phase 2b .... 20
FACTS ALLEGED WITH RESPECT TO COUNTS I, II, AND III .... 21
I. Defendants Violated the Securities Act by Omitting Material Information from the Defective Registration Statement .... 21
II. The Defective Registration Statement Also Violated SEC Regulation S-K .... 23
SECURITIES ACT CLASS ACTION ALLEGATIONS .... 25

COUNT I

(Against Defendants Alto, Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York for Violations of Section 11 of the Securities Act)....................26

COUNT II

(Against Defendant Alto for Violations of Section 12(a)(2) of the Securities Act)....................27

COUNT III

(Against Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York for Violations of Section 15 of the Securities Act)....................29

ADDITIONAL FACTS ALLEGED ONLY WITH RESPECT TO COUNTS IV AND V....................30

I. Defendants Etkin, Smith, and Powell Made Additional Misleading Statements....................30

II. The Truth Begins to Emerge....................38

III. The Exchange Act Defendants Made Misleading Statements With Scienter....................39

A. CW Accounts Are Indicative of Scienter....................39

B. Etkin and Powell Made Statements Indicative of Scienter....................40

C. Post-Class Period Admissions and Developments....................41

D. Core Operations....................45

E. Defendants' Coverup Enhances Scienter....................47

F. The Exchange Act Defendants' Claimed Expertise Supports Scienter....................49

EXCHANGE ACT CLASS ACTION ALLEGATIONS....................50

COUNT IV

(Against Defendants Alto, Etkin, Smith, and Powell for Violations of Section 10(b) of the Exchange Act And Rule 10b-5)....................52

COUNT V

(Against Defendants Etkin, Smith, and Powell for Violations of Section 20(a) of the Exchange Act)....................54

PRAYER FOR RELIEF....................54

DEMAND FOR TRIAL BY JURY....................55

## TABLE OF ABBREVIATIONS AND DEFINITIONS

| Abbreviation | Definition |
|---|---|
| **2Q 2024 10-Q** | SEC Form 10-Q filed on August 13, 2024 |
| **2023 10-K** | SEC Form 10-K filed on March 21, 2024 |
| **2024 10-K** | SEC Form 10-K filed on March 20, 2025 |
| **Abdel** | Fadi Abdel |
| **Adjunctive or Adjunctive Population** | Patients on other medical treatments that took ALTO-100 |
| **Alto or the Company** | Alto Neuroscience, Inc. |
| **ALTO-100** | Alto's flagship drug candidate in the most advanced stage during the Class Periods |
| **ANRO** | Alto's NYSE ticker symbol |
| **Beiter** | Lead Plaintiff Eileen Beiter |
| **Biomarker** | Observable characteristics of certain biological conditions |
| **Bishop** | Andrew Bishop |
| **CDO** | Chief Development Officer |
| **CEO** | Chief Executive Officer |
| **CFO** | Chief Financial Officer |
| **Chen** | Po Yu Chen |
| **Class Period, Exchange Act Class** | March 18, 2024 through October 22, 2024, both dates inclusive |
| **Complaint or TAC** | Third Amended Complaint |
| **Cox** | Christopher Nixon Cox |
| **CRO or CROs** | Contract Research Organization |
| **C-Suite** | Alto's senior executives, including the CEO, CFO and CDO |
| **CW or CWs** | Confidential Witness or Confidential Witnesses |

| | |
|---|---|
| **Decentralized Sites or Decentralized Trial Sites or Remote Sites** | Remote sites for patients in Phase 2b |
| **Dimitropoulos** | Chris Dimitropoulos |
| **Dreyfus** | Andrew Dreyfus |
| **Defendants** | Alto and the Individual Defendants |
| | |
| **Etkin** | Amit Etkin |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **Exchange Act Class** | Class consisting of all persons who purchased or otherwise acquired Alto's common stock between March 18, 2024 and October 22, 2024, both dates inclusive |
| **Exchange Act Defendants** | Alto, Etkin, Smith, and Powell |
| **FDA** | United States Food and Drug Administration |
| **Feldman** | Lead Plaintiff Nathan Feldman |
| **IPO** | Initial Public Offering |
| **Individual Defendants** | Etkin, Smith, Powell, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, York |
| **IND** | Investigational new drug |
| **Jackson, Mississippi** | A remote site located in Jackson, Mississippi that conducted Phase 2b for Alto |
| **Liang** | Michael Liang |
| **MADRS** | Montgomery-Åsberg Depression Rating Scale |
| **MDD** | Major Depressive Disorder |
| **Monotherapy or Monotherapy Population** | Patients not on any other anti-depressant that took ALTO-100 |
| **NYSE** | New York Stock Exchange |
| **Phase 2a** | ALTO-100 Phase 2a Trial for MDD |

| | |
|---|---|
| **Phase 2b** | ALTO-100 Phase 2b Trial for MDD, a 6-week placebo-controlled study |
| **Plaintiffs or Lead Plaintiffs** | Special Situation Funds, Feldman, Beiter |
| **Powell** | Jessica Powell |
| **Prospectus** | February 5, 2024 Final Prospectus on Form 424(b)(4) |
| **Registration Statement** | January 12, 2024 Registration Statement on Form S-1 and two January 29, 2024 Amendments on Forms S-1/A |
| **SEC** | U.S. Securities and Exchange Commission |
| **Securities Act** | Securities Act of 1933 |
| **Securities Act Class** | a Class consisting of all persons who purchased or otherwise acquired Alto's common stock pursuant or traceable to the Company's Registration Statement filed with the SEC on Form S-1 on January 12, 2024, and twice amended on Form S-1/A on January 29, 2024, and the body of which was incorporated into the final prospectus on Form 424(b)(4) filed on February 5, 2024 |
| **Securities Act Defendants** | Alto, Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, York |
| **Smith** | Nicholas Smith |
| **Special Situation Funds** | Lead Plaintiffs Special Situations Cayman Fund, L.P., Special Situations Fund III QP, L.P., Special Situations Life Sciences Fund, L.P. |
| **Weaver** | Aaron N.D. Weaver |
| **York** | Gwill York |

Lead Plaintiffs Special Situations Cayman Fund, L.P., Special Situations Fund III QP, L.P., Special Situations Life Sciences Fund, L.P. (collectively, the "Special Situations Funds"), Nathan Feldman ("Feldman"), and Eileen Beiter ("Beiter") (together with the Special Situations Funds, "Plaintiffs" or "Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Third Amended Complaint for Violations of the Federal Securities Laws (hereafter the "Complaint" or the "TAC") against Defendants (as defined below), allege the following, based upon personal knowledge as to Plaintiffs and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of conference calls Defendants held with analysts and investors, any public announcements made by the Defendants, Defendants' filings with the United States Securities and Exchange Commission ("SEC"), wire and press releases published by and regarding Alto Neuroscience, Inc. ("Alto" or the "Company"), analysts' reports and advisories about the Company, articles about Defendants and their industry in financial publications or other news outlets, regulatory filings, interviews with knowledgeable former employees of the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of the following two Classes:

   a. Securities Act Class: a Class consisting of all persons who purchased or otherwise acquired Alto's common stock pursuant or traceable to the Company's Registration Statement filed with the SEC on Form S-1 on January 12, 2024, and twice amended on Form S-1/A on January 29, 2024 (hereafter the "Registration Statement"), and the body of which was incorporated into the final prospectus on Form 424(b)(4) filed on February 5, 2024 (hereafter the "Prospectus"). The Securities Act Class asserts claims under Sections 11, 12(a) and 15 of the Securities Act of 1933 ("Securities Act"). These claims are grounded in strict liability, and do not assert intent to defraud.

   b. Exchange Act Class: a Class consisting of all persons who purchased or otherwise acquired Alto's common stock between March 18, 2024, and October 22, 2024, both

dates inclusive. The Exchange Act Class asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

Excluded from the Classes are: Defendants, as defined herein, former and current officers, senior managers, and directors of Alto, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, related entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above.

2. This Action concerns Defendants' misstatements and omissions about the Phase 2b trial for Alto's most-advanced drug, ALTO-100 for Major Depressive Disorder ("MDD") (hereafter "Phase 2b").

3. The misstatements and omissions relate to three distinct issues: (1) Alto's significant challenges in meeting enrollment targets, and the questionable practices used to address those challenges, which increased the likelihood of enrolling professional patients; (2) Defendants' use of "decentralized" (*i.e.*, remote) clinical trial sites, and the undisclosed risks their use posed to the trial's success; and (3) Defendants' failure to ensure compliance with trial protocol through verification and testing, and their overreliance on trial sites and their investigators—rather than their in-house experts that they trumpeted to investors—to determine eligibility.

4. The challenged misstatements and omissions were made at two separate times. Defendants launched an initial public offering ("IPO") in February 2024, and filed a defective Registration Statement that omitted the three risks described above: enrollment, remote site impacts and lack of compliance through testing and verification. Leading up to the IPO, the Company faced serious issues in Phase 2b. Two well-placed Confidential Witnesses ("CWs") confirmed that, before Alto went public, Alto faced major challenges with respect to both its ability to meet enrollment requirements for Phase 2b as well as the conduct at Alto's remote sites, which comprised a significant proportion of the overall study population. Alto had difficulty enrolling "qualified patients," *i.e.*, patients who met the Phase 2b qualification criteria, including an actual MDD diagnosis (as opposed to paid professional patients who signed up simply to get a check) and a firm commitment to ingest ALTO-100 as directed. These difficulties continued through Alto's IPO and into the Spring of 2024 based on the experience of

at least one CW who worked for a third party and who was hired to increase enrollment when Alto encountered difficulties. Defendants are liable for omitting risks from defective Registration Statement regardless of whether a false and misleading statement was made. SEC Regulation S-K specifically require issuers to disclose items bearing on whether historical performance (the preliminary test) was likely to be consistent with future results (Phase 2b). Even if Alto could not determine whether there were material uncertainties about Phase 2b's success, Regulation S-K required disclosure unless Defendants affirmatively determined that no material effect was reasonably likely to occur. No attempt was made to meet this demanding standard. After the IPO, as the risks and problems associated with Phase 2b became worse, Defendants made a series of misleading statements that were, at the very least, deliberately reckless to the truth.

5. To address enrollment concerns, Alto skipped important screening and verification procedures. Multiple CWs confirm that Alto continued to do almost nothing to verify that participants in the trial had MDD, and used a series of unreliable tools to recruit potential patients as the conditions became more desperate. Specifically, Alto advertised on social media and other forums to recruit patients for Phase 2b, paid patients to participate in the trial, considered increasing the payments to boost enrollment, employed third parties to advertise to and recruit patients, relied on third parties to determine eligibility, utilized a lax screening process for decentralized trial sites in particular, and even re-screened patients who did not initially qualify to participate in Phase 2b in effort to boost their scores and thus, in turn, the trial's enrollment figures. Alto also set up only a small number of trial sites to evaluate whether patients in Phase 2b actually took ALTO-100 despite knowing that compliance was an issue from the results of an earlier trial that preceded Phase 2b. These problems were especially acute in a remote site located in Jackson, Mississippi, which former Alto employees described as "the worst site" and a complete "shit show" and where participants were being screened and enrolled in Phase 2b with limited oversight from the Company.

6. After the Company went public, the concealed risks were exacerbated by the completely inadequate controls the Company had put in place to monitor whether patients in Phase 2b were even complying with the treatment protocol in the first place. A significant portion of the participants in Phase 2b participated in the trial entirely on a remote basis through Alto's decentralized sites. Even

though Alto admitted knowing before Phase 2b that "forgotten/missed dose[s]" and "halting of the prescribed treatment" were "common protocol deviation[s]" when testing for ALTO-100,[1] Alto conducted its pivotal Phase 2b with virtually no safeguards to verify that its participants were taking the product, or even that they had in fact been medically diagnosed with MDD since it never bothered to check any medical records and took patients wholly at their word as multiple CWs confirm. Further, despite setting up trial sites in areas known to attract professional patients, Alto refused to utilize sponsor eligibility reviews that would have monitored the trial site activity to ensure compliance, instead giving trial sites minimal supervision and broad discretion to conduct trial enrollment and protocol enforcement however they saw fit. A new CW confirms that sponsor eligibility reviews, including a review of medical records to weed out professional patients, only only occurred after Phase 2b failed. Alto also later admitted that it did not bother to check patients' medical records at the time of enrollment or run known pharmacokinetic ("PK") tests to determine whether the patients enrolled in the trial even ingested ALTO-100.

7. Between March 18, 2024, and October 22, 2024, or during the Exchange Act Class Period, the misrepresentations became egregious, and Defendants continued to mislead investors about all three categories of risks related to enrollment, remote sites and compliance with protocols. The Defendants who are alleged to have violated the Exchange Act claimed that they had left no stone "unturned" and could think of nothing that gave them pause about Phase 2b. They falsely claimed to watch "every [clinical] site and every patient like a hawk[,]" when the opposite was true and the Company outsourced eligibility checks to third party trial sites and their investigators, according to a new CW. Defendants claimed to monitor clinical sites proactively, in real time, to intervene and prevent problems from occurring, when in reality, they refused to check medical records or conduct the necessary sponsor eligibility reviews to allow them to identify and remediate any problems.

8. On October 22, 2024, the truth concealed by Alto and the Defendants who violated the Exchange Act began to emerge when Alto announced in a press release that Phase 2b had failed to meet

---

[1] *See* ALTO NEUROSCIENCE, INC., *An Open-Label Study of ALTO-100 in Adults with Major Depressive Disorder and/or Posttraumatic Stress Disorder*, Protocol No. ALTO-100-001 Amendment 1 (May 31, 2022) https://cdn.clinicaltrials.gov/large-docs/32/NCT05117632/Prot_SAP_000.pdf, at 55.

its primary endpoint. On this news, the price of Alto's common stock fell by nearly 70% from its previous day's closing price of $14.53 to close at $4.36 on October 23, 2024. The price of Alto's common stock declined again the next trading day to close at $4.13 on October 24, 2024. Alto then promptly abandoned the development of ALTO-100 to treat MDD.

9. After the Exchange Act Class Period ended, Alto and its Chief Executive Officer ("CEO") corroborated the CW accounts described in this Complaint. They publicly confirmed that Phase 2b failed because Alto recruited professional patients, *i.e.*, those interested in financial benefits and disinterested in participating in the clinical trial. They also conceded that the failure to screen professional patients was caused by a failure to check medical records and urine samples, and was exacerbated by misconduct at decentralized sites, heavy recruitment on social media, and allowing third parties to screen patients. Notably, two CWs confirm that Alto's CEO internally admitted concerns both about enrollment as well as the decentralized sites before the Exchange Act Period commenced.

10. The Exchange Act Defendants' actual knowledge or reckless disregard of the truth is further bolstered by their own statements, positions and experience, and the core operations inference. Attempts to intimidate, threaten and mislead witnesses who either cooperated or could cooperate with Lead Plaintiffs' investigation into the claims raised in this Complaint only strengthen an already-compelling inference of wrongdoing.

11. As a result of Defendants' wrongful acts and omissions, and the consequent precipitous decline in the market value of Alto's securities, Lead Plaintiffs and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to §§ 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77o), and §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §§ 240.10b-5, 240.14a-9).

13. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331, § 22 of the Securities Act, and § 27 of the Exchange Act.

14. Venue is proper in this District pursuant to § 22 of the Securities Act, (15 U.S.C. § 77v),

§ 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District. Alto has its principal place of business in this District and Defendants committed tortious acts and transacted business in this District.

15. In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

16. Lead Plaintiff Special Situations Cayman Fund, L.P., as set forth in the certification accompanying its Motion for Appointment as Lead Plaintiff (ECF No. 21-2), purchased Alto common stock during the Class Periods and 13,500 shares of Alto common stock pursuant to the IPO.

17. Lead Plaintiff Special Situations Fund III QP, L.P., as set forth in the certification accompanying its Motion for Appointment as Lead Plaintiff (ECF No. 21-2), purchased Alto common stock during the Class Periods and 46,500 shares of Alto common stock pursuant to the IPO.

18. Lead Plaintiff Special Situations Life Sciences Fund, L.P., as set forth in the certification accompanying its Motion for Appointment as Lead Plaintiff (ECF No. 21-2), purchased Alto common stock during the Class Periods and 60,000 shares of Alto common stock pursuant to the IPO.

19. Lead Plaintiff Feldman purchased or otherwise acquired Alto's common stock at artificially inflated prices during the Class Periods, as described in Mr. Feldman's previously filed Certification (ECF No. 25-3) and Declaration (ECF No. 25-4).

20. Lead Plaintiff Beiter purchased or otherwise acquired Alto's common stock at artificially inflated prices during the Exchange Act Class Period, as described in Ms. Beiter's previously filed Certification (ECF No. 25-3) and Declaration (ECF No. 25-4).

21. Defendant Alto is a Delaware corporation with principal executive offices located at 650 Castro Street, Suite 450, Mountain View, California 94041. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ANRO."

22. Defendant Amit Etkin ("Etkin") is Alto's President, CEO, and Chair of the Company's

Board of Directors, and served in those positions during the entirety of the relevant period. Etkin signed Alto's defective Registration Statement and its Annual Reports filed with the SEC on Form 10-K.

23. Defendant Nicholas Smith ("Smith") is Alto's Chief Financial Officer ("CFO") and Chief Business Officer and served in those positions during the entirety of the relevant period. Smith signed Alto's defective Registration Statement and its Annual Reports filed with the SEC on Form 10-K.

24. Defendant Jessica Powell ("Powell") is Alto's Chief Development Officer ("CDO") and served in that position during the entirety of the relevant period.

25. Defendant Po Yu Chen ("Chen") was a Director of Alto. Chen signed Alto's defective Registration Statement.

26. Defendant Christopher Nixon Cox ("Cox") was a Director of Alto. Cox signed Alto's defective Registration Statement.

27. Defendant Chris Dimitropoulos ("Dimitropoulos") was a Director of Alto. Dimitropoulos signed Alto's defective Registration Statement.

28. Defendant Andrew Dreyfus ("Dreyfus") was a Director of Alto. Dreyfus signed Alto's defective Registration Statement.

29. Defendant Michael Liang ("Liang") was a Director of Alto. Liang signed Alto's defective Registration Statement.

30. Defendant Aaron N.D. Weaver ("Weaver") was a Director of Alto. Weaver signed Alto's defective Registration Statement.

31. Defendant Gwill York ("York") was a Director of Alto. York signed Alto's defective Registration Statement.

32. The Defendants identified in Paragraphs 22 through 31 are sometimes referred to herein collectively as the "Individual Defendants." Alto and the Individual Defendants are sometimes collectively referred to herein as the "Defendants." Alto, Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York are sometimes referred to as the "Securities Act Defendants." Alto, Etkin, Smith, and Powell are sometimes referred to as the "Exchange Act Defendants."

33. The Individual Defendants possessed the power and authority to control the contents of

Alto's SEC filings, press releases, and/or other market communications. The Securities Act Defendants were provided with copies of Alto's defective Registration Statement alleged herein to be materially false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or to cause it to be corrected.

34. Because of their positions with Alto, and their access to material information available to them but not to the public, the Exchange Act Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the investing public, and that the representations being made were materially false and misleading and omitted to state material facts.

35. Accordingly, Defendants are liable for the materially false and misleading statements and omissions pleaded herein.

## FACTS COMMON TO ALL CLAIMS

### I. Background

#### A. Alto's Business and Operations

36. Alto is a clinical-stage biopharmaceutical company that focuses on the development of neuropsychiatric products tailored to specific patient populations. Specifically, Alto focuses on identifying brain-based biomarkers it claims are particularly responsive to the products the Company is attempting to develop. Poor verbal memory is the biomarker for patients Alto expected to benefit from ALTO-100. Alto claims that treatments based on biomarker recognition can be more effective than the trial-and-error approach common in modern medicine.

37. During the relevant period, Alto told investors that rather than use Contract Research Organizations ("CRO"), the Company conducted clinical trials entirely in-house "using a team of clinical operations experts . . . that engage directly with clinical trial sites and provide clinical monitoring, oversight, and support to ensure trials are run with the highest emphasis on quality and efficiency." It claimed that this "insourced model" "result[ed] in higher quality clinical and biomarker data."

38. The Company generated no revenue during the Class Period or in the year before the Class Period. ALTO-100 was the Company's flagship drug candidate in the most advanced stage during the Class Period. The Company also had no drugs approved by the FDA during the Class Period, making

it entirely dependent on investors to fund its operations until it could bring a product to market.

**B. The FDA's Approval Process**

39. In the United States, the FDA regulates drugs, and they cannot be marketed or sold without its approval. A pharmaceutical company must first submit an investigational new drug ("IND") application that outlines preclinical study results and proposed phases of human clinical trials. There are typically three phases, each of which must be executed successfully before the new drug can undergo FDA review and approval. 21 C.F.R. § 312.21.

40. Phase 1 clinical trials are the initial introduction of an IND into a small pool of humans, typically focused on discovering the product's safety profile. Once the safety profile is established and dosage selected, the product candidate typically progresses to Phase 2 testing, which usually involve larger patient populations and evaluate or conduct exploratory analysis of the product's efficacy. 21 C.F.R. § 312.21(b).

41. Phase 2 clinical trials are meant to provide sufficient evidence of preliminary efficacy for specific indications to warrant further investigation. There are two kinds of Phase 2 trials. A Phase 2a trial is an exploratory, hypothesis-generating study that is neither designed nor statistically powered to establish that a drug is effective. A majority of drugs that appear promising in Phase 2a never reach the market. Alto itself used the Phase 2a study not to prove that ALTO-100 worked, but to generate and then test a possible biomarker for use in later trials. The Phase 2b trial for ALTO-100 was a study designed to determine whether ALTO-100 actually worked in patients identified by the cognitive biomarker. It did not.

42. Even if the IND demonstrates sufficiently promising efficacy in a Phase 2 trial, sponsors move forward with confirmatory Phase 3 trials to gather additional information in a large patient population about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the product and to provide an adequate basis for marketing approval for widespread public use. 21 C.F.R. § 312.21(c).

43. With few exceptions, a pharmaceutical company that does not successfully complete each and every trial phase cannot seek the FDA's approval to market the medicine through an IND. ALTO-100 for MDD patients could not advance to Phase 3 trials because Phase 2b failed, so the

Company abandoned clinical development of ALTO-100 for MDD patients altogether.

### C. Defendants Initiate the High-Stakes Phase 2b Clinical Trial to Validate ALTO-100 for MDD

44. In January 2023, Alto reported the results of the Phase 2a trial for ALTO-100. Phase 2a was a single-arm, open-label study with no placebo control, and thus could not establish that ALTO-100 actually worked. That study was designed only to identify a candidate biomarker and correlate it with symptom change. Phase 2b, however, was a placebo-controlled study intended to test whether ALTO-100 was efficacious in the biomarker-defined population to confirm poor verbal memory as a predictive biomarker of patients who would have a positive response to ALTO-100 in treating MDD. In connection with Phase 2a, Alto tested some participants' PK levels to assess whether they actually took the pills as specified by trial protocol. Etkin later admitted to this fact. On March 12, 2025, he told investors that Alto "saw about 90% compliance" from participants in Phase 2a, "and that's measured by PK in either the monotherapy or adjunctive group." PK testing was important because, as Alto publicly admitted, "forgotten/missed dose[s]" and "halting of the prescribed treatment" were "common protocol deviation[s]" in testing ALTO-100. As a result of the PK testing, Defendants later admitted that there were compliance issues in Phase 2a. Despite knowing that fact and knowing that PK testing was a way of ensuring compliance since some patients were tested by this method in Phase 2a, Defendants never bothered to check Phase 2b participants' medical records to ensure that patients paid to participate in Phase 2b actually had been diagnosed with MDD. Nor did they test the PK levels of any Phase 2b participants to assess protocol compliance. And despite Phase 2a's limitations, Defendants told investors that its results supplied "clear evidence of efficacy," and demonstrated a "significantly greater change" in "patients with a biomarker profile" than "those without the biomarker profile." The Company used these announcements to generate positive investor sentiment and quickly launch Alto's IPO.

45. Alto originally designed Phase 2b to include 200 participants across 26 clinical trial sites. However, by the Fall of 2023, the FDA objected to the design, and asked Alto to expand the trial from 200 to 266 patients specifically because of concerns that a smaller number would not have enough statistical power to evaluate ALTO-100 in the monotherapy population, *i.e.*, patients taking ALTO-100 without the added benefit of another anti-depressant—the very subgroup that Alto ultimately admitted

failed to show a statistically significant response. And as Defendants understood, unlike the adjunctive patients whose MDD diagnosis was verified by the fact that they were already taking prescribed medication to treat MDD, the monotherapy patients posed a significantly greater risk of *not*, in fact, suffering from MDD, but rather entering Phase 2b solely for the payment the Company promised.

46. Phase 2b was a 6-week study involving, in part, paid patients. Enrollment across the United States began on January 10, 2023, randomizing patients 1:1 to take 40mg twice daily of ALTO-100 or a placebo. Two-thirds of the enrolled patients took ALTO-100 as a monotherapy, and the remaining one-third took ALTO-100 as an adjunctive. The primary endpoint for Phase 2b was the change from baseline on the Montgomery-Åsberg Depression Rating Scale ("MADRS")—a 10-item, clinician-rated scale used to measure the severity of depressive symptoms in adults—from its original baseline over a 6-week double-blind treatment period in patients positive for the cognitive biomarker, with improvement in the overall population assessed as a secondary endpoint.

47. To qualify as a trial participant in Phase 2b, patients were supposed to: (1) be diagnosed with moderate to severe MDD; (2) at baseline, either not take any antidepressant medication, or take a single Selective Serotonin Reuptake Inhibitor, Serotonin and norepinephrine reuptake inhibitor, mirtazapine, or bupropion; and (3) and comply with all study assessments and procedures. Patients who were pregnant or breastfeeding were not eligible to participate in Phase 2b.[2]

48. Phase 2b was conducted at thirty-four (34) centralized and decentralized trial sites across the United States. A centralized trial site is where patients visit specific locations for all procedures connected with the trial, including data collection and monitoring. Conversely, a decentralized trial site is where the trial activity occurs at the participant's home. Trials that take place through decentralized trial sites depend on the patient to independently keep up with the trial protocols and take the drug or placebo assigned at randomization. The use of decentralized trial sites in this case was particularly risky given that, as Alto admitted in the defective Registration Statement, patients with MDD are a vulnerable population that cannot be relied upon to comply with trial protocols. Without proper methods of verification, Alto could not ensure that patients enrolled in Phase 2b were actually taking ALTO-100 as

[2] https://clinicaltrials.gov/study/NCT05712187?tab=history&a=7#version-content-panel.

directed.

49. On information and belief, patients were enrolled in Phase 2b from January 10, 2023, through at least April 2024, as evidenced by Alto's six Study Records submitted to the National Library of Medicine between January 25, 2023, and January 10, 2024. The Study Records listed Phase 2b's Overall Status as "Recruiting" and CW accounts support that recruitment continued through April 2024.[3] By July 2024, enrollment for Phase 2b had ended as evidenced by Alto's Study Record submitted to the National Library of Medicine on July 22, 2024, that listed Phase 2b's Overall Status as "Active, not recruiting."[4] After the 6-week treatment period, Phase 2b had an additional 7 weeks of monitoring to assess the safety of ALTO-100.

**II. Alto Experienced Significant Challenges Meeting Phase 2b Enrollment Targets Before Alto Went Public**

50. Prior to Alto's IPO, between January 10, 2023, and January 12, 2024, significant enrollment challenges emerged at the Company in light of the FDA's feedback on trial design as well as Alto's failure to supervise protocol adherence at remote sites, which Defendants publicly admitted were a significant cause of Phase 2b's failure based on the account of CW4 and Etkin's admissions on March 4, 2025, and March 12, 2025, about the conduct of Phase 2b at the site level which led to a greater likelihood of professional patients (*i.e.*, those who participated for payment rather than medical need). Specifically, during this time period, Alto struggled to enroll at least 266 patients that met the qualifications criteria for Phase 2b. This is confirmed by, among other things, the accounts of CW1 and CW2. It is not plausible to presume that the Defendants were unconcerned about their ability to enroll qualified patients. Unqualified patients were supposed to be excluded from Phase 2b.

51. Alto employed Confidential Witness 1 ("CW1") from June 2022 to May 2023.[5] CW1 served as a Clinical Trial Specialist, and reported to Alto's Senior Vice President of Innovation, Fadi

---

[3] https://clinicaltrials.gov/study/NCT05712187?tab=history&a=1#version-content-panel.
[4] https://clinicaltrials.gov/study/NCT05712187?tab=history&a=7#version-content-panel.
[5] CW1's LinkedIn profile indicates that CW1's employment ended at Alto in August 2023, but Defendants informed Plaintiffs that CW1's employment ended at Alto in May 2023. For the purposes of this pleading, both dates are before the Class Period or before the Company went public in February 2024 but after Phase 2b started on January 10, 2023. As such, the all-hands meeting CW1 related where Etkin expressed concerns about the remote sites necessarily occurred before Alto's IPO.

Abdel ("Abdel"). CW1 screened patients for Phase 2b and conducted follow-up interviews with patients once they were enrolled. CW1 was also assigned to the Jackson, Mississippi site that enrolled only remote patients.

52. CW1 attended all-hands Company meetings in early 2023 in which Etkin discussed the status of ALTO-100's clinical trials. According to contemporaneous notes documented by Plaintiffs' investigator while interviewing CW1, CW1 observed that during one such all-hands Company meeting held before the Company went public, Etkin became increasingly frustrated at the progress of ALTO-100's clinical trials. During the all-hands meeting, according to CW1, Etkin expressed concerns that Phase 2b was trending differently than Phase 2a, and about something they were not expecting to see, and something was off, and it had a lot to do with the decentralized trial, the remote trial. Because of these concerns with the remote sites, CW1 stated that Etkin got on to CW1's team and they could not do anything right and everything was wrong. CW1 construed that to be a reference to CW1 and CW1's team who recruited patients for the remote site in Jackson, Mississippi.

53. Other CWs corroborated Alto experienced serious challenges with enrollment within Alto's C-Suite before the Company went public. Confidential Witness 2 ("CW2") was a Senior Clinical Trial Specialist from November 2022 to November 2024, and then a Trial Master File and Quality Document Support Specialist at Alto from November 2024 to May 2025. As a Senior Clinical Trial Specialist, CW2 screened potential participants in the ALTO-100 trials and interviewed them after they were enrolled. CW2 was one of only ten Alto employees assigned to screen, enroll and conduct follow-up sessions with clinical trial participants for Alto's decentralized trial sites. CW2's work was focused on the decentralized site in Jackson, Mississippi. CW2's team screened thousands of potential participants for Phase 2b. As a Senior Clinical Trial Specialist, CW2 reported to Abdel. As a Trial Master File and Quality Document Support Specialist, CW2 reported to Alto's Vice President of Quality, Michelle Robinson Moran.

54. CW2 stated that as a result of enrollment challenges, Alto's executives put intense pressure on Abdel to increase enrollment for Phase 2b throughout the time that CW2 worked on Phase 2b. Because the Phase 2b enrollment period ran from January 10, 2023 through at least April 2024, the

pressure campaign described by CW2 occurred during that same time period. CW2 confirmed that this pressure campaign existed throughout the time that CW2 screened participants for the remote site.

55. The defective Registration Statement identified Abdel as Alto's Senior Vice President of Innovation and a "Key Employee" at the Company alongside five other C-suite executives. After being pressured himself, Abdel, in turn, put intense pressure on CW2's team to increase enrollment. CW2 knows this because, throughout the period in which CW2 screened participants for Phase 2b, Abdel regularly met with C-suite executives, and then expressly relayed to CW2 that those C-suite executives were not happy about enrollment and internally expressed concerns that enrollment targets for Phase 2b were not being met. According to CW2, every time Abdel met with the C-suite, he came back and said the C-suite was not happy, and relayed that Alto's top leaders were focused solely on enrollment numbers and that the numbers were not meeting what the C-suite wanted. Abdel also asked CW2's team to work weekends to boost enrollment. Executives in the C-suite typically include the CEO, CFO and CDO, *i.e.*, Etkin, Smith, and Powell.[6]

56. CW2 recalled that, throughout the period in which they screened participants for Phase 2b, the screening team was under so much pressure to increase enrollment for Phase 2b that the team considered advertisements for trial participants on bus stop shells, Craigslist, and multiple social media sites. CW2 explained that the advertisements for Phase 2b committed to pay participants for enrolling in the clinical trial. CW2 also explained that this practice attracted participants who simply sought to get paid, sometimes going as far as to lie to enroll in the trial. CW2 also confirmed that Alto considered increasing the payment amount to trial participants, but CW2 objected, stating that Alto was already receiving applications from patients who were only interested in receiving a payout.

57. Confidential Witness 8 ("CW8") worked at Alto from February 2022 to May 2025. CW8 served as a Clinical Scientist and reported to Chief Medical Officer, Dr. Adam Savitz. As a Clinical Scientist, CW8 oversaw the clinical trials at Alto, including Phase 2b, working with the medical monitor of the trials and assisting Alto's data science team with their analysis of information collected in the trials. Through these duties, CW8 was able to observe how Phase 2b was conducted, as well as steps Alto took in response to Phase 2b's failure.

---

[6] https://www.investopedia.com/terms/c/c-suite.asp.

58. CW8 confirmed the account of CW2 that, during the Phase 2b enrollment period, Alto's leadership became concerned about hitting enrollment milestones and put pressure on employees to boost enrollment.

**III. Alto Failed to Conduct Basic Verification to Ensure Qualified Participants Enrolled in Phase 2b**

59. Because of the challenges Alto faced enrolling sufficient qualified participants and in an effort to meet the FDA's requirement to increase the number of patients enrolled in Phase 2b, Alto engaged in questionable recruitment and verification practices. These practices necessarily increased the likelihood of enrolling patients who were not adequately vetted, thus increasing the likelihood that professional patients would be attracted to and enrolled in Phase 2b.

60. Promising to pay individuals to participate in a clinical trial, especially without a detailed verification of their medical history, presents the known risk of attracting individuals who may not have MDD or who are unwilling to comply with the trial's procedures and requirements. CW8 confirms that Alto offered money to assist in site recruitment in Phase 2b when enrollment slowed down. Despite understanding the risk that payment to trial participants presented, Alto did nothing to verify that participants in Phase 2b had actually been diagnosed with MDD and, in fact, failed to implement commonsense guardrails to ensure that participants were in fact following trial protocols and taking ALTO-100 as directed.

61. According to CW2, patients were screened and follow-up interviews were conducted for the Jackson, Mississippi site via video calls. CW2 confirmed that Alto did not check trial participants' medical records to confirm accuracy and simply accepted whatever the patients represented. CW2 also affirmed that Alto failed to verify any information in follow-up interviews with trial participants. CW2 explained that for the Jackson, Mississippi site, there was no way of confirming whether patients actually took ALTO-100 during Phase 2b. Instead, Alto simply continued to take patients at their word.

62. CW2 further affirmed that, during the screening process, Alto had potential patients answer a questionnaire concerning the patient's health, medications, drug use, and levels of depression, and if a person scored an 8 or higher on the questionnaire, they would be allowed in the trial even without a verifiable diagnosis of MDD. CW2 confirmed that Alto sorted applicants into high and medium

priority tiers based on those scores and instructed employees to first work to enroll the list of potential patients who scored 8 or higher, and then re-screen patients whose initial interviews did not qualify them to participate in Phase 2b, in an effort to go through the questions again and to boost their scores so they could be included in Phase 2b. According to CW2, after the re-screening, those patients' scores would rise to 8 or higher, and they could move forward in the screening process.

63. Alto employed Confidential Witness 3 ("CW3") from March 2023 to November 2024. CW3 served as a Clinical Trial Specialist and reported to Abdel. CW3 screened patients for Phase 2b and conducted follow-up interviews with patients once they were enrolled.

64. CW3 corroborated that, when screening patients for Phase 2b, the Company did not verify pertinent information by checking medical records or requiring proof of a doctor's diagnosis of MDD. Instead, it simply took the patients at their word. CW3 also corroborated that Alto advertised on Craigslist and paid patients to enroll in Phase 2b.

65. Alto employed Confidential Witness 4 ("CW4") from September 2021 to April 2025. CW4 served as a Chief of Staff, and later as a Human Resources and Operations Associate. As a Chief of Staff, CW4 reported directly to Etkin, and later to Smith, and then later, when working as a Human Resources and Operations Associate, reported to Alto's General Counsel and Chief Administrative Officer. CW4 onboarded and off-boarded employees at Alto, and also facilitated annual employee performance reviews. CW4 was familiar with the Alto employees who worked on Phase 2b.

66. According to CW4, Alto created its own platform to screen patients for clinical trials, which had potential participants fill out an online questionnaire. CW4 also confirmed that Abdel and Alto Director of Data Engineering, Faizan Badami, created Alto's platform. Like CW2, CW3, and CW7, CW4 corroborated that Alto advertised on social media and elsewhere to recruit patients for Phase 2b. Like CW2 and CW3, CW4 also corroborated that Alto did not verify a participant's medical records and instead took patients at their word. CW4 further stated that CW4 believed Smith knew Abdel was cutting corners and that people were seeing things they should not see.

67. According to CW8, contrary to Defendants' claims that they utilized an "insourced" approach to Phase 2b, Alto outsourced screening to clinical trial sites, and played a hands-off role in patient enrollment. This was done in an effort to boost enrollment for Phase 2b. CW8 explained that

sponsor eligibility reviews allow a sponsor to oversee a clinical trial site's operations, including by reviewing medical records, and intervene in the enrollment process to correct any mistakes, thereby ensuring that the clinical trial site enrolls only qualified, and not professional patients. CW8 confirmed that Alto utilized sponsor eligibility reviews only after Phase 2b failed. CW8 confirms that Alto did not conduct any sponsor eligibility reviews until late 2024 – well ***after*** the Phase 2b enrollment period. CW8 stated that Alto began to conduct sponsor eligibility reviews because the failure to conduct such reviews resulted in the enrollment of professional patients in Phase 2b. CW8 explained that sponsor eligibility reviews involve examining a patient's medical records and history to screen out professional patients. For example, according to CW8, medical records indicating that a participant recently attended a drug rehabilitation program may increase the likelihood of noncompliance and professional patients. CW8 further confirmed that Etkin personally participated in the sponsor eligibility reviews that Alto adopted after Phase 2b failed.

68. CW8 further stated that Alto's data science team attempted to develop a way to analyze patient data to identify professional patients, including data points that demonstrated exaggerated symptoms or other signs that the patient was not a real, qualified trial participant. However, this method of data analysis was never used during Phase 2b despite numerous misrepresentations concerning Alto's access to superior data.

69. Alto employed Confidential Witness 9 ("CW9") from March 2025 to June 2025. CW9 served as Associate Director, Clinical Monitoring at Alto and reported directly to Powell. CW9 managed and trained Alto's Clinical Research Associates, who were responsible for monitoring clinical trial sites to ensure trial protocols were followed and patient safety was protected.

70. CW9 confirmed that within the clinical trial industry, it is well known that certain geographic areas of the United States have a much higher rate of professional and/or unreliable patients enrolling or attempting to enroll in drug trials. According to CW9, one of these areas was in Florida. Of Phase 2b's 34 clinical trial sites, 5 were located in Florida, and an additional 5 clinical trial sites were located in the surrounding area, thereby increasing the likelihood that Phase 2b would attract professional patients.

### IV. Multiple CWs Corroborate that the Remote Sites Were More Likely to Enroll Participants Who Did Not Have MDD and Were Unable to Confirm Compliance

71. Driven by its enrollment struggles and its need to enroll a sufficient number of participants to complete Phase 2b, Alto used decentralized sites to conduct a substantial proportion of Phase 2b. Alto had virtually no capacity to control trial participants enrolled at the decentralized sites, confirm their MDD diagnosis, or their compliance with the study protocol, including whether they were even taking ALTO-100 as directed. Alto's lack of control over the conduct of the decentralized sites heightened the extant risk that participants without MDD would participate in the study and, in turn, the extant risk that Phase 2b would fail.

72. The decentralized arm of Phase 2b, through which Alto intended to accelerate recruitment by enrolling participants nationwide, did not open until around mid-2023, approximately six months after Phase 2b began. This was because Alto had yet to resolve basic logistics with the remote sites, like securing psychiatrists licensed in each state, arranging how to ship pill packets, and confirming how patients would complete their check-ins, all of which further compressed the time that Alto had to enroll a sufficient number of participants in Phase 2b, as reported by CW8.

73. Alto employed Confidential Witness 5 ("CW5") from March 2023 to January 2025. CW5 served as a Clinical Research Associate. CW5's duties included monitoring trial sites and ensuring patient safety, data integrity, and that the trial sites were following the protocol.

74. In the course of CW5's duties, CW5 monitored the Jackson, Mississippi site run by Dr. Andrew Bishop ("Bishop"). According to CW5, the Jackson, Mississippi site was "terrible . . . just terrible." Specifically, CW5 stated that the Jackson, Mississippi site struggled to complete tasks correctly and on time.

75. CW5 stated further that the Jackson, Mississippi site director, Haley Dougay, was supposed to be in charge of the Clinical Trial Specialists and Coordinators but failed to keep up with what needed to be reviewed and completed for the trials at the Jackson, Mississippi site.

76. According to CW5, Bishop did a poor job at managing the Jackson, Mississippi site, which CW5 described as "the worst site."

77. This is confirmed by CW2, who described the Jackson, Mississippi trial site as a poorly

operated "shit show." CW2 communicated these concerns to Abdel, but CW2's concerns were disregarded. CW2 suspected that the poor quality of participants at the decentralized sites undermined the overall results of Phase 2b. CW2 said that Abdel resigned from Alto around the same time that Alto shut down the Jackson, Mississippi site.

78. Alto employed Confidential Witness 6 ("CW6") from February 2023 to November 2024. CW6 served as a Clinical Research Coordinator. CW6's duties included screening patients via Zoom for Phase 2b.

79. According to CW6, in or around the summer of 2023, in the middle of the recruitment for Phase 2b and before many false and misleading statements alleged herein were made, there was a slowdown in enrollment and, for an approximate six-week period, CW6 did not screen any potential patients for enrollment at the Jackson, Mississippi site. To boost enrollment during the slowdown, CW6 also explained that Alto contracted with a third-party vendor to help find patients for the Jackson, Mississippi site. CW6 recalled that the third party was hired to help with recruitment at the Jackson, Mississippi site overseen by Bishop. CW6 also stated that one of Bishop's own clinical employees was helping to screen patients for the clinical trial, but that the person was overwhelmed.

**V. Alto Relied on Third Parties to Fill Enrollment Gaps Before and After the IPO**

80. Alto continued to experience difficulties enrolling patients that met the Phase 2b qualifications criteria both immediately before and after the IPO.

81. Confidential Witness 7 ("CW7") was employed by Excell Research from January 2024 to April 2024. Excell Research is a medical research site that has conducted multiple clinical trials, mostly for neurological and psychiatric conditions. Excell Research enrolled patients for Alto's ALTO-100 clinical trials during the Class Period. CW7 served as a Director of Patient Recruitment. CW7's duties included overseeing patient recruitment for clinical trials at Excell Research, including for Phase 2b.

82. According to CW7, Excell Research enrolled approximately 30 patients for Phase 2b, with 70% of those patients enrolled in a decentralized clinical trial site.

83. CW7 confirmed that third party recruiters, including Trial Partners, ImageBloom, and StudyKIK, were hired by Alto to place advertisements to attract participants for Phase 2b, and that the

third parties advertised for Phase 2b on social media, among other forums. CW7 also confirmed CW6's account that Alto hired third party recruiters for short periods of time when enrollment for Phase 2b had slowed down.

84. As evidenced by CW7's role in recruiting Phase 2b patients between January 2024 and April 2024 on behalf of Excell Research, Alto continued to experience difficulties in enrolling a sufficient number of patients that met the Phase 2b qualifications criteria immediately before as well as after the IPO, and continued to employ third parties to enroll Phase 2b participants after it went public, demonstrating that the problems were continuous and uninterrupted, not isolated and temporary.

## VI. Capitalizing on Positive Investor Sentiment, Alto Launched an IPO

85. On January 12, 2024, Alto filed a defective Registration Statement on Form S-1. On February 1, 2024, the defective Registration Statement became effective. On February 2, 2024, Alto's shares began publicly trading on the NYSE. On February 5, 2024, the Company filed the Prospectus with the SEC, which incorporated and formed part of the defective Registration Statement. Alto raised approximately $128.6 million from the IPO before underwriting discounts and commissions and other offering expenses.

## VII. Alto's Lax Monitoring Practices Increased the Risk of Enrolling Professional Patients in Phase 2b

86. Alto's lax monitoring practices ultimately threatened Phase 2b's success. CW2 stated that, at decentralized sites, monitoring practices and follow-ups occurred remotely through video calls. CW2 also stated that for the follow-up interviews, Alto relied solely on what Phase 2b patients said, and did not do anything else to verify the truth of Phase 2b patients' statements. Similarly, CW6 confirmed that, during the Phase 2b treatment period, CW6 conducted follow-up interviews with Phase 2b patients via Zoom, simply asking patients how they were doing and if there were any adverse events/side effects to report. Alto's reliance on the word of Phase 2b patients increased the likelihood of enrolling professional patients who were either not truly suffering from MDD or did not follow the trial's protocols. The trial's inclusion/exclusion criteria made those who did not follow the protocols ineligible to participate but Alto enrolled enough of them to cause the trial to fail, as it later admitted.

## FACTS ALLEGED WITH RESPECT TO COUNTS I, II, AND III

### I. Defendants Violated the Securities Act by Omitting Material Information from the Defective Registration Statement

87. Under a sub-heading entitled "Risks Related to Product Candidate Development and Commercialization," the defective Registration Statement represented enrollment risks as merely hypothetical: "**we *may* experience difficulty in finding and enrolling sufficient qualified patients for our biomarker-guided trials, enrollment in clinical trials *may* be slower than we anticipate** . . . ."

88. The statements identified in Paragraph 87 were materially false and misleading when made because the enrollment-related risks had already materialized. Specifically, the defective Registration Statement omitted to disclose that: (a) Alto had already experienced difficulty enrolling qualified patients, as confirmed by CW2 and CW8; (b) Etkin was already concerned about the decentralized sites, as confirmed by CW1; (c) Etkin and other C-suite executives were "not happy" about enrollment and internally expressed concerns that enrollment targets for Phase 2b were not being met and, as a result, put pressure on employees to recruit faster, as confirmed by CW2 and CW8; (d) Alto recruited patients without verification, treating each applicant's account as "the source of truth," which prevented it from determining whether the participants in Phase 2b were qualified at all, as confirmed by CW2, CW3, and CW4; (e) Alto re-screened patients who did not initially qualify to participate in Phase 2b to boost their scores and the trial's enrollment figures, as confirmed by CW2; (f) Alto solicited and paid trial participants, thereby increasing the risk of attracting professional patients, as confirmed by CW2, CW3, and CW8; (g) Alto hired third party recruitment vendors both before and after the IPO to solicit and enroll participants at decentralized sites when enrollment slowed, as confirmed by CW6 and CW7; (h) Alto failed to properly oversee the sites and instead utilized a "hands off" approach towards the sites and their enrollment practices, as confirmed by CW8; and (i) Alto failed to verify compliance through PK testing or other means despite experiencing compliance problems in Phase 2a.

89. Similarly, the defective Registration Statement also claimed that enrollment related risks to the trial's success were merely hypothetical: "**We *may* find it difficult to enroll patients in our clinical trials. *If* we encounter difficulties enrolling subjects in our clinical trials, our clinical**

**development activities** ***could be*** **delayed or** ***otherwise adversely affected***." The defective Registration Statement further stated that "[s]ubject enrollment is affected by many factors including" but not limited to: the "***willingness of patients to participate in a decentralized clinical trial***"; "***continued enrollment of prospective patients by clinical trial sites***"; and "***the ability to monitor patients adequately during and after treatment***[.]"

90. The statements identified in Paragraph 89 were materially false and misleading when made because for the same reasons set forth in Paragraph 88. In addition, each of the enumerated factors was not a contingency that may affect enrollment in the future but a then-existing problem Alto was already confronting: (a) as to the "willingness of patients to participate in a decentralized clinical trial," Alto had been unable to enroll patients that met the qualifications criteria for Phase 2b through ordinary recruitment, and resorted to questionable recruitment practices, including utilizing advertisements on Craigslist and social media, and paying patients to enroll as confirmed by CW2, CW3, and CW8; (b) as to "continued enrollment of prospective patients by clinical trial sites," enrollment slowed down for six weeks during the summer of 2023 according to CW6, and Alto also continued to experience enrollment issues both before and after the IPO, requiring the assistance of outside recruitment vendors, as confirmed by CW7 who worked at Excell Research between January 2024 and April 2024; and (c) as to "the ability to monitor patients adequately during and after treatment," Alto relied solely on the word of trial participants, often obtained through video calls, without any independent verification or PK testing that confirmed that they were following Phase 2b protocol as confirmed by CW2, CW6, and CW8.

91. In a sub-heading entitled "Internal Clinical Development Expertise and Decentralized Clinical Trial Infrastructure," Defendants made the following misleading statements about the high quality and efficiency of Alto's clinical trials:

> ***We make use of our own internal capabilities and expertise to conduct our clinical trials, rather than outsourcing clinical development execution to contract research organizations, or CROs. We have built a team of clinical operations experts, led by Dr. Adam Savitz and Jessica Powell, that engage directly with clinical trial sites and provide clinical monitoring, oversight, and support to ensure trials are run with the highest emphasis on quality and efficiency***. This insourced model creates synergies between trials, and enables us to conduct multiple studies simultaneously, reduce cost, and apply learnings across programs to enhance execution. ***We believe our approach results in higher quality clinical and biomarker data***, benefits we have now observed through our two completed Phase 2a trials. Finally, our strict approach to data oversight enables us to

> design software tools, such as Spectra, Techcheck, and Altoscope, which are tailored to the requirements of our biomarker data collection with an understanding of how these data will ultimately be gathered in clinical practice. While we conduct most of our clinical work internally, we do selectively employ CROs when conducting our Phase 1 pharmacodynamic trials and use certain CRO capabilities to augment our internal expertise.

92. The statements identified in Paragraph 91 were materially false and misleading when made because, as confirmed by CW8, Alto did not "engage directly with clinical trial sites and provide clinical monitoring, oversight, and support," but instead allowed clinical trial sites to operate without meaningful supervision while Alto took a "hands off" approach towards oversight and monitoring. Moreover, Defendants' statements were misleading because they omitted to disclose that Alto had already: (a) compromised "higher quality clinical and biomarker data" by employing questionable recruitment and screening practices for Phase 2b, including failing to verify medical records, and instead treating each applicant's account as "the source of truth," which prevented Alto from determining whether the participants in Phase 2b were qualified at all, as confirmed by CW2, CW3, CW4, and CW6; (b) re-screened patients who did not initially qualify to participate in Phase 2b to boost their scores and the trial's enrollment figures, as confirmed by CW2; (c) solicited and paid trial participants, thereby increasing the risk of attracting professional patients as confirmed by CW2, CW3, and CW8; (d) hired third party recruitment vendors both before and after the IPO to solicit and enroll participants when enrollment slowed, as confirmed by CW6 and CW7; (e) engaged several trial sites near locations that attracted professional patients; and (f) failed to ensure compliance through PK testing or other forms of verification despite experiencing compliance problems earlier in the Phase 2a trial.

## II. The Defective Registration Statement Also Violated SEC Regulation S-K

93. SEC Regulation S-K required the Securities Act Defendants to include in the defective Registration Statement a section called "Management Discussion and Analysis." As the plain text of the regulation states: "The discussion and analysis must focus specifically on . . . uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results. . . ." 17 C.F.R. § 229.303(a) ("Item 303"). The Securities Act Defendants knew, or should have known, that the existing difficulties with Phase 2b created a material risk that it would not confirm the efficacy of ALTO-100. "Disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial

condition or results of operations." SEC Release Nos. 33-8056; 34-45321; FR-61.

94. Item 105 also required the Securities Act Defendants to include in the defective Registration Statement a "discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). The discussion of risk factors must be specific to the particular company and its operations, and must explain how the risk affects the company and/or the securities being offered. Generic or boilerplate attempts to disclose potential risks and shield oneself from liability—like the Securities Act Defendants did here—do not tell investors how the specific risks could affect their investment. *See* Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

95. Put simply, Item 105 required the Securities Act Defendants to disclose the most significant risks that ***could*** adversely affect Alto's present or future business expectations and prohibited the Defendants from relying on generic risks that could apply to virtually any other biopharmaceutical company in the industry. They failed to do so and left undisclosed myriad significant risks specific to Phase 2b, including that Alto: (a) faced difficulty finding and enrolling patients who met the qualification criteria for Phase 2b, as confirmed by CW2 and CW8; (b) employed questionable recruitment and screening practices to boost enrollment, as confirmed by CW2, CW3, and CW4; (c) failed to meaningfully oversee the sites, and instead utilized utilizing a "hands off" approach towards the sites and their enrollment practices, as confirmed by CW8; and (d) failed to ensure compliance through PK testing or other forms of verification despite experiencing compliance problems earlier in the Phase 2a trial.

96. Item 303 affirmatively required the Defendants to disclose uncertainties concerning enrollment, questionable recruitment and screening practices, lack of oversight over trial sites, and a total failure to ensure compliance with the trial protocols. *See* 17 C.F.R. § 229.303. Regulation S-K's rigorous disclosure requirements required Defendants to disclose all these risks with a high degree of specificity. Under Item 303, even if a defendant cannot determine whether an uncertainty will occur, disclosure is still required unless the defendant affirmatively determines that no material effect is reasonably likely. The Securities Act Defendants cannot meet that standard. Yet Defendants disclosed to investors none of

these conditions, the risks they already posed, or their impact on Alto. Defendants also violated Item 105 by failing to disclose Phase 2b's risk of failure in particular with the high degree of specificity demanded by Item 105, and, in fact, the trial ultimately failed when the undisclosed risks fully materialized.

## SECURITIES ACT CLASS ACTION ALLEGATIONS

97. The Securities Act Class consists of all persons who purchased or otherwise acquired Alto's common stock pursuant or traceable to the Company's defective Registration Statement, and the body of which was incorporated into the Prospectus. The Securities Act Class asserts claims under Sections 11, 12(a), and 15 of the Securities Act. These claims are grounded in strict liability, and do not assert that any Securities Act Defendant acted with the intent to defraud. Excluded from the Securities Act Class are: Defendants, former and current officers, senior managers, and directors of Alto, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, related entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above.

98. The members of the Securities Act Class are so numerous that joinder of all members is impracticable. On March 21, 2024, the Company filed its Form 10-K ("2023 10-K"). According to the 2023 10-K, Alto had "87 stockholders of record" and the "actual number of holders of our common stock is greater than this number of record holders," because it also "includes stockholders who are beneficial owners, but whose shares are held in street name by brokers or held by other nominees" and shares held "in trust." Additionally, the Company's securities were actively traded on the NYSE. While the exact number of Securities Act Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the Securities Act Class. Record owners and other members of the Classes may be identified from records maintained by the Company, its transfer agent and brokers, and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

99. Common questions of law and fact exist as to all members of the Securities Act Class and predominate over any questions solely affecting individual members of the Securities Act Class. Among the questions of law and fact common to the Securities Act Class are:

a. Whether the Securities Act Defendants made inaccurate statements and/or omitted material information to investors in the defective Registration Statement;

b. Whether the Securities Act Defendants' misrepresentations and omissions violated federal securities laws;

c. Whether the Securities Act Defendants' misrepresentations and omissions were material; and

d. Whether the Securities Act Defendants were control persons under Section 15 of the Securities Act.

100. Lead Plaintiffs' claims are typical of the claims of the members of the Securities Act Class as all members of the Securities Act Class were similarly affected by Defendants' wrongful conduct in violation of federal law, and all assert the same legal claims arising out of the same conduct.

101. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Securities Act Class. Lead Plaintiffs have no interests antagonistic to the Securities Act Class and have retained highly experienced counsel specializing in securities litigation.

102. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all claims is impracticable. Furthermore, as the damages suffered by individual Securities Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action on behalf of the Securities Act Class.

## COUNT I

**(Against Defendants Alto, Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York for Violations of Section 11 of the Securities Act)**

103. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

104. This Count is based on strict liability and does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

105. This Count is asserted against the Company and each Securities Act Defendant named

herein for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Lead Plaintiffs, who purchased and/or otherwise acquired Alto's securities traceable to the defective Registration Statement (*see* ECF Nos. 21-2, 25-3, 25-4), and all members of the Class who purchased or otherwise acquired Alto's securities pursuant to, or traceable to the defective Registration Statement.

106. The Company is the issuer of the stock issued via the defective Registration Statement. As such, the Company is strictly liable for each misleading statement contained therein, even for innocent misrepresentations.

107. Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York signed the defective Registration Statement and/or were directors or senior officers of the Company at the time the defective Registration Statement was effected and each consented to be identified as a director or senior officer of Alto in the defective Registration Statement. Therefore, each had a duty to make a reasonable investigation into the statements contained in the defective Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, these Defendants should have known of the misleading statements and omissions contained in the defective Registration Statement. As such, each of these Defendants is liable to Lead Plaintiffs and the Securities Act Class.

108. Lead Plaintiffs and other members of the Securities Act Class acquired Alto's securities without knowledge of the untruths and/or omissions alleged herein. Lead Plaintiffs and the other members of the Securities Act Class were thus damaged by Defendants' material misstatements and omissions.

109. This Action was brought within one year after the discovery of the untrue statements and omissions and within three years of the offering date.

## COUNT II
## (Against Defendant Alto for Violations of Section 12(a)(2) of the Securities Act)

110. Lead Plaintiff Special Situation Funds repeats and re-alleges each and every allegation contained above as if fully set forth herein.

111. This cause of action is brought on behalf of the Securities Act Class against Defendant

Alto for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2). This cause of action does not allege nor intend to allege fraud or fraudulent intent, and any implication of fraud or fraudulent intent is expressly disclaimed.

112. Section 12(a)(2) gives rise to liability as to "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading[.]" 15 U.S.C. § 77l(a)(2). At a minimum, liability under Section 12(a)(2) extends to those who passed title to the security to the purchaser.

113. Alto qualifies as a statutory seller pursuant to SEC Rule 159A, which provides that an issuer is a statutory seller for purposes of Section 12(a)(2) regardless of the form of underwriting. Specifically, SEC Rule 159A(a), 17 C.F.R. § 230.159A(a)(1)-(4), provides, in part, the following "[d]efinition of seller for purposes of section 12(a)(2) of the [1933] Act":

> For purposes of section 12(a)(2) of the Act only, in a primary offering of securities of the issuer, regardless of the underwriting method used to sell the issuer's securities, seller shall include the issuer of the securities sold to a person as part of the initial distribution of such securities, and the issuer shall be considered to offer or sell the securities to such person, if the securities are offered or sold to such person by means of any [prospectus] . . . [or] other communication that is an offer in the offering made by the issuer to such person.

114. For the purpose of SEC Rule 159A(a), "information is provided or a communication is made by or on behalf of an issuer if an issuer or an agent or representative of the issuer authorizes or approves the information or communication before its provision or use." Note 1, 17 C.F.R. § 230.159A(a); *see also* 70 Fed. Reg. 44722 at 44769 (Aug. 3, 2005).

115. The Prospectus contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein not misleading, and omitted to state material facts required to be stated therein. Defendant Alto owed Lead Plaintiff Special Situations Funds and other members of the Securities Act Class a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that they were true and accurate. Defendant Alto, in the exercise of reasonable care, should have known of the material misstatements and omissions of material fact contained in the Prospectus, as set forth herein.

116. Lead Plaintiff Special Situations Funds and other members of the Securities Act Class

did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus when they purchased Alto common stock pursuant to or traceable to the Prospectus.

117. By reason of the conduct alleged herein, Defendant Alto violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Lead Plaintiff Special Situations Funds and other members of the Securities Act Class who purchased Alto common stock pursuant to or traceable to the Prospectus sustained substantial damages in connection with their purchases. Accordingly, Lead Plaintiff Special Situations Funds and the other members of the Securities Act Class who hold Alto common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their Alto common stock to Defendant Alto. The Securities Act Class members who have sold their Alto common stock also seek damages to the extent permitted by law.

**COUNT III**
**(Against Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York for Violations of Section 15 of the Securities Act)**

118. Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

119. This Count is asserted pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York.

120. Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York were each control persons by virtue of their positions as directors, senior officers, and/or authorized representatives of the Company. Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York had the power to influence, and did, in fact, exercise control over the day-to-day activities of Alto, and did cause it to issue a defective and misleading Registration Statement.

121. Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York directly participated in the control of Alto by having signed, or authorized the signing of, the defective Registration Statement and authorizing the sale of Alto common stock to Lead Plaintiffs and other members of the Securities Act Class.

122. As control persons, Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York were involved with the day-to-day operations of Alto and were involved in reviewing and/or providing descriptions of Alto's operations and business prospects, including Phase 2b, in the defective Registration Statement. Each had the ability to control the contents thereof, including by withholding signature until the misleading statements were corrected.

123. Lead Plaintiffs and other members of the Securities Act Class acquired Alto's securities without knowledge of the untruths and/or omissions alleged herein. Lead Plaintiffs and the other members of the Securities Act Class were thus damaged by the primary violations of the Company. By virtue of the conduct alleged herein, and their status as control persons of the Company, Defendants Etkin, Smith, Chen, Cox, Dimitropoulos, Dreyfus, Liang, Weaver, and York are each secondarily liable to Lead Plaintiffs and the Securities Act Class for the primary violations of Alto.

## ADDITIONAL FACTS ALLEGED ONLY WITH RESPECT TO COUNTS IV AND V

### I. Defendants Etkin, Smith, and Powell Made Additional Misleading Statements

124. Unlike Counts I, II, and III, which are premised only on strict liability, Counts IV and V allege that after the Company went public, Alto, Etkin, Smith, and Powell, or the "Exchange Act Defendants," made additional misstatements with scienter in violation of Section 10(b) and Section 20(a) of the Exchange Act. The Exchange Act Defendants possessed the power and authority to control the contents of the Company's public communications with investors as well as the ability and opportunity to prevent their issuance or to cause them to be corrected.

125. On March 18, 2024, Etkin attended a Fireside Chat at UBS's Virtual CNS Day. In response to a specific analyst question about whether the Company ran into any hurdles in executing Phase 2b, Etkin made the following misleading statements:

> **Analyst:** For this type of biomarker-driven strategy, do you think that there is a limitation from how many sites are available in the US or outside US that can actually execute on a study like this? Did you run into that type of a hurdle?
>
> **Etkin:** ***We have not. Essentially, we are looking for good quality sites. We're looking for sites that know psychiatric patients, preferably that treat psychiatric patients so that the people they bring in are going to be high quality participants.*** But then we don't actually count on them knowing how to do any of the biomarkers because we teach them. And in teaching them, we've also been doing this for a long time, we've learned both how to teach them and how to ensure high quality data collection through software that we develop and give to them for them to use during acquisition. ***And so right now we're***

> ***getting very, very high QC pass rate for data collection that has not been a barrier at all. And as I mentioned, we have data collection happening in people's homes in a decentralized clinical trial framework, which is frankly more like what clinical care is going to look like ultimately down the line. We've tested a lot of these things in our trials in the phase 2As that we brought into the phase 2Bs. We've tried to change as little as possible in how we do these trials and then that should translate well into a phase 3.***

126. The statements identified in Paragraph 125 were materially false and misleading when made because, when asked whether the number of clinical trial sites needed had created any hurdles to execution of Phase 2b, Etkin falsely responded that it had not. Alto's decentralized sites were not "good quality sites" bringing in "high quality participants" with a "very high QC pass rate for data collection" and, in fact, poor site quality and the monitoring limitations of its decentralized sites had already become a significant "barrier" for quality data collection and threatened the successful execution of Phase 2b. Additionally, Defendants' difficulties in enrollment caused Alto to compromise trial integrity with a series of shortcuts, including paying and heavily recruiting patients, as confirmed by CW2 and CW3, skipping medical record verification, as confirmed by CW2, CW3, and CW4, and declining to verify drug intake, as confirmed by CW8. Moreover, his statements were misleading because he omitted that some of Phase 2b's sites were located near areas with a concentration of professional patients, as confirmed by CW9, and Alto had a "hands off" approach towards trial sites and their enrollment practices, as confirmed by CW8, which caused an increased risk of enrolling professional patients due to Alto's failure to exercise oversight despite false claims of "good quality sites" and "high quality participants." Etkin's statements were also misleading because they omitted that Alto re-screened patients who did not initially qualify to participate in Phase 2b to boost their scores and the trial's enrollment figures, as confirmed by CW2.

127. On March 21, 2024, the Company filed its 2023 10-K, signed by Etkin and Smith. The 2023 10-K contained the same misstatements that were previously made in the defective Registration Statement regarding the high quality and efficiency of the Company's clinical trials:

> We make use of our own internal capabilities and expertise to conduct our clinical trials, rather than outsourcing clinical development execution to contract research organizations, or CROs. ***We have built a team of clinical operations experts, led by Dr. Adam Savitz and Jessica Powell, that engage directly with clinical trial sites and provide clinical monitoring, oversight, and support to ensure trials are run with the highest emphasis on quality and efficiency.*** This insourced model creates synergies between trials, and enables us to conduct multiple studies simultaneously, reduce cost, and apply learnings across

> programs to enhance execution. ***We believe our approach results in higher quality clinical and biomarker data, benefits we have now observed through our two completed Phase 2a trials.*** Finally, our strict approach to data oversight enables us to design software tools, such as Spectra, Techcheck, and Altoscope, which are tailored to the requirements of our biomarker data collection with an understanding of how these data will ultimately be gathered in clinical practice. While we conduct most of our clinical work internally, we do selectively employ CROs when conducting our Phase 1 pharmacodynamic trials and use certain CRO capabilities to augment our internal expertise.

128. The statements identified in Paragraph 127 were materially false and misleading when made for the same reasons identified in Paragraph 92.

129. Later in the 2023 10-K, under a "Risks Related to Product Candidate Development and Commercialization" sub-heading, Defendants continued to misrepresent enrollment difficulties as remote possibilities: "***We may find it difficult to enroll patients in our clinical trials. If we encounter difficulties enrolling subjects in our clinical trials, our clinical development activities could be delayed or otherwise adversely affected***." The Company further stated that "[s]ubject enrollment is affected by many factors including" but not limited to: the "***willingness of patients to participate in a decentralized clinical trial***"; "***continued enrollment of prospective patients by clinical trial sites***"; and "***the ability to monitor patients adequately during and after treatment***[.]"

130. The statements identified in Paragraph 129 were materially false and misleading when made for the same reasons identified in Paragraph 90.

131. As Defendants previously did in the defective Registration Statement, Defendants also portrayed in the 2023 10-K additional risks of clinical trial team compliance and remote testing as hypothetical risks:

> We rely on, and intend to continue to rely on, our internal clinical development expertise to conduct our current and future clinical trials. This model includes internal teams and systems as well as external vendors and CROs to comprise a full clinical trial team. ***If our clinical trial team does not*** comply with applicable regulatory requirements, meet expected deadlines***, or run trials effectively, our development programs and our ability to seek or obtain regulatory approval for or commercialize our product candidates may be delayed.***

132. The statements identified in Paragraph 131 were materially false and misleading when made because: (a) Alto had already taken significant shortcuts with Phase 2b in enrolling patients, especially at the decentralized trial sites, and Defendants had already expressed concerns about such enrollment, including the ability to hit enrollment targets as CW2 confirms; (b) Alto had already

compromised the chances to obtain meaningful results from Phase 2b by skipping basic verification of medical records and drug intake; (c) Defendants had already expressed internally concerns about the conduct of decentralized sites, like Jackson, Mississippi; and (d) as a result of the foregoing, Alto already faced major undisclosed uncertainty about the design, enrollment, and conduct of Phase 2b.

133. On June 6, 2024, Etkin attended the Jefferies Global Healthcare Conference. During the conference call, Etkin made the following materially misleading statements:

> And then we run these trials ourselves. We don't use CROs. ***We have an internal clinical operations team which allows us to make sure we have the right sites, are bringing in the right patients who are consistent between the phase 2A and the phase 2B, all run within the United States, and that the design of the phase 2B in turn leaves little gap to the phase three***. It's designed to look like a phase 3 as well. So trying to give ourselves every chance of success, and ultimately trying to avoid the pitfalls often in biotech, which is where you just take that big swing prematurely before you actually know enough about your drug. And that's true really for all of our programs.

134. The statements identified in Paragraph 133 were materially false and misleading when made because Alto's internal clinical operations team did not "make sure" that Alto had "the right sites" or was "bringing in the right patients," but instead compromised trial integrity with a series of shortcuts designed to boost enrollment and lower costs, including paying and heavily recruiting patients and re-screening unqualified patients, as confirmed by CW2 and CW3; relying on decentralized sites, as confirmed by CW2 and CW7; skipping medical record verification, as confirmed by CW2, CW3, and CW4; and declining to verify drug intake, as confirmed by CW8. Further, Defendants did not utilize an internal clinical operations team to oversee the trial sites, but instead allowed them to operate without meaningful supervision while Alto took a "hands off" approach and failed to oversee or monitor them as confirmed by CW8.

135. Etkin also discussed the Company's ability to oversee Phase 2b, misleadingly assuring investors that the Company was in a position to immediately remedy any issues related to Phase 2b:

> ***So trying to do all of those things that best position the study while also watching every site and every patient like a hawk.*** So every single clinical and biomarker data set gets reviewed prior to randomization at Alto as well as by the site as well as by the third party and rating vendors. ***So a lot of eyes on everything, constantly monitoring sites, making sure that any one site doesn't go and recruit that many more people than other sites, so we have representation broadly. And so far so good. I think actually executing it through an internal team also builds a lot of ownership in what we're doing.***

136. The statements identified in Paragraph 135 were materially false and misleading when made because Alto did not have "a lot of eyes on everything" and, contrary to Etkin's assertion that Alto was "watching every site and every patient like a hawk[,]" it did not even bother to look at patient medical records, as confirmed by CW2, CW3, and CW4, or test patients to verify that they followed the trial protocol and took the drug as directed, and failed to oversee and monitor the sites as confirmed by CW8's account.

137. On August 13, 2024, Alto filed with the SEC its quarterly report for the second quarter of 2024 on Form 10-Q (the "2Q 2024 10-Q"). The 2Q 2024 10-Q contained substantively the same misstatements identified in Paragraphs 127, 129, and 131, which were materially false and misleading and omitted to state material facts for the same reasons set forth in Paragraphs 128, 130, and 132.

138. On September 9, 2024, Alto held an Investor Day and presented to shareholders. During that presentation, Powell presented on behalf of the Company and spoke about how the Company closely monitored clinical sites proactively and intervened quickly if problems arose at any point:

> The last one I'll talk about today is our actual approach to monitoring. We do things just like a CRO does in terms of traditional monitoring aspects. CROs really are about reviewing individual case report forms, an example of which is shown on the upper right here. At Alto, we do things with our own unique way, we're a very data driven company, I'll get to that in a little bit, but we really focus on direct data entry with our sites and real time data review. What this means is our CRAs are picking up data entry errors in real time. ***We do things like eligibility review that prevent inadvertent enrollment and this is really a shift from reactive monitoring, which is really the industry norm, to more of a proactive approach so that we're picking up site issues earlier in the process.***
>
> We also use a mix of onsite and remote risk-based monitoring, this is assessing what type of risk a site may have and spending more time with them if they need it. And we use independent external raters to confirm MDD as well as monitor rater performance. And Amit and Adam have both spoken to that a few times already but we're using third parties to actually confirm the MDD diagnosis before the patients are enrolled into the study and we're using third parties to independently monitor the rater performance over the study conduct. ***This ensures we have another layer of independent oversight in addition to what we're doing internally and we go deeper***. We do cumulative reviews and there's two plots here. The middle one is actually looking at our own monitor's performance. ***So, we are monitoring how our CRAs are actually looking at the site data and we have many metrics to look at that, this is just one so that, if an individual CRA falls off, we can pick that up pretty quickly, within a week or two, and go in and intervene and support that***.
>
> The bottom one here is a plot that shows the reasons for screen failure across sites. There are many reasons for screen failure, we're just checking trends here, and we're able to compare those to the study averages, to the expected averages and, ***if you see something abnormal in a site, you can go in and intervene***. These are two examples, we're doing

> this across protocol deviations, concomitant medications, adverse events such that ***we get this really comprehensive view of how a site is performing and can intervene very quickly if we pick up nuances and, again, data-driven company, really looking at metrics across sites to intervene.***

139. The statements identified in Paragraph 138 were materially false and misleading when made because, contrary to Powell's claims, Alto was not conducting sponsor eligibility reviews at any of its trial sites, including its decentralized sites, which would have prevented enrollment or monitoring issues from occurring, and instead had a "hands off" approach towards the decentralized sites and their enrollment practices, as confirmed by CW8. For this reason, Alto's approach to clinical trials did not allow it to "pick up site issues earlier in the process" and "intervene," and, in reality, the Jackson, Mississippi site's issues remained problematic throughout Phase 2b, as confirmed by CW2, CW4, and CW5. Additionally, the statements omitted to disclose that Alto had already: (a) engaged in questionable recruitment and screening practices for Phase 2b, as confirmed by CW2, CW3, and CW4; (b) re-screened unqualified patients to participate in Phase 2b by boosting their scores, as confirmed by CW2; (c) solicited and paid participants to meet enrollment targets, thereby increasing the risk of attracting professional patients, as confirmed by CW2, CW3, and CW8; and (d) failed to verify compliance through PK testing or other means despite knowing that compliance was an issue based on the prior trial, Phase 2a's results.

140. Powell continued to make material misrepresentations about how Alto knew it was "enrolling real patients" (as opposed to paid professional patients or patients without an actual MDD diagnosis), limited score inflation from clinical sites, had "high quality data" and was making sure that "execution" went according to plan:

> ***And all of these metrics set us up very well to pick up patient trends or site trends that, really, we can intervene on and ensure they do not become an issue for the site. We know that we are enrolling real patients at sites that have high quality data. So, at the end of the study, we are confident that we have a well-executed, well-balanced study.***

141. The statements identified in Paragraph 140 were materially false and misleading when made because, among other things, Alto did not "know that [it] was enrolling real patients." In fact, as a result of Alto's questionable recruitment and screening practices, Alto had attracted and enrolled professional patients who were not "real," and did not follow the Phase 2b protocol, as confirmed by

CW2, CW3, CW4, and CW8. The fact that heavy recruitment of professional patients caused the trial to fail is a fact conceded by Defendants in their post-Class Period statements as well as in their submissions to the Court in this very litigation. As Etkin admitted, Phase 2b included "a fairly large number of professional patients who we assessed as people who were saying that they were taking the drug, but repeatedly detected none in their blood." Further, Alto was unable to "pick up patient trends or site trends" that would allow the Company to "intervene" because the trial sites operated autonomously, and Alto could not identify issues or intervene because it had failed to properly monitor and oversee the trial sites that recruited professional patients despite falsely suggesting otherwise, as confirmed by CW2, CW5, CW6, and CW8.

142. During Alto's Investor Day, Etkin likewise gave investors false assurances about Alto's clinical trial quality and made brazenly false statements claiming that Alto had been "sweating the details" on execution, left no stone unturned, and he could not think of anything that was missing from the clinical trial:

> Multiple external data sets, looking at placebo so think here about how oncology or rare disease often work that you have other external control arms, we've implemented that here and looked at placebo to show similar or slightly worse response to placebo in poor memory patients. The drug has been very well tolerated, over 400 people dosed prior to the phase 2B so there's no surprising adverse events as we go into the phase 2B and then really ***sweating the details on both execution*** and designing the study to try to mitigate placebo in the first place. ***So, I would ask a question which we ask ourselves all the time which is can you think of any stone we have not unturned and turned over and seen what's there? Is there anything that we've missed? Is there any thought that we didn't have that we should have had? We don't think so.*** We'd certainly love if anybody has suggestions which really says that short of just doing the trial itself, there's not any more to do and, lucky for us, October is around the corner and we're well on track to report results next month.

143. The statements identified in Paragraph 142 were materially false and misleading when made because, contrary to Etkin's claims, Alto left plenty of stones unturned, and missed many crucial steps that resulted in a poorly executed trial. Indeed, Alto compromised Phase 2b's integrity with a series of shortcuts designed to boost enrollment, including: (a) questionable recruitment and screening practices, including treating each applicant's account as the source of truth, which prevented Alto from determining whether the participants in Phase 2b were qualified at all, as confirmed by CW2, CW3, and CW4; (b) the use of decentralized sites that enrolled patients unsupervised by the Company, as

confirmed by CW2 and CW5; (c) overreliance on trial sites and their investigators to check patient eligibility rather than Alto checking medical records or other forms of verification to ensure real patients enrolled in the trial, as confirmed by CW8; and (d) the failure to ensure that trial participants complied with the protocols either through PK testing or other means of verification despite being on notice of compliance problems based on the results of the Phase 2a trial.

144. On September 26, 2024, Etkin attended TD Cowen's 4th Annual Novel Mechanisms in Neuropsychiatry Summit. At this event, Etkin misrepresented that there was nothing that gave him "any pause at all" concerning Phase 2b:

> So, I don't think a CRO exists that has the capacity to do cognitive measures in real-time patient selection. We're doing EEG, we're doing wearables, all of that, we're QCing in real time as well. Often, CROs don't even do real-time data entry. So, when you are looking at data and site performance, it's months delayed relative to when the events happen.
>
> ***So, you can't get in there and fix it in a real-time way, and we can in our trials. You get a much better, higher quality data set.*** You also reduce the cost. We run at about half the cost of our industry peers for these kinds of trials.
>
> * * *
>
> Everything we do is to constrain that variability, and there's nothing in what we've seen so far in our monitoring of the trial and our conduct that would suggest anything different. So, our guidance is that we would expect placebo to come in the historical norms. We would expect the variability in terms of the standard deviation to come within historical norms, standard deviation of the change scores. ***There's nothing per se that has given us any pause at all.***

145. The statements identified in Paragraph 144 were materially false and misleading when made because Defendants were not actually able to "get in there and fix [the Phase 2b trial] in a real time way" and there was plenty to give them "pause." Instead, Alto compromised Phase 2b's integrity with a series of shortcuts designed to boost enrollment, including: (a) questionable recruitment and screening practices, including treating each applicant's account as the source of truth, which prevented Alto from determining whether the participants in Phase 2b were qualified at all, as confirmed by CW2, CW3, CW4, and CW6; (b) the use of decentralized sites that enrolled patients unsupervised by the Company, as confirmed by CW2 and CW5; (c) overreliance on trial sites and their investigators to check patient eligibility rather than Alto checking medical records or other forms of verification to ensure real patients enrolled in the trial, as confirmed by CW8; and (d) the failure to ensure that trial participants

complied with the protocols either through PK testing or other means of verification despite being on notice of compliance problems based on the results of the Phase 2a trial.

## II. The Truth Begins to Emerge

146. On October 22, 2024, after the market closed, Alto issued a press release announcing that Phase 2b "did not meet its primary endpoint, assessed by a change from baseline in [MADRS], compared to placebo." Specifically, the "biomarker-defined MDD patient group treated with ALTO-100 did not demonstrate a statistically significant improvement in depressive symptoms compared to placebo." Moreover, "ALTO-100 did not demonstrate benefit over placebo on the pre-specified key secondary analyses." This announcement was a corrective disclosure and materialization of the foreseeable risk that the Exchange Act Defendants had previously concealed from the investing public, including Lead Plaintiffs and other members of the Exchange Act Class.

147. On this news, the price of Alto's common stock fell by nearly 70% from its previous day closing price of $14.53 to close at $4.36 on October 23, 2024. The price of Alto's common stock declined again the next trading day to close at $4.13 on October 24, 2024.

148. Analysts interpreted Phase 2b's failure as a warning sign for Alto's entire business model. For example, analysts from Jefferies observed that Phase 2b's failure "raises questions around [Alto's] overall biomarker approach to CNS/psychiatry (*e.g.*, tailoring treatments to maximize efficacy)." Andrew Tsai and Matthew Barcus, *Overall Precision Psychiatry Approach Hurt by (-) Phase IIb Depression Results*, JEFFERIES, Oct. 22, 2024, at 1; *see also* Myles R. Minter and John Boyle, *ALTO-100 Phase IIb Miss in Depression Disappointing; Focus Will Shift to ALTO-300 Data Phase IIb in First Half of 2025*, WILLIAM BLAIR, Oct. 22, 2024, at 1 (noting that the Phase 2b failure "undoubtedly will cast investor doubt on Alto's Precision Neuropsychiatry approach to pair specific mechanisms of action to patient biomarkers of drug response.").

149. Further, analysts immediately and significantly reduced the value of Alto's common stock because of Phase 2b's failure, with one analyst reducing the price target to $4 a share. Laura Chico, *Moving to Neutral, New $4 Target Following ALTO-100 Readout*, WEDBUSH, Oct. 23, 2024, at 1. News articles also directly attributed the decline in Alto's stock price to the announcement that Phase 2b had failed. On October 22, 2024, after the market closed, Bloomberg reported that the price of Alto's

common stock fell "after saying Phase 2b study of ALTO-100 in patients with major depressive disorder didn't meet its primary endpoint." Many other publications focused on finance and the biopharmaceutical industry, including but not limited to SeekingAlpha, MT Newswire, Fierce Pharma, FirstWord Pharma and BioWorld, also directly linked the decline in Alto's stock price to Phase 2b's failure.

150. Unlike Alto, which fell nearly 70% on October 23, 2024, the S&P 500 declined by less than 1% on the same date (close to close). IBB, an ETF focused on the biotech industry, fell less than 1.5%. Both the S&P 500 and IBB fell an order of magnitude less on October 23, 2024, than Alto, indicating that market and industry factors did not cause the price decline.

151. Over the subsequent months, Defendants conceded that Phase 2b's failure was the direct result of the failure to exclude professional patients in Phase 2b, and the Company's failure to effectively monitor the decentralized sites to make sure that participants were actually taking ALTO-100 during Phase 2b. *See infra* at Section III(C).

152. As a result of the Exchange Act Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Exchange Act Class members have suffered significant losses and damages. The damages suffered by Lead Plaintiffs and other members of the Exchange Act class were directly and proximately caused by the Exchange Act Defendants' wrongful conduct as alleged herein.

## III. The Exchange Act Defendants Made Misleading Statements With Scienter

### A. CW Accounts Are Indicative of Scienter

153. As described in detail in Paragraphs 51 through 86, many of the CWs were in a position to know about the serious problems Phase 2b faced since they screened patients, participated in meetings where Etkin spoke, reported to high-level executives who directly reported to Etkin or otherwise described events that were well known throughout a small company of only 63 employees. Among other things, CW1 and CW2 confirmed that Etkin was worried about the remote sites and the C-Suite, which included Etkin, Powell and Smith, internally expressed concerns about the ability to meet enrollment expectations even before the Company went public. CW2, CW3, and CW4 confirmed that Alto systematically failed to conduct basic verification, which itself created a huge risk of enrolling

professional patients in the trial. CW2, CW3, CW4, and CW7 confirmed that Alto paid patients to enroll in the trial, and relied heavily on social media sites and other advertising mechanisms to recruit patients. Etkin ultimately admitted that social media advertising was one of the causes for patients' "noncompliance" in Phase 2b. CW2 also confirmed that Alto re-screened patients who did not initially qualify to participate in Phase 2b to boost their scores and the trial's enrollment figures.

154. CW2 further confirmed that Abdel, who was a "Key Employee" and the link between Alto's C-suite and the screening team, reported that management basically said they are not happy and that the numbers were not meeting what they wanted. According to CW2, a failure to hit the required targets led the C-suite to put pressure on Abdel to increase enrollment when they were not happy with the numbers, and Abdel then pressured CW2 and other employees to increase enrollment. Defendants Etkin, Powell and Smith were members of the C-suite. Their pressure campaign to enroll patients lasted throughout the time that CW2 worked on Phase 2b, which means that Defendants were concerned about meeting enrollment targets both before and after the IPO or for most of the Class Period. This is corroborated by the fact that CW7 and CW7's third party employer were hired to increase enrollment even after the IPO, and Alto turned to third parties when enrollment had slowed down.

155. CW4 confirmed that a presentation was shown demonstrating that the remote site in Jackson, Mississippi was the leading cause of Phase 2b's failure, the same site Etkin internally expressed concerns about from the very beginning. CW4, who reported directly to Smith, further confirmed that Smith knew Abdel was cutting corners and that people were seeing things they should not see. And CW6, CW7, and CW8 confirm that Alto extensively relied on third parties to make up for enrollment shortfalls. Moreover, CW8 confirmed that Alto outsourced patient screening and did not conduct any sponsor eligibility reviews until late 2024. Those sponsor eligibility reviews conducted later in 2024 evaluated medical records to screen out professional patients, which Defendants neglected to do during Phase 2b.

**B. Etkin and Powell Made Statements Indicative of Scienter**

156. Etkin and Powell had actual knowledge of the limitations of Alto's in-house clinical trial team. They knew, for example, that paid trial participants could feign MDD and were also at high risk of non-compliance. They also knew that Alto was struggling to find a sufficient number of participants

with MDD. They were also aware of the deficiencies in monitoring compliance—particularly at remote sites and the Jackson, Mississippi location. Despite their knowledge, they repeatedly assured investors that their in-house clinical trial operations were superior to industry-standard practice and resulted in higher quality data. They also never disclosed to investors what they knew about the problems Alto faced in replicating the participant pool for Phase 2b.

157. Etkin and Powell spoke publicly and in detail about ALTO-100 and Phase 2b. *See* ¶¶125, 133, 135, 138, 140, 142, 144. Etkin and Powell regularly addressed pointed questions from analysts concerning ALTO-100 and its clinical trials and responded with a high degree of specificity to demonstrate that they were aware and sufficiently knowledgeable of the details that rendered Defendants' statements misleading when made and further supports a strong inference that they knew or recklessly disregarded the true facts concerning the severe problems with Phase 2b.

158. Further, Etkin and Powell repeatedly asserted their own knowledge of Alto's purportedly hands-on and superior in-house clinical trial operations. Powell told investors, for example, that "[w]e *know* that we are enrolling real patients at sites that have high quality data." But by the very nature of this statement, Powell either was aware that she lacked this knowledge—*i.e.*, that Alto was "enrolling real patients at sites with high quality data"—or made the statement recklessly without basis. In the same way, Etkin claimed to investors that Alto was "watching every site and every patient like a hawk." But Alto was not, and Etkin either knew that Alto was not doing so or—like Powell—recklessly claimed Alto was doing so without any basis.

**C. Post-Class Period Admissions and Developments**

159. Events and Defendants' own admissions after the Class Period bolster an inference of fraud and corroborate the CWs' accounts.

160. Internally, many Alto employees recognized that the key failure of Phase 2b stemmed from the Jackson, Mississippi site and the participation of remote, professional patients seeking a cash payout. According to CW4, after Phase 2b's results were announced, CW4 attended an all-hands Company meeting, which Alto senior executives attended, including Etkin and Smith. CW4 confirmed that, according to the data presented at the all-hands meeting, the decentralized sites and, in particular, the trial site in Jackson, Mississippi, had the worst metrics among all trial sites for Phase 2b.

161. CW4 explained that the data presented at the all-hands Company meeting demonstrated that the decentralized site with remote participants dragged down the overall results of Phase 2b. According to CW4, Alto employees suggested in the all-hands Company meeting that the poor data was due to serial trial participants, *i.e.*, professional patients, who lied to meet the criteria and merely sought the cash payout for participating in Phase 2b. Alto employees at the all-hands meeting further commented amongst themselves that, if the results from the Jackson, Mississippi trial site had not been included in Phase 2b, the results would have been much better.

162. CW4 and CW2 also confirmed that, shortly after the failure of Phase 2b, Abdel – who designed the screening process for Phase 2b – was forced out of the Company and resigned.

163. Externally, the Exchange Act Defendants also made damning admissions that substantively corroborated the CW accounts from both before and during the Class Period. Etkin repeatedly admitted that Phase 2b failed because of what he called "compliance," *i.e.*, patients in the trial not taking ALTO-100 as directed, if at all, or otherwise withdrawing from the trial entirely. For example, on November 18, 2024, at the Stifel Healthcare Conference, Etkin admitted that the driver of noncompliance was the monotherapy cohort—the "red flag" group the FDA had expressed concerns about when it directed Alto to increase the number of trial participants:

> And it came down, as you said, to why essentially. And the why for us, we try to be as simple, as much drawn by the ground truth as possible, turned out to be about compliance. ***When we looked at compliance with the drug in patients based on blood draws, we saw that the adjunctive population was fully compliant and the effect size therefore is something that we'd trust. The monotherapy group was far less compliant than we had anticipated.***

164. When pressed directly regarding why Phase 2b's failure would not impact Alto's other clinical trials, Etkin again blamed "compliance," stating, "and it's incredibly frustrating for us and for everybody else that we saw the outcome we saw, the compliance was a factor."

165. On November 20, 2024, at the Jefferies London Healthcare Conference, Etkin admitted that Alto did not even check any medical records, stating that the Exchange Act Defendants simply took "***the patient's word for it.***"

166. On March 4, 2025, Etkin spoke at TD Cowen's 45th Annual Healthcare Conference and conceded Alto's in-house clinical trials had greater quality control issues than industry practice.

Specifically, he admitted that Phase 2b's failure was the result of "the conduct of the trial, ***especially at the site level***, which leads to a greater likelihood of professional patients, a greater likelihood of data that you have a harder time trusting." This occurred, according to Etkin, "when we enlarged the study" and "went and added sites in the second half of the study," which is where the "noncompliance rate" of "over 40% here in the monotherapy arm" was "clustered." As confirmed by CW1, Etkin was already worried about remote sites before the Company went public and right after Phase 2b commenced. *See* ¶¶51–52.

167. On March 12, 2025, Etkin spoke at the Leerink Global Healthcare Conference and admitted that Phase 2b's failure was also caused by a lack of "sponsor-eligibility review," which means "***sites can't enroll patients without our say-so***," "***measuring urine antidepressant levels***," and requiring "***medical and pharmacy records***[.]" As CW6 confirmed, the site run by Bishop in Jackson, Mississippi was separately enrolling patients on its own. Etkin further stated that Alto was also "working on essentially diversifying our clinical trial sites and patient sources ***away from the common sources of patient risk like recruitment through social media that has driven a lot of problems across trials to date***." Etkin again confirmed that the "issue that really we think drove" the failure of Phase 2b was "a professional patient site-level conduct issue." As CW8 confirms, Alto adopted sponsor eligibility reviews in late 2024, following the failure of Phase 2b, and that Etkin personally participated in them. And CW2 confirms that, during the Class Period, the social media campaigns, including considering paying patients even more as the need for increasing quality patients in the trial became more acute, increased the risk of professional patients enrolling in Phase 2b.

168. On March 20, 2025, the Company filed its 2024 10-K where Alto again admitted that compliance was the main obstacle in Phase 2b, stating that there was an "inconsistency" between the effects of ALTO-100 on the monotherapy and adjunctive populations in Phase 2b "due to a higher than anticipated level of non-compliance with study medication in the monotherapy group, while the adjunctive group demonstrated a high level of compliance (56% in the monotherapy vs. 100% in the adjunctive)."

169. The 2024 10-K further revealed that "[o]nly a subset of sites within the study were setup to evaluate PK levels." "PK" means pharmacokinetic, which is the study of how the body interacts with

administered substances for the entire duration of exposure. Therefore, "PK levels" refers to the concentration of a drug in a patient's body over time. PK levels are tested through analyzing biological samples, including blood, urine, saliva, or tissue. Here, the PK levels measured the concentration of ALTO-100 in a patient's body.

170. The 2024 10-K revealed that Alto was only able to establish the PK levels of 53 of 266 patients in Phase 2b to confirm that they were in fact taking ALTO-100 as directed as a result of Alto's decision to set up "[o]nly a subset of sites within the study . . . to evaluate PK levels":




171. During the April 29, 2025 Jones Trading Virtual CNS Symposium, Etkin again conceded that the failure of Phase 2b was because of "professional patients in a subset of the study[.]"

172. On September 17, 2025, at TD Cowen's 5th Annual Novel Mechanisms in Neuropsychiatry & Epilepsy Summit, Etkin specifically admitted that Phase 2b had "a fairly large number of ***professional patients who we assessed as people who were saying that they were taking the drug, but repeatedly detected none in their blood***." Going forward, Etkin explained that Alto would be "***requiring medical and pharmacy records. You have to show that you're getting refills prior to coming in, blood measures or urine measures that you're taking the drug*** . . ." As CW2, CW3, and CW4 confirm, the failure to do basic tasks like checking a patient's medical records was a persistent issue in Phase 2b throughout the Class Period.

173. On March 16, 2026, Alto filed its Form 10-K where it provided an update on its Phase 2b trial for ALTO-100 to treat bipolar disorder, and outlined how adjustments from the Phase 2b trial

for ALTO-100 for MDD – most notably PK testing – significantly benefitted Alto's Phase 2b trial for ALTO-100 to treat bipolar disorder:

> ***A blinded pharmacokinetic, or PK, analysis from the first cohort of patients in this trial demonstrated that 96% of samples for ALTO-100 qualified as PK positive.*** A sample was considered PK positive if observed drug levels were above a pre-specified minimum threshold. ***We believe these results underscore the effectiveness of the operational adjustments made to trial design and execution following the completion of the ALTO-100 MDD Phase 2b trial.*** Enrollment in this trial is ongoing, with a target of approximately 200 patients, and we expect to report topline data from the study in the second half of 2026.

174. Alto repeated this update on its Phase 2b trial for ALTO-100 to treat bipolar disorder in the Company's Forms 10-Q filed on May 13, 2026 and August 12, 2026. These updates implicitly concede the importance of PK testing, showing that the failure to adopt similar testing in Phase 2b despite knowing that there were compliance problems in Phase 2a was a substantial factor in Phase 2b's failure.

175. As a result, Defendants' internal and external actions after the Class Period, and the widespread acknowledgement that the risks outlined by the CWs, as known to the Company at the beginning of the Class Period, was the cause of the failure of Phase 2b, demonstrate that they either knew about the issues and risks associated with Phase 2b, or at least, recklessly disregarded them.

**D. Core Operations**

176. The successful development and commercialization of ALTO-100 concerned the Company's core operations. Alto is a small company of only 63 employees. ALTO-100 for MDD was the Company's most advanced trial and the first drug the Exchange Act Defendants expected to bring to market. All other drugs in Alto's pipeline were months, if not years, behind in terms of their capacity to succeed.

177. Moreover, Alto had no revenue or profits throughout the Class Period, as it admitted in its 2023 10-K, when it told investors, "[w]e have no products approved for commercial sale and have not generated any revenue from product sales to date. As a result, we are not profitable, have incurred substantial losses in each period since our inception, and we expect to incur significant losses for the foreseeable future." Consequently, the Company's success was largely dependent on the success of Phase 2b.

178. Conversely, the upside from Phase 2b was huge. As noted by analysts covering the Company, should the ALTO-100 clinical trials succeed, it "could lead to a >$2.5B[illion] peak sales opportunity." *See* Brian P. Skorney, Luke P. Herrmann, and Charles A. Moore, *Alto Neuroscience, Inc. (ANRO): 1Q24 Print Straightforward, Awaiting 2H24 Phase 2b ALTO-100 Results*, BAIRD EQUITY RESEARCH, at 3.

179. Further, Phase 2b's success was critical not only for the Company's goal to corner the multi-billion-dollar market for MDD treatment, but also justify Alto's entire business model. As one analyst commented, "[d]ata from this trial could de-risk Alto's Precision Psychiatry Platform approach with the next readout leveraging EEG based biomarkers identified by Alto Scope in the Phase IIb trial of ALTO-300 in adjunctive MDD therapy." Myles R. Minter and Sarah Schram, *Biotechnology: Takeaways From Expert Breakfast With Sanjay Mathew, M.D. Discussing Several Upcoming Catalysts in the Neuropsych Space*, WILLIAM BLAIR, Apr. 11, 2024, at 3. Another noted that Phase 2b had "the potential to validate [Alto's] CNS/psychiatry platform and novel biomarker-based approach." Andrew Tsai, AJ Velazquez-Mao, and Matthew Barcus, *Phase IIb Depression Data Could De-Risk Overall Precision Psychiatry Approach*, JEFFERIES, May 14, 2024, at 1. Thus, it would de-stigmatize Alto's biomarker-based approach in manufacturing drugs, and lead to increased confidence from the market and an increased inflow of capital from investors.

180. Indeed, when Alto announced that Phase 2b had failed, analysts interpreted the results as a major risk to the Company's business model, with one analyst remarking that the failed clinical trial "undoubtedly will cast investor doubt on Alto's Precision Neuropsychiatry approach to pair specific mechanisms of action to patient biomarkers of drug response." Myles R. Minter and John Boyle, *ALTO-100 Phase IIb Miss in Depression Disappointing; Focus Will Shift to ALTO-300 Data Phase IIb in First Half of 2025*, WILLIAM BLAIR, Oct. 22, 2024, at 1. Further, analysts deemed ALTO-100's failed Phase 2b to show poor prospects for Alto's other drugs, stating that while Alto was still investigating ALTO-203 and ALTO-300, "neither program holds credit in our estimates and following the ALTO-100 miss, we are hesitant to change this view . . . Finally, we are increasing our valuation discount rate to 40% (prior 25%) which reflects increased development risks . . . We are moving to Neutral (from Outperform) as we anticipate the stock will be range-bound absent success from the 1H25 readouts." Laura Chico,

*Moving to Neutral, New $4 Target Following ALTO-100 Readout*, WEDBUSH, Oct. 23, 2024, at 1.

181. Accordingly, a failed clinical trial that could invalidate Alto's entire existence in the eyes of the market supports a strong inference that the subject of the fraud was so important that it would be absurd to assume that Defendants did not know the specific facts that rendered their statements false and misleading when made.

**E. Defendants' Coverup Enhances Scienter**

182. The Exchange Act Defendants' scienter is enhanced by Alto's attempts to intimidate, or otherwise place undue pressure on, witnesses who could confirm or corroborate the allegations of fraud raised in this litigation. On information and belief, the Exchange Act Defendants and/or their agents have contacted numerous CWs or other former Alto employees in an attempt to have them recant what they truthfully disclosed to Plaintiffs' investigators or otherwise discourage them from cooperating with Plaintiffs' investigation. Several CWs who voluntarily provided information to Plaintiffs before the Amended Complaint was filed on January 23, 2026 (ECF No. 52) have discontinued any communication, likely due to this pressure.

183. Even worse, at least one potential new witness contacted by Plaintiffs to confirm or corroborate the TAC's allegations told Plaintiffs' investigators that the Exchange Act Defendants, through their agents, sent threatening emails to discourage witnesses from cooperating with Plaintiffs and their Counsel. A screenshot of the conversation between that potential witness and Plaintiffs' investigator is depicted below:




184. Because this potential witness had not previously been identified in any prior filing in this Action and was only recently contacted by Plaintiffs' investigators, there is no way for Defendants to have known the identity of the potential witness and thus this was not an effort to determine whether facts attributed to a witness already identified in the complaint were true. Instead, it was an attempt to

silence witnesses and discourage them from coming forward. Nor can the potential witness be motivated to misrepresent the existence of the Exchange Act Defendants' threats since the witness has not provided any information yet or been identified in any complaint.

185. The "generic" nature of the threatening email referenced by the victim of the intimidation raises a strong inference that many former or current employees were similarly threatened or otherwise dissuaded from cooperating with Plaintiffs' investigation of fraud.

186. Other communications Defendants' agents sent to potential witnesses also indicate that the witnesses were misled into not cooperating with Plaintiffs' Counsel. At least one witness was told that: (a) securities fraud claims are "commonly filed" even when there is no wrongdoing; (b) plaintiffs' investigators sometimes misrepresent their identities; (c) disputes arise "in many cases" regarding whether ***Plaintiffs' Counsel*** "misrepresented" or "misstated" what the CW said; and (d) CWs likely become "embroiled" in litigation "for years." These statements were false and designed to intimidate potential witnesses. They were intended to, and did have the effect, of discouraging witnesses from coming forward with additional information related to the Exchange Act Defendants' violations of federal securities laws.

187. Consequently, the Exchange Act Defendants' attempts to intimidate or otherwise pressure or mislead former or current Alto employees with the purpose of preventing their truthful disclosure of fraud enhances an inference of scienter.

188. The Exchange Act Defendants also covered up the full trial results from Phase 2b. Federal regulations require that the results of the clinical trials must be submitted to the FDA no later than a year after the clinical trial is completed. 42 C.F.R. §§ 11.42(b), 11.44(a). The results are then posted online within 30 days regardless of whether quality control review is complete.

189. The Exchange Act Defendants were aware of this requirement, as Alto submitted the results of Phase 2a for ALTO-100 to the FDA. *See Pilot Decentralized Trial*, ClinicalTrials.gov, Nat'l Library of Medicine, https://clinicaltrials.gov/study/NCT05419869?locStr=Jackson,%20 Mississippi&country=US&state=Mississippi&city=Jackson&term=ALTO&rank=3&tab=results (last visited Apr. 1, 2026).

190. Phase 2b's primary completion date was September 5, 2024. However, the Exchange

Act Defendants have withheld the full results from the public. According to the National Library of Medicine's website, the Phase 2b "[s]tudy results have not been submitted." *Phase 2b Study of ALTO-100 in MDD*, ClinicalTrials.gov, Nat'l Library of Medicine, https://clinicaltrials.gov/study/NCT05712187?term=ALTO-100&rank=3&tab=results&a=2 (last visited Aug. 24, 2026). Instead, on September 4, 2025, the Exchange Act Defendants requested an extension to delay disclosing the full trial results, and continue to withhold them from investors.

**F. The Exchange Act Defendants' Claimed Expertise Supports Scienter**

191. The Exchange Act Defendants' decades of experience in the fields of psychiatry, neuroscience and biotechnology fields, including seeking FDA approval for pharmaceutical drugs, further supports their scienter. Indeed, the defective Registration Statement assured investors that "core members of [Alto's] scientific and clinical leadership team bring decades of experience across CNS drug development" and that, "[t]o date, our management team has been involved in the approval of 25 drugs and the clinical development of more than 100 product candidates."

192. Before founding Alto, Etkin was a Professor of Psychiatry and Behavior Sciences at the Stanford University School of Medicine and claims to be an international leader in the neuroscience of psychiatric disorders and their treatments. Consequently, Etkin had significant experience in both the relevant fields and in conducting scientific trials to know the risks associated with Phase 2b and Alto's failure to properly screen and monitor the Phase 2b participants.

193. Before joining Alto, Smith served in various roles at several biopharmaceutical companies, including in senior roles related to investor relations. Accordingly, Smith had significant experience to know the necessity of accurately disclosing the material risks of Phase 2b in the SEC filings that he signed.

194. Powell has a B.A. in Biology from Texas A&M University, and has decades of experience in the neuroscience and biotechnology fields. Powell's specific experience was touted in the defective Registration Statement, including that she "has led numerous early- and late-stage development programs in neuroscience over her more than 20 years in the field" and brought "more than 20 years of neuroscience research to the team with a heavy emphasis on operational efficiency." Powell's decades of experience in neuroscience and with clinical trials would have alerted her to risks

to Phase 2b posed by Alto's failure to properly screen and monitor the Phase 2b participants.

## EXCHANGE ACT CLASS ACTION ALLEGATIONS

195. The Exchange Act Class consists of all persons who purchased or otherwise acquired Alto's common stock between March 18, 2024, and October 22, 2024, both dates inclusive. The Exchange Act Class asserts claims under Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. Excluded from the Class are: Defendants, former and current officers, senior managers, and directors of Alto, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, related entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above.

196. The members of the Exchange Act Class are so numerous that joinder of all members is impracticable. According to the 2023 10-K, Alto had "87 stockholders of record" and the "actual number of holders of our common stock is greater than this number of record holders," because it also "includes stockholders who are beneficial owners, but whose shares are held in street name by brokers or held by other nominees" and shares held "in trust." Additionally, the Company's securities were actively traded on the NYSE. While the exact number of Class members for the Exchange Act Class is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the Exchange Act Class. Record owners and other members of the Exchange Act Class may be identified from records maintained by the Company, its transfer agent and brokers, and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

197. Common questions of law and fact exist as to all members of the Exchange Act Class and predominate over any questions solely affecting individual members of the Exchange Act Class. Among the questions of law and fact common to the Exchange Act Class are:

a. Whether the Exchange Act Defendants' misrepresentations and omissions violated federal securities laws;

b. Whether the Exchange Act Defendants' misrepresentations and omissions were material;

c. Whether the Exchange Act Defendants made misrepresentations and omissions to investors during the Exchange Act Class Period;

d. Whether the Exchange Act Defendants acted with scienter;

e. Whether the prices of Alto's securities during the Exchange Act Class Period were artificially inflated because of the Exchange Act Defendants' conduct complained of herein; and

f. Whether the members of the Exchange Act Class have sustained damages and, if so, what is the proper measure of damages.

198. Lead Plaintiffs' claims are typical of the claims of the members of the Exchange Act Class as all members of the Exchange Act Class were similarly affected by Defendants' wrongful conduct in violation of federal law, and all assert the same legal claims arising out of the same conduct.

199. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Act Class. Lead Plaintiffs have no interests antagonistic to the Exchange Act Class and have retained highly experienced counsel specializing in securities litigation.

200. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all claims is impracticable. Furthermore, as the damages suffered by individual Exchange Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Exchange Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

201. For the Exchange Act Class, Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. During the Exchange Act Class Period, Defendants made public misrepresentations of material fact and failed to disclose material facts necessary to make the statements they publicly made during the Exchange Act Class Period not misleading under the circumstances in which they were made;

b. Alto's shares traded in an efficient market;

c. Alto's shares were liquid and traded with heavy volume during the Exchange Act Class Period;

d. Alto's shares traded on the NYSE, and the Company was covered by multiple analysts,

journalists, and industry commentators;

e. The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

f. Lead Plaintiffs and members of the Exchange Act Class purchased, acquired and/or sold Alto's shares between the time the Exchange Act Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

g. The market for Alto common stock was open, well-developed and efficient at all relevant times. As a result of the Exchange Act Defendants' materially false and misleading statements, Alto common stock traded at artificially inflated prices during the relevant period. The artificial inflation dissipated as the market learned of the nature and extent of the Exchange Act Defendants' misrepresentations.

h. Based upon the foregoing, Lead Plaintiffs and the members of the Exchange Act Class are entitled to a presumption of reliance upon the integrity of the market.

202. Alternatively, Lead Plaintiffs and the members of the Exchange Act Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Exchange Act Defendants omitted material information in their Exchange Act Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT IV

**(Against Defendants Alto, Etkin, Smith, and Powell for Violations of Section 10(b) of the Exchange Act And Rule 10b-5)**

203. Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein except the allegations related only to the Securities Act claims identified in Paragraphs 124 through 202.

204. During the Exchange Act Class Period, the Exchange Act Defendants or Alto, Etkin, Smith, and Powell, individually and in concert, directly or indirectly, (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts

necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

205. The Exchange Act Defendants acted with scienter in that they knew or deliberately disregarded that the public statements made during the Exchange Act Class Period were false or misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements as primary violations of the securities laws. The Exchange Act Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's materially misleading statements, and/or their associations with the Company, were privy to confidential proprietary information concerning the Company and participated in the fraudulent scheme alleged herein.

206. The Exchange Act Defendants had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and during the Exchange Act Class Period intended to be deceitful, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company personnel.

207. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Exchange Act Class Period. Lead Plaintiffs and the other members of the Exchange Act Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Exchange Act Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of these Defendants' false and misleading statements.

208. Had Lead Plaintiffs and the other members of the Exchange Act Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

209. As a result of the wrongful conduct alleged herein, Lead Plaintiffs and other members of

the Exchange Act Class have suffered damages in an amount to be established at trial.

210. By reason of the foregoing, the Exchange Act Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Lead Plaintiffs and the other members of the Exchange Act Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Exchange Act Class Period.

**COUNT V**
**(Against Defendants Etkin, Smith, and Powell for Violations of Section 20(a) of the Exchange Act)**

211. Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein except the allegations related only to the Securities Act claims identified in Paragraphs 124 through 202.

212. During the Exchange Act Class Period, as the CEO of Alto, Etkin, CFO of Alto, Smith, and CDO of Alto, Powell, exercised control over the day-to-day activities of the Company, including the description to investors of Alto's operations, material trends, and operating environment. Because of their roles and responsibilities at Alto, Etkin, Smith, and Powell knew the adverse non-public information concealed by Alto. Further, they exercised authority and capability to control the contents of the misleading statements made as alleged herein.

213. As control persons of a publicly owned company, Etkin, Smith, and Powell each had a duty to disseminate accurate and truthful information with respect to Phase 2b, and to promptly correct any public statements issued by Alto which had become materially false and/or misleading.

214. By virtue of their positions and their power to control public statements about Alto and Phase 2b, Etkin, Smith, and Powell had the power and ability to control the actions of Alto and its employees. By reason of such conduct, Etkin, Smith, and Powell are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant Action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as Class Representatives;

B. Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Classes by reason of the acts and transactions alleged herein;

C. Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Securities Act Class and Exchange Act Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiffs hereby demand a trial by jury.

Dated: August 28, 2026

Respectfully submitted,

**POMERANTZ LLP**

By: /s/ Omar Jafri

Omar Jafri (*pro hac vice*)
Christopher P.T. Tourek (*pro hac vice*)
Jaime D. Nolasco Esquivel (*pro hac vice*)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: ojafri@pomlaw.com
ctourek@pomlaw.com
jnolasco@pomlaw.com

*-and-*

Jennifer Pafiti
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
E-mail: jpafiti@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs and the Proposed Classes*

**ROLNICK KRAMER SECURITIES LITIGATION LLP**
Lawrence M. Rolnick (*pro hac vice*)
Marc B. Kramer (*pro hac vice*)

Nicole T. Castiglione (*pro hac vice*)
PENN 1, Suite 3401
One Pennsylvania Plaza
New York, New York 10119
Tel.: 212.597.2800
lrolnick@rksllp.com
mkramer@rksllp.com
ncastiglione@rksllp.com

*Co-Lead Counsel for Co-Lead Plaintiffs and the Proposed Classes*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*<u>/s/ Omar Jafri</u>*
Omar Jafri